# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

ORANGE LAKE COUNTRY CLUB, INC., a Florida corporation, and WILSON RESORT FINANCE, L.L.C., a Delaware limited liability company,

          Plaintiffs,

v.

REED HEIN & ASSOCIATES, LLC d/b/a TIMESHARE EXIT TEAM, MITCHELL REED SUSSMAN d/b/a MITCHELL REED SUSSMAN & ASSOCIATES, SCHROETER GOLDMARK & BENDER, P.S.; BRANDON REED, TREVOR HEIN, and THOMAS PARENTEAU,

          Defendants.

_____/

CASE NO.: 17-cv-1542-Orl-31DCI

1

**PLAINTIFFS' OPPOSITION TO DEFENDANT**
**MITCHELL REED SUSSMAN'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Orange Lake Country Club, Inc. and Wilson Resort Finance, L.L.C. (collectively, "Orange Lake" or "Plaintiffs"), by and through undersigned counsel, submit this response memorandum in opposition to Defendant Mitchell Reed Sussman d/b/a Mitchell Reed Sussman & Associates' ("Sussman") Motion for Summary Judgment [DE 197] (the "Motion").

**PRELIMINARY STATEMENT**

Sussman and the TET Defendants[1] are part of an illegal conspiracy that has caused severe financial consequences for owners of Orange Lake timeshare interests ("Orange Lake Owners" or "Owners") and for Plaintiffs. Sussman's devastating deposition testimony tells the story. In 2013, Defendants Trevor Hein, Brandon Reed, and Sussman concocted a scam dedicated to preying upon Plaintiffs' Owners based on false promises that the TET Defendants and Sussman have some magic method of making Owner's timeshare obligations disappear. As a result of the 2013 meeting, the TET Defendants and Sussman entered into a retainer agreement. Sussman's "direct relationship" under the retainer is with TET, but Sussman performs timeshare "exit" services for TET customers.

The first step in Sussman and the TET Defendants' scheme involves Sussman's form representation letters. Without ever meeting with or speaking to a particular Owner, or knowing the factual circumstances, Sussman sends letters of representation to Plaintiffs, which are boilerplate and baseless. Sussman's letters instruct Plaintiffs to cease communicating with TET's customers. The letters either state that the TET customers wish to terminate their timeshare contracts without reference to any legal basis whatsoever, or wish to terminate their obligations on false legal grounds.

The next step is for Sussman to employ one of his three "secret sauce" methods to exit TET's customers from their timeshares, including: (1) resignation; (2) unilateral deed backs to Plaintiffs; and

(3) deed to "associates" (paid by Sussman) without providing any right of first refusal as required by Plaintiffs' contracts with their Owners.  But each of Sussman's strategies is unlawful and ineffective. Indeed, resignations do not excuse existing contractual obligations. Sussman's unilateral deeds purportedly transferring interests to Plaintiffs are similarly invalid because they are not accepted by, or delivered to, Plaintiffs and there is no mutual intent for title to pass as required by law.  As to the deeds to "associates" method—and in direct conflict with Florida law—Sussman does not use an escrow agent and conveys the  timeshare interests to financially needy individuals who clearly do not have the intent or ability to pay the financial obligations associated with timeshare ownership.  *See id.* Fla. Stat. § 721.17(3).  Sussman claims that he is aware of these legal prohibitions on his methods, but admits he does not comply with them.  Just as Sussman's testimony makes clear that he is aware his methods are unlawful, the TET Defendants are, too.

The final step in the scheme is for the TET Defendants and/or Sussman to advise Owners that the above strategies have succeeded and that the Owners no longer have to pay the financial obligations due under their contracts.   By providing those instructions to Owners, the TET Defendants and Sussman intentionally interfere with Plaintiffs' contracts; the Owners stop paying Plaintiffs; and the Owners and Plaintiffs are harmed.   In Sussman's own words, "every single one" of the Owners suffers negative consequences.

Despite the harm to the Owners and Plaintiffs, the TET Defendants and Sussman profit from their perverse scam to the tune of millions of dollars.  Sussman's own testimony establishes that he has received approximately 7,800 referrals from TET and was paid at least $500 per file—this rough estimate alone points to a total of $3.9 million in revenue from Sussman's business with TET, not to mention the exorbitant fees TET collected upfront from these customers.

---

[1]   The TET Defendants for purposes of this Motion include Reed Hein & Associates, LLC d/b/a Timeshare Exit Team ("TET"), Brandon Reed, Trevor Hein, and Thomas Parenteau.

Notwithstanding the undeniable conspiracy and clearly unlawful actions, Sussman claims he is entitled to summary judgment. In support of his Motion, and without any underlying factual support, Sussman asserts three affirmative defenses: first, Sussman urges that Plaintiffs' conspiracy claim, based on an underlying claim of tortious interference, is barred because Sussman is not a "stranger" to the contracts at issue; second, that he cannot be liable for conspiracy because his actions are First Amendment petition activity protected by the *Noerr-Pennington* doctrine; and, third, that Florida's litigation privilege immunizes him from liability. As set forth below, none of Sussman's affirmative defenses have merit, and, at a minimum, genuine issues of material fact exist precluding summary judgment. The Motion should be denied.

## STATEMENT OF UNDISPUTED MATERIAL FACTS[2]

TET advertises through various media and brands itself as a "consumer protection firm" dedicated to "exiting" timeshare owners from their contracts with timeshare developers.[3] When contacted by a potential customer, TET advises that it has a "proprietary process" for timeshare "exits."[4] But TET's only "proprietary process" is identifying which "vendor/partner/attorney" TET will refer its customers to.[5]

TET advises prospective customers to cease all communication with their timeshare developers and to stop paying their timeshare obligations.[6] The nonpayment is the "leverage" used against Plaintiffs by TET and/or its "vendors," including Sussman, in hopes of then being able to "exit" a timeshare owner from his/her contractual obligations.[7] TET charges customers who formally retain

---

[2] Attached hereto as Ex. A is Plaintiffs' statement of objections to Sussman' Statement of Uncontroverted Facts and Conclusions of Law [DE 197-3].

[3] *See* Ex. B (Decl. of T. Freeman ("Freeman Decl.")) at ¶ 3.

[4] *Id.* at ¶ 5.

[5] *See* Ex. C (Excerpts of Chasity Porter Deposition, July 31, 2018 ("Porter Dep.")) at p. 137, ll. 1-9.

[6] *See* Ex. B (Freeman Decl.) at ¶ 6.

[7] *Id.*

TET thousands of dollars in upfront fees.[8]  The customer files are then transferred to "vendor" lawyers to perform the work of trying to complete an "exit."[9]  The "vendor" lawyers do not meet or communicate with TET customers,[10] and there is no evidence in the record to substantiate that, once a "vendor" lawyer is assigned, he or she analyzes the situation or performs any substantive legal work.[11]

Sussman is a law firm "vendor" retained by TET.[12]  The agreement between Sussman and the TET Defendants states as follows:

> This [Agreement] … is being entered into as of December __, 2013, … by and between the law offices of Mitchell Reed Sussman & Associates ("Attorney") and Trevor Hein, Brandon Reed, Reed Hein & Assoc. aka Timeshare Exit Team ("Client").
>
> Client desires to obtain the services of Attorney, on its own behalf[.]
>
> Attorney has spent significant time, effort, and money to develop certain proprietary information, regarding the liquidation and return of timeshares which Attorney considers vital to its business and goodwill. ("Proprietary Information")
>
> Client agrees to pay Attorney, on a FIXED FEE basis, for his services pursuant to the attached pricelist for each timeshare transfer and/or cancellation file.
>
> Client acknowledges that *none of the services to be rendered by Attorney pursuant to this Agreement consist of filing legal action in either state or federal court*.[13]

Pursuant to this agreement, Sussman has provided services in connection with over 7,800 customers referred to him by TET (including Orange Lake Owners) at a minimum fee of $500 per file.[14]  Sussman accepts all referrals from TET, regardless of whether the TET customer meets any criteria to cancel their timeshare contract.[15]  Sussman, however, never communicates with his TET

---

[8]  *See* Ex. E (Excerpts of Thomas Parenteau Deposition, September 24, 2018 ("Parenteau Dep.")) at p. 154, ll. 7-25; *see also* Composite Ex. F (Owner Statements).

[9]  *See* Ex. C (Porter Dep.) at pp. 22-23, ll. 4-10; *See* Ex. B (Freeman Decl.) at ¶ 14.

[10]  *See* Ex. B (Freeman Decl.) at ¶ 15; *see also* Ex. F (Owner Statements)

[11]  *See* Ex. B (Freeman Decl.) at ¶ 9; *see also* Ex. G (Excerpts of Sussman Deposition, Oct. 3, 2018 ("Sussman Dep.")) at p. 48, ll 1-6; p. 36, ll. 8-17; p. 55, ll. 3-9.

[12]  *See* Ex. C (Porter Dep.) at pp. 22-23, ll. 4-10.

[13]  Ex. D (emphasis added).

[14]  *See* Ex. G (Sussman Dep) at pp. 32-33, ll. 3-11; 34, ll. 2-6.

[15]  *See* Ex. G (Sussman Dep.) at p. 36, ll. 5-17; pp. 60-61, ll. 22-2; p. 181, ll. 8-14.

customer referrals.[16]   There is no evidence of any direct agreements between Sussman and TET's customers,[17] and Sussman admits that his client is TET.[18]

TET and Sussman are expressly aware that TET's customers have contracts with Plaintiffs.[19] Sussman claims not to have employees, but then states that he assigns his TET customer files to his "associates," who work for him as independent contractors.[20]   Sussman instructs his "associates" to send form letters on his behalf for all new TET customer files, including any Orange Lake Owners.[21] His "associates" are not supposed to change or customize the form letters,[22] which accuse Plaintiffs of, *inter alia*, misrepresentation and fraud, regardless of the underlying facts of any given TET customers' situation.[23]   Sussman's form letter also instructs Plaintiffs not to communicate with the TET customers.[24]   As a result, Plaintiffs often send their Owners' statements, invoices, and other correspondence to Sussman, who never forwards it to his TET customer referrals to be paid.[25] Sussman's form letters also inform Plaintiffs that the TET customers will not be paying any financial obligations associated with their timeshare ownership.[26]   Sussman admits that his letters are completely boilerplate, as he does not investigate the particular situation of the TET customers.[27]

---

[16] *Id.*

[17] *See* Ex. G (Sussman Dep.) at pp. 42, ll. 9-11.; To the extent Sussman attempts to rely on power of attorney ("POA") documents to argue that an attorney-client relationship exists between Sussman and TET's customers (which he has not done), he has failed to put forth any evidence establishing the same. In any event, when faced with the same facts that Sussman would have the Court adopt here relating to POA's, Judge Irick ruled that no attorney-client relationship exists pursuant to any such POAs. *See* Ex. H [DE 214].

[18] *Id.*

[19] *See* Ex. G (Sussman Dep.) at pp. 125, ll. 12-18.

[20] *See* Ex. G (Sussman Dep.) at pp. 50-51, ll. 7-9.

[21] *Id.*; *see also* Composite Ex. I (Sussman Form Letter).

[22] *See* Ex. G (Sussman Dep.) at p. 51, ll. 11-20.

[23] *See* Ex. G (Sussman Dep.) at pp. 54-55, ll. 14-9; pp. 212-14, ll. 23-1.

[24] *See* Ex. G (Sussman Dep.) at p. 196, ll. 5-10.

[25] *See* Ex. G (Sussman Dep.) at pp. 196-98, ll. 11-2.

[26] *See* Ex, G (Sussman Dep.) at pp. 203-04, ll. 23-7.

[27] *See* Ex. G (Sussman Dep.) at p. 98, ll. 4-15.

If Sussman does not receive a response to his form letters, Sussman employs three methods to attempt to "exit" the TET customers from their timeshare contracts: (1) resignation, (2) unilateral deed back without notice to Plaintiffs, or (3) deed to "associates" (paid by Sussman) without notice to Plaintiffs and without providing any right of first refusal as required by Plaintiffs' contracts with their Owners.[28] Sussman employs these strategies on a mass basis with TET's knowledge and approval and for TET's customers. [29] Litigation *could* also be a strategy to attempt to "exit" a timeshare owner.[30] However, Sussman has never filed a lawsuit on behalf of an Orange Lake Owner.[31]

Sussman has several attorneys that perform various services in connection with his "exit" methods, such as preparing deeds to be filed in the real property records, including Andre T. Young.[32] Sussman also hires several "associates" who Sussman compensates to accept deeds transferring ownership from Sussman's timeshare owner clients.[33] Specifically, Sussman pays individuals who cannot avoid the timeshare obligations and have no intent to pay such obligations to be grantees in transactions with Sussman's TET customers as grantors, and, in turn, tells the TET customers that they no longer have any responsibility for their timeshare obligations. The first strategy employed by Sussman is resignation.[34]

The resignation strategy involves notifying Plaintiffs that the Owner is resigning from their timeshare ownership.[35] Sussman claims that he only uses this method if the timeshare interest at

---

[28] *See* Ex. G (Sussman Dep.) at p. 96, ll. 11-16.
[29] *See* Ex. G (Sussman Dep.) at p. 96, ll. 11-16.
[30] *See* Ex. G (Sussman Dep.) at pp. 93-94, ll. 15-5.
[31] *See* Ex. G (Sussman Dep.) at p. 95, ll. 17-22; p. 272, ll. 13-15.
[32] *See* Ex. G (Sussman Dep.) at pp. 22, ll. 6-17; p. 240, ll. 6-11; p. 254, ll. 19-21; p. 255, ll. 7-10; p. 255, ll. 13-19; p. 257, ll. 11-17; p. 258-59, ll. 15-4; p. 259, ll. 11-16; p. 294, ll. 16-23; *see also* Ex. J (Andre T. Young Declaration ("Young Declaration")).
[33] *See* Ex. G (Sussman Dep.) at pp. 113-14, ll. 17-13.
[34] *See* Ex. G (Sussman Dep.) at pp. 75-77, ll. 7-12.
[35] *See* Ex. G (Sussman Dep.) at pp. 75-77, ll. 7-12.

issue is based on a points system, as opposed to a deeded real property interest.[36]  However, his form letter of representation, even to deeded properties such as Plaintiffs', includes a notice of resignation.[37]  Sussman claims that resignation absolves the Owner of any financial obligations, regardless of whether Plaintiffs accept the resignation.[38]  Following submission of notices of resignation, Sussman has been advised that Plaintiffs do not accept or acknowledge the resignation, or that the resignation does not relieve Owners of their contractual obligations.[39]  But Sussman admits that he does not tell Owners that they may be sued if they submit a resignation because he does not communicate with them.[40]

If Sussman is unable to complete an "exit" by resignation, the second strategy is to have the Owners convey their timeshare interests by deed back to Plaintiffs.[41]  To complete this strategy, Sussman has a deed prepared for the Owner to sign, designating Plaintiffs as the grantee.  The Owner signs it, and Sussman has it filed in the real property records.[42]  Although the deeds recite that the grantee pays the grantor consideration in an amount of $10 (or some other amount), Sussman admits that no such consideration changes hands.[43]  Sussman then notifies the Orange Lake Owner that they no longer have to pay the financial obligations associated with timeshare ownership.[44]

As a general practice, Sussman does not inform Plaintiffs that the deed is recorded, unless his TET customer referral specifically requests that Plaintiffs be informed.[45]  Sussman admits that this process is not accepted by Plaintiffs, and that it has resulted in "hundreds" of foreclosures against,

---

[36] *See* Ex. G (Sussman Dep.) at p. 97, ll. 2-7.
[37] *See* Ex. G (Sussman Dep.) at pp. 97-98, ll. 13-12.
[38] *See* Ex. G (Sussman Dep.) at pp. 75-77, ll. 8-14.
[39] *See* Ex. G (Sussman Dep.) at pp. 216-17; 219-21, ll. 6-6.
[40] *See* Ex. G (Sussman Dep.) at pp. 77-78, ll. 15-24.
[41] *See* Ex. G (Sussman Dep.) at p. 93, ll. 15-24.
[42] *See* Ex. G (Sussman Dep.) at pp. 101-03, ll. 4-24.
[43] *See* Ex. G (Sussman Dep.) at pp. 286-87, ll. 4-4.
[44] *See* Ex. G (Sussman Dep.) at p.122, ll. 1-9; pp. 282-85, ll. 25-19.
[45] *See* Ex. G (Sussman Dep.) at pp. 272-73, ll. 17-11.

among others, his TET customer referrals because the developers, including Plaintiffs, do not consider the unilateral deed back to be a valid conveyance of the timeshare interest when the developer has not consented to/accepted the deed.[46]   Nonetheless, Sussman claims that this unilateral deed back is effective to transfer ownership of the timeshare interest, and to absolve the timeshare owner of any financial obligations.[47]   Sussman admits that he does not tell his TET customer referrals that Plaintiffs do not accept the unilateral deed backs because he does not communicate with them.[48]

If Sussman determines that he is or will be unable to complete an "exit" by resignation or by unilateral deed back, his final strategy is to have the Owner convey the timeshare interest by deed to one of Sussman's "associates."[49]   Plaintiffs are not provided an opportunity to exercise their right of first refusal as set forth in the contracts between Plaintiffs and their Owners.[50]   In addition, Plaintiffs are not advised of the transfer or the recording of the deed by Sussman or one of his local counsel lawyers.[51]

Moreover, even though the deeds recite that the "associate" (grantee) paid the Owner (grantor) $10 (or some other amount), no such consideration changes hands;[52] instead, Sussman pays the grantee—"associate" or "straw buyer"—$100 to accept the deed.[53]   Sussman claims he advises the associates (grantees) of the financial obligations associated with timeshare ownership, and the adverse

---

[46] See Ex. G (Sussman Dep.) at pp. 244, ll. 7-14; 104-05, ll. 12-9.

[47] See Ex. G (Sussman Dep.) at pp. 101-03, ll. 4-24.

[48] See Ex. G (Sussman Dep.) at pp. 77-78, ll. 15-24; pp. 105-08, ll. 5-16; pp. 283-85, ll. 22-19.

[49] See Ex. G (Sussman Dep.) at pp. 93-94, ll. 15-1.

[50] See Ex. G (Sussman Dep.) at pp. 135-36, ll. 3-5.

[51] See Ex. G (Sussman Dep.) at pp. 366-67, ll. 13-6 (copies of deeds were provided to the timeshare owner clients or to the companies that referred the timeshare owners to Sussman, but not to the timeshare companies or developers); see also, generally Ex. J (Young Decl.).

[52] See Ex. G (Sussman Dep.) at pp. 132-34, ll. 8-20; pp. 129-31, ll. 7-11.

[53] See Ex. G (Sussman Dep.) at pp. 295-96, ll. 11-19 (During his deposition, Sussman acknowledged that there are likely outright forgeries in connection with the deeds his "associates" prepared and accepted at his direction.)

consequences of failing to meet those obligations.[54]   According to Sussman, however, these individuals are financially needy, they need money to pay their basic bills, and they often request that more timeshare interests be deeded to them to receive more $100 payments.[55] When asked what he does to ensure that the associates have the ability and intent to pay the associated financial obligations, Sussman testified, "nothing."[56]

Sussman claims that the deeds to associate are "absolutely" effective, but only if the timeshare developer never challenges it.[57]   Sussman further claims that the method absolves timeshare owners of liability, not because of any legal process, but rather because anti-deficiency statutes limit any remedy.[58]   Sussman is aware that Plaintiffs do not consider this method to legitimately transfer ownership of a timeshare interest, but his TET customer referrals are never made aware of this fact.[59]

As a general rule, even after the deed to associate transaction is effectuated, Sussman still receives statements/invoices from developers, including Plaintiffs—since he sends letters of representation instructing Plaintiffs not to contact Owners and never notifies Plaintiffs of the transfer.[60] Sussman does not forward those statements to his associates—the new alleged owners—to be paid.[61] In Sussman's words, he considers those statements "trash."[62]

Tellingly, at some point in 2016, after instructing Sussman to engage in his deed to associate practice for years, TET directed Sussman to reverse the deeds to associate he had completed.[63]  This was a result of years of controversy regarding the practice.[64]  In fact, Sussman

---

[54] *See* Ex. G (Sussman Dep.) at pp. 110-11, ll. 18-22.; p. 112, ll. 7-21.
[55] *See* Ex. G (Sussman Dep.) at p. 113, ll. 5-13; p. 300, ll. 3-5 ("she desperately needs the money").
[56] *See* Ex. G (Sussman Dep.) at pp. 134-35, ll. 24-2.
[57] *See* Ex. G (Sussman Dep.) at p. 146, ll. 3-12.
[58] *See* Ex. G (Sussman Dep.) at pp. 122-25, ll. 1-11.
[59] *See* Ex. G (Sussman Dep.) at pp. 140-41, ll. 14-5, 141, ll. 6-16.
[60] *See* Ex. G (Sussman Dep.) at pp. 239-40, ll. 20-5.
[61] *Id.*
[62] *Id.*
[63] *See* Ex. G (Sussman Dep.) at p. 180, ll. 19-22; (Porter Dep.) at p. 212-13, ll. 1-12.

testified that in 2014 Louis Treiger, TET's lawyer, made clear that he "did not like" any of the methods Sussman was employing to "exit" TET's customers.[65]  Indeed, Sussmans' co-conspirator, Thomas Parenteau (TET's Chief Operating Office) testified that Sussman's methods are neither safe, legitimate, nor permanent.[66]  Despite this controversy, TET continued to send Sussman customer files for years ( *id.*), and instead fired Mr. Treiger in 2016.[67]  TET later instructed Sussman to have his associates sign deeds transferring the timeshare interests back to the TET customers.[68]  Sussman did not communicate with those TET customers, and Sussman has no idea if TET ever even told them the timeshare interests had been deeded back to them.[69]

Sussman admits that Plaintiffs have a right of first refusal under their contracts with their Owners, which is triggered when Sussman employs his deeding methods.[70]  But there is no evidence that Sussman has ever once complied with the right of first refusal requirements.  He does not communicate with Plaintiffs aside from his form letters, let alone advise them that one of their Owners has a purchaser or provide them with all that is required by the contract and applicable statutes prior to effectuating the transfer/resale.[71]  Sussman further admits that all of his TET customer referrals suffer negative credit reporting consequences as a result of his three methods.[72]  In addition, when Plaintiffs are not paid—because of Sussman's actions—Plaintiffs foreclose on the TET customer's timeshare interest, and sometimes sue for breach of the

---

[64] *See* Ex. G (Sussman Dep.) at p. 87, ll 7-21; pp. 88-93, ll. 22-8.
[65] *Id.*
[66] *See* Ex. G (Parenteau Dep.) at pp. 48-51, ll. 16-24.
[67] *See* Ex. K (Excerpts of Tanya Freeman Dep. ("Freeman Dep.")) at pp.  156-58, ll. 21-17; p. 187, ll. 5-8.
[68] *See* Ex. G (Sussman Dep.) at pp. 180-83, ll. 19-2.
[69] *See* Ex. G (Sussman Dep.) at p. 87, ll 7-21; pp. 88-93, ll. 22-8; Tanya Freeman also testified that TET actively tried to cover up Sussman's fraudulent practices.  *See* Ex. K (Freeman Dep.) at pp. 129-, ll. 6-21.
[70] *See* Ex. G (Sussman Dep.) at pp. 126-27, ll. 6-17.
[71] *See* Ex. G (Sussman Dep.) at pp. 135-36, ll. 3-5.
[72] *See* Ex. G (Sussman Dep.) at p. 80, ll. 1-11.

promissory notes that Sussman causes his TET customer referrals to breach.[73]  Despite the harm described, Sussman considers his TET customer files successfully closed, enriching himself to the detriment of Plaintiffs and their Owners.[74]

## ARGUMENT

### I. Summary Judgment Standard

It is well-established that a claim is not properly dismissed on summary judgment where a genuine issue of material fact exists for the consideration of the trier of fact at trial.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "[A] dispute about a material fact is 'genuine' ... if the evidence is such that a reasonable [fact-finder] could return a verdict for the nonmoving party." *Id.* at 248.  In its review of the facts presented, a court shall "view[] all facts, and the inferences to be drawn from them, in the light most favorable to the non-movants." *Forsyth v. Barr,* 19 F.3d 1527 (5th Cir. 1994).

### II. Summary Judgment As To Plaintiffs' Conspiracy Claim Against Sussman Is Not Appropriate

#### 1. Sussman Has Failed To Establish That He is Privileged To Interfere

Sussman urges that because Plaintiffs' claim against the TET Defendants for tortious interference with contracts fails as a matter of law, Plaintiffs' claim against Sussman for conspiracy (premised on the underlying claim for tortious interference) must necessary fail.  *See EMI Sun Vill., Inc. v. Catledge,* No. 13-CV-21594-KMM, 2013 WL 5435780, at *4 n. 11 (S.D. Fla. Sept. 27, 2013). To prove its tortious interference claim (Count I), Plaintiffs must show (1) the existence of a business relationship, even if not evinced in a formal written agreement; (2) that the defendant knew of the relationship; (3) the defendant intentionally and unjustifiably interfered with the relationship; and (4) damage to the plaintiff.  *See Bray & Gillespie Mgmt. LLC v. Lexington Ins. Co.,* 527 F. Supp. 2d 1355, 1367 (M.D. Fla. 2007).   Sussman does not dispute that the first, second, and fourth elements of the

---

[73] *See* Ex. G (Sussman Dep.) at pp. 105, ll. 1-9.

cause of action are met. Instead, he contends that Plaintiffs' claim for tortious interference (and therefore the conspiracy claim) cannot stand because Sussman is not a "stranger" to the contracts at issue, and is therefore privileged to interfere.[75]

Sussman's argument is premised upon an uncontroverted legal principal: claims for tortious interference do not exist against one who is himself a party to the business relationship or contract. *See Montgomery & Larmoyeux v. Philip Morris, Inc*., 992 F.Supp. 1372, 1375 (S.D. Fla. 1998); *Salit v. Ruden McClosky, Smith, Schuster & Russell, P.A.*, 742 So.2d at 386. Sussman, however, has not and cannot demonstrate that by virtue of his relationship with TET, an attorney-client relationship between Sussman and Orange Lake Owners is somehow forged. Instead, Sussman admits that he was "acting as the attorney for TET under a 'master fee agreement' at the 'direction' of *his client*, TET." Mot. at 7 (internal citations omitted) (emphasis added). He then leaps to the unsupported conclusion that "much like an insurance company attorney who represents the aligned interest of both the insurance company and its insured," by writing form representation letters, Sussman was somehow "acting on behalf" of TET customers. *Id.* But this not enough. In fact, when faced with the same distorted version of the facts that Sussman presents here and the corresponding lack of supporting evidence, Judge Irick ruled that no attorney-client relationship exists between the Defendant law firms and Orange Lake Owners. *See* Ex. H [DE 214]. Accordingly, Sussman has failed to meet his burden to establish that he has a privilege to interfere with Plaintiffs' contracts with their Owners. *See Singleton v. Dep't of Corr.*, 277 F. App'x 921, 923 (11th Cir. 2008) ("[T]he burden of establishing an affirmative defense lies on the defendant, not on the plaintiff[.]").

## 2.    The Privilege To Interfere Is Not Absolute

---

[74] *See* Ex. G (Sussman Dep.) at p. 198, ll. 3-15.

[75]   To the extent Sussman argues that Plaintiffs' conspiracy claim fails because it is based on the retainer agreement between the TET Defendants and Sussman (Mot. at 5-6), Sussman's argument misses the mark. Sussman confuses the legal relationship at issue—the one between Plaintiffs and their Owners.

Even if a privilege to interfere might otherwise exist—which is denied—the privilege is not absolute.  *See Salit* , 742 So. 2d at 383.  "[An] agent can be considered a third party to the contract for [] purposes of a tortious interference claim if the agent acts outside the scope of agency or is not acting in the principle's [sic] best interests." *Bray*, 527 F.Supp.2d at 1367–68 (internal citations omitted); *O.E. Smith 's Sons, Inc. v. George*, 545 So.2d 298, 299 (Fla. 1st DCA 1989) (The privilege is "divested where the defendant acts solely with ulterior purposes and the advice [to terminate] is not in the principal's best interest.") (internal quotations omitted).

Sussman recognizes the "ulterior purpose" or "not in the best interest" exception but asserts that the exception does not apply here.  Sussman is wrong.  The record fully supports Plaintiffs' claim that the TET Defendants and Sussman collectively act for independent ulterior motives, or certainly not in the best interests of Orange Lake Owners.[76]  Sussman's services to the Owners are based on the false representation that he can negotiate the cancellation of their timeshare contracts.  Despite his promise, Sussman does not even investigate any given Owners' situation.  Sussman then employs one of his three "secret sauce" methods, which Sussman knows are expressly rejected by Plaintiffs and contrary to civil and criminal law, as discussed below.  Nevertheless, Sussman represents to Owners that his methods, including recording deeds to associates or deeds back to Plaintiffs, are valid and that Owners are released from their obligations.  Sussman admits that ***all*** of his TET customer referrals suffer negative credit reporting consequences, and they are often foreclosed on or sued directly for monetary damages.  In line with this Court's prior ruling, Sussman is not shielded from liability where the evidence establishes that the TET Defendants and Sussman caused Owners to breach their contracts,

---

[76] *See, e.g.* Ex. L (Email from Orange Lake Owner to Sussman, stating: "The quitclaim process you have prepared for our Orange Lake timeshare is not what was proposed to us[.] . . . Based on those conversations, we were anticipating a deed in lieu of foreclosure.  We are not comfortable with the quit claim deed process.  Our mortgage states all outstanding sums are due and payable immediately upon transfer of the property.")

"not to aid them in successfully ending their contracts with Plaintiffs, but 'for purely selfish and mercenary reasons so as to earn and retain a large pre-paid retainer.'"  *See* Ex. M [DE 209] at p. 8.

Florida criminal law confirms that Sussman's methods, including recording fraudulent deeds are against the best interest of his TET customer referrals.  *See* Fla. Stat. § 817.535 (2)(a) (outlawing filing or directing someone to file, with the intent to defraud or harass another, "any instrument containing a materially false, fictitious, or fraudulent statement or representation that purports to affect an owner's interest in the property described in the instrument").[77]  The quitclaim deeds that Sussman directs be filed contain false information because they claim $10.00 (or some other amount) was accepted as valid consideration for the deed or list a false "value/sales" price of the property.  *See, e.g.,* Ex. N.  Sussman ***admits***, however, that such consideration or sales price payments are never made.

Likewise, Chapter 721 of Florida's Vacation and Timeshare Plans Act codifies the unlawfulness of Sussman's deed to associates method.  Florida law expressly provides a process for resales of timeshare interests, including the use of an escrow agent, to effectuate the transfer.  *See, generally,* Fla. Stat. § 721.17(3).  Knowingly failing to do so is a third-degree felony (*see id.* at (3)(d)), and "no person shall participate … in a plan or scheme, a purpose of which is to transfer a consumer resale timeshare interest ***to a transferee that the person knows does not have the ability, means, or intent to pay all assessments and taxes associated with the consumer resale timeshare interest.***"  *See id.* at (3)(e). Sussman claims he advises his associates of the financial obligations relating to timeshare ownership, and the adverse consequences of failing to meet those obligations.  However, there is

---

[77]  Sussman's unilateral deeds purportedly transferring interests to Plaintiffs are also invalid because they are not accepted by or delivered to Plaintiffs, and there is no mutual intent for title to pass.  *See, e.g., Ellis v. Clark*, 23 So. 410 (Fla. 1897) (A valid transfer of a real property interest by deed requires delivery and acceptance of the deed, combined with mutual intent for title to pass.).

absolutely no evidence that his associates have the ability or intent to pay. To the contrary, Sussman admits that these individuals are financially needy, even describing them as "desperate."[78]

Moreover, Sussman's conduct is virtually identically to the conduct for which an attorney—who later lost her license to practice law in the State of Virginia—pled guilty to. *See* Composite Ex. O. Specifically, the attorney pled guilty to mail and wire fraud under federal laws in September 2016 based on her role in a conspiracy to fraudulently transfer hundreds of timeshare units and was sentenced to 50 months in prison. *Id.* Amazingly, based on a the false promise that he can obtain a valid timeshare "exit" for his TET customer referrals, Sussman is in fact involving them in criminal activity for his own pecuniary gain.

Sussman's reliance on *Richard Bertram, Inc. v. Sterling Bank & Trust*, 820 So.2d 963, 965-66 (Fla. 4th DCA 2002) for the proposition that an attorney cannot be liable for tortious interference with his clients' contract, is also unavailing. Sussman has failed to establish an agency relationship between him and Orange Lake Owners rendering them his "clients" (as is his burden), and therefore, *Bertram* is inapposite.[79] *See e.g., Int'l Stamp Art, Inc. v. U.S. Postal Serv.*, 456 F.3d 1270, 1274 (11th Cir. 2006) (When asserting an affirmative defense, a defendant must establish that there is no genuine issue of material fact as to any element of that defense.).[80]

---

[78] *See* Ex. G (Sussman Depo) at p. 113, ll. 5-13; p. 300, ll. 3-5 ("she desperately needs the money").

[79] Either way, this Court has previously recognized that under *Bertram* "neither an agent nor an employee can conspire with his or her corporate principal or employers . . .[where] the agent has a personal stake in the activities separate from the principal's interest." *See* [DE 209] at 10. Here, Plaintiffs have established that "Sussman had personal interests in furthering the conspiracy in that [he] acted for [his] own pecuniary gain," and Sussman has failed to provide any evidence to alter the Court's prior analysis. *Id.* at 11.

[80] Sussman incorrectly argues that summary judgment is warranted because it is undisputed that "[Sussman] never even spoke to TET's clients, [so] it can hardly be said that [he] advised TET customers to do anything, much less breach their contracts." Mot. at 8. But Plaintiffs' claim is for

III.    **The *Noerr Pennington* Doctrine Does Not**
        **Immunize Sussman From Liability For Conspiracy**

    1.    ***Noerr-Pennington* Does Not Apply**

A valid petition to the government is protected by the *Noerr-Pennington* doctrine. However, if the conduct in question is not "an effort to convince the government to *do* something," there is no "petition" and there is no immunity. FTC Staff Report, *Enforcement Perspectives on the Noerr-Pennington Doctrine* 18 (2006) (emphasis in original); *see also Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988). Indeed, courts have repeatedly acknowledged the need to tie a claim for *Noerr-Pennington* immunity to actual petitioning. *See, e.g, In Slip-N-Slide Records, Inc. v. TVT Records, LLC*, No. 05-21113- CIV-TORRES, 2007 WL 473273, at *7 (S.D. Fla. Feb. 8, 2007).

Sussman's conspiracy with TET in no way implicates the First Amendment right to petition in any context, much less outside the realm of antitrust litigation. Judge Irick has already ruled that no attorney-client relationship exists on the facts of this case. *See* Ex. H. In addition, Sussman's testimony confirmed that he has never initiated any litigation against Plaintiffs. Sussman, in fact, is contractually prohibited from representing TET's customers in any litigation or formal proceeding. Accordingly, the evidence demonstrates that Sussman does nothing more for TET on behalf of Orange Lake Owners other than send boilerplate representation letters that are not unique to any Owner's situation and engage in the three unlawful "exit" methods described above. Sussman has wholly failed to establish that his actions are legitimate "petitioning activity," and he cannot shift the burden to Plaintiffs to show that his affirmative defense lacks merit as a matter of law. At a minimum, there is a genuine issue of material fact as to whether Sussman's activities warrant *Noerr-Pennington* protection.

---

Sussman's conspiracy with TET to interfere with Plaintiffs' contracts, based on the scheme described *supra*—a much broader set of facts than the limited "letters" Sussman asks this Court to focus on.

This Court should also decline to extend *Noerr-Pennington* immunity to bar state tort claims where such claims are completely unrelated to antitrust laws. *See, e.g., Slip-n-Slide Records, Inc.,* 2007 WL 473273, at *21--22. In *Slip-n-Slide Records, Inc.*—a case (as here) involving tortious interference claims based on demand letters—the court stated:

> Significantly, [defendant] has cited no case from [the Eleventh Circuit] that holds that the federal antitrust doctrine works to bar state tort claims wholly unrelated to an antitrust claim, and this Court will not extend the *Noerr-Pennington* doctrine to bar the traditional state-law tort claims asserted here by [plaintiffs]. Frankly, the doctrine has likely been extended far beyond what the exercise of judicial restraint should allow. Accordingly, this doctrine does not shield [defendant] from any liability it may have for interfering with [plaintiff's] relationship with [the third party].

*Id.* As in *Slip-n-Slide Records, Inc.*, this Court should decline Sussman's invitation to expand the *Noerr-Pennington* doctrine even further than currently recognized by the Eleventh Circuit.

## 2. The "Sham" Exception to *Noerr-Pennington* Is Applicable

Even if *Noerr-Pennington* did apply, which it does not, the "sham" litigation exception applies. Courts have recognized that immunity does not extend to petitioning activity that is a "sham" and is not a "genuine effort to influence legislation" or other government action but instead is merely an attempt to injure another. *See E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961). In order "[t]o abrogate *Noerr-Pennington* immunity as conduct attendant to a "sham" litigation, a litigant must establish '(1) the lawsuit [is] objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits; and (2) the party bringing the allegedly baseless suit did so with a subjective motivation . . . to interfere directly with the business relationships of a competitor.'" *SilverHorse Racing, LLC v. Ford Motor Co.*, No. 6:16-CV-53 ORL-22KRS, 2016 WL 7137273, at *3 (M.D. Fla. Apr. 27, 2016) (internal citations omitted). The question whether a petition is a sham "is generally a question of fact for the jury[.]" *Indep. Taxicab Drivers' Emps. v. Greater Hous. Transp. Co.*, 760 F.2d 607, 612 n. 9 (5th Cir.1985).

18

Sussman relies heavily on the *SilverHorse* case.  There, the defendant sent letters warning the plaintiff's clients of potential trademark infringement.  *See SilverHorse Racing, LLC*, 232 F. Supp. 3d at 1212.  The defendant owned the trademark, the plaintiff used the trademark in connection with related goods, and the plaintiff marketed and sold the goods bearing the trademark to the same customers as the defendant.  *Id.*  Because an objective litigant could conclude that the letters were "reasonably calculated to elicit a favorable outcome," the court held that the letters were not objectively baseless, and did not need to reach the issue of subjective intent.  *Id.*

Sussman's reliance on *SilverHorse,* however, is misplaced for several reasons.  First, the plaintiff in *SilverHorse* did not dispute that the *Noerr-Pennington* doctrine extended to the defendants' demand letters as Plaintiffs have done so here.  *See supra* at pp. 17-18.  Second, the court in *SilverHorse* reasoned that that the pre-suit letters at issue were not objectively baseless because they "are customarily used as the first formal step in the process of enforcing the law of intellectual property and vindicating economic interests in intellectual property," especially where the statutes protecting intellectual property rights often require pre-suit notification to alleged infringers.  *Id.* at *1212.  The court further noted that the plaintiff "failed to proffer any evidence demonstrating that [defendant] sent [] letters to [plaintiff's] distributors in bad faith or with anticompetitive intent."  *Id.*

That is not the case here.  Judge Irick has found that no attorney-client relationship exists on these facts, and Sussman's letters are boilerplate and do not state a legitimate basis for Orange Lake Owners to terminate their timeshare interests, much less constitute the "first formal step" in lawsuits "reasonably calculated to elicit a favorable outcome." *See* Ex. I.  Indeed, the letters are sent by Sussman without him ever meeting or communicating with any given Owner and discussing the Owner's unique situation.  The letters also contain legal impossibilities because (as Sussman is well-aware) Owners are bound by their legally enforceable contracts with Plaintiffs, despite Sussman's unlawful exit methods.

In addition, Sussman's complete inability to demonstrate that he ever even contemplated any litigation against Plaintiffs establishes a subjective intent to use the letters to interfere with Plaintiffs' contracts.

Sussman's letters and related actions are therefore a deeply abusive use of the pre-litigative process and have no credible claim to First Amendment Protection. At a minimum, this Court should find that a genuine issue of material fact exists regarding the applicability of the "sham" exception .

## IV.   The Litigation Privilege Does Not Immunize Sussman From Liability For Conspiracy

"[The litigation] privilege extends to statutory and common law causes of action, immunizing conduct undertaken during litigation and 'conduct that is 'necessarily preliminary' to a judicial proceeding.'" *Fridovich v. Fridovich*, 598 So. 2d 65, 66 (Fla. 1992). "Conduct that is 'necessarily preliminary' to a judicial proceeding is confined to pre-suit communications that are a statutory or contractual condition precedent to suit. *Id.* (citing *Pledger v. Burnup & Sims, Inc.*, 432 So. 2d 1323, 1327 (Fla. 4th DCA 1983) (declining to extend absolute immunity to pre-litigation settlement efforts)) (emphasis added); *see also Trent v. Mortg. Elec. Registration Sys.*, Inc. 618 F.Supp.2d 1356, 1361 (M.D. Fla. 2007) (declining to extend the litigation privilege to other pre-suit communications).

Sussman portrays the litigation privilege as an absolute bar, but Plaintiffs' evidence establishes (and Judge Irick's prior ruling suggests, *see* Ex. H) that Sussman does not represent Orange Lake Owners, and therefore, the ligation privilege never attaches. Sussman cannot proffer any lawsuits or proceedings against Plaintiffs before a judge or court as he admits that none exist. In fact, the very agreement between TET and Sussman makes clear that litigation is completely outside the scope of Sussman's services. Sussman certainly knows this and disingenuously ignores that he has no legitimate reason to invoke the litigation privilege.

Instead, Sussman hangs his hat on the proposition that the "privilege extends to 'pre-suit communications.'" *See Trent v. Mortgage Elec. Registration Systems, Inc.*, 618 F.Supp.2d at 1361

20

(emphasis added).  But the litigation privilege is not extended to pre-suit communications where they are not required by law.  *See id.* at 1360.  Sussman does not even attempt to establish that his baseless letters were legally required "statutory or contractual condition precedents" to suit, and the mere threat of litigation is insufficient to establish the privilege.  *See AGM Inv'rs, LLC v. Bus. Law Grp., P.A.*, 219 So. 3d 920, 925 (Fla. 2nd DCA 2017) ("[I]t is well-accepted elsewhere that tortious conduct will not be protected by the litigation privilege as being preliminary to future litigation unless that future litigation was actually contemplated in good faith and under serious consideration.").

Moreover, even if Sussman's demand letters were protected pre-suit communications—which they are not—they would not be automatically entitled to immunity.  *See Kelly v. Palmer, Reifler, & Assocs., P.A.*, 681 F. Supp. 2d 1356, 1369 (S.D. Fla. 2010) (holding that a qualified litigation privilege applies to acts taken as necessarily preliminary to litigation where there is: (1) good faith; (2) an interest to be upheld; (3) a statement limited in its scope to this purpose; (4) a proper occasion; and (5) publication in a proper manner) (internal citations omitted)).  As set forth throughout, Sussman cannot prove that his form letters were sent in good faith.  At best, as in *Kelly*, "whether [Sussman's form letters were] a good-faith attempt at pre-litigation settlement negotiations or whether [they were delivered] with the express intent to injure the plaintiff" is a factual question more properly resolved by a trier of fact.  *Kelly*, 681 F. Supp. 2d at 1368 (internal citations omitted).

## CONCLUSION

For the foregoing reasons, Sussman has not met his summary judgment burden with respect to Plaintiffs' claim for conspiracy.  Accordingly, Sussman' Motion must be denied. [81]

---

[81] Plaintiffs do not address Sussman's arguments relating to Count II—Plaintiffs' interference with advantageous business relationships claim—as Plaintiffs will not be re-pleading the claim following the Court's recent Order, dismissing the claim without prejudice. [*See* DE 209].

DATED:  November 7, 2018                         Respectfully submitted,


                                        By:      */s/ Jeffrey A. Backman*
                                                 RICHARD W. EPSTEIN
                                                 (Trial Counsel)
                                                 Florida Bar No. 229091
                                                 JEFFREY A. BACKMAN
                                                 Florida Bar No. 662501

                                                 GREENSPOON MARDER LLP
                                                 201 E. Pine Street
                                                 Orlando, FL  32801
                                                 (407) 425-6559

                                                 and

                                                 200 E. Broward Blvd., Suite 1800
                                                 Ft. Lauderdale, FL  33301
                                                 (954) 491-1120
                                                 richard.epstein@gmlaw.com
                                                 maria.salgado@gmlaw.com
                                                 jeffrey.backman@gmlaw.com
                                                 khia.joseph@gmlaw.com


                        **<u>CERTIFICATE OF SERVICE</u>**

        I HEREBY CERTIFY that I have filed the foregoing with the Clerk of Court via CM/ECF this

7th day of November 2018.  I further certify that any party that enters an appearance in this matter will

receive a copy of this document via CM/ECF or in some other authorized manner for those counsel or

parties who are not authorized to receive Notice of Electronic Filing.



                                */s/ Jeffrey A. Backman*