Mitchell Sussman
October 03, 2018

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

ORANGE LAKE COUNTRY CLUB, INC.,
a Florida corporation, and WILSON
RESORT FINANCE, LLC, a Delaware
limited liability company,

        Plaintiffs,

      vs.                No. 17-cv-1542-Orl-31DCI

REED HEIN & ASSOCIATES, LLC d/b/a
TIMESHARE EXIT TEAM, MITCHELL
REED SUSSMAN d/b/a MITCHELL REED
SUSSMAN & ASSOCIATES, SCHROETER
GOLDMARK & BENDER, P.S.; BRANDON
REED, TREVOR HEIN, and THOMAS
PARENTEAU,

        Defendants.

_____

VIDEOTAPED DEPOSITION OF MITCHELL REED SUSSMAN

October 3, 2018

10:07 a.m.

9680 Haven Avenue, Suite 140

Rancho Cucamonga, California

Reported By:

DEBRA J. DE LA MARE

CSR No. 6203

Mitchell Sussman
October 03, 2018                                                2

```
 1    APPEARANCES:

 2
         For the Plaintiff Orange Lake Country Club, Inc.,
 3       et al:

 4           GREENSPOON MARDER
             JEFFREY A. BACKMAN
 5           Attorney at Law
             200 East Broward Boulevard
 6           Suite 1800
             Fort Lauderdale, Florida 33301
 7           954/491-1120
             jeffrey.backman@gmlaw.com
 8
         For the Defendant Reed Hein & Associates, LLC:
 9
             BENTON, ORR, DUVAL & BUCKINGHAM
10           PANDA KROLL
             Attorney at Law
11           39 North California Street
             Ventura, California 93001
12           805/648-5111
             pkroll@bentonorr.com
13
         For the Defendant Schroeter Goldmark & Bender:
14
             GROWER, KETCHAM, EIDE, TELAN & MELTZ
15           CHARLES J. MELTZ
             Attorney at Law
16           901 North Lake Destiny Road
             Suite 450
17           Maitland, Florida  32751
             407/423-9545
18           cjmeltz@growerketcham.com
             (Appearing Telephonically)
19

20       For the Defendant Reed Hein & Associates, LLC, et al.:

21           WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP
             AMY BAKER
22           Attorney at Law
             111 North Orange Avenue
23           Suite 1200
             Orlando, Florida  32801
24           407/203-7599
             amy.baker@wilsonelser.com
25           (Appearing Telephonically)
```

```
 1    APPEARANCES (Continued):

 2

      For the Defendant The Law Offices of Mitchell Reed
 3    Sussman & Associates:

 4         SPECTOR, GADON & ROSEN, PC
           MICHAEL J. MCGIRNEY
 5         Attorney at Law
           360 Central Avenue
 6         Suite 1550
           St. Petersburg, Florida  33701-3830
 7         727/490-4578
           mmcgirney@lawsgr.com
 8         (Appearing Telephonically)

 9    General Counsel for the Defendant Reed Hein &
      Associates, LLC:
10
           STEPHANIE LOOSVELT
11         Attorney at Law
           220 120th Avenue NE
12         Bellevue, Washington 98005
           702/748-7777
13         stephanie@loosveltlaw.com
           (Appearing Telephonically)
14

15

      Also Present:       (Appearing Telephonically) -
16                        GREGG STROCK
                          CULLEN WILLIAMS
17

18    The Videographer:  RICH WAGNER

19

20

21

22

23

24

25
```

1    accounting.  Anything that you could even conceive of.

2        Q    Is there a primary specialty that your office

3    focuses in?

4        A    Just real estate.  That's it.  The construction

5    litigation, disputes with contractors.

6        Q    These folks that you mentioned, these six, and

7    I'm sure we'll find some other names over the course of

8    the years, but these six that you specifically mentioned,

9    are any of them lawyers?

10       A    Leslie is a lawyer.

11       Q    And what's Leslie's last name?

12       A    Benjamin.

13       Q    Have you had other 1099 lawyers provide services

14   through your law firm in the past?

15       A    Sure.  There are all of those independent

16   contractor agreements from lawyers in different states

17   that prepare deeds.

18       Q    Do you have all of your independent contractors

19   sign independent contractor agreements?

20       A    Absolutely.

21       Q    Do you have a record of all of them?

22       A    Oh, I have a record, I think, of some of the

23   recent ones, but from 40 years ago, the answer is an

24   unequivocal no.  From ten years ago, maybe.

25       Q    How about five years ago?

Mitchell Sussman
October 03, 2018                                    32

1   only by client name?

2       A      Correct.

3       Q      Part of your law practice includes representing

4   timeshare owners, correct?

5       A      Yes.

6       Q      How many clients would you estimate you have had

7   over the past five years where you have provided some sort

8   of services related to timeshare?

9       A      I cannot give you a number other than that it is

10  many thousands.

11             I believe that Thomas testified that the

12  Timeshare Exit Team sent me 7800 files by themselves.

13      Q      Who is Thomas?

14      A      Thomas was the deposition that was taken last

15  Monday.

16      Q      Thomas Parenteau, is that who you're referring

17  to?

18      A      Correct.

19      Q      Okay.

20      A      So you can start with that number.  It's more

21  than that.

22      Q      Did you have other companies like Timeshare Exit

23  Team that would send you referrals or clients?

24      A      Yes.

25      Q      How many?

Mitchell Sussman
October 03, 2018                              33

1       A     Over the course of ten years, I think that the

2   number is about 40.

3       Q     Did they send you volumes similar to what you're

4   describing T.E.T. sent you?

5       A     I will say that in my opinion, that T.E.T. is the

6   preeminent company in this field, and that they have sent

7   me far more files than any of the other entities.

8       Q     So on your laptop, you have organized by client

9   in excess of, what, 8,000 or so timeshare-related clients?

10      A     I think that's probably why the computer crashed,

11  but be that as it may, yes.

12      Q     Do you have any way of telling which of those

13  relate to Orange Lake?

14      A     Only by plugging in the search Orange Lake, and

15  then all of the documents related to Orange Lake came out,

16  which were then dropped into a flash drive and sent to

17  McGirney and so on and so forth.

18      Q     That's only if a document actually says Orange

19  Lake in it, though, correct?

20      A     Well, the documents would have Orange Lake in the

21  demand letter, or the document would say Orange Lake in

22  the deed, and so that would then let me know that this is

23  a file that's an Orange Lake file.

24      Q     And generally speaking, over the last five years,

25  what documents should exist in your client files?

Mitchell Sussman
October 03, 2018                                      34

1      A     Essentially those two documents.

2      Q     Any others?

3      A     I think you probably know at this moment that the

4   fees that I was paid by the Timeshare Exit Team were as

5   little as $500 per file.  Sometimes more, so when you're

6   getting paid $500 a file, that doesn't require much work.

7           Some attorneys charge $500 just to generate

8   deeds, and so those two basic items were really what I was

9   hired to do, and that is essentially what these other

10  entities hire my law firm to do, which is to send out the

11  demand letter, see if we can get a positive response,

12  which in many cases we do, and they -- for example, Welk

13  wants $2,000 as their exit fee or $500 depending on the

14  financial condition.

15          So if we write a letter to Welk, Welk's attorney

16  will respond saying in this case, "We want $500 or

17  $2,000."  At which point, they will generate paperwork and

18  I don't have to do the deed.

19          Wyndham Worldmark, they have their own procedure.

20  Bluegreen has its own procedure.  Diamond has its own

21  procedure.  All of them have their own procedure,

22  Marriott, dah-dah-dah.

23          Many of them very simply will respond to my

24  office with, "Yes, our exit or cancellation fee is 'X'

25  dollars."

Mitchell Sussman
October 03, 2018                               36

1      Q     All of the customers that you've had that relate

2   to Orange Lake or Westgate, they all had contracts with

3   those two developers, correct?

4      A     I don't know that, that is necessarily the case.

5      Q     Did you ask your customers for their contracts

6   with the developer before providing services to them?

7      A     My communications were with T.E.T.

8      Q     Did you ever speak to any of T.E.T.'s customers?

9      A     There may have been an attempt by their customers

10  to call, or perhaps they called and didn't designate

11  themselves as a T.E.T. customer, but if they had called

12  into my office and said that they were a T.E.T. customer,

13  I would let them know that they needed to discuss the

14  matter directly with T.E.T.

15     Q     Why?

16     A     Because I was not being paid for customer

17  service.  That was not part of what I was doing.

18     Q     Did you consider -- when T.E.T. would send you a

19  referral, did you have to accept it in any way?  Was there

20  anything that you had to do, or it just came over and you

21  sent a demand letter?

22     A     When -- and you have a copy of the retainer.  I

23  think you have one that's unredacted if I'm not mistaken.

24  It says for -- essentially, that I am to advise them on

25  various ways, T.E.T.

Mitchell Sussman
October 03, 2018                                          37

1       Q     You are to advise T.E.T.?

2       A     Yes.

3       Q     Okay.

4       A     That's what it states, and so that's what I --

5   that's what I do.

6       Q     Okay.  I'm -- I'm not sure I'm following.

7             So you said before that -- I guess it was Thomas'

8   estimate, but at some point in time or over the course of

9   time, T.E.T. has sent you roughly 7800 of its customers

10  for you to perform timeshare-related services, correct?

11      A     Correct.

12      Q     Do you consider -- did you consider any of those

13  7800 to be your clients?

14      A     Every one.

15      Q     So you were performing services --

16            MR. BACKMAN:  Let's go off the record for a

17  second.

18            THE VIDEOGRAPHER:  The time is now approximately

19  10:50 a.m.  We're off the record.

20            (Off-the-record discussion held.)

21            THE VIDEOGRAPHER:  Here begins Media Number 2 in

22  the videotaped deposition of Mitchell Reed Sussman.  The

23  time is now approximately 11:00 a.m.  We are back on the

24  record.

25            MR. BACKMAN:  Thank you.

Mitchell Sussman
October 03, 2018                    38

1    BY MR. BACKMAN:

2        Q    Are you still comfortable in your seat?  We had

3    to move some things around.

4        A    Yes.

5        Q    You're good.

6             All right.  One of the things when we were on the

7    break and resetting the video, apparently the

8    videographer -- when you're moving in your seat, it

9    muffles the sound, so if you could try to limit that as

10   much as possible, that would be great so we can get a

11   clean record.

12            We were talking about the -- the customers that

13   get referred to you from T.E.T., and I think right before

14   we took that short pause, you had told me that you

15   provide services -- legal services to each of those

16   customers, and you consider them to be your clients; is

17   that right?

18       A    Yes.

19       Q    But I think just before that, you had said you

20   never talked to any of those customers.  And, in fact, you

21   make it a point not to if they call and identify

22   themselves as being a T.E.T. customer; is that right?

23       A    Yes.

24       Q    And why don't you talk to the clients that you're

25   performing services for?

1    A    Because my direct relationship is with T.E.T.  If

2 they ask me to discuss something with a customer, I would

3 have certainly done that, but when they ask me to

4 essentially communicate with them so that they can do the

5 customer service, then I comply with that request.  That

6 is their request.  They are the entity that's paying me.

7    Q    How many of T.E.T.'s customers that have been

8 referred to you have you spoken with?

9    A    I have no recollection of speaking to any of

10 them.  Although, I did -- this is one of the Bar

11 complaints.

12        I did receive a letter and an e-mail from one of

13 the T.E.T. customers who said they had no idea that I was

14 their attorney, and that they didn't want me to work on

15 the file, and so I immediately e-mailed them and wrote

16 them back copying them with a letter of nonrepresentation

17 so that they were satisfied with the fact that I was no

18 longer working on their file per their request.

19    Q    Did you ever participate in -- strike that.

20        Do you know whether T.E.T. advises its customers

21 that their timeshare issue is going to be handled by you?

22    A    I have no idea.

23    Q    Have you ever been part -- a party to a

24 conversation where T.E.T. said that to somebody that was

25 being referred to you?

Mitchell Sussman
October 03, 2018                                    40

1      A    No.

2      Q    Have you seen any correspondence where T.E.T. is

3   advising its customers that they are going to be -- strike

4   that -- that their case is going to be assigned to you?

5      A    No.

6      Q    You just mentioned one particular letter where

7   somebody said they didn't know that you were representing

8   them and they wanted you to get out.

9           Are you familiar with any other circumstances

10  like that relating to T.E.T.'s customers?

11     A    There may be, but there's only the one that I

12  recall at this time.

13     Q    Do you have copies of those e-mails relating to

14  that particular event?

15     A    I produced that as part of my production.

16     Q    So when T.E.T. refers you a customer, they send

17  you an e-mail?

18     A    They send an e-mail, yes.

19     Q    And attached to that e-mail is this Intake Form

20  that you were referring to?

21     A    I'm sure you have a copy of it because I saw some

22  in the production.

23     Q    Is that a form that you prepared and gave to

24  T.E.T. to have its customers complete, or is that

25  something that T.E.T. did on its own?

Mitchell Sussman
October 03, 2018                                    42

```
 1        A    No.

 2        Q    Do you respond to T.E.T. in any way when you get

 3    a -- a case assignment?

 4        A    There is no direct response to the case

 5    assignment.

 6        Q    So once it's sent to you, it's assumed that

 7    you're handling it?

 8        A    Correct.

 9        Q    Do you sign any agreements -- do you sign any

10    agreements directly with T.E.T.'s customers?

11        A    No.   There are -- there are powers of attorneys

12    that T.E.T. was generating for a long time, and then if

13    there was specific powers of attorney required by any of

14    the developers who would say, "Well, we don't know," you

15    know, "that you're the attorney for Jane Doe," and in

16    which case, in those instances, I would generate my own

17    personal power of attorney and send it to T.E.T. so that

18    they could have the customer execute it, and then T.E.T.

19    would send it back to me so that I could send it to the

20    developer.

21        Q    Only if the developer asked for it?

22        A    Only if the developer asked for it.

23        Q    Do you recall any situations where either

24    Westgate or Orange Lake asked for that?

25        A    I don't believe they did.
```

Mitchell Sussman
October 03, 2018                                48

1           So once you get the referral from T.E.T., do you

2    have any discussions with the T.E.T. representatives

3    relating to your handling of that particular account?

4        A    No.

5        Q    Ever?

6        A    Yes, never.

7        Q    Okay.  So you never have conversations with the

8    T.E.T. folks about your handling of the accounts?

9        A    We would have either weekly or monthly phone

10   conferences about a bulk of files, but not as individual

11   files when they would come over.

12       Q    Okay.  So at some point during the course of the

13   relationship in your handling of a particular T.E.T.

14   customer's timeshare issue, you would have conversations

15   with the folks at T.E.T. relating to those particular

16   accounts?

17       A    Yes.

18       Q    Okay.

19       A    Again, we would have either weekly or monthly or

20   biweekly phone conferences, and we would discuss whatever

21   files were problematic and how to handle them.

22       Q    Would you identify and discuss each and every

23   file that you were handling?

24       A    No.

25       Q    You would only discuss the ones that you would

Mitchell Sussman
October 03, 2018                                    50

1    anymore.  They have internally, you know, handled it

2    through other vendors.

3        Q    Okay.  So when was the last time you got a file

4    from them?

5        A    I would say most of the files probably stopped

6    coming to me in early 2016.

7        Q    Okay.  So once you get the file, what do you do

8    on your end?

9        A    We immediately -- I assign one of these

10   independent contractors.

11            MR. MCGIRNEY:  This is Mike McGirney.  Sorry

12   guys.  We are getting the alert on my phone.  Sorry for

13   the distraction.

14            MR. BACKMAN:  That's all right.

15            MS. KROLL:  He could go on mute.

16            THE WITNESS:  I would assign it to one of the

17   independent contractors.  They would write the letter.

18            I would, of course, initially write the letters

19   as it relates to each of the developers so that the letter

20   was customized for each of the developers.

21   BY MR. BACKMAN:

22       Q    So -- so you yourself prepared a form letter?

23       A    Right.

24       Q    To be sent to respective developers depending

25   upon certain things that you may have learned --

1      A      Correct.

2      Q      -- as to the practices of each developer?

3      A      Correct.

4      Q      Okay.  And then so you would -- go ahead.

5      A      I would give them to the independent contractors.

6  The ones that wrote the most letters got paid the most.

7  The ones that lollygagged and didn't write letters would

8  get paid a little, and I didn't care where or when they

9  did it.

10     Q      Were they -- strike that.

11            Did -- the independent contractors to whom you

12  assigned these files, would they change or customize these

13  letters?

14     A      They were not supposed to.

15     Q      So all they had to do was take your form letter,

16  change the names, change the address and send it to the

17  developer?

18     A      Essentially.  Although, over time, some of the

19  letters would evolve based upon what the developer wanted

20  to see in the letter.

21     Q      Explain that to me.  What do you mean by that?

22     A      Well, for example --

23            MR. BACKMAN:  Hey, Panda, it's really loud.

24            MS. KROLL:  Okay.

25            THE WITNESS:  Wyndham had various categories.

1      Q     Okay.

2      A     Every single one.

3      Q     Have they --

4      A     And they have refused it.  It doesn't matter if

5   they're dead.  It doesn't matter if the person has no

6   money.  It doesn't -- it doesn't matter what the reason

7   is.

8      Q     Has that generally been the position of Orange

9   Lake and Westgate since 2013 or so?

10     A     Yes.

11     Q     It's always been your experience in dealing with

12  those two developers?

13     A     Yes.

14     Q     So for those developers, have you advised your

15  independent contractors to change your general form letter

16  in any way to account for the way in which Orange Lake and

17  Westgate respond to you?

18     A     No, because the form letter covers the basis that

19  it needs to cover.

20     Q     Do you know that in every one of your form

21  letters to Westgate and Orange Lake on behalf of your

22  clients, you accused both developers respectively of

23  misrepresentation of fraud?

24     A     Yep.

25     Q     Do you know that that's the case for every single

Mitchell Sussman
October 03, 2018                     55

1    one of your letters?

2        A    Yes.

3        Q    So you make no effort or you have your

4    independent contractors make no effort to actually

5    identify the circumstances associated with your particular

6    client when it comes to Westgate and Orange Lake?

7        A    For the reason that it doesn't matter what you

8    say to them or what you offer them.  The answer is always

9    the same.

10       Q    Okay.  We talked a little bit about your intake

11   in connection with customers that come from T.E.T.

12            When a customer comes to you directly, what is

13   your process?

14       A    I've produced my Intake Form.

15       Q    You're talking about the -- the --

16       A    The one that's online.

17       Q    -- questionnaire online?

18       A    That's it.  That's the sole total Intake Form.

19       Q    Nobody ever comes to you other than on the

20   computer?

21       A    No.

22       Q    You never get phone calls for clients -- from

23   clients?

24       A    Well, they -- they will either get word of mouth

25   or they will have read one of the many articles that I

Mitchell Sussman
October 03, 2018                    60

1      A     Absolutely.

2      Q     Okay.  Have you ever told T.E.T. that T.E.T.

3  should tell its clients the same thing?

4            THE WITNESS:  I think we're talking about

5  rendering legal advice, so I don't know if anybody wants

6  to make an objection.

7  BY MR. BACKMAN:

8      Q     Again, I haven't heard one, sir.

9      A     All right.

10     Q     Go ahead.  They are all capable lawyers on the

11  phone.

12     A     Okay.  Well, all of the time.

13     Q     Do you know whether they did that?

14     A     I don't know.

15     Q     What about the other 40 companies that send you

16  cases?  Do you tell them that --

17     A     All of the time.

18     Q     Do you know if they did it?

19     A     I don't know.

20     Q     Did you ever talk to your clients once -- well,

21  strike that.

22           For the 40 other companies that send you

23  referrals, do you speak to those clients directly?

24     A     No.

25     Q     It's the same structure that you described for

Mitchell Sussman
October 03, 2018                                    61

1    T.E.T.?

2         A    Precisely.

3         Q    Are you able to tell me for your -- for your

4    Westgate clients which ones or how many came to you

5    directly as opposed to through one of these companies that

6    you work with?

7         A    My -- my business plan is not -- as it relates to

8    the timeshares is not to, shall I say, compete in any way,

9    shape or form with retail guys and whatever it is that

10   they're doing, okay?  And so the amount of individual

11   phone calls that I get and the amount of files that I get

12   that come to me directly versus come to me from a

13   T.E.T.-styled company, I -- my estimate is that it's ten

14   percent of my files that come to me directly.

15        Q    And that's through word of mouth or somebody

16   looking on the internet and seeing your website?

17        A    It's either a search of the internet or word of

18   mouth.

19        Q    Do you do any advertising?

20        A    I have zero advertising budget.

21        Q    Now -- well, budget and doing advertising are two

22   different things.

23        A    Well, you have got to tell me -- you have got to

24   tell me what you mean by that, because what does

25   advertising mean?

1   if they're willing to take money.

2       Q    Okay.  Let's run through the five and then -- or

3   however many there are --

4       A    Okay.

5       Q    -- and then we'll --

6       A    And then --

7       Q    -- we'll get into details.

8       A    Then there is the second most preferred which is

9   resignation.

10      Q    And by that, you mean what?

11      A    By sending a notice stating that the particular

12  owner no longer wishes to be a member of the club.

13      Q    Does that require any type of action by the

14  developer?

15      A    Well, I get action by the developer.  Some of

16  them say, "We accept your notice."  Some of them say,

17  "We'll accept your notice except with a payment," or the

18  other ones will say, "No, we don't think that you can

19  resign."

20      Q    Okay.  And for that latter category, what

21  happens?

22      A    Well, then it's incumbent upon them to take

23  whatever legal action they wish to take to invalidate what

24  I feel is a valid resignation.

25      Q    Do you believe that if you send a Notice of

Mitchell Sussman
October 03, 2018                                    76

1   Resignation knowing that the developer doesn't actually

2   accept the resignation or doesn't believe it's applicable,

3   that, that is a valid exit?

4       A    I believe it's a valid exit based upon the

5   authority of the United States Supreme Court.

6       Q    And what authority is that?

7       A    I believe the letters that you have that I have

8   furnished to you give you the exact citation of the case,

9   so you've got it there.

10      Q    Do you believe that a resignation that is not

11  approved or accepted by the developer leaves your client

12  at risk of a potential lawsuit?

13      A    It may.  That is -- I'm going to use -- I'm going

14  to first say that, that virtually never happens.

15      Q    Not my question, though.

16           To be able to effectively resign under whatever

17  statute or case law you're -- you're relying upon, do you

18  believe that the owner still has to comply with all of his

19  or her contractual obligations owed to the timeshare prior

20  to that resignation?

21      A    Prior to that resignation, absolutely.

22      Q    So if they're not paid in full at the time of

23  the, quote, resignation, do you believe that your client

24  would need to pay in full and comply with the terms of the

25  contract --

Mitchell Sussman
October 03, 2018                    77

1     A    Yes.

2     Q    -- despite the resignation?

3     A    Yes.

4     Q    And do you tell your clients that?

5     A    Yes.

6     Q    Have you ever done a resignation for a client

7  that wasn't paid in full?

8     A    Yes.

9     Q    Have you ever done a resignation to Westgate --

10 well, we will go one at a time -- to Westgate for a client

11 that wasn't paid in full?

12    A    Perhaps.

13    Q    How about for Orange Lake?

14    A    Perhaps.

15    Q    And in those instances, did you tell the

16 respective clients that they needed to meet their

17 contractual obligations in order for this to be effective?

18    A    The clients are aware of two things.  Number

19 one -- and the ones that I communicate with.

20         Number one, that there's always the possibility

21 of them being sued.

22    Q    You tell them that?

23    A    Absolutely.

24    Q    Do you send that to them in writing?

25    A    We talk about this.  And my retainers state quite

Mitchell Sussman
October 03, 2018                                    78

1    clearly that I will not represent them if there is a

2    lawsuit.   That, that is the subject of another retainer

3    because my fees are so ridiculously low.

4        Q     Right.   So if the client gets sued as a result of

5    your resignation of them --

6        A     Right.

7        Q     -- you don't represent that client?

8        A     I could conceivably, but depending on where they

9    live.   Since I only live in the State of California, I

10   would then have to hire someone to represent them.

11       Q     And only if they agreed to pay you?

12       A     Correct.   Otherwise, if there is a lawsuit, I

13   would have to refund their money in full because that is

14   the terms of my retainer agreement with them.

15       Q     For every client of yours that has been the

16   subject of a lawsuit from a developer after you

17   represented them, did you refund their money?

18       A     Absolutely.

19       Q     All right.   You made a distinction between the

20   clients that you spoke with and the clients that maybe

21   were referred to you by one of these other companies.

22       A     Right.

23       Q     What is that distinction?

24       A     Well, I don't communicate with those clients, so

25   that -- for example, which this is one of the things that

Mitchell Sussman
October 03, 2018                    87

1   what I was doing.  And I said, "But then you don't have to

2   take my consult.  You don't have to take my advice."

3          Some of them agreed with what I was doing and so

4   forth, you know, so they always had counsel who, I guess,

5   supervised me.  You could say that.  Reviewed my stuff.

6      Q     Who's that?

7      A     There was -- the one that -- that I recall was

8   Coby something.  Maybe it was Coby Kohen, and then there

9   was another guy before that who I did not get along with

10  at all.  I don't remember his name.

11     Q     Is that Louis Treiger?

12     A     Maybe that was his name, yeah.

13     Q     Why didn't you guys get along?

14     A     Because he didn't think that I -- that I knew

15  what I was doing.

16          I said, "Well, then do it yourself."

17     Q     What complaints did he have?

18     A     Well, what complaints didn't he have?

19     Q     Well --

20     A     Every complaint that I could possibly, like,

21  think of.

22     Q     Like what?

23          Did he have a problem -- let's see.  We talked

24  about negotiations.  Did he have a problem with your

25  negotiating people out of their timeshares?

Mitchell Sussman
October 03, 2018                              88

```
 1     A    He had a problem --
 2          MS. BAKER:  I'm going to object.  I'm going to
 3    object and instruct you not to answer that.
 4          MR. BACKMAN:  What rendering of legal advice is
 5    that?
 6          MS. BAKER:  They're discussing the legal advice
 7    that Mr. Sussman was providing, and that's attorney-client
 8    privilege, very clearly so, and I'm instructing him not to
 9    answer.
10    BY MR. BACKMAN:
11     Q    Did he have a problem --
12          MR. BACKMAN:  Go ahead.  Make your record.  I'm
13    going to make mine.
14    BY MR. BACKMAN:
15     Q    Did he have a problem with the resignation
16    practice that you described?
17     A    Yes.
18     Q    What did he tell you?
19          MS. BAKER:  I'm going to instruct you not to
20    answer that.  Attorney-client privilege.
21    BY MR. BACKMAN:
22     Q    Did you get into arguments with Mr. Treiger?
23     A    Yes.
24     Q    Often?
25     A    Yes.
```

Mitchell Sussman
October 03, 2018                                    89

1     Q     About what?

2     A     About all of the --

3           MS. BAKER:  Again, I'm going to instruct you not

4     to answer to the extent that you would be disclosing any

5     attorney-client communications, so you're not going to

6     disclose any attorney-client communications about the

7     legal advice that you were rendering to Reed Hein or about

8     their feelings on it.

9     BY MR. BACKMAN:

10    Q     Were these arguments relating to advice that you

11    were rendering to Reed Hein -- Reed Hein, or were these

12    arguments about the way in which you were handling Reed

13    Hein's customers?

14    A     Both.

15    Q     Can you tell me about the issues relating to your

16    handling of the Reed Hein customers?

17    A     The resignations, he didn't like.  The deeds back

18    to the developer, he didn't like.  The deeds to the people

19    that wanted to go resell them, he didn't like.  I mean,

20    you know, he didn't like anything, really.

21    Q     He didn't like the methods that you were

22    employing to get people exited from their time -- to get

23    the T.E.T. customers exited from their timeshares?

24    A     Correct.

25    Q     All right.  When -- when, generally speaking,

Mitchell Sussman
October 03, 2018                                    90

```
1    were these various arguments with Mr. Treiger?
2         A    Maybe 2014.
3         Q    And did these arguments continue for a period of
4    time?
5         A    Sure.
6         Q    They were constant?
7         A    Yes.
8         Q    During the time that these arguments were taking
9    place back and forth, was Reed Hein still sending you
10   customers?
11        A    Yes.
12        Q    Was Reed Hein aware -- I take it from these
13   arguments that it was, but was it aware that you would
14   send these Notices of Resignation to developers?
15        A    Yes.
16        Q    And that, that would be one way in which you
17   would have one of T.E.T.'s customers exited from his --
18   his or her timeshare obligations?
19        A    Yes.
20        Q    We haven't gone through the rest of the list yet,
21   but was there also a method that you employed that you
22   refer to as deeds to associates?
23        A    Yes.
24        Q    And was Reed Hein familiar with the fact that,
25   that was a method that you employed --
```

1        A     Yes.

2        Q     -- to get its customers out of its timeshare

3    obligation?

4        A     Yes.

5        Q     And that was one of the things that Mr. Treiger

6    took issue with?

7        A     Yes.

8        Q     And then I think you mentioned it briefly, but

9    there was a process by which you would deed back to the

10   various developers particular timeshares from Reed -- for

11   Reed Hein's customers; is that right?

12       A     Yes.

13       Q     And is that one of the practices that Mr. Treiger

14   took issue with?

15       A     Yes.

16       Q     And as these arguments were taking place with

17   Mr. Treiger relating to these methods of exiting, Reed

18   Hein was continuing to send you files?

19       A     Yes.

20       Q     Was Mr. Reed aware of the issues that Mr. Treiger

21   was raising?

22       A     Yes.

23       Q     Was Mr. Reed involved in any of these

24   conversations, be it telephone or in person, where

25   Mr. Treiger was expressing his -- his concerns?

Mitchell Sussman
October 03, 2018                    92

1      A    Yes.

2      Q    Was Mr. Hein also present?

3      A    Yes.

4      Q    Mr. Hein was aware of these issues?

5      A    Yes.

6      Q    Was Mr. Parenteau present?

7      A    I'm not sure if Thomas was on board with the

8   company at that time.

9      Q    Was anyone else present?

10     A    It's hard for me to know, because these were all

11  telephonic -- no, actually, they came and visited me in

12  Beverly Hills one time, and it was Treiger, Brandon and

13  Trevor.  The three of them.

14     Q    What was the purpose of that meeting?

15     A    To have these conversations.

16     Q    Conversations about the concerns that Louis was

17  raising?

18     A    Yes.

19     Q    Was Trevor and Brandon expressing any concern?

20     A    They were.  And at some point I was instructed to

21  undo some of the transactions where the deeds were to the

22  associates, which I did.

23     Q    And how many of those did you undo?

24     A    I don't know.  It could have been a hundred.

25     Q    Why did you undo them?

Mitchell Sussman
October 03, 2018                    93

1      A     They asked me to do it.

2      Q     Did they tell you why?

3      A     Because they had a concern as to the validity of

4   that as an exit strategy.

5      Q     Did you continue to do deeds to associate for

6   customers even after you had those meetings?

7      A     Not for T.E.T.

8      Q     But for others?

9      A     Sure.

10     Q     And in your general business where you handle

11  these directly, correct?

12     A     Sure.

13     Q     Not through a third-party exit company?

14     A     Sure.

15     Q     So I want to go back to this list that we were

16  doing for most preferred to least preferred, and we've got

17  negotiations that actually end in an agreement, right?

18     A     (No audible response.)

19     Q     Yes?

20     A     Yes.

21     Q     And we've got resignations, which we talked

22  about, and we will get into a little bit more later.

23           What would be the next?

24     A     Deed back to the resort.

25     Q     And what about after that?

Mitchell Sussman
October 03, 2018                              94

1      A      Deed to an associate.

2      Q      And after that?

3      A      Litigation.

4      Q      So litigation is the least preferred?

5      A      Correct.

6      Q      Why?

7      A      It's the most time consuming and costly, and you

8   can't do it for $500.

9      Q      And just, I guess, for the edification of

10  somebody seeing this or reviewing it later, litigation,

11  you mean the filing of a lawsuit against the developer on

12  behalf of your client?

13     A      Correct.

14     Q      All right.  And the amount of money that you're

15  getting paid, whether it's through the referral from a

16  third-party exit company or direct from a client, doesn't

17  allow you to file a lawsuit?

18     A      It says so in my retainer there has to be a

19  separate retainer for litigation.

20     Q      At what point in your handling of a particular

21  client -- and tell me, please, if it's distinguishable

22  based upon a third-party exit referral or directly hiring

23  you.

24            At what point in the process do you decide that

25  litigation is the only alternative?

Mitchell Sussman
October 03, 2018                              95

1        A    When the client says to me that this is what they

2    would like to do.  In which case, I then say, "Well, my

3    fee is $600 an hour, and I need $6,000 as a retainer," or

4    whatever it is that I need.

5        Q    Before the client gets to a point where he or she

6    says that they want to sue a developer, do you go through

7    the other four options that you just mentioned?

8        A    I give them the choice.

9        Q    Have you ever had a client tell you that they

10   would rather pay you to file a lawsuit as opposed to you

11   just preparing a deed and sending it back to the

12   developer?

13       A    Sure.

14       Q    How many lawsuits have you filed on behalf of

15   Westgate timeshare owners?

16       A    Never.

17       Q    How many lawsuits have you filed on behalf of

18   Orange Lake timeshare owners?

19       A    Never.

20       Q    How many successful negotiations have you had for

21   an Orange Lake timeshare owner?

22       A    I would say less than a handful.

23       Q    How many successful negotiations have you had for

24   a Westgate owner?

25       A    The same answer.  I would say less than a

1   handful.

2        Q    And did those successful negotiations end in a

3   written agreement with the developers?

4        A    Or a letter saying we've decided to take back or

5   prepare our own deed where we take it back.

6        Q    And when were those, if you can recall?

7        A    They were very early in the development of the

8   program.  Probably in 2008, '09, '10.

9        Q    Any since 2013?

10       A    I am not aware of any.

11       Q    So for any clients of yours or those for whom

12   you're providing services as a result of a referral that

13   own an Orange Lake or Westgate timeshare, the only methods

14   of exit were either resignation, deed back to resort or

15   deed to associate, correct?

16       A    Correct.

17       Q    And whether you got a particular customer through

18   T.E.T. or you got one directly, your processes for how you

19   handled those three types of exits were the same, correct?

20       A    Correct.

21       Q    It's just that for those that were referred to

22   you from T.E.T., all of the things that you're telling me

23   you would tell your client -- your direct clients, you

24   don't know whether those people were told that

25   information?

Mitchell Sussman
October 03, 2018                    97

1     A     I have no idea.

2     Q     The resignation, does it matter what type of

3   timeshare the individual owns?

4     A     Yes.

5     Q     And -- and what type of timeshare ownership would

6   be subject to a resignation?

7     A     Non-deeded.

8     Q     Do you know what type of timeshare ownership

9   Orange Lake has?

10     A     I believe that it may have both.  I know that it

11   has deeds, but I'm not sure if some of the developers at

12   Orange Lake acquired had a point system.

13     Q     Have you looked into that for those that you have

14   sent -- for those Orange Lake owners on whose behalf you

15   sent Notices of Resignation?

16     A     I think that with Orange Lake and Westgate, that

17   the ultimate cancellation or exit is either a deed to a

18   third party or a deed back to the resort.

19           I don't believe we used resignations for Orange

20   Lake per se.  Certainly, we wouldn't if any of the

21   property was deeded, so that's why one of the things that

22   I must know is, "Do you have a deed?"  And, "If so, please

23   provide it."

24     Q     Do you know whether or not you have sent these

25   Notices of Resignation to Orange Lake and Westgate?

Mitchell Sussman
October 03, 2018                    98

1        A     I'm sure that I have.

2        Q     Do you know whether you've done it for properties

3    that were deeded?

4        A     I may have, but I know that the letters also

5    contain in the abundance of caution the request that they

6    accept a DIL, which I assume you know, but for the record,

7    that means a deed in lieu.  It is in a form letter that

8    every single one of my letters contains at the very

9    outset.

10       Q     Right.  Your form letters run the gamut

11   regardless of the particular circumstances of the owner.

12       A     Right.  And it -- we -- we always -- you have

13   them, thousands of them, hundreds of them, whatever.  You

14   have them, right?  They all say the same thing.  "Please

15   take back your timeshare."

16       Q     And -- and when you -- you used some Latin phrase

17   earlier, but when you run into developers like Orange Lake

18   and Westgate that have told you definitely that they are

19   not going to negotiate these things --

20             MS. KROLL:  Sorry.

21             MR. BACKMAN:  You scared me.

22   BY MR. BACKMAN:

23       Q     -- do you take any of that into consideration --

24       A     Sure.

25       Q     -- before you move on to the next process of just

Mitchell Sussman
October 03, 2018                           101

1           MR. BACKMAN:  All right.  So why don't we run

2      through this tape and then we will take a break.

3      BY MR. BACKMAN:

4           Q     For the deed back to resort, can you describe

5      what that means to me -- to you?

6           A     It's exactly that.  We prepare a deed, and we

7      give it back to the developer.

8           Q     For Westgate, do you know whether Westgate in its

9      contractual documents with its owners has first right of

10     refusal?

11          A     I do.

12          Q     For the deedbacks to Westgate, has Westgate ever

13     agreed to accept one?

14          A     No.

15          Q     Has Westgate told you that it will not accept?

16          A     They have written me some letters.  Some of them

17     years after.  Some of them months after, but, yes, they

18     eventually will communicate with my office and say, "We do

19     not wish to accept these deeds back."

20          Q     Have they told you over the course of the last

21     five years that they will not accept deedbacks?

22          A     Yes.

23          Q     Did they tell you in 2013?

24          A     I don't believe so.

25          Q     Did they tell you in 2014?

Mitchell Sussman
October 03, 2018                                    102

1      A    I don't believe so.

2      Q    Did they tell you in 2015?

3      A    Maybe in '15.  More likely in '16 or '17.

4  Probably not before -- certainly not before then.

5      Q    Have you deeded back properties to Westgate since

6  being notified that it does not accept that practice?

7      A    Yes.

8      Q    Why?

9      A    Because I think that their response is not

10  sufficient as a rejection of it.

11      Q    Do you believe that you can deed back a property

12  to Westgate and sufficiently have your clients, air

13  quotes, exited from their timeshare obligations even

14  though the developer has told you that it doesn't accept

15  it?

16      A    Yes.

17      Q    On what basis?

18      A    Various laws.

19      Q    What laws?

20      A    Real estate laws.

21      Q    Which ones?

22      A    The ones that I rely on.

23      Q    Can you tell me any of them?

24      A    They are cited in briefs.

25      Q    Does it matter what state you're in?

Mitchell Sussman
October 03, 2018                                    103

1      A    Does it matter what state you're in?  It may, but

2  in the State of Florida, there is some specific laws that

3  I'm familiar with.

4      Q    You're familiar with them, but not enough to tell

5  me what they are?

6      A    Well, they're -- they're cited in my briefs.

7      Q    Okay.  So --

8      A    I mean, I don't remember the name of the case,

9  but they are cited in my briefs.

10     Q    Other than what's in -- well, what briefs are you

11 referring to?

12     A    I filed a motion for summary judgment in

13 Westgate.

14     Q    So other than the case law that would be cited in

15 your motion for summary judgment, are you familiar with

16 any other authority that says that you can deed it back

17 despite your knowledge that the developer doesn't accept

18 it?

19     A    The general principal that prohibits restrictions

20 on alienation.

21     Q    Okay.  Are you done?

22     A    Yes.

23     Q    Okay.  Anything else?

24     A    No.

25     Q    Okay.  How about for Orange Lake?  Are you

Mitchell Sussman
October 03, 2018                          104

 1   aware -- strike that.

 2           Has Orange Lake advised you that it will not

 3   accept deedbacks?

 4      A    It may have.

 5      Q    Do you know when?

 6      A    It would only have been recently.

 7      Q    Do you know as a practice that Orange Lake

 8   doesn't accept deedbacks?

 9      A    I don't think I've received much, if any, in the

10   way of their refusal, but, again, even if they had

11   refused, it wouldn't affect my legal opinion about it.

12      Q    Do you -- do you tell your clients that -- do you

13   tell your clients that Westgate and Orange Lake don't

14   accept deedbacks?

15      A    I tell my clients that they don't accept

16   anything.

17      Q    Do you explain to your clients the risks

18   associated with you deeding it back despite the knowledge

19   that it's not accepted by the developer?

20      A    Sure.

21      Q    And what -- what are those risks?

22      A    That they can be foreclosed upon.

23      Q    Any other risks?

24      A    Well, conceivably, there could be some litigation

25   over it.

Mitchell Sussman
October 03, 2018                           105

1      Q      They could get sued for breach of the note?

2      A      That could happen.

3      Q      It has happened, no?

4      A      I'm -- if you're aware of a case, maybe it has or

5   maybe it hasn't.  I don't have a specific recollection.

6      Q      Are you aware of any circumstances where an

7   Orange Lake or Westgate owner subsequently was the subject

8   of a foreclosure action after one of your deeds?

9      A      Sure, hundreds of them.

10     Q      Okay.  Do you represent them in those adverse

11  actions after your deeds are --

12     A      They're in rem actions.

13            You don't know what that means, right?

14     Q      What does that mean?

15     A      I'm not going to have to give you, like, legal

16  advice at this point, but I have hundreds of them.

17     Q      What's -- what's an in rem action?

18     A      I -- you know what?  I suggest that we take a

19  break.  You go do some research, and then you will know

20  exactly what an in rem action means.

21     Q      You used the phrase so I'm curious what it is.

22     A      Well, it's an action whereby they take back the

23  property.

24     Q      Okay.  Do you represent them in those actions?

25     A      I don't need to.

Mitchell Sussman
October 03, 2018                                    106

1      Q     Why not?

2      A     Because they are taking back the property.

3      Q     It's a foreclosure action, is it not?

4      A     Yes, of course.

5      Q     And that is something that your clients are the

6  subject of, no?

7      A     And I let them know at the very outset.

8      Q     And you don't provide that in writing, though,

9  right?

10      A     What I provide in writing is -- you need to

11  understand that there are negative credit implications of

12  any debt cancellation.  Any debt cancellation of any kind,

13  whether it's bankruptcy -- and, by the way, bankruptcy

14  attorneys don't interfere with anybody's contract even

15  though they get them to not pay.

16          This is a very simple -- this is debt work.  This

17  is work by an attorney who is experienced in the field of

18  debt adjustment, and in every single piece of debt

19  adjustment work of any kind that I have done in 41 years,

20  there is always the potential of negative credit

21  consequences.

22          And believe me, we tell people, and I in

23  particular tell them if they are not willing to accept

24  that as a result, they should keep their timeshare.

25      Q     Is that what your website says?

Mitchell Sussman
October 03, 2018                    107

1    A    It's all there for you to look at.

2    Q    Is that what the YouTube video said?

3    A    I have -- that YouTube video is about ten years

4    old.  I have no idea what even the content of that video

5    is right now.

6    Q    Have you ever seen T.E.T.'s marketing?

7    A    No.

8    Q    Do you know whether that's what T.E.T.'s

9    marketing says?

10   A    I have no idea.

11   Q    Do you know whether the marketing that T.E.T.

12   utilizes says that they can get you out for any reason

13   with no negative consequences?

14   A    I have no idea, and I certainly hope that that's

15   not what they say.

16   Q    Do you think you should know that since you are

17   providing services to their customers and you believe that

18   their customers should actually know that there are

19   negative consequences?

20   A    Again, this is the part of her objection that I

21   guess --

22   Q    I am not asking what you told them.  I am asking

23   you whether you should know that.

24        MS. BAKER:  Yeah, to the extent that you happened

25   to disclose advice to Reed Hein, I'm going to instruct you

Mitchell Sussman
October 03, 2018                                    108

1    not to answer.

2           THE WITNESS:  All right.  Well, then --

3    BY MR. BACKMAN:

4      Q    It's not.  I'm asking whether you think you

5    should know that.

6      A    I know that.

7      Q    No, whether you should know whether they're

8    telling their customers that or not.

9      A    Oh, I do know if they are or are not telling them

10   that.  I do know if they are or not.

11          I don't know what they're doing now.  I am not

12   working with them on a -- I certainly knew -- in 2013,

13   2014, 2015, et cetera, I knew.

14     Q    Did you ever review any of their marketing during

15   that time period?

16     A    No.

17          MR. BACKMAN:  We have to stop.  We have got to

18   change the tape.  We might as well get some lunch.

19          THE VIDEOGRAPHER:  The time is now approximately

20   12:28 p.m.  We're off the record.

21          (A lunch recess was taken from 12:28 p.m. to 1:03

22   p.m.)

23          THE VIDEOGRAPHER:  Here begins Media Number 3 in

24   the videotaped deposition of Mitchell Reed Sussman.  The

25   time is now approximately 1:03 p.m.  We're back on the

Mitchell Sussman
October 03, 2018                    110

1      Q    Okay.  Go ahead.  And you pay them a hundred
2  dollars?
3      A    I pay them a hundred dollars a deed, and then at
4  that point, they can either use it, sell it, do whatever.
5  A lot of times they try and get money for it either on
6  eBay or wherever.
7      Q    Are these all people you know?
8      A    Essentially, yes.  I do this as a kindness to
9  them because they need the money.
10     Q    How is it a kindness to them?  That's the part
11 I'm not following.
12     A    If I sent you a thousand deeds at a hundred
13 dollars a deed, you would have a hundred thousand dollars.
14     Q    Do you send them all of the underlying paperwork
15 associated with that timeshare ownership?
16     A    We send them whatever, you know, information that
17 we have.  Mostly the maintenance statement.
18     Q    Do you tell these people that they have to
19 fulfill the continued timeshare obligations when they take
20 the transfer?
21     A    We tell them that they can do with it as they
22 please.
23     Q    So is that a "no" to my question?
24     A    (No audible response.)
25     Q    My question was:  Do you tell them that they have

Mitchell Sussman
October 03, 2018                    111

1   to continue to fulfill the associated timeshare

2   obligation?

3       A    We tell them that there is an associated

4   obligation.  They understand the term "maintenance fees."

5       Q    Are there any other obligations?

6       A    I do not -- I do not instruct them what to do

7   once they get it.

8       Q    Do you tell them that they don't have to pay

9   those maintenance fees?

10      A    No.

11      Q    The people on whose behalf that you're sending --

12  strike that.

13           Your client is transferring the deed in this

14  particular deed to associate program?

15      A    Uh-huh.

16      Q    Your client is transferring the deed to a third

17  party, correct?

18      A    Right.

19      Q    Because your client doesn't want to be in the

20  timeshare obli -- doesn't want to deal with the timeshare

21  obligations any longer, correct?

22      A    Yes.

23      Q    And that's how you advertise, right?  "If you

24  have a timeshare" --

25      A    I do not advertise.

Mitchell Sussman
October 03, 2018                                   112

```
 1      Q    Okay.  Sorry.
 2           Your website says, "If you have a timeshare and
 3    you don't want to be in it anymore and you want to get
 4    out, come to me," right?
 5      A    It speaks for itself.  What it says very clearly
 6    is, "Try and work it out with your developer."
 7      Q    Right, but the whole point of your
 8    timeshare-related business, be it through third-party
 9    relationships you have or direct referrals that come to
10    you through some word of mouth or somebody looking at your
11    website, you are trying to get in, quote, timeshare
12    clients for the purpose of getting those people out of
13    their timeshare obligations, right?
14      A    That is the goal is to free these people of the
15    financial obligations that are part and parcel of
16    timeshare ownership.
17      Q    Right.
18           And so you find third-party, you call them,
19    associates, and you pay them a hundred dollars to take the
20    burden that your client no longer wants?
21      A    Correct.
22      Q    And you consider that to be a kindness?
23      A    Let me --
24           MR. MCGIRNEY:  I object to the form.
25    ///
```

Mitchell Sussman
October 03, 2018                    113

1   BY MR. BACKMAN:

2       Q    You can answer.

3       A    Yeah, I understand that.

4            Let me expound on that phrase if I may.

5       Q    Please, because I don't understand it.

6       A    Okay.  I literally have them pleading with me for

7   more deeds, so, yes, I consider it a kindness.  And when

8   they don't get them, they say, "How come I only got two

9   deeds this month?  I want more."

10           So, yes, I consider it a kindness.  I'm helping

11  them pay their food bill, their electric bill, their rent

12  bill, their mortgage, et cetera.  It's a form of income to

13  them.  So, yes, again, I consider it a kindness.

14      Q    When you pay these people a hundred dollars per

15  deed, do you 1099 them for those payments?

16      A    Yes.

17      Q    Are -- these folks that you're deeding these

18  properties to, are they also the people that you're

19  sending the information for preparation of letters of

20  representation and other things?

21      A    Not necessarily.

22      Q    Are there -- is there some overlap with some of

23  the folks?

24      A    There is.

25      Q    And which ones?

Mitchell Sussman
October 03, 2018                    114

```
 1      A     There was with Fawn, but Fawn no longer works --
 2  does any work.  She has moved out of state.
 3      Q     That is Fawn Weaver?
 4      A     Yes.
 5      Q     Okay.
 6      A     She has moved out of state.  I do not know where
 7  she is.  She no longer gets deeds, and she no longer
 8  writes letters.
 9            There is with Yanni.  She still writes letters
10  and receives deeds.
11            Tom never wrote letters, Stanford.
12            Durst is a real estate agent who just needs more
13  money, so he doesn't write letters.
14      Q     We are going to go through some of them --
15      A     Yeah.
16      Q     -- so we will see all of the names --
17      A     Yeah.  Yeah.
18      Q     -- and you just let me know.
19            Do you tell these third parties that they're
20  obligated to -- I think I asked you this, but that they're
21  obligated to pay maintenance?
22      A     They understand that because -- they get the
23  fact, because I tell them in very clear terms, A, "You may
24  receive phone calls from the timeshares if you don't pay,
25  and, B, you will certainly get negative credit reporting
```

Mitchell Sussman
October 03, 2018                    122

1      Q     You don't represent to your clients upon the

2  completion of a deedback or a deed to associate that

3  they're done, and they're relieved of all of their

4  obligations?

5      A     I represent to them that once they are no longer

6  on title, that they are relieved of their obligations.

7  Yes, of course I tell them that.  And if they're not and

8  there's any action of any kind to collect on a note or

9  maintenance against them, I will refund their money.

10     Q     Do you agree with me that the note is a separate

11 obligation from their maintenance obligations associated

12 with title?

13     A     Sure.

14     Q     Okay.  By being relieved of ownership, if you

15 will --

16     A     Right.

17     Q     -- in light of the deeds that you prepare, they

18 are still responsible for their note, correct?

19     A     Not necessarily.

20     Q     Under what circumstances would they not be

21 responsible to pay their contractual obligations?

22     A     If the note is attached to a piece of property,

23 then there are antideficiency laws in states.

24     Q     You believe that you're -- whether it's a

25 deedback resignation, or deed to associate, it eliminates

Mitchell Sussman
October 03, 2018                    123

1    the contractual obligations that the owner has to the
2    developer under the terms of the note?
3        A    Again, the answer to this depends upon the
4    existence of antideficiency laws and remedies that are
5    attached to a piece of real estate so --
6        Q    So what state would -- would somebody be relieved
7    of their contractual promissory note obligation simply
8    because you deeded the timeshare to one of your
9    associates?
10       A    California.
11       Q    Okay.  Any others?
12       A    There's a whole host of them, but, again, I'm not
13   prepared to talk about them at this moment because there
14   are many.  As a matter of fact, most of the states are
15   that way.
16       Q    Okay.  More than 50 percent of the states in the
17   country are that way?
18       A    Well, here's -- here's what I can tell you about
19   this.  That I can tell you that over the past ten years, I
20   am aware of perhaps, and this is even perhaps -- probably
21   a third, but perhaps a handful of lawsuits on a promissory
22   note related to timeshares.
23       Q    Okay.  What does that have do with anything in
24   terms of my question I was asking?
25       A    You just asked me to --

Mitchell Sussman
October 03, 2018                    124

1      Q    No, I asked you in what states does the practice

2  that you engage in, in deeding these to third parties

3  relieve automatically the owner of the timeshare from his

4  or her contractual promissory note obligation?

5      A    In all of the states -- the answer very simply is

6  in all of the states that have antideficiency legislation.

7      Q    What is antideficiency legislation?

8      A    I am not going to teach law here, okay?  If you

9  do not know what it is, then I am sorry.

10     Q    Do you know what it is?

11     A    Oh, I'm very familiar with it.

12     Q    Okay.  Tell me about it then.

13          You're telling me that the reason you do this is

14  because you think it's legal, and the reason you think

15  it's legal is because of some what?  Say it one more time.

16     A    You don't know what it is, right?

17     Q    Say it one more time.

18     A    I don't have to say it one more time.

19     Q    Anti something.

20     A    Why don't you read it back?

21     Q    It's okay.

22          You're telling me that the reason why it's legal

23  is because of whatever this is that you just mentioned.

24  I'm asking you to tell me about it, and you can't.

25     A    Oh, I can.  I choose not to because --

1      Q    Okay.

2      A    -- this is a legal question.  That I am not here

3  to teach law.  I gave you the answer as to why.  There is

4  a thing called antideficiency legislation just like there

5  is a thing known as an in rem action.

6      Q    Sure.  So you're refusing to answer my question

7  as it is?

8      A    I am not refusing to answer your question.

9      Q    So please tell me what it is then.

10     A    It's legislation that exists that prevents people

11 from suing on notes.  That's what it is.

12     Q    Okay.  Are you familiar with the contracts that

13 exist between your clients and the timeshare developers?

14     A    Yes.

15     Q    And you're familiar that contracts exist between

16 Orange Lakes -- the Orange Lake owners and Orange Lake,

17 correct?

18     A    Yes.

19     Q    And you're familiar that there are contracts that

20 exist in the Westgate clients that you represent between

21 those clients and Westgate, correct?

22     A    Yes.

23     Q    Are you familiar that -- with the concept of the

24 first right of refusal?

25     A    Yes.

Mitchell Sussman
October 03, 2018                    126

1      Q     Are you aware that both the Orange Lake and

2   Westgate contracts have a first right of refusal clause?

3      A     Yes.

4      Q     What do you do before you deed a property back to

5   one -- sorry.

6            Before you deed a property to an associate, what

7   do you do to comply with the contractual obligation to

8   provide those developers with their first right of

9   refusal?

10     A     Do you even have one of my letters here in these

11  exhibits, because it's right there in my letter.

12           MR. BACKMAN:  Can you just repeat the question

13  for me, Madam Court Reporter?

14           (Record read:  "Q  What do you do before you

15           deed a property back to one -- sorry.

16           Before you deed a property to an associate,

17           what do you do to comply with the contractual

18           obligation to provide those developers with

19           their first right of refusal?")

20  BY MR. BACKMAN:

21     Q     Can you answer that question?

22     A     I ask them if they want to exercise it.

23     Q     In every instance before you deed it back to an

24  associate, you've asked either Orange Lake or Westgate

25  whether they want to exercise their first right of

Mitchell Sussman
October 03, 2018                              127

1   refusal?

2       A    Not only Orange Lake and Westgate, but every

3   timeshare on the face of the planet.   That is the first

4   thing that I ask them.

5       Q    Do you do that in writing?

6       A    Yes.   That's why I said, "Where are my letters?"

7       Q    Sure.

8            So your position is that the form letter -- what

9   you -- I think what you term letter of representation.   Is

10  that -- do I have that right?

11      A    I don't call it that.

12      Q    Okay.   Your -- your form letters that you send

13  upon being retained by a client or being referred a client

14  from one of the third-party exit companies has language

15  that you believe complies with the contractual obligation

16  to provide the developer with a first right of refusal?

17      A    Yes.

18      Q    At the time that you send those demand letters,

19  have you decided what -- which of your exit strategies

20  you're going to employ for a particular customer?

21      A    No.

22      Q    Is there any communication between the grantor

23  and the grantee in these deed to associate transactions?

24      A    Sometimes there may be.

25      Q    In what instances?

Mitchell Sussman
October 03, 2018                    129

1       A    A hundred dollars.

2       Q    Well, that's from you, correct?

3       A    Yes.

4       Q    All right.  To the person acquiring the deed in

5  the transaction, right?

6       A    Correct.

7       Q    If the person that's acquiring the deed, the one

8  essentially buying it in this transaction, does that

9  person provide any consideration to your client in

10 exchange for this deed?

11      A    They receive the -- the grantee receives a

12 hundred dollars.

13      Q    Right.  So what you're saying is the seller pays

14 the buyer.  That's what you're saying.  The seller pays

15 the buyer by way of the lawyer paying the buyer?

16 That's -- that's what you're telling me?

17      A    That the seller is not paying the buyer.  They're

18 paying me, but it would be a fair statement to say that,

19 that hundred dollars is built into whatever fee that I

20 charge, so that I wouldn't charge $90 for someone to get

21 out of their timeshare.

22      Q    When you charge the fee, do you know the way in

23 which you're going to accomplish the exit?

24      A    No.

25      Q    So you have no idea if you're going to deed it to

Mitchell Sussman
October 03, 2018                    130

1   an associate when you charge the fee?

2       A    Correct.

3       Q    Okay.  What money goes from your associate back

4   to the client?

5       A    None.

6       Q    Do you believe that for a deed in the

7   deed-to-associate-type transaction that the person

8   receiving the deed needs to provide some sort of

9   consideration to the person providing the deed?

10      A    Are you asking me whether or not the people that

11  buy timeshares are paying for the timeshares?

12      Q    No, I am talking about your deed to associate

13  transactions.

14      A    Yeah, they're giving money to the person who owns

15  it just like the timeshare owner is giving money to

16  Westgate or Orange Lake.  The person who is the grantee is

17  giving the money to the grantor.  That's what's happening

18  in those transactions.

19      Q    No.  You told me before that you consider the

20  grantee to be your associate, correct?

21      A    That has been asked and answered multiple times.

22      Q    Am I right?

23           Well, you just reversed everything so I'm just

24  curious.

25      A    The grantee is -- in the transaction that you

Mitchell Sussman
October 03, 2018                                    131

```
 1   have referred to as deeds to associates --
 2       Q     Let's go back.  Let's just talk about the
 3   associate.
 4             The only person in the transaction to these deeds
 5   to associates that get any money is the associate?
 6       A     The associate receives money, a hundred dollars.
 7       Q     Right.
 8             That is the only one in the transaction that gets
 9   any money, correct?
10       A     That receives a check, yes.  They receive a
11   check.
12       Q     Did you yourself prepare any of the deeds in
13   these deed to associate transactions?
14       A     No.  As you know, I hire attorneys to do that.
15       Q     Do you know what they say?
16       A     Do I know what who says?
17       Q     What the deeds say.
18       A     These are quitclaim deeds.
19       Q     Okay.  Do you know what the basic language and
20   terms is?
21       A     I have read them.
22       Q     Do you know whether it says that a consideration
23   was exchanged?
24       A     Ten dollars.
25       Q     Yeah.
```

Mitchell Sussman
October 03, 2018                    132

1              Was $10 paid from your associates to the

2    seller -- I'm sorry, to the folks that were conveying the

3    title?

4        A    There was actually more than $10 paid by the

5    person who was deeding the property, the consideration.

6        Q    One of us is -- is misunderstanding the other.

7        A    Okay.  Well, that's --

8        Q    The deeds say -- I am going to just use plain

9    language.

10       A    Yep.

11       Q    Bob is conveying title to Associate X --

12       A    Yeah.

13       Q    -- right?

14            The deeds say that in exchange for Bob deeding

15   that property to Associate X, Associate X is paying -- in

16   fact, it says it has paid, $10 to Bob.

17       A    It's a recital.

18       Q    Did that ever happen?  Did any associate ever pay

19   $10?

20       A    To the grantor?

21       Q    Yeah.

22       A    No.

23       Q    Okay.

24       A    It's a recital.

25       Q    What is that -- what do you mean by that, that

Mitchell Sussman
October 03, 2018                                    133

1    it's a recital?

2        A    It's something that needs to be recited in order

3    to have a deed recorded.

4        Q    It doesn't need to be true?

5        A    In -- in point of fact, the grantor is receiving,

6    in my estimation, tens of thousands of dollars worth of

7    consideration, if not more, much less $10.

8        Q    That's nice that you want to throw that in now,

9    but is that what the deed said?

10       A    The deed says what they need to say in order to

11   be effective.

12       Q    Right.  So I am back to my original question.

13            To be effective, it has to say that, that

14   consideration was exchanged, right?

15       A    Right.  It has to -- it has to recite some form

16   of consideration.

17       Q    Does it actually have to be true?

18       A    It's more than true.

19       Q    Okay.  Even though -- even though in none of

20   those deed to associate transactions did the grantor

21   actually receive the $10 as reflected --

22       A    You know, we can go back to law school, but I

23   think we all know that consideration consists of a number

24   of things, not only the payment of money.

25       Q    You're just not answering my question.  You keep

Mitchell Sussman
October 03, 2018                              134

1    talking around it.  In --

2        A    I'm not going to give you an answer that you

3    think you want.

4        Q    Is there --

5        A    I'm going to give you the real answer.

6        Q    Sure.

7             Is there a single transaction in your deed to

8    associate practice where the associate actually paid the

9    amount of consideration set forth in the deed?

10       A    Asked and answered, and I will answer it again.

11            The associate does not pay $10.  The grantor

12   receives consideration in the form of relief from their

13   ongoing obligations which from Contracts 101 is

14   consideration, and it's far more than $10.

15       Q    And that's your answer for all of your deed to

16   associate deeds?

17       A    My answer for all of the deeds to associates is

18   directly the associate does not pay $10.

19       Q    Okay.

20       A    They provide other consideration.

21       Q    What do you do --

22       A    Do you understand what I just said, that they

23   provide other consideration?

24       Q    What do you do to ensure that these third-party

25   associates actually have the ability and intent to pay the

Mitchell Sussman
October 03, 2018                    135

1   timeshare obligations once they acquire the property?

2        A    Nothing.

3        Q    You said that you believe that your form demand

4   letters provide in this circumstance in this case, either

5   Orange Lake and/or Westgate, with their option to exercise

6   their first right of refusal.  Do I have that right?

7        A    Absolutely.

8        Q    Have they ever exercised that right?

9        A    I don't know the answer to that.

10       Q    Have they told you that they will not?

11       A    That they will not exercise the right?

12       Q    Correct.

13       A    I don't know if they write that directly, but

14  since they refuse to accept the property back when I offer

15  it to them, I infer that to mean that they're not

16  accepting their right of first refusal since I'm offering

17  it to them for zero.

18       Q    So your position that you offer them a right of

19  first refusal is the language in your form demand letter

20  where you say that your client is willing to sign a deed

21  in lieu?

22       A    Absolutely.

23       Q    Do you tell them in the form demand letters that

24  you're going to -- that your client, I guess, has some

25  desire to deed the property to a third party?

Mitchell Sussman
October 03, 2018                    136

1        A     No.

2        Q     Isn't that where the right of first refusal

3    arises?

4        A     You can make that argument.  I don't agree with

5    it.

6        Q     Have you read the contract?

7        A     I believe that it arises when they sign the

8    contract, and then if they want to unload, that's --

9    there's no right --

10       Q     I don't understand what you mean by that.

11       A     Okay.  Well, there is no right of refusal unless

12   the customer signs the contract.

13       Q     What contract?

14       A     With Orange Lake.

15       Q     Right.  So --

16       A     That kind --

17             THE REPORTER:  I'm sorry.  Can you repeat your

18   answer?

19             THE WITNESS:  Are we on -- are we on the same

20   page here?

21             There is no right of first refusal whatsoever

22   unless the timeshare owner signs a contract with Orange

23   Lake or Westgate.

24   BY MR. BACKMAN:

25       Q     How does your client that's coming to you to get

Mitchell Sussman
October 03, 2018                    140

1      Q    Do you believe that the right of first refusal

2   kicks in when you want to transfer or deed the property to

3   a third party?

4      A    I think that they have already waived their

5   right, so, no.

6           Is that a clear answer?

7      Q    No, it's not.

8      A    Well, but that's what it is.  That's my opinion.

9           In other words, once I offer it to them for

10  nothing, for absolute bagel, zero, why in God's name would

11  I think they would want to pay a hundred dollars or a

12  thousand dollars or $10,000 when I've offered it to them

13  for zero?

14     Q    Have either Westgate or Orange Lake ever

15  consented to one of your deed to associate transactions?

16     A    They have written letters, I believe, stating

17  that they are ineffective, "Because you have failed to

18  offer us the right of first refusal."

19     Q    And in those circumstances, do you tell your

20  clients that despite this deed being executed and

21  delivered to a third party, that the developers believe

22  that your client is still the actual owner?

23     A    Yes.

24     Q    You tell all of your clients that?

25     A    Yes, that that's the developer's belief, and

Mitchell Sussman
October 03, 2018                    141

1   that's why they're still receiving maintenance fees.

2        Q    Do you tell your clients that they can ignore

3   that?

4        A    Essentially, yes, because I don't believe that

5   they are still the owners.

6        Q    And what about the clients that you get from

7   third-party exit companies?  Do they know this?

8        A    Well, I don't know what they know from the third

9   parties, but believe me, I tell all of the third-party

10  exit companies exactly what I just recited during the

11  course of this heated discussion which is, A, I believe

12  that by offering them the right of first refusal for free

13  and their refusal to accept it tells me that they've

14  waived it, because they're certainly not going to pay

15  10,000, 5,000, 2,000, 1,000 or even a hundred dollars

16  since I've already offered it to them for nothing.

17       Q    Are you aware of a single instance where any of

18  your associates ever paid anything to the developer after

19  a deed was delivered to them?

20       A    I believe that that's absolutely true, sure.

21       Q    Who has made a payment?

22       A    I can't tell you, you know, after ten years, but

23  I know that -- that some of these associates have wanted

24  to go on vacations.

25       Q    Who has gone on vacation?

Mitchell Sussman
October 03, 2018                    146

1    developer comes back later and actually acts upon its

2    rights?

3         In other words, your process of deeding to an

4    associate without getting the right of first refusal,

5    whatever it may be, all of the things that you said that

6    you do, there are risks associated with that.  I think you

7    agree with that, but the client is considered to be,

8    quote, successfully exited as long as the developer never

9    comes back and knocks on his or her door?

10        A    Absolutely, because that's all that they want,

11   never have to pay another dime.  That is what the client

12   is seeking as an ultimate resolution of their case.

13        Q    But it's not a permanent exit?

14        A    I don't know what that means.

15        Q    Well, I mean, the developer could come back at

16   any time and act upon its rights.

17        A    Well, I think we all know what a statute of

18   limitations is, but be that as it may, I am not here to

19   teach law.

20        Q    I'm not sure that was an answer to my question.

21        A    I think your question implied that ten years from

22   now the developer could come back.

23        Q    Can they?

24        A    No.

25        Q    Okay.  What's the statute of limitations?

Mitchell Sussman
October 03, 2018                    180

1      Q      Did you ever have any in-person meetings with

2    Mr. Treiger?

3      A      They flew down to meet me in Beverly Hills, the

4    three of them.  I think I testified to that.

5      Q      That's right.

6             Other than that one?

7      A      No.

8      Q      Do you know who Dan Costco is?

9      A      I heard his testimony.  I don't know or have not

10   met him.  I heard.  I sat in on his deposition.  He was

11   CFO or some such thing for --

12     Q      Did you ever speak with him?

13     A      I never spoke to him.  He might have been sitting

14   in on one of the conference calls that took place.

15     Q      But you're not sure?

16     A      I have no idea if he did or did not sit in on a

17   conference call.  I certainly did not speak to him

18   directly.

19     Q      When T.E.T. decided that it no longer wanted you

20   to do the deeds to associates and, in fact, they asked you

21   to deed -- deed them back, correct?

22     A      Yes.

23     Q      What did T.E.T. tell its customers with respect

24   to those transactions and why those deeds needed to be

25   undone?

Mitchell Sussman
October 03, 2018                                    181

1      A     I have no idea.

2      Q     Did you tell them to tell those customers

3  anything?

4      A     No.

5      Q     Those people were T.E.T.'s customers that you

6  were performing legal services on behalf of?

7      A     Correct.

8      Q     And you have told me repeatedly that you never

9  spoke to T.E.T.'s customers, correct?

10     A     Well, again, someone might have called my office.

11     Q     Understood.  I just mean specifics.

12           You never intentionally spoke to somebody that

13  was a T.E.T. customer?

14     A     Absolutely not.

15     Q     So when this occurred and there was this practice

16  that T.E.T. wanted you to undo, in order to effectuate the

17  transfer of the timeshare now from one of your associates

18  back to the original owner, did you have any conversations

19  with the original owner?

20     A     Not that I recall, no.

21     Q     Did you ask them if they wanted it back?

22     A     Not that I recall.

23     Q     Did T.E.T. tell you that they wanted it back?

24     A     I don't think that was actually their -- their

25  concern.

Mitchell Sussman
October 03, 2018                                182

1    Q    Did T.E.T. ever tell you that the original owner
2  wanted it back?
3    A    No.
4    Q    Do you know whether anybody provided that
5  original owner with any information as to all of the
6  obligations that, that person is now going to be under
7  again since they -- that person was previously told they
8  were out?
9    A    Well, I'm glad we agree on that point.
10        I don't know what T.E.T. said to them to be
11 honest.  I really don't.
12   Q    Did it cause you any concern as the lawyer
13 effectuating this transfer of property not speaking to the
14 individual that was receiving it?
15   A    Well, I absolutely -- these were the arguments.
16 I thought that Louis Treiger didn't know diddly-do about
17 the real estate business.  That's all.
18   Q    Right.  So you had some concerns, it sounds like,
19 with deeding it back to these people without them knowing
20 that, that was occurring.
21   A    Well, I was instructed to do this by T.E.T. and
22 the brilliant Mr. Louis Treiger.
23   Q    Do you know what happened once those deeds were
24 delivered to these original owners that previously thought
25 that they no longer owned that property?

Mitchell Sussman
October 03, 2018                        183

1      A     No, because I had performed the service that I
2  was asked to do.
3      Q     Did you keep the money that you were paid in
4  connection with those particular customers?
5      A     Of course, because I did the work that they asked
6  me to do.
7      Q     Once the -- once the deeds from the associate
8  was -- sorry.
9            Once the associate deeded the property back to
10 that particular T.E.T. customer, did you continue to
11 handle that file?
12     A     No.
13     Q     Do you know who did?
14     A     No.
15     Q     At the time that T.E.T. finally said, "Hey" -- I
16 think you said sometime in 2016 they finally said, "Hey,
17 we" -- "we don't want you" -- "we're not going to send you
18 anymore customers," did they take back customers that they
19 had previously referred to you?
20     A     They -- over the course of time from 2016 through
21 today even, there are lists that I would say that they
22 would send me every six months or so in which they asked
23 that I send non-rep letters and close the file.
24     Q     They're still sending you those every six months
25 or so?

Mitchell Sussman
October 03, 2018                    191

1    with?

2        A    Exactly.

3        Q    Right.

4             And do you take any notes with respect to the

5    particular circumstances relating to yours or your

6    associates handling of a particular file?

7        A    I don't take notes.

8        Q    Do your associates take notes and put them in a

9    file?

10       A    You would have to ask them directly because --

11   again, because I'm doing these files for so little, the

12   only way it makes sense for me to do this is to literally

13   assign the files to these independent contractors.  Each

14   of which does its own little thing.

15            You've heard the name of Jeffrey Corcoran, right?

16       Q    Uh-huh.

17       A    Okay.  So you know what Jeffrey does.  Jeffrey

18   prepares --

19       Q    -- prepares a lot of deeds.

20       A    That's exactly what he does, and I pay him to do

21   that, right, and so then, you know, everybody has their

22   own little thing.  I pay them.

23            He sends me an invoice.  "I did a hundred deeds."

24   He says, "You owe me $5,000," or whatever.  That's the way

25   it works.

Mitchell Sussman
October 03, 2018                    190

1    recollection of him and the circumstances surrounding the

2    exit of his timeshare?

3        A    I don't.

4             You need to understand that in ten years, 10,000

5    is a conservative number.  I mean, I've got 7800 from one.

6        Q    What do you think a more realistic number is?

7        A    You know, I don't need to go on record.  I've

8    done a lot.  Let's just say thousands and thousands and

9    thousands.

10       Q    Do you have any independent recollection of a

11   single client and the particular circumstances surrounding

12   his or her exit, or do they all kind of blend together?

13       A    They mostly blend together.

14            There are some that -- how can I say this?  There

15   are some that were plaintiffs in lawsuits that I have a

16   clearer recollection of than the thousands and thousands

17   of files that I handled in a non-litigation way.  Those,

18   you could probably throw out 50 names and I would say I

19   have no recollection of that.

20            When you're dealing with thousands and thousands

21   and thousands of files -- and, oh, by the way, I'm 67

22   years old.

23       Q    Well --

24       A    I don't remember a whole lot of things.

25       Q    And 90 percent of them you never meet or speak

Mitchell Sussman
October 03, 2018                                    196

1    doing a lot of business with T.E.T., they could send me a

2    hundred files in a week, all right?  They didn't, like,

3    wire transfer $50,000 with a list.  They just wire

4    transferred 50,000 in my hypothetical.

5        Q    The -- the form demand letters -- the formal

6    letters that you would send to the developers upon getting

7    assigned a case or being retained, they also told the

8    developers to no longer communicate with the owner; is

9    that correct?

10       A    Yes.

11       Q    And did developers such as Orange Lake and

12   Westgate start sending those owner's statements directly

13   to you?

14       A    Some of them did.  Some of them didn't.  Some of

15   them totally ignored the request not to communicate.

16       Q    When you would get statements for your clients or

17   customers that have been referred to you that were sent to

18   you by the developer, would you then send them to your

19   clients?

20       A    No.

21       Q    Why not?

22       A    The clients have access online to get anything

23   that they want from any of these developers at any time.

24       Q    If it came through for somebody related -- that

25   was referred to you through T.E.T., would you send the

Mitchell Sussman
October 03, 2018                    197

1    statements to T.E.T.?

2        A    No.

3        Q    Did you tell T.E.T. that, "Owner 'X'" -- "Owner

4    'X' is getting statements sent to me?"

5        A    They knew that some of these statements were

6    being sent to me.

7        Q    How did they know that?

8        A    Because we had conversations about that.

9        Q    You talked about the fact that you're now getting

10   owner statements?

11       A    I can get mail that's -- can you see this?  This

12   can be the mail that I receive in a day, (indicating).

13       Q    Okay.

14       A    They're -- they're maintenance statements.

15       Q    Right.  You get a lot of maintenance

16   statements --

17       A    Sure.

18       Q    -- because you send a lot of letters for the

19   10,000 or so --

20       A    Right.

21       Q    -- clients, right?

22       A    Right.

23       Q    And you just let those pile up in your office or

24   do you throw them away?

25       A    I consider them trash.

1    Q    You throw them away?

2    A    Yes.

3         Now, when I get a letter that says, "We're

4    foreclosing," on the other hand, that's not trash, or when

5    I get a letter that says, "We are exercising our right to

6    take back your timeshare," that is not trash.

7    Q    Right.  That, you send to the clients, and then

8    you tell the clients --

9    A    "Congratulations."

10   Q    -- "Congratulations.  You're out?"

11   A    Exactly.

12   Q    And then when the client calls you about the

13   foreclosure, you tell them that they have to give you more

14   money to defend them or don't worry about it?

15   A    Right.

16   Q    The same thing when the developer sues for breach

17   of the promissory note?

18   A    Which developer has sued for that?  I don't know.

19   Q    You are not familiar with any of those?

20   A    I'm not.

21   Q    Okay.  Something funny?

22   A    Yeah.

23   Q    What?

24   A    It's funny that you should be asking me these

25   questions when you should already know the answer to these

Mitchell Sussman
October 03, 2018                                    203

1    the money that I've paid them to represent me.

2            This is no different than what happens every day

3    when T.E.T. or any of the other third-party entities send

4    me money to represent their customers.

5        Q    When your lawyer wants to talk to you, does he

6    call you or does he have to contact the insurance company

7    and have the insurance company contact you?

8        A    He can call me if he wishes.

9        Q    Okay.  When you want to talk to him, can you call

10   him?

11       A    I just did three or four times.

12       Q    Right, at every break you've called him, correct?

13       A    Correct.

14       Q    And you have talked to him on a regular basis,

15   correct?

16       A    Right.

17       Q    Right.

18            And when you need documents to produce in the

19   litigation, he calls you.  He tells you, "You get them."

20   You give them to him, and you move on with the litigation,

21   correct?

22       A    Yes.

23       Q    Okay.  Do you see in the second paragraph there

24   it says:

25            "In light of the foregoing, they will no

U.S. LEGAL SUPPORT
www.uslegalsupport.com

Mitchell Sussman
October 03, 2018                                    204

```
 1              longer be making any payments on the
 2              timeshare"?
 3              Do you see that?
 4       A      Yes.
 5       Q      Is that in all of your form retainer letter --
 6   I'm sorry -- demand letters?
 7       A      Yes.
 8       Q      Then in the fourth paragraph it says:
 9              "Because my clients have no ill will towards
10              your company, they are prepared to execute a
11              deed in lieu or other appropriate document by
12              which my clients will return the timeshare
13              interest to you."
14              Do you see that?
15       A      I do.
16       Q      Okay.  Is that what you were talking to me about
17   before that you believe constitutes an effort to provide
18   Orange Lake and Westgate with their right of first
19   refusal?
20       A      Yes.
21       Q      And is that in all of your demand letters?
22       A      Yes.
23       Q      To Westgate and Orange Lake?
24       A      To anybody and everybody that is a timeshare
25   developer, and I -- also, if we can go to the second page
```

Mitchell Sussman
October 03, 2018                                  212

1     Q     I'm trying to be, but you keep talking in

2   circles.

3     A     I keep on telling you the same answer over and

4   over again.

5           It is very hard for me to parse out the specifics

6   of any individual file when I've handled in excess of

7   10,000 files.

8           This dates back to December of 2015.  I have

9   absolutely no independent recollection of this file or

10  virtually every other file.

11    Q     All right.  Is the basis for your writing this

12  statement at the time that you wrote it in all of your

13  form demand letters the prior description that you gave me

14  as to what you think a timeshare sales presentation

15  involves?

16    A     Are you trying to change my testimony?  I told

17  you as it relates to -- to Westgate, I've heard what David

18  Siegal says about his --

19    Q     Right.

20    A     -- about what they're supposed to do in order to

21  close the deal.  I heard him say it, and so did the rest

22  of the world.

23    Q     My question is:  When you prepared these form

24  demand letters, the form demand letter that you prepared

25  included this language of claims of misrepresentation and

Mitchell Sussman
October 03, 2018                              213

1    fraud, right?

2        A    Yes.

3        Q    And that was before you had ever spoken to any

4    particular customer on whose behalf the letter was going

5    to be sent, right?

6        A    I think we have established that I basically

7    don't talk to these customers, so that the information --

8        Q    Right.

9        A    -- would have to come from a third-party entity

10   that would be forwarding me the files, or in the ten

11   percent of the files that are based upon someone searching

12   and finding me on the web, then it would have to come from

13   the information that they would put in their Intake Form.

14       Q    Right.  But you're not changing your letter based

15   on any of that?

16       A    No, I'm not, because inherently -- be very clear.

17   Inherently, I believe that the tactics of the timeshare

18   industry are well known and not well respected because of

19   the pressure and the things that are said to these people.

20       Q    And so these letters that are not altered in any

21   way to account for the particular circumstances of the

22   particular client?

23       A    That is correct except to the extent that it goes

24   to a different developer, and there's different laws that

25   are cited in the letters depending on which developer I'm

Mitchell Sussman
October 03, 2018                              214

1    sending the letter to.

2              (Plaintiff's Exhibit 6 was marked for

3              identification.)

4    BY MR. BACKMAN:

5        Q    I'm going to hand you what I have marked as

6    Exhibit 6.  This is a letter dated April 1st, 2015 from --

7    I'm going to get this.  I'm going -- I'm not going to do

8    well with this -- Constructora Los Arcos Del Cabo

9    S-a-D-e-c-v.

10             Do you see that?

11       A    I do.

12       Q    All right.  And it's to you, correct?

13       A    It is.

14       Q    And it's referring to Robert Case and Ms. Cindy

15   Shute and their timeshare membership at that particular

16   place -- location that I just --

17       A    Right.

18       Q    -- butchered, right?

19             Did you receive this letter?

20       A    It's addressed to me.  I would assume that it got

21   to me.

22       Q    Do you have any reason to believe that you didn't

23   receive it?

24       A    No.

25       Q    Did you ever speak -- it's signed by somebody

Mitchell Sussman
October 03, 2018                                  216

1          foreclosure procedures, adverse reporting to

2          credit agencies and damage to your client's

3          credit rating.  If you would like to propose

4          a present value buyout settlement payment

5          that your client is willing to make to

6          terminate the purchase documents, I will

7          present that offer to the seller for

8          consideration."

9          Do you see that?

10    A    Yes.

11    Q    Was this in response to a letter where you

12   attempted to, quote, resign membership from this facility

13   on behalf your clients?

14    A    I think that's what it refers to.

15    Q    And do you see right under what I just read it

16   says and underlined, "Resignation of membership does not

17   release obligations due"?

18    A    That's her position.

19    Q    And she goes through and she tells you all of the

20   reasons why because you're citing perhaps U.S. statutes

21   and case law and she's in Mexico?

22    A    These are U.S. citizens.

23    Q    Okay.  So now it doesn't matter where the

24   developer is?  It matters where your clients are?

25    A    All of the files have different rationales behind

Mitchell Sussman
October 03, 2018                                    217

```
 1    them.
 2            This is, by the way, why you need an attorney to
 3    come up with a rationale for each particular file.
 4        Q    Okay.  So she -- you agree with me.  She goes
 5    through the reasons why your authorities are not binding
 6    on her, and she tells you that, and then she says on the
 7    bottom of the second page there -- it says:
 8                "Your letter indicates that it constitutes
 9                your client's formal 'Notice of Resignation,'
10                from the vacation club.  While your client
11                may have a right to resign, please understand
12                that such resignation does not relieve your
13                client of its obligations to pay the purchase
14                price, maintenance fees, and other obligations
15                associated with your client's membership."
16            Do you see that?
17        A    Okay.  I see it.
18        Q    And then she again asks that your client pay her
19    obligations.
20            What did you do when you received this letter?
21        A    What I always do, which is inform the client that
22    this particular developer is interested in a check of some
23    kind in order to secure a release.
24        Q    Did you provide a copy of this to your client?
25        A    Always.
```

Mitchell Sussman
October 03, 2018                     239

1     A     No.

2     Q     They send their work to various different

3  lawyers?

4     A     I -- I assume they do.

5     Q     How did you come to hook up with these 40 or so?

6     A     They find me.

7     Q     Is there a particular person that introduces you

8  to these people?

9     A     No.

10          They typically call my office and leave a

11  message, and say that, "We're either in the listing

12  business," or, "We're former timeshare salespeople," or

13  whatever it is that they previously have done, and that

14  they are thinking of getting into the timeshare

15  cancellation business, but they don't have a clue how to

16  do it, and they need an attorney.

17     Q     And it's likely that your Westgate clients came

18  through some or all of these third-party exit companies?

19     A     Correct.

20     Q     The deed to associates, once the transaction is

21  finalized and the -- the timeshare is transferred to one

22  of your associates, in the event that you receive

23  maintenance fee statements from the timeshare developers

24  because of your Notice of Representation, do you then send

25  those to your associates if the property has been

Mitchell Sussman
October 03, 2018                                    240

 1   transferred?

 2      A    You have asked and answered that -- I have

 3   answered it.  They are trash.  Maintenance statements by

 4   themselves do not contain any significant information for

 5   me.

 6      Q    I was asking you before we took a break who Andre

 7   Young is.

 8      A    Yes.

 9      Q    Who is Mr. Young?

10      A    He is one of the many lawyers that I have hired

11   in the past to prepare deeds in Florida.

12      Q    And tell me about that relationship.  How does

13   that work with the counsel?

14      A    He sent me an agreement, asked me to sign it.  I

15   did.  He sends me invoices as to how many deeds he

16   records.

17      Q    How does he get the deeds?

18      A    They are sent to him.

19           I believe Gomez was handling Andre Young as one

20   of his things that he was doing.

21      Q    So Mr. Gomez would send him what exactly?

22      A    A copy of the deed.

23      Q    A copy of what deed?

24      A    The original deed.

25      Q    Okay.  Anything else?

Mitchell Sussman
October 03, 2018                                    244

1   was signed by Mr. Young?

2       A    I don't think I reviewed his Declaration.

3       Q    Did you or somebody or one of your --

4       A    Which case did you file it in?

5       Q    One of these two that we're here on today.

6       A    Okay.

7       Q    Did you or -- did you or one of your associates

8   advise Mr. Young that all of the deeds that he would be

9   preparing and recording were approved by the developers?

10      A    Never.  He never even asked.

11      Q    If he said otherwise, would you think that he was

12  lying?

13      A    He never asked me, and when he asked me, I said,

14  "Of course they're not approved.  That's ridiculous."

15           (Plaintiff's Exhibit 13 was marked for

16           identification.)

17  BY MR. BACKMAN:

18      Q    Let me hand you what I have marked as Exhibit --

19  go ahead.

20      A    His concern was simply -- and he had this

21  document prepared.  His concern was simply am I deeding --

22  am I deeding this with the consent of the grantor?

23      Q    Let me -- what is that?  What exhibit number?

24      A    This is the retainer agreement where I agreed to

25  pay him $75 or $95.

Mitchell Sussman
October 03, 2018                    254

1      Q    So then if they existed, you produced them?

2      A    I hope so.

3      Q    Do you know what a Notice of Nonacceptance is?

4      A    Sure.

5      Q    Have you been receiving those from Westgate?

6      A    I have been recently.

7      Q    Have you been receiving those from Orange Lake?

8      A    I may have.

9      Q    And what are you doing to advise your clients

10   when you receive those?

11     A    I don't think they're effective, so, no, I don't

12   do anything.

13     Q    You don't do anything?  You don't call your

14   clients --

15     A    No.

16     Q    -- or your associates to whom deeds were

17   transferred?

18     A    No, because I don't think that they're effective.

19     Q    Who is James Kohn, K-o-h-n?

20     A    Let me see.  He might be a lawyer in Florida

21   possibly.

22     Q    Do you have a written agreement with him?

23     A    I may have.

24     Q    Is the process for him to prepare deeds on behalf

25   of your clients the same as what we have been describing

U.S. LEGAL SUPPORT
www.uslegalsupport.com

Mitchell Sussman
October 03, 2018                    255

1    for Mr. Young?

2         A    Yes.

3         Q    And would one of your associates be sending

4    Mr. Kohn e-mails with the various information required for

5    him to be able to prepare and record those deeds?

6         A    Correct.

7         Q    Who is Summer Williams?

8         A    Also an attorney that was hired to prepare deeds.

9         Q    Is she still doing that for you?

10        A    No.

11        Q    Is Mr. Kohn still doing it for you?

12        A    I don't know.

13        Q    Who is Gerardo Ortega?

14        A    I think he's another Florida attorney.

15        Q    Does he still work for you?

16        A    I don't know that he ever worked for me.

17        Q    Did he ever prepare a deed on behalf of one of

18   your clients to be recorded in the State of Florida?

19        A    I'm not sure of that.

20        Q    Who is Leslie Benjamin?

21        A    She is the attorney that I mentioned earlier who

22   works in the desert.

23        Q    Is Leslie a licensed Florida attorney?

24        A    No.

25        Q    Do you have local counsel to prepare and record

Mitchell Sussman
October 03, 2018                              257

1    prepared and recorded deeds ever had communications with

2    any of your clients?

3         A    Well, I know that Mr. Young did.

4         Q    Any of the others?

5         A    I don't -- I wouldn't know that for an absolute

6    fact.

7         Q    How do you pay these lawyers?

8         A    Just like Mr. Young's invoices.

9         Q    Do you send them wire transfers?

10        A    No, I write them checks.

11        Q    Do you know who Robert Kerr is?

12        A    Also a lawyer who prepares deeds.

13        Q    In Florida?

14        A    Perhaps.

15        Q    How did you find him?

16        A    The way that I find all of these lawyers.  I

17   place an ad in the local Bar journal or online.

18        Q    Do you consider a -- a foreclosure -- a completed

19   foreclosure by one of the developers against one of your

20   clients to constitute an exit?

21        A    Is it an in rem action?

22        Q    It's a foreclosure against your client.

23        A    When I know the answer to that question, then

24   I'll know the answer.

25        Q    You don't know the difference -- if there's a

Mitchell Sussman
October 03, 2018                                    258

1    difference between an in rem action and a foreclosure?

2    I'm asking you.

3        A    I know the difference.

4        Q    So you can't answer my question because you don't

5    know whether a foreclosure constitutes an in rem

6    proceeding?

7        A    This depends on a variety of situations.  There

8    are things called judicial foreclosures, and there are

9    nonjudicial foreclosures.  The question is:  Is it an

10   in rem action?

11       Q    So you can't answer my question then?

12       A    I can answer your question if you want to qualify

13   what type of foreclosure it is.  Then I can answer your

14   question.

15       Q    How long have you known Jeffrey Corcoran?

16       A    I've never met Jeffrey Corcoran.  He lives in

17   Northern California.  He has been doing work for me for

18   the past maybe three years.

19       Q    You think he recently passed the Bar, right?

20   That's what you said before?

21       A    I believe did he.

22       Q    The State Bar of California?

23       A    Yes.

24       Q    Is he licensed in any other states?

25       A    I don't know that.

Mitchell Sussman
October 03, 2018                                          259

1    Q    He prepares deeds for you?

2    A    Yes.

3    Q    He records those deeds?

4    A    Yes.

5    Q    Does he only do that for California properties?

6    A    No.

7    Q    Where else does he does that -- do that?

8    A    I don't know.

9    Q    Does he do that for Florida properties?

10   A    No.  He's not supposed to anyway.

11   Q    Do you know who Daniel Stern is?

12   A    Sure.

13   Q    Who is he?

14   A    He is a lawyer.  He prepares deeds.

15   Q    Is he also in Florida?

16   A    I believe he is.

17   Q    Do you have any direct communications -- besides

18   from the dispute that took place with Mr. Young that we

19   just talked about, do you have any direct communications

20   with the local lawyers?

21   A    Not really.  I pay their bills when they send

22   them.

23   Q    All of the communication is through the

24   associates that you provide 1099s to?

25   A    Correct.

Mitchell Sussman
October 03, 2018                                    272

1       A    Oh, always.

2       Q    Okay.  They have just gotten more formal?

3       A    There's actually a letter on my website that very

4   early -- maybe it was ten or nine or eight, or whatever.

5   Very early Westgate did take back at least one, because

6   that's an example.  It may have been more, but I don't

7   know now.

8       Q    But in the last five years or so, the position

9   has always been firm that they won't take them back, and

10  they don't approve the third-party transfers, and they

11  don't agree that your resignations are valid, correct?

12      A    Essentially true.

13      Q    And they won't negotiate with you, and you

14  haven't filed lawsuits?

15      A    Correct.

16      Q    I forgot to ask this.

17           When -- when you do a deedback to the developers,

18  in this case Orange Lake or Westgate, do you send anything

19  to Orange Lake or Westgate notifying them that the deed

20  has been transferred back to them?

21      A    The -- sometimes, yes, at the request of the

22  customer perhaps.

23           The deed always will go to the customer with the

24  instruction that if there is any issue, that they need to

25  hold onto their deed and send a copy to their resort.

Mitchell Sussman
October 03, 2018                          273

1      Q    But as a matter of practice, you don't do it

2  unless the customer says so?

3      A    Exactly.  If the customer asks for it, then we

4  will do it.

5      Q    How many examples can you give me where the

6  customer has asked you to do it?

7      A    It would be a total guess on my part.

8      Q    Probably very, very, very few?

9      A    Maybe -- out of, again, the hypothetical 10,000

10  number, which is in reality much greater, maybe there's a

11  hundred.  Maybe less.

12      Q    Do you tell the clients that you're deeding the

13  property back to the developer before you deed it back to

14  the developer?

15      A    They don't care what the method is.

16      Q    By "they," you mean your clients?

17      A    The clients do not care what the method is, and I

18  have no idea at the outset what the method is going to be.

19          Now, with that said, in the last few years, I

20  have been able to determine that come hell or high water,

21  Orange Lake and Westgate, they're not going to do

22  anything.

23      Q    I'm --

24      A    And so the method as it relates to them is if

25  it's a non-Florida property or it's in another state where

Mitchell Sussman
October 03, 2018                                    282

1      A    Oh, I know it's, like, ten times or more,

2    absolutely.

3      Q    And this person went to T.E.T. for the purpose of

4    getting exited from her timeshare, correct?

5      A    I would assume so.

6      Q    And you told her that, that was accomplished by

7    way of this Notice of Resignation that we're looking at as

8    Exhibit 22, correct?

9      A    That was clearly an error.

10     Q    Right.  And my question is:  Since January 18,

11   2016, do you know whether you or anybody from Timeshare

12   Exit Team has reached out to Ms. Taylor to let her know

13   that this was wrong?

14     A    I have no idea what the status of this particular

15   account is, and when Westgate produces the documents that

16   I've requested, then I will know what the status of this

17   account is, whether it is still active or not active or

18   whether, in fact, it's been foreclosed upon.

19          Do you know the status of this account?

20          (Plaintiff's Exhibit 23 was marked for

21          identification.)

22   BY MR. BACKMAN:

23     Q    Let me hand you what is marked as Exhibit 23.

24     A    I take it you don't.

25     Q    This is a letter from Mitchell Reed Sussman &

Mitchell Sussman
October 03, 2018                                        283

```
 1   Associates dated September 12th, 2016.  It's addressed to

 2   James Scott and Carol Fields-Scott in Fort Pierce,

 3   Florida.  It's reference:  Timeshare transfer Westgate

 4   Lakes.

 5           Do you see that?

 6    A    Yes.

 7    Q    It says:

 8           "Please find enclosed the document

 9           transferring your timeshare from Westgate

10           Lakes."

11           The next line says:

12           "Since you are no longer the owner, you

13           are not responsible for future fees in

14           connection with the timeshare."

15    A    Correct.

16    Q    Do you see that?

17           And then attached is a copy of a quitclaim deed

18   from the Scotts back to Westgate Lakes, right?

19    A    Yes.  That's consistent with what I just told you

20   earlier.  That they get the deeds as evidence of the work

21   that was done.

22    Q    And you've told them that because of this

23   deedback, despite everything that you know with respect to

24   Westgate's position on it, that they have been -- that

25   they are, quote, not responsible for future fees in
```

1    connection with the timeshare, end quote?

2        A    Yes.  That is my position.

3        Q    You don't tell -- is there another letter that

4    you send them that tells them all of the other things that

5    you were talking about earlier with respect to the risks

6    associated with this?

7        A    I don't know what other things you're referring

8    to.

9        Q    Okay.  All of the testimony that we had earlier

10   with respect to deedbacks --

11       A    For the last six hours or eight hours, I --

12       Q    I --

13       A    I don't think that, that is a properly-formed

14   question.

15       Q    That's fine.

16            In connection with your congratulatory letters

17   that you sent --

18       A    Right.  Yes.

19       Q    -- advising them of their exit, do you send

20   anything else?

21       A    If a problem arises in some form, then by all

22   means, we deal with it.

23       Q    Right.  So the answer to my question is, no, you

24   don't send anything else, but if the timeshare company

25   comes back later and takes issue, then you'll tell them

Mitchell Sussman
October 03, 2018                                      285

1   that they can pay you more to defend them from that

2   timeshare action, correct?

3       A    You totally misquoted everything that I just said

4   and made up your own testimony.

5       Q    Okay.  What's the correct answer?

6       A    I just gave it.  Can you read it back?

7       Q    Well, it didn't answer my question so --

8       A    I think it is.

9       Q    I will try again.

10          Do you send any other documents upon the

11  conclusion of the, quote, exit other than the

12  congratulatory letter that we're looking at as Exhibit 23?

13      A    If need be, yes.

14      Q    So under what circumstances would it be needed?

15      A    Under the circumstances that the client was in

16  distress because the client had received some form of

17  notice from the timeshare --

18      Q    Right.

19      A    -- that they were not, in fact, released.

20          MR. BACKMAN:  Do you want to take a picture of

21  it?

22          MS. KROLL:  That's fine.

23  BY MR. BACKMAN:

24      Q    Do you know the current status of the Scotts'

25  account?

Mitchell Sussman
October 03, 2018                                286

1      A    No.   Do you?

2           Will you produce those documents since I have

3    asked for them?

4      Q    If you could look at the quitclaim deed for me

5    that's attached to Exhibit 23 --

6      A    Right.

7      Q    -- the grantors are the Scotts?

8      A    If that's what it says.

9      Q    And the grantee is Westgate Lakes, correct?

10     A    If that's what it says.

11     Q    Okay.   And then in the deed, it says:

12          "Witness it that the grantor, for and in

13          consideration of the sum of $10 in hand by

14          grantees, the receipt whereof is hereby

15          acknowledged."

16          Do you see that?

17     A    Yes.

18     Q    Did Westgate Lakes pay the grantors in this deed

19    transaction $10?

20     A    No.

21     Q    In all of your deedbacks to the developers, be it

22    Westgate or Orange Lake, did you ever get the $10 in

23    consideration paid to your clients?

24     A    It's a recital which means --

25     Q    If you could just answer the question.

Mitchell Sussman
October 03, 2018                    287

1      A    The answer is that it is a recital that is

2   required and is actually not necessary.

3      Q    So is the answer "no?"

4      A    The answer is "no."

5           (Plaintiff's Exhibit 24 was marked for

6           identification.)

7   BY MR. BACKMAN:

8      Q    I will hand you what's been marked as Exhibit 24.

9   It's a letter dated August 11, 2017 from your office to

10  Allan Coe and Rose Coslett regarding a Westgate timeshare

11  transfer.

12          Do you see that?

13     A    Yeah.

14     Q    It's the same form congratulatory letter that we

15  looked at earlier, right?

16     A    Yes.

17     Q    Is this the basic form that you used for all of

18  your clients?

19     A    Yes.

20     Q    All of your letters say that:

21          "Since you are no longer the owner, you are

22          not responsible for future fees in

23          connection with the timeshare"?

24     A    Correct.

25     Q    If you could look at that deed for me real quick.

Mitchell Sussman
October 03, 2018                                    294

1       A    The agreement is by virtue of their conduct.

2       Q    In this case, the foreclosure?

3       A    Yes.

4       Q    Got it.

5            (Plaintiff's Exhibit 26 was marked for

6            identification.)

7  BY MR. BACKMAN:

8       Q    It's not the greatest copy.  I'm handing you

9  what's marked as Exhibit 26.

10           This is a letter from you dated August -- October

11  23rd, 2015.  It relates to an Orange Lake Country Club

12  Villas property, correct?

13      A    Yes.

14      Q    And this is one of your congratulatory letters?

15      A    Yes.

16      Q    Who is Nicole Beresh?

17      A    Where do you even see that name?

18      Q    As the preparer.

19           Sorry.  Noreen Beresh.

20      A    She is a deed preparer who at one time was

21  preparing deeds.

22      Q    She was one of your 1099s?

23      A    They were all 1099'd.

24      Q    Who is A.J. Underwood?

25      A    A.J. Underwood.  Oh, that's Amy.

Mitchell Sussman
October 03, 2018                           300

```
 1      Q      She works for your wife?

 2      A      She does.

 3      Q      Does she now get paid to be one of your

 4   associates to take transfers of timeshares?

 5      A      She desperately needs the money, yes.

 6      Q      Does she have the ability to pay the timeshare

 7   obligations?

 8      A      Well, she gets paid from my wife.  She works at

 9   Starbucks, so, yes, she has the ability.  I think all of

10   them have the ability.

11      Q      How many properties have you deeded to her?

12      A      I have no idea.

13      Q      Has she ever used a timeshare?

14      A      I don't know.

15      Q      Do you care?

16      A      Not really.

17      Q      Do you care if she pays?

18      A      No.

19      Q      Do you tell her that she has to pay?

20      A      I tell her that she can do what she wishes with

21   it.

22      Q      Do you tell her that if she doesn't pay, it could

23   have negative consequences on the client that you had

24   initially transferred the property to Miriam?

25      A      I tell her that it has negative consequences to
```

Mitchell Sussman
October 03, 2018                           366

1    instructions to were given that instruction.

2         Q    Who at T.E.T. told you to stop the practice?

3         A    I believe it was Brandon.

4         Q    Did he send you an e-mail or a letter?

5         A    I think that this was a phone conversation with

6    Louis on the phone.

7         Q    And you informed all of your associates -- and

8    you continued to inform all of your associates that they

9    can't do deedbacks for T.E.T. customers?

10        A    That they can't --

11        Q    I'm sorry.  Deed to associates for T.E.T.?

12        A    Correct.  Correct.

13        Q    You had testified for Ms. Baker that the

14   timeshare companies received copies of all of the deeds.

15        A    Yes, when, in fact, there were deeds.

16        Q    For every deedback that you did to a timeshare

17   for Westgate and Orange Lake --

18        A    Yes.

19        Q    -- you sent a copy to the developer?

20        A    I testified about this earlier.

21        Q    Well, that's why I'm confused, because your

22   testimony for her was different.

23        A    Well, her dep -- her question -- her question was

24   different.  Her question was different.

25             The deeds were provided to the third-party

Mitchell Sussman
October 03, 2018                                        367

 1  entities or the individuals so that they had it should

 2  they need to send it to the developer if the developer

 3  questioned them about a maintenance bill.

 4      Q    Right.  But otherwise, you did not send any deeds

 5  to any of the developers, correct?

 6      A    That is correct.

 7           MR. BACKMAN:  Okay.  Thank you.

 8           I have nothing further.

 9           MR. MCGIRNEY:  All right.

10           MR. BACKMAN:  All right.  Thanks everyone.

11           MR. MCGIRNEY:  You can --

12           THE REPORTER:  Pardon me?  I couldn't hear you.

13           MR. BACKMAN:  He said "read," so they'll -- he's

14  going to review it and sign it.

15           THE REPORTER:  Oh.

16           MR. BACKMAN:  Your process.  We agree to waive

17  where we are.

18           THE WITNESS:  Send it to me.  Send the original

19  to me at the address 1053 South Palm Canyon, okay?

20           MR. BACKMAN:  Okay.

21           All right.  Thanks everybody on the phone.

22  Chuck, I'll see you Friday.

23           MR. MELTZ:  All right.  Thank you.

24           MR. BACKMAN:  Bye.

25           MR. MELTZ:  That sounds good.