## IN THE UNITED STATES DISTRICT COURT OF
## THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

ORANGE LAKE COUNTRY CLUB, INC., et al.,

        Plaintiffs,

v.

REED HEIN & ASSOCIATES, LLC d/b/a TIMESHARE EXIT TEAM; et al.,

        Defendants.

CASE NO.: 17-cv-1542-GAP-DCI

_____/

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs Orange Lake Country Club, Inc. and Wilson Resort Finance, LLC (collectively, "Orange Lake") move for partial summary judgment, pursuant to Rule 56, against Defendants Reed Hein & Associates, LLC d/b/a Timeshare Exit Team ("TET"), Brandon Reed, Trevor Hein, Thomas Parenteau (TET, Reed, Hein, and Parenteau are collectively "TET Defendants"), and Mitchell Reed Sussman d/b/a Mitchell Reed Sussman & Associates ("Sussman"). Plaintiffs move for partial summary judgment on Defendants' affirmative defenses. DE258 (TET Defendants' Answer); DE257 (Sussman's Answer); DE284 (Order Striking Certain Defenses).

## PRELIMINARY STATEMENT

TET Defendants are running a Ponzi scheme that preys on a small segment of Orange Lake's customers who seek to get out of their legally binding contracts. TET Defendants do this by holding themselves out as consumer advocates and falsely advertising that they can cancel Orange Lake's contracts. TET Defendants instruct Orange Lake's customers to stop paying obligations owed to Orange Lake for two reasons: (1) to mislead timeshare owners to believe they TET's fee is reasonable because they will not have to pay Orange Lake; and (2) to create leverage to negotiate an "exit" and

hope that Orange Lake will foreclose on the timeshare, which TET Defendants consider a valid "exit." This is a Ponzi scheme because TET Defendants are aware they cannot lawfully deliver on their promise to obtain an "exit," yet they continue soliciting new clients, using the new revenue to sustain a business model swelling with legacy Orange Lake owners they cannot lawfully "exit."

To conceal their scheme, TET Defendants rely on transfer companies—which TET Defendants claim not to do—who transfer unencumbered timeshare interests to persons and entities with no ability or intent to pay the obligations associated with timeshare ownership. However, for mortgaged timeshare interests—like those at issue in this case—TET Defendants employ lawyers like Mitchell Sussman, who recently consented to an injunction prohibiting the same conduct at issue in this action,[1] and who has been denied *pro hac vice* admission to this Court for misconduct.[2] These lawyers erect false communication barriers between Orange Lake and its customers by claiming to represent the owners, which has the added benefit to Defendants of making sure timeshare owners do not pay Orange Lake because billing statements are sent to the lawyers who throw them in the trash.

With timeshare owners stuck with having paid TET thousands of dollars each, having defaulted on their obligations at TET's instruction or manipulation, and unable to communicate with Orange Lake, TET Defendants either do nothing, or they employ one or more of several illegal strategies to purportedly obtain an "exit." Eventually, TET Defendants falsely congratulate timeshare owners on an "exit," when no such thing has occurred.

In an attempt to avoid liability, Defendants assert numerous baseless affirmative defenses. The Court has already ruled on Sussman's Motion for Summary Judgment, which involved many of the same defenses. DE259. As set forth below, the undisputed facts demonstrate that Plaintiffs have standing, Defendants are not agents of the timeshare owners, Defendants' interference is not justified or

---

[1]   DE198 in *Westgate Resorts, Ltd. v. Sussman*, Case No. 6:17-cv-01467-RBD-DCI.
[2]   DE21 in *Hilton Resorts Corp. v. Sussman*, Case No. 6:19-cv-00305-GAP-DCI.

privileged, they are not entitled to the litigation privilege, and did not provide privileged legal advice. Moreover, Defendants' affirmative defenses based on *Noerr-Pennington* (First Amendment) and antitrust statutes are off-base and fail as a matter of law. As to Orange Lake's false advertising claim, TET Defendants' statements constitute advertising within the Lanham Act, and Orange Lake is within the protected zone of interests. Moreover, all the complained-of conduct occurred during the applicable limitations periods, and Defendants' limitations and laches defenses fail as a matter of law. Finally, there is no evidence Orange Lake failed to mitigate its damages.

**STATEMENT OF UNDISPUTED FACTS**

**TET's Marketing**

1.     TET is aware that the timeshare owners have contracts with Orange Lake that require them to make contractual payments to Orange Lake. Ex. A (Parenteau Depo) at 282:17 – 283:4. TET makes no effort to ascertain whether any of its customers have any legal or factual grounds that would justify termination of those contracts. *Id.* at 283:5-9. TET's corporate representative testified that TET does not claim any legal justification to interfere with Orange Lake's contracts. *Id.* at 283:10-15.

2.     TET spends approximately $1 million per month marketing its services through all media forms, the majority of which is spent on paid radio endorsements. *Id.* at 25:18 – 26:20; 33:23 – 34:13.

3.     TET agrees that it has always advertised that a timeshare owner can *legally* and *permanently* exit his timeshare for any reason, *id.* at 42:19-22; 89:6-8; 44:11-16; 104:1-3, and its marketing from inception until "late 2017" was that timeshare owners can *safely* exit their timeshares for any reason, *id.* at 43:15-23. However, TET admits that it never considered exit methods used by Sussman to be "safe." *Id.* at 49:11 – 50:7. Similarly, TET agrees that, in the majority of instances, exit methods used by Sussman are not "permanent." *Id.* at 51:12 – 52:2.

4.      TET has advertised, "our personal guarantee to you is that our team of consumer advocates will get you out of your timeshare contract," *id.* at 112:12-24, that it has a 100% success rate, *id.* at 63:21-25, and that it has a 100% money-back guarantee, *id.* at 56:20 – 57:7.

5.      TET has advertised that it will "force the resort to take the timeshare back." *Id.* at 114:15 – 117:6.   However, TET agreed that this only includes voluntary agreements made by timeshare companies with their consent.  *Id.*

6.      TET has advertised that it has a proprietary process, and that it works directly with timeshare companies to secure an exit.  *Id.* at 68:22 – 69:3.  However, the only "proprietary" part of the process is assigning vendors. Ex. B (Porter Depo) at 137:1-9.

**TET's Sales Presentation**

7.      Despite branding itself as a consumer protection firm, TET is a for-profit business whose goal is to sell as many services as possible.  Ex. A at 142:1-13.  To that end, TET employs sales scripts communicating: (1) timeshares have no value; (2) timeshare owners are subject to special assessments; and (3) it's hard to use a timeshare, all leading to the stated conclusion that there is no benefit to owning a timeshare.  *Id.* at 149:20 – 50:18.  The sales presentation also communicates that timeshare listing companies are a scam, and hiring an attorney is too expensive.  *Id.* at 149:23-25; 150:19 – 151:1.[3]

8.      The presentation claims, "We [TET] help about 1,000 people successfully exit their timeshares each month," Ex. A at 162:6 – 163:12, but—even including Sussman's unlawful exit methods—TET has completed approximately 15,000 exits since 2013, an average of only 250 per month.  *Id.*

9.      TET's sales presentation clarifies that TET will use attorneys to give timeshare companies a choice—either take back the timeshare or fight in court. Ex. A at 166:24 – 169:9.  It does not matter to

---

[3]   Ironically, TET's sales script uses scare tactics with stories of other exit companies transferring timeshares to straw purchasers not recognized by the timeshare company, which were ineffective and left the owner still liable, despite the owner's belief he had been exited.  Ex. A at 160:24 – 162:5.  This is exactly what Sussman did for TET's customers.  *Id.*

TET whether there is any valid legal basis to have the agreement cancelled, *id.*, raising the obvious inference that TET threatens baseless litigation as a negotiation tool.

10.     The final part of the sales presentation is TET's fee.  For timeshare interests without a mortgage, TET's fee depends solely on the annual maintenance fees and ranges from $2,795 to $7,500. Ex. A at 154:7-25.  TET's fee for timeshares with a mortgage is calculated similarly, except that TET's fee includes an additional amount equal to a percentage of the mortgage balance. *Id.* at 158:13-22.  The amount has no correlation to the work TET will have to perform. *Id.* at 154:7-25.

11.     The ultimate point of the sales presentation is to demonstrate to the timeshare owner that TET's fee is cheaper than paying the timeshare company. Ex. A at 154:2-5.  Thus, TET presents its fee to the timeshare owner by comparing it to the cost of timeshare ownership over a 15-year or 30-year period, to make TET's fee appear reasonable. *Id.* at 155:12 – 156:18; 171:5-12.

12.     Prior to 2017, TET admits that it instructed customers not to pay obligations owed to the timeshare companies.  Ex. A at 129:24 – 130:12.  TET's Director of Marketing, Scott Loughran, testified the instruction was given because it worked—timeshare companies would more readily work with a defaulted timeshare owner. Ex. C at 147:18 – 148:7.  TET is also aware that at least one of its attorney vendors—Sussman, to whom TET assigned 7,800 files—instructed customers not to pay obligations owed to the timeshare companies.  Ex. A at 132:2-8.  TET's sales script also discussed paying obligations owed to timeshare companies:

> A majority of our clients choose not to pay the timeshare for two reasons.  One, you are giving them [timeshare company] exactly what they want: Your money.  So, it can cause them to delay the process further.  And two, payment is a form of agreement

*Id.* at 159:17 – 160:10.

13.     Although TET claims it discontinued the practice of instructing owners not to pay, the issue is first documented on June 1, 2016.  Ex. D.  As of June 21, 2017, TET was still providing strongly-

worded reminders to its salespersons. Ex. E; Ex. F. Yet, TET did not provide its sales employees with approved verbiage to use on the issue of timeshare owners paying their obligations until July 26, 2017. Ex. G. Although TET claims it disciplined individuals for violating the new directive to not instruct owners not to pay, Ex. A at 240:3-16, TET has failed to produce any related documents, Ex. H.

**TET's Vendors – Transfer Companies**

14.     Shortly after inception, TET implemented its current business model of utilizing third-party "vendors" to do any work that will be done to secure an exit.[4]  Ex. A at 70:5-22; 226:19-22.

15.     TET uses non-attorney transfer companies, such as Standard Timeshare Transfers ("STT"), and others, *id.* at 73:25 – 77:22, and assigns as many as 75% of its customers to these non-attorney vendors, *Id.* at 86:17 – 87:1.  Only accounts that are paid-in-full may be transferred., Ex. I (Brown Depo) at 29:17 - 30:5; 62:21-23, and for such accounts, TET collects the additional $600 - $900 transfer fee, immediately refers the timeshare owner to the transfer company, and retains its entire fee—several thousand dollars—for making the referral  Ex. A at 156:19 – 157:25; 275:3-21.

16.     Like Sussman, STT offers rebates to "purchasers," such that the "purchasers" actually net up to $250 by accepting a transfer of the timeshare.  Ex. I at 67:19 – 68:8.  STT also transfers timeshares to individuals and entities without regard to whether those "purchasers" have the ability or intent to pay the obligations associated with the timeshare.  *Id.* at 63:5 – 64:19.[5]  STT also has the original timeshare owner "seller" pre-pay maintenance fees, *id.* at 68:16 – 69:18, which effectively delays discovery of the fact that STT's "purchasers" do not have the ability or intent to pay timeshare obligations.

---

[4]     Some small percentage of TET's customers—less than 5%—are assigned to TET's in-house "Top Gun" team, which consists of 2-3 TET employees who intentionally conceal their identity from the timeshare companies and attempt to negotiate exits directly with timeshare companies. Exhibit A at 78:11 – 81:8.  Although uncommon, TET's upper management has also attempted to negotiate "bulk settlements" with timeshare companies. *Id.* at 81:16 – 85:8.

[5]     STT has never attempted to verify whether any of the "purchasers" in the transfer transactions actually paid the timeshare obligations, even as to "purchasers" acquiring 50+ timeshares.  Ex. I at 64:20 – 65:2; 102:23 – 103:16; 103:17 – 105:24

**TET Vendors – Attorneys**

17.     The Court has already found TET failed to establish the existence of any attorney-client privilege between any timeshare owner and any attorney.  DE214 at 5-7.  The Court further found that, to the extent TET claimed to derive authority to create an attorney-client relationship from any powers of attorney, TET failed to establish that novel theory.  DE214 at 7-10.  The Court has also already found a fact issue exists as to whether TET Defendants and Sussman conspired.  DE259 at 10-11.

18.     For mortgaged accounts ineligible for an STT transfer, TET has used four different attorneys— initially and briefly, an attorney named Abrams, then Sussman, then Privett, and then SGB.  Ex. A at 72:17 – 73:24.  TET paid Sussman at least $500 per file for 7,800 files, paid Privett $650 or $1,200 per file for 6,000 files, and paid SGB $300,000 per month.  *Id.* at 249:7-18; 266:11-23; 287:19-24.

19.     Upon assigning an attorney vendor, TET does not inform the customer of the attorney's contact information.  Ex. A at 93:14 – 94:10.  The customer is not given any input or opportunity to direct what will occur.  *Id.* at 95:2 – 97:1.[6]  To the contrary, the attorneys decide what action or inaction to take.  *Id.* at 252:20 – 253:1; 261:14-17; 287:13-18.

20.     Sussman accepts all referrals from TET, regardless of whether the TET customer meets any criteria to cancel their timeshare contract.  Ex. J at 36:5-17; 60-22 – 61:2; 181:8-14.   He does not communicate with timeshare owners assigned to him by TET, *id.*, and he does not analyze the facts or circumstances of any timeshare owners' situation, *id.* at 48:1-6; 36:8-17; 55:3-9; 98:4-15.  Instead, he sends formulaic letters to Orange Lake, informing Orange Lake the timeshare owner will not pay, and referencing fraud or misrepresentation, but not asserting claims or threatening legal action.  *Id.* at 50:7 – 51:20; 54:14 – 55:9; 196:5-10; 196:11 – 198:2, 203:23 – 204:7; 212:23 – 214:1,

---

[6]   Customers assigned to SGB are supposedly given an opportunity to talk to SGB about options, but if the customer does not call, SGB makes the decision.  Ex. A at 99:10 – 101:12.

21.     Sussman has never filed suit against Orange Lake.  *Id.* at 93:15 – 94:5; 95:17-22; 272:13-15. However, with TET's knowledge and approval, Sussman then employs three "exit" strategies that he knows Orange Lake does not accept.  *Id.* at 96:11-16.

22.     First, Sussman's resignation method involves a letter to Orange Lake, advising that the timeshare owner is resigning.  *Id.* at 75-77.  Sussman is aware Orange Lake does not accept or consider resignations valid, *id.* at 104; 272, but his position is that Orange Lake must take legal action to invalidate the process, *id.* at 75-77.  Even Sussman admits that owners are responsible for paying timeshare obligations—i.e., mortgages—prior to the resignation, yet Sussman does not advise the owners, leaving them exposed to claims by Orange Lake, *id.* at 76-77.

23.     Second, Sussman's unilateral deed method involves having the timeshare owner sign a deed to convey the timeshare back to Orange Lake.  *Id.* at 93; 101.  Sussman pays attorneys to prepare the deeds under false pretenses., *id.* at 240, 254-55, 257, 258-59, 294; DE224-10, and the deeds falsely state that Orange Lake paid $10 when no consideration changes hands, Ex. J at 286-87.  Sussman has the deed recorded, DE224-14, without informing Orange Lake, yet aware that Orange Lake does not accept or consider the deeds valid, Ex. J at 104-06.

24.     Third, Sussman's deed to associate method involves having timeshare owners sign a deed to convey the timeshare to his so-called "associates."  *Id.* at 93-94.  Each deed recites that the grantee paid the grantor $10, but instead of that consideration changing hands, Sussman pays the associates $100. *Id.* at 110, 112, 133-34.  Sussman does nothing to ensure the associates have the ability and intent to pay the timeshare obligations, and indeed, the associates accept the deeds because they need the $100. *Id.* at 110-12, 134-35, 300.  After the transfer, when Sussman receives billing statements from Orange Lake, he does not forward them to the associates—the supposed new owners—because the statements are "trash."  *Id.* at 239-40.  Sussman carries out this method without giving Orange Lake an opportunity

to exercise its right of first refusal, *id.* at 135-36, and he does not provide Orange Lake any notice, *id.* at 366-67.   Sussman is aware Orange Lake does not accept or consider these transfers to be valid, but Sussman does not advise the timeshare owners of that fact.  *Id.* at 140-41.

25.      Privett, for his part, generally did nothing, but instead falsely reported to TET that he was working, as exemplified by the testimony of Lenora Amadi, below.

26.      During exits, TET employees provide false status updates to timeshare owners suggesting TET was working on an exit, when no work was being performed.  Ex. A at 243:7-11.

27.      Once a TET vendor supposedly completes an "exit," TET falsely notifies the timeshare owner that he no longer owes any obligations to Orange Lake.  DE224-14; Ex. J at 272-73; 282-85.  Orange Lake has foreclosed on hundreds of TET Defendants' and Sussman's customers after these practices, resulting in negative credit reporting.  Ex. J at 104-06.

28.      Even though TET was aware of Sussman's practices—and its general counsel vocally opposed same since 2014—TET allowed Sussman to run amok until it claims it terminated its relationship with Sussman in April 2016.   Ex. A at 254:16 – 255:7; Ex. J at 87:7-21; 88:22 – 93:8.   Even after supposedly terminating its relationship with Sussman, TET still had approximately 6,000 open files with Sussman, 700 of which were still open as of September 2018.  Ex. A at 256:19 – 257:13.

29.      TET also claims it terminated its relationship with Privett in August 2016.  *Id.* at 262:2-4.  Even after supposedly doing so, TET still had approximately 6,000 open files with Privett, approximately 1,600 of which remained open as of September 2018.  *Id.* at 262:2-19.

**Timeshare Owners**

Lenora Tracy Bailey-Amadi

30.      Amadi owned one Orange Lake timeshare.  Ex. K (Amadi Depo) at 10:21-25.  From TET's radio endorsement, she understood TET would work to get anyone out of a timeshare.  *Id.* at 16:10-22.

She viewed TET's website, where she got the impression that TET could get anyone out of a timeshare for any reason, and that TET would do so safely, legally, and permanently. *Id.* at 19:1 – 20:19. She also had the impression that TET would negotiate with Orange Lake to resolve the timeshare, *id.* at 21:18-25, and that TET had a high success rate, which was important to her, *id.* at 22:16-22.

31.     She attended a TET's sales presentation where she voiced no complaints against Orange Lake. *Id.* at 25:12-17; 26:15-20. The presentation focused on convincing her she should hire TET to get out of her timeshare, and on how much she would have to pay Orange Lake over the life of her timeshare ownership, compared to TET's fee. *Id.* at 27:6-25. In that context, the TET salesperson volunteered she should just stop paying Orange Lake—i.e., to pay TET instead—and then explained that TET had attorneys to handle any lawsuits filed against her and a credit repair company to address any negative credit reporting. *Id.* at 28:8 – 29:3; 29:14-21. The salesperson instructed her to stop communicating with Orange Lake, *id.*, and reiterated TET's money-back guarantee. *Id.* at 32:19 – 33:13.

32.     She hired TET on March 27, 2016 for $6,500, *id.* at 35:22 – 36:10, and she stopped making her payments because TET instructed her to do so. *Id.* at 39:5-11.

33.     She was aware that TET hired an attorney to act on her behalf, but she did not know the attorney's name, and she never talked to the attorney. *Id.* at 40:10 – 43:13. She is unaware of any investigation the attorney (Privett) may have conducted prior to sending a letter of representation in June 2016, and she did not receive any substantive updates from June 2016 to August 2017. *Id.* at 43:14 – 47:6. In August 2017, she learned from Orange Lake that Prviett had not done anything for her, other than sending a letter of representation in June 2016. *Id.* at 47:12 – 48:11.

34.     After Orange Lake voluntarily cancelled Amadi's timeshare in August 2017, TET had the gall to claim credit, and TET refused to refund the money Amadi paid TET. *Id.* at 48:14 – 49:10; 49:14 – 50:3; 50:13 – 51:5. Amadi requested a refund on August 7, 2017, *id.* at 52:18 – 54:1; 57:14 – 58:7, and

as of September 2017—after Orange Lake already cancelled Amadi's contract—TET pretended to still be working on an "exit" and claimed Orange Lake was delaying the process, *id.* at 59:14 – 60:10. Ultimately, on November 21, 2017—three months after Orange Lake cancelled Amadi's contract— Privett provided a supposed timeline of efforts made to cancel Amadi's contract, which TET provided to Amadi. *Id.* at 62:23 – 63:6. Of course, the efforts listed were "bogus"—in Amadi's words—since she had already secured her own timeshare cancellation from Orange Lake directly three months before. *Id.* at 63:7 – 64:14. A month later, TET sent Amadi a letter on December 29, 2017, congratulating her on the exit TET supposedly secured, but which TET had nothing to do with procuring. *Id.* at 65:15 – 66:13. TET never issued her a refund. *Id.* at 67:12-14.

<u>Michael O'Malley</u>

35.     He owned two timeshares, but he was no longer using them, and no longer wanted to own them. Ex. L (O'Malley Depo) at 19:17 – 20:4; 22:16-19.

36.     He heard a radio endorsement for TET indicating TET would get him out of the timeshare or refund its fee. *Id.* at 22:24 – 24:17. He relied on the endorser. *Id.* at 25:3-7.

37.     He attended a TET sales presentation. *Id.* at 26:15 – 27:21. The TET salesperson told him TET could get him out in 6 to 9 months, but that he should not communicate with Orange Lake. *Id.* at 27:22 – 28:25. TET did not give him any indication of what it was they would be doing to get him out of the timeshare. *Id.* at 30:13 – 31:4. But, the salesperson gave him the impression it would easy, and that the "exit" would be legal and permanent. *Id.* at 31:5-19. TET promised him an unconditional money-back guarantee. *Id.* at 32:21 – 33:5.

38.     He was never informed that Sussman or any other attorney was purportedly acting on his behalf, he never spoke to any such attorney, and no such attorney ever investigated his circumstances.

*Id.* at 38:1-23.  He never authorized TET or any attorney to assert claims of fraud or misrepresentation on his behalf, *id.* at 39:5-8, notwithstanding Sussman's letter referencing same.

39.     Until the time he contacted TET, he was current on his timeshare obligations.  *Id.* at 22:20-23. Unsurprisingly, after Sussman sent a letter of representation to Orange Lake, O'Malley confirmed he stopped receiving billing statements.  *Id.* at 39:20-23; 62:17 – 63:12.   When he did not receive statements, he did not pay.  *Id.* at 62:17 – 63:8.

40.     O'Malley received a deed from TET to transfer the timeshare to Tom Stanford—a known Sussman "associate"—and O'Malley signed it and returned it.  *Id.* at 40:7 – 42:14.  Thereafter, TET informed him the timeshare was cancelled, and that he had no further obligations.  *Id.* at 43:11 – 44:7.

41.     O'Malley later learned that whatever Sussman had done was ineffective.  Even though TET had Sussman reverse the deed to associate transaction—i.e., deed the property back to O'Malley— O'Malley was never told of and never consented to that.  *Id.* at 56:4 – 57:5; 58:20 – 59:7.

42.     Three years after he hired and paid TET almost $6,000 in July 2015, and as of May 2018, O'Malley was not out of either timeshare—despite the supposed prior exit with Sussman that was reversed—and he had to pay the amounts that accrued with Orange Lake, along with late fees, in addition to paying additional fees to TET for an STT transfer.  *Id.* at 64:22 – 70:4.  TET ultimately transferred of one of his timeshares through STT, but as of O'Malley's deposition in January 2019, nothing had occurred with the second timeshare.  *Id.* at 70:5-23.

**Other Timeshare Owners**

43.     James Lietzow, Del Retta Seth, Sheryl Cox, and Tiffany Dallman also gave depositions, and they each had similar experiences as Amadi and O'Malley.  Neither TET nor Sussman timely disclosed any other timeshare owner witnesses.  *See, e.g.,* DE318.

44.      Lietzow summarized his experience with TET as being misled in several ways: (1) he was told he would have one point of contact, but every time he called TET, he spoke to someone different who did not know what was going on; (2) he was told it would take 6 to 12 months, but nothing was done in more than 3 years; (3) TET demanded additional fees after telling him TET's fee was all inclusive; (4) TET never secured an exit; (5) TET attempted to take credit when he secured his own exit; and (6) TET refused to issue a refund.  Ex. M (Lietzow Depo) at 65:13 – 66:25.

**Orange Lake's Damages**

45.      TET Defendants had agreements with 1,235 unique Orange Lake timeshare owners.[7]  Ex. N (Wolf Report) at 19.  Orange Lake has calculated TET Defendants' net revenues from Orange Lake timeshare owners, for purposes of Lanham Act profit disgorgement, as $8,664,960.  *Id.* at 20.

46.      Of those 1,235 unique Orange Lake timeshare owners, and as of the expert discovery deadline, data was available for 672 accounts.  *Id.* at 3 n.3.  Of those 672 accounts, Orange Lake excluded 424 because they did not have mortgage balances, and Orange Lake is only seeking tortious interference and FDUTPA damages based on mortgage balances, not on maintenance fee balances.  *Id.* at 8.  Of the remaining 248 accounts with mortgages, Orange Lake identified at least 187 accounts that had defaulted in proximity to when the owner hired TET.   *Id.* at 6-13 & Exhibit E (first missed payments).  Orange Lake has calculated its tortious interference and FDUTPA damages as $3,637,240.  *Id.* at 13.

47.      Orange Lake cannot recoup any portion of its loss by foreclosing on or otherwise recovering timeshares from defaulted customers and re-selling same due to the inability to recover sunk costs from the first sale, recovery and re-sale costs, and existing supply of available inventory.  *Id.* at 13-18.

---

[7]    TET Defendants claim that some number of these (approximately 100) were not TET customers.  The precise number is immaterial for purposes of this motion.

## MEMORANDUM OF LAW

### I.     Summary judgment standard

Summary judgment is appropriate where there is "no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A party may move

for summary judgment on any "claim or defense," or "part of [a] claim or defense." FED. R. CIV. P.

56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  On issues for which the nonmovant would

bear the burden of proof the movant has two options: (1) it may simply point out a lack of evidence to

support the nonmoving party's case; or (2) it may provide "affirmative evidence demonstrating that the

nonmoving party will be unable to prove its case at trial." *United States v. Four Parcels of Real Prop.*

*In Green & Tuscaloosa Ctys*, 941 F.2d 1428, 1438 (11th Cir. 1991).  "The burden then shifts to the

nonmoving party, who must go beyond the pleadings and present affirmative evidence to show that a

genuine issue of material fact exists.  *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).  A court

must view the evidence and reasonable inferences in the light most favorable to the nonmovant, *Battle*

*v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006), but the non-moving party must rely on more than

conclusory statements or allegations unsupported by facts.  *Evers v. Gen'l Motors Corp.*, 770 F.2d 984,

986 (11th Cir. 1985).  "A factual dispute is genuine if the evidence is such that a reasonable jury could

return a verdict for the moving party." *Four Parcels*, 941 F.2d at 1438.

### II.    Orange Lake Has Standing[8]

Standing requires: (1) an injury in fact; (2) fairly traceable to the challenged conduct; and (3)

redressability.  DE 209 at p. 11 (citing *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016)).  Here, the

evidence establishes that Orange Lake has been injured in numerous ways, most notably in the form of

---

[8]    DE258 (TET Defendants' Answer) at Fourth Affirmative Defense.

lost revenues from the timeshare contracts with which Defendants interfered.[9]  This is an injury in fact.
Next, the lost revenues are traceable to Defendants' conduct because there is evidence that Defendants
instructed timeshare owners not to pay contractual amounts owed to Orange Lake, and testimony from
those timeshare owners that they stopped paying contractual amounts owed to Orange Lake based on
Defendants' instructions.  Thus, Orange Lake's injury is fairly traceable to Defendants.  Lastly, a final
judgment in this action awarding Orange Lake money damages in the amount of unpaid contractual
payments would redress the harm.  For the foregoing reasons, Orange Lake has standing, and TET
Defendants' standing defense fails as a matter of law.

### III.      Defendants Are Not Agents And Were Not Privileged to Interfere[10]

To have an agency, the principal must acknowledge that the agent will act for him, the agent
must accept the undertaking on the principal's behalf, and the principal must control the actions of the
agent.  *See, e.g., Goldschmidt v. Holman*, 571 So. 2d 422, 424 n.5 (Fla. 1990); *Font v. Stanley Steemer
Int'l*, 849 So. 2d 1214, 1216 (Fla. 5th DCA 2003).  Here, the evidence establishes that neither TET
Defendants nor Sussman were agents of the timeshare owners because there is no evidence that the
timeshare owners controlled any aspect of Defendants' actions, and to the contrary, Sussman and TET
made decisions independent of one another and independent of the timeshare owners.  In fact, the Court
already found that it could not reasonably conclude that an agency relationship existed between
Sussman and the timeshare owners.  DE259 at p. 13.  There is no competent evidence that TET
Defendants or Sussman were agents of the timeshare owners.

Even if there were a fact question as to whether TET Defendants or Sussman were agents of
the timeshare owners—which is denied—an agent's "privilege to interfere" with the principal's

---

[9]    Orange Lake has been harmed in other ways, including general harm to its commercial and
business interests, which is traceable to Defendants and redressable through injunctive relief.

[10]    DE258 (TET Defendants' Answer) at Second & Third Affirmative Defenses; DE257
(Sussman's Answer) at Second, Sixth, Seventh, & Ninth Affirmative Defenses.

contracts is not absolute. *See Sloan v. Sax*, 505 So. 2d 526, 528 (Fla. 3d DCA 1987). To the contrary, "[T]he privilege afforded [to] an agent . . . is not available where the agent acts solely with ulterior purposes and the advice is not in the principal's best interest," *Scussel v. Balter*, 386 So. 2d 1227, 1228-29 (Fla 3d DCA 1980), where "improper methods" are employed, *KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1327 (11th Cir. 2004), or if they act in bad faith, *CSDS Aircraft Sales & Leasing, Inc. v. Lloyd Aereo Boliviano Airlines*, No. 09-CIV-22274, 2011 WL 1559823, at *5 (S.D. Fla. Apr. 22, 2011). Here, the evidence establishes that TET Defendants and Sussman did all those things, each of which, individually, defeats Defendants' affirmative defense. More specifically, TET Defendants and Sussman both generated millions of dollars in revenues from upfront fees charged to timeshare owners. Those fees were generated by falsely promising an exit, and then instructing timeshare owners not to pay Orange Lake. Once the fees were generated, TET performed no work other than assigning a timeshare owner to a "vendor," and often charged several thousand dollars to refer a timeshare owner to a vendor that TET paid less than one thousand dollars. Whether the vendor procured a lawful exit or not, TET falsely instructed timeshare owners they owed no further obligations.

For his part, Sussman carried out unlawful "exit" methods as a smoke screen to claim he had done something to justify keeping his part of the fee—i.e., for his own greed. He did so without the timeshare owners knowing of his existence, and without communicating with the timeshare owners. If one of TET's customers became aware of his existence and called him, he categorically refused to speak with them. There is no evidence that the owners instructed, advised, or controlled Sussman.

Neither TET nor Sussman provided advice that was in the timeshare owners' best interest— they told timeshare owners to default in the hopes of obtaining negotiation leverage or a foreclosure; they cut off communication with the timeshare owner and provided false status updates; they falsely instructed timeshare owners they had no further contractual obligations after unlawful "exit" methods;

etc.  Defendants want to claim they were acting as "agents" of the timeshare owners, but their actions misled timeshare owners and put those owners at risk of severe adverse consequences and money judgments.  Defendants acted with ulterior motives, gave advice not in the owners' best interest, employed improper methods, and acted in bad faith, conclusively defeating their agency defense.

Further, the evidence establishes Sussman was not an agent for TET Defendants, notwithstanding Sussman's claim that TET was his "client."  Sussman did what he wanted, when he wanted.  However, even if there were a fact question on that issue—which is denied—such an agency relationship is no defense to a conspiracy claim if "the agent has a personal stake in the activities separate from the principal's interest."  *Richard Bertram, Inc. v. Sterling Bank & Tr.*, 820 So. 2d 963, 966 (Fla.4th DCA 2002).  Here, the evidence establishes that Sussman had an independent interest or personal stake apart from TET Defendants' interest—he was paid $500 to $1,000 per file for 7,800 files—and such an agency relationship is no bar to a finding of conspiracy between them.

## IV.   Defendants are not entitled to litigation privilege[11]

Florida's litigation privilege affords immunity for acts or statements in the course of judicial proceedings, if they have some relation to the proceeding.  *Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. U.S. Fire Ins. Co.*, 639 So. 2d 606, 607-08 (Fla. 1994).  That privilege "extends to the protection of the judge, parties, counsel, and witnesses, and arises immediately upon the doing of any act required or permitted by law in the due course of the judicial proceeding or as necessarily preliminary thereto."  *Ange v. State*, 123 So. 916, 917 (Fla. 1929).  Pre-suit communications are only protected if "necessarily preliminary" to judicial proceedings, which means the communications were required by statute or contract as a condition precedent to suit.  *Pledger v. Burnup & Sims, Inc.*, 432 So. 2d 1323, 1326 (Fla. 4th DCA 1983); *see also Trent v. Mortg. Elec.*

---

[11]   DE258 (TET Defendants' Answer) at Ninth Affirmative Defense; DE257 (Sussman's Answer) at Fourth Affirmative Defenses.

*Registration Sys., Inc.*, 618 F.Supp.2d 1356, 1360 (M.D. Fla. 2007) (declining to extend litigation privilege to pre-suit communications not required by law).  Here, neither Sussman nor TET Defendants contemplated litigation or any other judicial proceeding, and they did not act or speak in connection with any non-existent proceeding; they certainly did not engage in any action or statement that was necessarily preliminary to any such non-existent proceeding.  Moreover, the Court already found that Sussman's letters of representation do not fall within the litigation privilege.  DE259 at p. 17.  There is no evidence that anything else Sussman did falls within the litigation privilege.

As to TET Defendants, they assert the litigation privilege only through the attorneys they hired to work on their customers' files.  However, as with Sussman, the attorneys TET Defendants hired generally did not engage in any pre-litigation or litigation conduct as to Orange Lake.  In late 2018, SGB filed one lawsuit against Silverleaf Resorts, an affiliate of Orange Lake, which was supposedly undertaken in the course of SGB's work for TET.  First, to the extent TET Defendants argue that this one lawsuit creates a litigation privilege for them turns the law on its ear—TET Defendants hired SGB, not the other way around.  Second, Orange Lake has not asserted claims against TET Defendants for anything they did in connection with that one lawsuit, if anything.  Third, the Court already found that TET Defendants were not necessary to any attorney-client relationship, if one had existed between the attorneys and the timeshare owners.  DE214.  Thus, to the extent SGB had any litigation privilege associated with the one lawsuit against Silverleaf, that privilege does not extend to TET Defendants. There is no evidence TET Defendants are covered by the litigation privilege.

## V.    *Noerr-Pennington* Does Not Apply[12]

TET Defendants do not expressly allege *Noerr-Pennington*, but rather allege general First Amendment protection.  To the extent the defense is separate from *Noerr-Pennington*, Plaintiffs

---

[12]   DE258 (TET Defendants' Answer) at Tenth Affirmative Defense; DE257 (Sussman's Answer) at Third Affirmative Defense.

first address *Noerr-Pennington*, followed by the First Amendment generally. The *Noerr-Pennington* doctrine "rests in large part on the general First Amendment guarantees of freedom to petition and freedom of association." *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1562 (11th Cir. 1992). "The essence of the doctrine is that parties who petition the government for governmental action favorable to them cannot be prosecuted under the antitrust laws even though their petitions are motivated by anticompetitive intent." *Video Int'l Prod., Inc. v. Warner-Amex Cable Commc's, Inc.*, 858 F.2d 1075, 1082 (5th Cir. 1988). The doctrine has been extended to protect First Amendment activity from claims of tortious interference, *id.* at 1084, but only as to "those acts reasonably and normally attendant [to] effective litigation," such as pre-suit demands and cease-and-desist letters that threaten litigation. *Coastal States Marketing, Inc. v. Hunt*, 694 F.2d 1358 (5th Cir. 1983); *McGuire Oil*, 958 F.2d at 1560.

The Court has already found that Sussman's letters of representation do not constitute government petitioning sufficient to invoke *Noerr-Pennington*, DE259 at p. 16, and there is no evidence Sussman engaged in any other government petitioning. Similarly, there is no evidence TET Defendants engaged in any government petitioning—i.e., they did not petition any Court or any government as to Orange Lake, or threaten to do so, or engage in any required pre-suit activity.

Even if Defendants had engaged in petitioning activity such that they could otherwise invoke *Noerr-Pennington*—which is denied—there is an exception for "sham" petitioning activities seemingly undertaken to induce government action, but actually done to interfere with the business of another, *McGuire Oil*, 958 F.2d at 1559. Orange Lake bears the burden of establishing the "sham" exception. *McGuire Oil*, 958 F.2d at 1558 n.9, 1560. To meet its burden, Orange Lake must show that the litigation activity was "objectively baseless, in the sense that no reasonable litigant could realistically expect success on the merits." *Prof'l Real Estate Investors v. Columbia Pictures Indus.*, 508 U.S. 49, 60 (1993). Here, TET Defendants and the attorneys they hired did not investigate or evaluate any

potential claims against Orange Lake.  Without doing so, they could not realistically expect success on the merits of any unasserted claims, and neither could any reasonable litigant.  Thus, the evidence establishes that, even if any of TET Defendants' or Sussmans' actions could be considered petitioning activity, same was objectively baseless and a sham.

To the extent TET Defendants' First Amendment defense is separate from *Noerr-Pennington*, it is somewhat of a novel argument.  The first issue is whether TET Defendants engaged in protected speech.  The First Amendment provides limited protection for commercial speech, but "there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity."  *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 563-64 (1980).  Thus, commercial speech that is false or misleading is not protected.  *Id.*  Here, TET Defendants' commercial speech is admittedly false in many regards, and clearly misleading in others.  Thus, TET Defendants have not engaged in protected First Amendment activity.

Next, the First Amendment only restricts government action; it does not prohibit private persons from abridging the First Amendment rights of others.  *Denver Area Educ. Tele. Consortium, Inc. v. F.C.C.*, 518 U.S. 727, 737 (1996).  The only government action potentially at issue in this case would be this Court entering an injunction that restricts TET Defendants' commercial speech.  The injunctive relief Orange Lake seeks, however, will only prevent TET Defendants from engaging in actions that are unlawful and not protected.  DE251 at ¶¶ 100-01, 109-10, 118-19, 128-29, 146-47.  For the foregoing reasons, TET Defendants' First Amendment defense fails as a matter of law.

## VI.    Sherman & Clayton Acts Do Not Apply[13]

While not clear, it appears TET Defendants are arguing that the relief Plaintiffs are seeking would unlawfully restrain trade.  There is no evidence to support TET Defendants' allegations, and the

---

[13]   DE258 (TET Defendants' Answer) at Thirteenth & Fourteenth Affirmative Defenses.

defenses are baseless.  First, the Sherman Act prohibits contracts, combinations, or conspiracies in restraint of trade (§ 1), and monopolies (§ 2).[14]  A restraint of trade can only exist if there is concerted activity among two or more firms, and a company and its subsidiary cannot engage in concerted activity.  *American Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 191, 194 (2010).  In addition to concerted activity—which they cannot establish—TET Defendants would have to prove an unreasonable restraint on trade like price fixing or division of markets among participants.  *Procaps, S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1081 (11th Cir. 2016); *see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007).  Here, there is no evidence or even any allegation that Orange Lake engaged in any concerted activity of that any such concerted activity restrained trade.

The Clayton Act similarly prohibits discrimination in pricing that substantially lessens or prohibits competition, or creates a monopoly, subject to numerous exceptions.  15 U.S.C. §§ 13(a), 14.[15]  TET Defendants have not articulated what it is that Orange Lake has done that could constitute discriminatory pricing, or how that has substantially lessened or prohibited competition, or created a monopoly.  There is no evidence of any discrimination in pricing or any restraint on competition.

Even if TET Defendants had properly alleged or had evidence that Orange Lake violated the Sherman or Clayton Acts—which is denied—such a defense is in the nature of unclean hands.  *See* Note, "*The Sherman Act as a Clean Hands Defense*," 50 Yale L.J. 1114 (April, 1941); 6 Callman on Unfair Comp., Tr. & Mono. § 23:17 (4th Ed.).  Here, there is no evidence that Orange Lake's unarticulated yet supposedly anti-competitive conduct has harmed TET Defendants, such that equity would bar Orange Lake from obtaining relief against TET Defendants.  Thus, the Court previously struck Defendants' unclean hands defenses as insufficient, DE284, and the same logic applies here.

---

[14]   TET Defendants have not alleged a monopoly, and the facts do not give rise to a monopoly.
[15]   TET Defendants also cite to 29 U.S.C. § 52-53.  DE258 at Fourteenth Affirmative Defense.  However, 29 U.S.C. § 52-53 expressly limits its application to restraining orders or injunctions in cases between employers and employees, and it has no application here.

## VII.    TET Defendants' Statements False as a Matter of Law / Not Puffery[16]

General statements of opinion, along with "exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely"—i.e., puffery—are not actionable.  *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997).  Here, however, the statements at issue are all factual matters—i.e., TET will procure an exit that is legal, safe, and permanent; instructing a timeshare owner he owes no further obligations when he actually does, etc.—and TET admits that these statements were literally false.  Accordingly, TET Defendants' defense fails as a matter of law.

## VIII.    TET Defendants' Statements Constitute Advertising Under Lanham Act[17]

TET Defendants allege that Plaintiffs' claims fail because the statements at issue were not made in *commercial competition* and therefore do not constitute commercial advertising or promotion.  However, the Court has already rejected TET Defendants' argument as a matter of law because plaintiffs and defendants need not be competitors.  DE209 at p. 16-17 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1394 (2014); *Tobinic v. Novella*, 142 F.Supp.3d 1275, 1280 (S.D. Fla. 2015), *aff'd sub nom.*, 848 F.3d 935 (11th Cir. 2017)).

## IX.    Plaintiffs within Protected Zone of Interests[18]

To establish a false advertising claim, a plaintiff must "plead (and ultimate prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations."  *Lexmark*, 134 S.Ct. at 1395.  As this Court found in a related case, unpaid promissory notes and other obligations of timeshare owners constitute "lost sales" and are sufficient injuries to commercial interests to bring Plaintiffs within the zone of protected interests.  DE161 at 17-18, *Diamond Resorts Int'l, Inc. v. Aaronson*, No. 6:17-cv-01394-RBD-DCI.   Orange Lake has

---

[16]    DE258 (TET Defendants' Answer) at Fifth Affirmative Defense.
[17]    DE258 (TET Defendants' Answer) at Eleventh Affirmative Defense.
[18]    DE258 (TET Defendants' Answer) at Twelfth Affirmative Defense.

presented evidence of millions of dollars of unpaid promissory notes and other obligations.  Thus, TET

Defendants' defense fails as a matter of law.

## X.      Claims Not Barred by Limitations[19]

Orange Lake's tortious interference, civil conspiracy, and FDUTPA claims are subject to a

four-year limitations period.  *Generally, Yusuf Mohamad Excavation, Inc. v. Ringhaver Equip., Co.*,

793 So.2d 1127, 1128 (Fla. 5th DCA 2001) (citing Fla. Stat. § 95.11); *Canon Latin America, Inc. v.*

*Lantech (C.R.) S.A.*, No. 08-21518-CIV, 2011 WL 240684, at *15 (S.D. Fla. Jan. 24, 2011).  Of the

timeshare owners for whom Orange Lake asserts such claims, the earliest first missed loan payment

was December 18, 2014.  Ex. N at Exhibit E.  Orange Lake first asserted its claims on August 24, 2017,

DE1, which is within the limitations period, and there is no evidence that any of Orange Lake's claims

are barred by limitations.

## XI.     Claims Not Barred by Laches[20]

The Lanham Act does not contain a statute of limitations.  Although the Florida four-year

limitations period is considered the touchstone for laches, *Ambrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531,

1546 (11th Cir. 1986), that does not mean the Lanham Act has a four-year statute of limitations, *Star-*

*Brite Distrib., Inc. v. Gold Eagle Co.*, No. 14-61841-CIV, 2016 WL 4470093, at *1 (S.D. Fla. Jan. 25,

2016).  Instead, to invoke laches, a defendant must demonstrate: (1) a delay in asserting a right or

claim; (2) the delay was not excusable; and (3) there was undue prejudice.  *Kason Indus. v. Component*

*Hardware Group, Inc.*, 120 F.3d 1199, 1203 (11th Cir. 1997).  Here, Orange Lake first asserted

Lanham Act claims in its Original Complaint, filed August 24, 2017.  DE1.  The presumptive four-year

period in which to file suit would therefore extend back to August 24, 2013, which is at or around the

time TET was formed.

---

[19]   DE258 (TET Defendants' Answer) at Sixteenth Affirmative Defense.
[20]   DE258 (TET Defendants' Answer) at Seventeenth Affirmative Defense.

However, because this is not a statute of limitations, courts consider whether the plaintiff delayed in asserting claims for more than four years after it knew or should have known of the offending advertisements. *Id.* In this case, Orange Lake cannot reasonably be expected to have known of its claims from the moment TET started operating. TET initially started with regional advertising, working its way into national advertising, and TET concealed (and still conceals) from Orange Lake the fact that it is working on behalf of its customers who own Orange Lake timeshares. Orange Lake did not make contact with any affected timeshare owner who worked with TET until 2016 and did not obtain evidence to support its claims until 2017. This makes sense because TET's "process" takes time—often years, as described above—to run its course, and as noted in the preceding section, the earliest timeshare owner default for which Orange Lake is asserting tortious interference claims was in December 2014. Thus, Orange Lake did not delay in bringing its claims. *Star-Brite Distrib.*, 2016 WL 447009 at *2 (reasonable for plaintiff to bring claims within four years of determining it had *provable* claims). There is no evidence that Orange Lake unreasonably delayed in asserting its claims, or that TET was prejudiced by any delay. Thus, TET Defendants' defense fails as a matter of law.

## XII.   Plaintiffs Did Not Fail to Mitigate[21]

With respect to failure to mitigate, this is the doctrine of unavoidable consequences, which the Florida Supreme Court has described as follows:

> The doctrine of unavoidable consequences, which is also somewhat inaccurately identified as the "duty to mitigate" damages, commonly applies in contract and tort actions. There is no actual "duty to mitigate" because the injured party is not compelled to undertake any ameliorative efforts. The doctrine simply prevents a party from recovering those damages inflicted by a wrongdoer that the injured party *could have* reasonably avoided. The doctrine does not permit damage reduction based on what could have been avoided through Herculean efforts. Rather, the injured party is only accountable for those hypothetical ameliorative actions that could have been accomplished through ordinary and reasonable care, without requiring undue effort or expense.

---

[21]   DE258 (TET Defendants' Answer) at First Affirmative Defense.

*Sys. Comp. Corp. v. Fla. Dep't of Transp.*, 14 So. 3d 967, 982 (Fla. 2009) (internal citations and quotations omitted).  Further, the plaintiff is "not obligated to accept offers that were not commercially reasonable or made no economic sense."  *Slip-in-Slide Records, Inc. v. TVT Records, LLC*, No. 05-CIV-21113, 2007 WL 3232270, *13 (S.D.Fla. Oct. 31, 2007).  "The burden of showing that the victim of tortious conduct failed to minimize his damages rests with the wrongdoer."  *Tenn. Valley Sand & Gravel Co. v. M/V Delta*, 598 So. 930, 933 (5th Cir. 1979).  Regardless of the reasonableness of the injured party' actions or inactions after the tort, if it has no impact on the harm caused by the tort, then the defendant cannot meet his burden to establish a so-called failure to mitigate.  *Id.*

As set forth above, Orange Lake has presented evidence that it could not have mitigated the harm caused by Defendants, for several reasons.  There is no competent evidence to the contrary, and TET Defendants' failure to mitigate defense fails as a matter of law.

## **CONCLUSION**

For these reasons, the Court should enter summary judgment against TET Defendants as to their  First, Second, Third, Fourth, Fifth, Ninth, Tenth, Eleventh, Twelfth, Thirteenth, Fourteenth, Sixteenth, and Seventeenth Affirmative Defenses and against Sussman as to his Second, Third, Fourth, Sixth, Seventh, and Ninth Affirmative Defenses.

Dated:  April 1, 2019.                    Respectfully submitted,

                                          GREENSPOON MARDER LLP

                                           /s/ Jeffrey A. Backman
                                          RICHARD W. EPSTEIN (FL Bar No. 229091)
                                          richard.epstein@gmlaw.com
                                          JEFFREY A. BACKMAN (FL Bar No. 662501)
                                          jeffrey.backman@gmlaw.com
                                          200 E. Broward Blvd., Suite 1800
                                          Fort Lauderdale, FL 33301
                                          Telephone: 954.491.1120
                                          Facsimile: 954.343.6958
                                          *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I have filed the foregoing with the Clerk of Court via CM/ECF on

April 1, 2019. I further certify that any party that enters an appearance in this matter will receive a copy

of this document via CM/ECF or in some other authorized manner for those counsel or parties who are

not authorized to receive Notice of Electronic Filing.

                                          */s/ Jeffrey A. Backman*
                                          Jeffrey A. Backman