ROBERT B. MORRISON - 03/08/2019

```
 1                          UNITED STATES DISTRICT COURT
                            MIDDLE DISTRICT OF FLORIDA
 2                          ORLANDO DIVISION

 3                          CASE NO.:  17-cv-01542-GAP-DCI

 4   ORANGE LAKE COUNTRY CLUB,
     INC., a Florida
 5   Corporation, and WILSON
     RESORT FINANCE, LLC, a
 6   Florida Limited Liability
     Company,

 7
          Plaintiffs,
 8
     vs.
 9
     REED HEIN & ASSOCIATES,
10   LLC, d/b/a TIMESHARE EXIT
     TEAM; THE LAW OFFICES OF
11   MITCHELL REED SUSSMAN &
     ASSOCIATES; and SCHROETER
12   GOLDMARK & BENDER, P.S.,

13        Defendants.
     _____/
14
     VIDEOTAPED
15   DEPOSITION OF:     BOB MORRISON

16   DATE:             FRIDAY, MARCH 8, 2019

17   TIME:             10:21 A.M. - 5:08 P.M.

18   PLACE:            WILSON, ELSER, MOSKOWITZ, EDELMAN &
                       DICKER, LLP
19                     111 NORTH ORANGE AVENUE, SUITE 1200
                       ORLANDO, FLORIDA 32801
20

21   STENOGRAPHICALLY
     REPORTED BY:      JAZZMIN A. MUSRATI, RPR
22

23

24

25
```

```
 1   A P P E A R A N C E S :

 2   JEFFREY A. BACKMAN, ESQUIRE
     OF: Greenspoon Marder
 3       200 East Broward Boulevard
         Suite 1800
 4       Fort Lauderdale, Florida 33301
         954.491.1120
 5       jeffrey.backman@gmlaw.com
         APPEARING ON BEHALF OF THE PLAINTIFFS
 6
     AMY L. BAKER, ESQUIRE
 7   OF: Wilson, Elser, Moskowitz, Edelman & Dicker, LLP
         111 North Orange Avenue
 8       Suite 1200
         Orlando, Florida 32801
 9       407.203.7599
         amy.baker@wilsonelser.com
10       APPEARING ON BEHALF OF THE DEFENDANT

11   PANDA KROLL, ESQUIRE - via telephone
     OF: Law Offices of Panda Kroll
12       5999B Ridgeview Street
         Camarillo, California 93012
13       805.764.0315
         pkroll@pandakrollesq.com
14       APPEARING ON BEHALF OF THE DEFENDANT

15   NATASHA E. LIAS, ESQUIRE - via telephone
     OF: Grower Ketcham Eide Telan & Meltz, P.A.
16       901 North Lake Destiny Road
         Orlando, Florida 32853
17       407.423.9545
         nelias@growerketcham.com
18       APPEARING ON BEHALF OF THE DEFENDANT

19   ALSO PRESENT:

20   Ron Fleming - Videographer

21   Stephanie Lusco - via telephone

22   Paige Johnson - via telephone

23

24

25
```

1                    C O N T E N T S

2    TESTIMONY OF BOB MORRISON
             CERTIFICATE OF OATH                      270
3            CERTIFICATE OF REPORTER                   271
             ERRATA SHEET                             272
4            READ AND SIGN LETTER                     273

5

                      PLAINTIFF EXHIBITS
6
     EXHIBIT                                          PAGE
7
         Exhibit 1....................................  6
8            Amended Notice of Taking Videotaped
             Deposition
9        Exhibit 2.................................... 11
             3/4/2019 Report of Robert B. Morrison,
10           ASA BV/IA
         Exhibit 3.................................... 26
11           Comparison Analysis of Orange Lake
             Clients to Total Clients
12       Exhibit 4.................................... 51
             Estimate of Future Earned Revenue from
13           OL Clients
         Exhibit 5.................................... 52
14           Open Accounts related to Orange Lake
             Resorts reflected in RHA Deferred
15           Revenue Account as of 2/28/2019
         Exhibit 6.................................... 85
16           Confidential | RH-219331
         Exhibit 7.................................... 85
17           Analysis of Costs Associated with
             Operating Revenue
18       Exhibit 8.................................... 205
             Confidential | RH-219331
19       Exhibit 9.................................... 269
             1/14/2019 Letter from Robert Morrison
20           to John Y. Benford, Esq. RE: Orange
             Lake Country Club Resorts, LLC, et al.
21           v. Reed Hein & Associates, LLC, et al.

22

23

24

25

1

2                    S T I P U L A T I O N S

3        It is hereby stipulated and agreed by and between

4    the counsel for the respective parties and the deponent

5    that the reading and signing of the deposition

6    transcript be reserved.

7                              ------

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                P R O C E E D I N G S

 2                      *********

 3           (Whereupon, the proceedings began at

 4      10:21 a.m.)

 5           THE VIDEOGRAPHER:  This begins Video Number 1

 6      to the videotaped deposition of Bob Morrison being

 7      taken in the matter of Orange Lake Country Club,

 8      Incorporated, et al. vs. Reed -- excuse me -- Reed

 9      Hein & Associates, LLC, et al.

10           Today's date is March 8, 2019.  The time on the

11      video monitor is 10:21 a.m.

12           The video operator today is Ron Fleming.  This

13      video deposition is being taken in Orlando, Florida.

14           Counsel, would you please identify yourselves

15      and affiliations.

16           MR. BACKMAN:  Jeffrey Backman for the

17      plaintiffs.

18           MS. BAKER:  Amy Baker for defendant, Reed Hein.

19      And also appearing on behalf of Reed Hein is

20      Stephanie Lusco, Panda Kroll, and Paige Johnson.

21           THE WITNESS:  Yes, ma'am.

22   BY MR. BACKMAN:

23      Q.  State your name for the record.

24      A.  Robert B. Morrison.

25      Q.  We met before we went on the record.
```

1    A.  Yes, sir.

2    Q.  You go by "Bob"?

3    A.  Yes.

4    Q.  Okay.  I can call you Bob today?

5    A.  Yeah, please.  Thank you.

6    Q.  Fantastic.  Have you ever been deposed before?

7    A.  Yes, sir.

8    Q.  How many times?

9    A.  Dozens.

10   Q.  All in an expert capacity?

11   A.  I think once or twice fact witness.  Totally

12   unrelated to what I do.  But the rest of them are as an

13   expert.

14   Q.  You ever involved in a lawsuit where you were a

15   party?

16   A.  I serve as receiver and trustee in bankruptcy

17   court, and so I initiate actions in that capacity.  But

18   as an individual, no.

19   Q.  Okay.  Never been sued by anyone?

20   A.  No.

21   Q.  You ever been arrested?

22   A.  No.

23       (Whereupon, Plaintiff Exhibit 1 was marked for

24   identification.)

25          MR. BACKMAN:  Let me hand you what I have

```
 1      marked as Exhibit 1.

 2              Just let Amy take a look.

 3              MS. BAKER:  This is yesterday's.

 4   BY MR. BACKMAN:

 5      Q.  You have Exhibit 1 in front of you?

 6      A.  Yes, I do.

 7      Q.  Have you seen that before?

 8      A.  Yes.

 9      Q.  If you could go to -- I think it's the last page.

10   There's a schedule.

11      A.  Yes, sir.  Exhibit A?

12      Q.  It's referenced as Exhibit A.  It's a notice of

13   taking deposition, correct?

14      A.  Yes.

15      Q.  Have you seen that schedule before today?

16      A.  Yes, sir.

17      Q.  Did you bring anything with you today that's

18   responsive to the request contained in that schedule?

19      A.  I did not bring them.  They were supplied to you

20   all.  But I didn't bring hard copies of them.

21      Q.  Do you know what was supplied to us?

22      A.  Yes.

23      Q.  Would you be able to identify it?

24      A.  Yes.

25      Q.  And other than what was supplied to us, you have
```

1  no additional documents or information that would be

2  responsive to those requests on Exhibit A?

3          MS. BAKER:  Object to form.

4      A.  That is correct, including what was -- I think

5  hopefully sent to you last night.

6  BY MR. BACKMAN:

7      Q.  Sure.  But other than the reliance of materials

8  that are referenced in your report that was sent to us,

9  along with what was handed to me this morning before the

10  deposition started, there's nothing else that you relied

11  upon in rendering the opinions and conclusions set out

12  in your report?

13          MS. BAKER:  Object to the form.

14      A.  There's nothing else responsive to the duces

15  tecum under Exhibit A.

16  BY MR. BACKMAN:

17      Q.  Okay.  That's a different response than my

18  question --

19      A.  Okay.

20      Q.  -- so I'll ask it differently.

21          Are there any documents or other information that

22  you relied upon for the conclusions and opinions in your

23  report aside from the documents and information that was

24  sent over to me?

25          MS. BAKER:  Object to form.

```
 1      A.   I understand the nuance of the question.
 2           I don't know whether I indicated in the report or
 3 not, but communications with the client in terms of
 4 documents, no.  I have identified all the documents upon
 5 which I relied in the report.
 6 BY MR. BACKMAN:
 7      Q.   Okay.  And for the communications with the
 8 client, did you take any notes?
 9      A.   No.
10      Q.   So it's simply based upon recall that you would
11 have relied upon communications from the client that got
12 incorporated into your conclusions and opinions?
13           MS. BAKER:  Object to form.
14      A.   Typically, what it would be is the discussions
15 would result in taking those discussions and
16 incorporating them into the analysis.  And then the
17 analysis is what is used to create the report.
18 BY MR. BACKMAN:
19      Q.   Will you be able to tell me, when we go through
20 the report, what's based upon something that you learned
21 directly from a communication with the client?
22      A.   It's -- somewhat I think I actually say in the
23 report, but yes.  Yes.  Yeah.
24      Q.   Okay.  So other than your recall of
25 communications and the documents that have been supplied
```

1  to me, there's nothing else that you relied upon?

2        MS. BAKER:  Object to form.

3     A.  To the best of my recollection, no.

4  BY MR. BACKMAN:

5     Q.  Okay.  All right.  So let's -- if you could take

6  a look through the large stack, and we'll add what you

7  just gave me this morning to it.

8        If you could just take a look through that large

9  stack and let me know if those are all the materials

10  that are referenced in your report or that were utilized

11  by you as reliance materials.

12     A.  So the stack you've given me, everything in here

13  was something that I did rely upon and did disclose in

14  my report.

15        I would need to go back to my report and look at

16  the things that I relied on to see if there's anything

17  missing from this stack.

18     Q.  Sure.  Is anything jumping out at you?

19     A.  I just looked to see if I recognize the document.

20  So I can't answer that at this point.

21     Q.  Okay.  So you need the list that's contained

22  within your report to compare to that?

23     A.  Yes.

24     Q.  To that stack of documents that we just looked

25  at?

1    A.  Yes.

2    Q.  I'm going to hand you what I marked as Exhibit 2.

3  I think I have a copy here.

4         (Whereupon, Plaintiff Exhibit 2 was marked for

5  identification.)

6  BY MR. BACKMAN:

7    Q.  So on Page 17 of your report, there's a section

8  that's titled "Relevant Documents and Information"; is

9  that correct?

10   A.  Yes.

11   Q.  Is that the section of your report that you were

12  referencing that you would like to look at in order to

13  compare it to the stack of documents that you just went

14  through?

15   A.  Yes.

16   Q.  Okay.

17   A.  Yeah, I noticed that the third amended complaint

18  for damages and injunctive relief is not in the stack.

19   Q.  It is.  It's -- that's okay.  We'll show it to

20  you.  There's a clip --

21        MS. BAKER:  I think that was an attachment to

22     the -- Mr. Wolf's report.

23  BY MR. BACKMAN:

24   Q.  Yeah.  So we printed them out in the way in which

25  they came to us.  They were in certain folders.

ROBERT B. MORRISON - 03/08/2019                    Page 12

1           So if you keep going, that clip there, there's

2    two documents in that binder clip.  You can feel free to

3    separate them.  If you look at the top left corner,

4    you'll see where it's separated.  The second one is the

5    third amended complaint.

6       A.  There we go.  Thank you.

7       Q.  But why don't we do it this way.  Let's just go

8    through your categories.  So 44A -- Paragraph 44A of

9    your report.

10      A.  Yes.

11      Q.  US return of partnership income for Reed Hein &

12   Associates for the year's end of December 31, 2013,

13   through 2017.

14          Did you see those documents in the materials that

15   you just looked at?

16      A.  Yes, I did.

17      Q.  Did you look at any other tax returns?

18      A.  No.  We -- I had asked for 2018, but it's not

19   prepared yet.

20      Q.  Okay.  Did you get any financial information for

21   2018?

22      A.  I don't recall whether the trial balance was for

23   2018 or not.  We got -- requested information like what

24   the exits were for 2018, but in terms of a -- a detailed

25   verifiable 2018, no.

1     Q.  So I want to make sure I understand.

2         Did you see any actual financial documents of

3    Reed Hein or Timeshare Exit Team for the year 2018?

4     A.  So no -- nothing that I would call a financial

5    statement or a presentation of financials.

6         Did get some data for 2018 in summary form from

7    the client; for example, what were the earned revenues

8    from 2018 from Orange Lake clients, here's the number.

9     Q.  Is that information contained within the

10   materials that are part of the stack that you're looking

11   at?

12    A.  It's in the report itself.  The actual document

13   itself is in -- yes, it is.  And it's also on a page of

14   one of the documents produced.

15    Q.  Can you show it to me, please.

16    A.  Sure.  It is -- there's a document here.  It's

17   actually -- I guess it's multiple copies is what the

18   deal is.  But it's stapled together.  It's a three-page

19   document.  It's titled at the top "Reed Hein &

20   Associates, LLC, doing business as Timeshare Exit Team

21   Comparison Analysis of Orange Lake Clients to Total

22   Clients."

23        And on the third page of that document is a

24   section that says -- it's titled "P," as in papa, "B,"

25   as in bravo, "C," as in Charlie, 2013 to 2018 Orange

1   Lake Clients and Total Clients."  And there's a schedule

2   by year of revenue from exits of Orange Lake clients and

3   revenue from exits total for the company.

4       Q.  Okay.  And where did you get those numbers from?

5       A.  That was provided to us by the client.

6       Q.  Did you do any independent verification of any of

7   those figures?

8       A.  No.

9       Q.  Did they provide any backup or source documents

10  relating to those figures?

11      A.  Only to the number -- to the number of closed

12  cases, but not to the dollars, no.

13      Q.  And what would that backup to the closed cases

14  look like?

15      A.  It's the previous two pages of that same

16  document.

17      Q.  Okay.  And so we're looking at that document that

18  you articulated with the title.  And on the top right on

19  the first page it references "workpaper"?

20      A.  Correct.

21      Q.  Okay.  Did you do anything to independently

22  verify the information relating to retained clients,

23  exited clients, and total clients?

24      A.  No.  This came from -- I forget the name of the

25  system.  But this came from their system, and it was

1  provided to us.  And then we -- in fact, if you go to

2  the third page again, you see where right about where it

3  says "PBC" two thousand -- okay.  You see the hyperlink?

4      Q.  Uh-huh.

5      A.  Okay.  That takes you to a document that they

6  provided to us from which we extracted this information.

7  In terms of confirming the information on the document

8  they gave to us, no, we didn't do anything to confirm

9  that.

10     Q.  Okay.  Did you provide this document that appears

11 when you go to the link that you just referenced?

12     A.  To you, actually, no, we didn't.

13     Q.  Okay.  Do you have that?

14     A.  We could get it pretty easily, yes.

15     Q.  Is -- what kind of document is it?

16     A.  It's a -- it's a hyperlink itself.  So it's a set

17 of graphs of this data.  And when you run the cursor

18 over the graph, it tells you the number.  And so it --

19 a -- if we were to provide it to you just in a hard

20 copy, it wouldn't have any numbers on it, would just be

21 the graph.  And so you really -- you need the hyperlink

22 to be able to go to it.  I'm not sure whether, now that

23 you have the hyperlink, if you-all can access that or

24 not.  You would have to -- we have to check with the

25 client.

1          But -- but, again, we can give you -- we could

2     certainly print out the -- the graphs, but they don't

3     have the numbers on them.  You have to move the cursor

4     over the graph to get the number.

5          Q.  Did you rely upon this graph that you're

6     referring to in connection with the statements and

7     opinions in your report?

8          A.  Yes.  And to be very clear, the graph --

9          Q.  One second.  Was that yes?  Yes, you relied on

10    them?

11         A.  Yes.  Yes.

12         Q.  Okay.  Go ahead.

13         A.  And to be very clear, the data, by moving the

14    cursor over the graph, is what is included in this -- in

15    this exhibit -- or it's not an exhibit yet -- in this --

16    this schedule.

17         Q.  How many pages appear?  Can you scroll through

18    various pages when you go to this link?

19         A.  It's two pages.

20         Q.  And it's just graphs?  Like a pie chart?

21         A.  No, they're bar charts.

22         Q.  Okay.

23         A.  There's -- yes.  So they -- there's a bar chart

24    of the retained clients.  There's a bar chart of the

25    exited clients.  There's a bar chart showing the length

```
 1  of time -- average length of time to exit between the

 2  Orange Lake clients and the non-Orange Lake clients.

 3     Q.  Something's telling me that what you're

 4  describing might be in that stack somewhere.  I guess

 5  it's not relevant at the moment.  If it's not, then

 6  obviously I need to see that.

 7     A.  At a break or something, we can get that for you.

 8     Q.  Sure.

 9         So other than that graph, the bar charts that

10  you're referring to, did you do anything to

11  independently verify Reed Hein's records as it relates

12  to the summary totals that you've included on this

13  workpaper?

14         MS. BAKER:  Object to form.

15     A.  No.  I have asked to get documentation and

16  records to be able to do that, but as of yet, no.

17  BY MR. BACKMAN:

18     Q.  What did you ask for?

19     A.  The backup behind it.

20     Q.  Why did you ask for that?

21     A.  Because I wanted to check it.

22     Q.  Is that the appropriate thing for an expert to do

23  in utilizing and relying upon the figures from the

24  client?

25         MS. BAKER:  Object to form.
```

1          MR. BACKMAN:  What's wrong with the form?

2          MS. BAKER:  Sorry?

3          MR. BACKMAN:  What's wrong with the form?

4          MS. BAKER:  I think it's argumentative.  I

5     think it is calling for something that you have not

6     laid a foundation for.

7          MR. BACKMAN:  Anything else?  Is that it?

8          MS. BAKER:  That's what comes to mind right

9     now.

10         MR. BACKMAN:  Okay.

11         MS. BAKER:  I reserve my right to raise

12    additional objections.

13  BY MR. BACKMAN:

14    Q.  You can answer.

15    A.  It is very common for experts to rely on the

16  testimony of others.  And it is my anticipation that if

17  I don't get an opportunity to confirm or verify, that

18  there will be testimony provided that that's -- that the

19  information is true and accurate.

20    Q.  Have you -- when you refer to testimony, you mean

21  sworn testimony like what you're doing today?

22    A.  Yes.

23    Q.  Have you reviewed any sworn testimony from

24  whoever it is that provided you with this summary

25  information that's contained in your workpaper?

1    A.  Not -- not at this point, no.

2    Q.  Okay.  But you believe that either sworn

3  testimony or an actual review of the source documents is

4  required for you to render opinions based upon these

5  numbers?

6         MS. BAKER:  Object to form.

7    A.  Not required, no.  It would go to the weight of

8  the evidence.  I mean, you know, reliance on what

9  management has told me is common for experts to do.  And

10  it's my anticipation that if management testifies,

11  they'll testify because I asked them, is this accurate

12  and complete?  And the answer was yes.

13  BY MR. BACKMAN:

14    Q.  Would you prefer to see the source documents

15  before rendering opinions on this information?

16    A.  No, not before rendering an opinion.  I rendered

17  an opinion.

18    Q.  Okay.  How can you verify that the information

19  that your opinion is based upon is accurate without

20  looking at the backup?

21    A.  Because the client has told me that it is

22  accurate and complete.

23    Q.  Who at the client provided you with the

24  information?

25    A.  It was -- Tina is her name.  I don't know whether

1  she -- she has some people working with her.  But she is

2  the one that provided the information.  And Stephanie --

3  I think Stephanie just was the conduit through which we

4  got the information.

5     Q.  What is Tina's last name?

6        MS. BAKER:  I don't recall.

7     A.  I don't know.

8  BY MR. BACKMAN:

9     Q.  How many times did you talk to -- well, did you

10  talk to Tina?

11    A.  Yes.

12    Q.  How many times?

13    A.  Probably three or four.

14    Q.  What did you talk to her about?

15    A.  About the economics of the business, about

16  accounting issues, about this -- you know, getting

17  information about the number of exits and the earned

18  dollars from those exits, the financial information.

19    Q.  What is Tina's position at the company?

20    A.  She is -- I think she's actually a consultant to

21  the company right now.  So not in -- she's not a W-2

22  employee.  She would be a 1099 employee -- or a 1099

23  contractor.

24    Q.  Does she have her own business?

25    A.  I don't know.

ROBERT B. MORRISON - 03/08/2019                    Page 21

1      Q.  Is she an accountant?

2      A.  Well, define accountant.

3          My impression is, yes, she's an accountant

4   because she -- we were talking about accounting issues

5   and she was quite knowledgeable of those accounting

6   issues.

7      Q.  As a consultant, what is it exactly that she does

8   with TET --

9      A.  You'd have to ask her.

10     Q.  -- or Reed Hein?

11     A.  You'd have to ask her.

12     Q.  You didn't ask her?

13     A.  No.

14     Q.  Who at Reed Hein does she work with?

15     A.  You'd have to ask her.

16     Q.  You didn't ask her?

17     A.  No.

18     Q.  Do you know anything about her background?

19     A.  No.

20     Q.  Do you know how long she's worked for Reed Hein?

21     A.  She mentioned it, but I forget now.

22     Q.  Just -- sorry.

23     A.  She mentioned it at one point, but I don't recall

24   what it is.

25     Q.  Does she have other clients that she consults for

ROBERT B. MORRISON - 03/08/2019                    Page 22

1    aside from Reed Hein?

2        A.  I don't know.

3        Q.  How long do you think you spoke with her?

4        A.  It would be a pure guess because it was -- as you

5    know, it's -- it's requested information.  I will get

6    back to you.  Here's what we have.  Okay.  But this --

7            So it's kind of back and forth.  In total, I

8    probably spoke with her an hour plus.  And my staff

9    people, I'm not sure exactly how long they would have

10   spoken with her.

11       Q.  Did anyone else from Reed Hein provide you with

12   information that relates to the information that's set

13   out in your report?

14       A.  Well, it -- I'm going to -- the names that were

15   involved, some of whom are attorneys, were Tina, Panda

16   was involved, and Stephanie was involved.

17       Q.  Anybody else?

18           MS. BAKER:  Me.

19       A.  There was a controller on at one point in time, a

20   gentleman, but he didn't -- he was -- he and Tina were

21   on at the same time.  And Tina was really the one that

22   provided the information.

23   BY MR. BACKMAN:

24       Q.  What was the controller's name?

25       A.  I don't recall.

1    Q.  Is there any information that Panda provided to

2  you that you relied upon or incorporated into your

3  report?

4    A.  That Panda did specifically?

5    Q.  Yeah.

6    A.  I -- I would not be able to tell you what was

7  provided to us by the client, by Tina individually, by

8  Panda individually, or by Stephanie individually.  It

9  was -- it was always a group discussion.  And sometimes

10  the information came from Amy, sometimes it came from

11  Panda, sometimes it came from Stephanie, and sometimes

12  it came from Tina.

13    Q.  Is there any information that you obtained

14  through your conversations on these group discussions

15  that you have withheld?

16    A.  No.  No.  Anything that is germane to the issues

17  here, it is part of my report and subject to -- to my

18  cross-examination today.

19    Q.  When did you ask for the source documents

20  relating to this workpaper document that we've been

21  talking about?

22    A.  It was immediately prior to February 26th.  I'm

23  trying to remember the days of the week now.  I believe

24  the 26th was midweek.  And I believe it was the Friday

25  before the 26th.

1    Q.  Have you been told why you haven't been provided

2  with the backup?

3    A.  Only that their -- their accounting -- everything

4  gets put together.  There's -- they have difficulty

5  pulling out revenue and/or expenses for any one given

6  client or customer.  And so it's -- it's a lot more than

7  just pressing a button and getting the information.

8    Q.  Do you know what type of -- strike that.

9        Are you familiar with a CRM?

10   A.  I know what a CRM is, yes.

11   Q.  Do you know whether Reed Hein utilizes any type

12  of CRM software?

13   A.  I believe they do.  I don't know what the

14  software is or its capabilities.

15   Q.  Have you ever heard of Salesforce?

16   A.  Yes, I have.

17   Q.  Do you know whether Reed Hein utilizes

18  Salesforce?

19   A.  I've seen reports that say -- well, in fact,

20  this -- this workpaper that we've been talking about,

21  that data came out of Salesforce.

22   Q.  Did you actually see the Salesforce reports?

23   A.  No.  That's -- we saw the graph from it.

24   Q.  Did you ask for access to the Salesforce --

25   A.  That's one of the things --

1      Q.  -- database?

2      A.  That's one of the things I've asked for.

3      Q.  Do you know whether it's difficult for them to

4   provide you access through the cloud or the Internet to

5   the Salesforce database?

6      A.  I have no idea.

7      Q.  They didn't offer to allow you to do that?

8          MS. BAKER:  Object to form.

9      A.  Not to date, no.

10  BY MR. BACKMAN:

11     Q.  But you asked?

12     A.  I've asked to have access to that underlying

13  data, yes.

14     Q.  Have they told you what data they keep for their

15  customers in Salesforce?

16     A.  No.

17     Q.  We're obviously going to get into a lot more

18  detail on some of these things.

19          But if I'm understanding what you did correctly,

20  you figured out the percentage of Orange Lake clients

21  that Reed Hein told you were successfully exited

22  compared to the total number that Reed Hein told you

23  were successfully exited for all of their customers; is

24  that correct?

25     A.  That's one of the things, yes.

1      Q.  Right.  And then you took that percentage and

2   multiplied it by the total revenue for Reed Hein to --

3   to come up with the revenue related to Orange Lake?

4      A.  No.

5      Q.  How did you come up with the revenue related to

6   Orange Lake?

7      A.  That's on the third page of that workpaper.  It

8   is information given to me by Reed Hein.

9      Q.  Okay.  So the spreadsheet in the middle -- the

10  spreadsheet -- the little table in the middle of the

11  third page of this workpaper -- let's do this, can I

12  have that, please.

13     A.  Okay.

14         (Whereupon, Plaintiff Exhibit 3 was marked for

15  identification.)

16  BY MR. BACKMAN:

17     Q.  So I've marked the workpaper that we've been

18  looking at as Exhibit 3.

19         All right.  So we go to that third page, and

20  there's a table that has five column headings, correct:

21  Year, Orange Lake revenue, Orange Lake number of case,

22  revenue (closed exits), revenue number of case.

23         Is that right?

24     A.  Yes.

25     Q.  Okay.  And these are figures that you did not

 1   independently verify?

 2       A.  That's correct.

 3       Q.  So you took the information that's in the OL

 4   revenue column that was provided by Reed Hein, and

 5   that's how you figured out -- or that's the basis for

 6   concluding that there were $3,077,610.85 in revenue

 7   related to Orange Lake?

 8       A.  In earned revenue related to Orange Lake during

 9   this time period, correct.

10       Q.  Did you do any calculations to come to that

11   conclusion?

12       A.  No.

13       Q.  Did you look at any source documents to come to

14   that conclusion?

15       A.  No.

16       Q.  If Reed Hein had a way to provide you with the

17   actual amount paid by a customer, would you want to see

18   that?

19       A.  For purposes of determining what the earned

20   revenue was from them, it would need to be not only just

21   what a customer paid, but whether that customer had a

22   successful exit or not.

23       Q.  Sure.  So if Reed Hein had a way to actually do

24   that with the actual data, the -- you would want to see

25   that?

1          MS. BAKER:  Object to form.

2    BY MR. BACKMAN:

3     Q.  Correct?

4     A.  As a secondary, yes.  That is what is being

5    represented in this prepared-by-client chart.

6     Q.  Do you know how many total Orange Lake customers

7    Reed Hein has had since 2013?

8     A.  Based on the data I have, there's somewhere in

9    the neighborhood of 12, 1300, somewhere in that range.

10     Q.  And what data is that based upon?

11     A.  That's based upon this document and based on the

12    document of unearned revenue as of now and the number of

13    Orange Lake clients in that earned revenue amount.

14     Q.  Are you able to tell me which of the 588 clients

15    referenced in this table comprised the 588?

16     A.  Ask that again, please.

17     Q.  Sure.  Let's take a step back.

18          OL number of case, that's the number of Orange

19    Lake customers that Reed Hein contends were successfully

20    exited?

21     A.  Correct.

22     Q.  Okay.  So you would agree with me, then, that

23    each of those -- sorry -- that that 588 represents 588

24    separate accounts?

25          MS. BAKER:  Object to form.

1      A.  I -- I would refer to them as clients.

2  BY MR. BACKMAN:

3      Q.  Okay.

4      A.  Clients in terms of Reed Hein taking them on

5  and -- and pursuing an exit.

6      Q.  Sure.  So 588 clients?

7      A.  Yes.

8      Q.  All right.  Are you able to tell me which

9  individuals comprise that 588?

10     A.  No.

11     Q.  Did you see -- strike that.

12         Are you familiar with a Reed Hein exit agreement?

13     A.  Yes.

14     Q.  That's the document that Reed Hein uses to sign

15  people up and ultimately get paid for the money that --

16  sorry -- for the services that Reed Hein is supposed to

17  be performing?

18     A.  Correct.

19     Q.  Have you seen any exit agreements for these 588

20  individuals?

21     A.  No, I've seen -- I think there's six sample

22  agreements.  But no, I have not looked at specific

23  agreements that related to specific Orange Lake clients,

24  no.

25     Q.  And your calculations for revenue were based

1  solely upon what you call "successful exit"; is that

2  right?

3      A.  Correct.

4      Q.  Who determines what a successful exit is?

5      A.  The agreements do.

6      Q.  Have you done any independent analysis to figure

7  out which of all of the Orange Lake owners have been

8  successfully exited?

9      A.  I've looked at the data of the number of Orange

10  Lake clients and those that were successful.  I have not

11  looked at specific clients and said this one was

12  successful, this one wasn't.

13      Q.  Somebody else determined whether somebody should

14  be included in this 588 based upon a successful exit?

15      A.  Okay.  So now I understand your question.  Yes,

16  yeah, I am accepting that the representation of 588

17  clients were successful is accurate.

18      Q.  Did you tell me before that your understanding is

19  that there's roughly 12 or 1300 total Orange Lake

20  clients?

21      A.  Roughly, yeah.

22      Q.  So about 40-something percent have been

23  successfully exited, based upon this table?

24          MS. BAKER:  Object to form.

25      A.  No, actually -- actually, that's -- thank you for

1   pointing that out.  No.  Because that 588 are only the

2   successful ones.  So the unsuccessful ones would have to

3   be added to that 12 or 1300.  So no.  No --

4   BY MR. BACKMAN:

5       Q.  I'm not sure I follow.

6       A.  Yeah.  Yeah.  I understand why you don't -- you

7   didn't follow.

8           The total number of clients would be higher than

9   that, higher than the 12 or 1300.  Because the 588

10  represents only successful ones.  The --

11      Q.  Right.

12      A.  What I calculated from the unearned revenue, what

13  I have for the unearned revenue, the additional 742, may

14  or may not be successful.  And so the total number of

15  customers would be higher than that 1200.

16      Q.  The total number of Orange Lake customers --

17      A.  Yes.

18      Q.  -- would be higher than that 1200?

19      A.  Yes.

20      Q.  So let me ask you the original question again

21  that got you to say 12 or 1300.

22          How many total Orange Lake clients does or did

23  Reed Hein have since 2013?

24      A.  And I'm glad we came back around, because I can't

25  answer that.  Because I don't know how many Reed -- I

 1   don't know by -- by number how many Reed Hein Orange

 2   Lake clients were unsuccessful in the years 2013 to

 3   2018.  That's another thing I've asked for, is the

 4   information regarding the -- the payments on the

 5   guarantee and how many were unsuccessful during that

 6   time period.

 7       Q.  Did you ask Reed Hein to provide you with the

 8   actual amount of refunds that they provided to Orange

 9   Lake owners?

10       A.  Not in those words, but I asked for information

11   related to what was -- what they did have to pay back in

12   terms of -- of the money-back guarantee and how many

13   Orange Lake -- how many clients and Orange Lake clients

14   were unsuccessfully exited.

15       Q.  Did you get the information?

16       A.  No.

17       Q.  Do you know how an unsuccessful exit is being

18   determined?

19       A.  From the contract, I understand it to be an

20   unsuccessful exit is one where there's not an exit.  I

21   mean, it's -- the -- and I'm -- I'm not going to get

22   into an interpretation of the agreement.  But it, you

23   know, sets forth what Reed Hein's responsibility is to

24   get to a successful exit and then what an

25   unsuccessful -- what an unsuccessful exit or non-exit

 1   is.

 2        Q.  Do you agree with me that the less revenue

 3   reported for purposes of your analysis, the better it is

 4   for Reed Hein in connection with the ultimate bottom

 5   line?

 6             MS. BAKER:  Object to form.

 7        A.  Mathematically, sure.

 8   BY MR. BACKMAN:

 9        Q.  Again, if I'm understanding this document

10   correctly, on the first page you have a line item that

11   says "total clients" and some various average

12   percentages.  And then you have exit percentage of total

13   OL clients 28.1 percent.

14             Do you see that?

15        A.  Uh-huh.

16        Q.  Does that -- is that yes?

17        A.  I'm sorry.  Yes.

18        Q.  That's okay.  You just got to have it for the

19   record.

20        A.  That's fine.  No.  Yeah.

21        Q.  Does that mean that the 588 represents 28 percent

22   of the total number of Orange Lake clients?

23        A.  That would be correct, based on the retention of

24   clients.

25        Q.  So then to get the total number of Orange Lake

ROBERT B. MORRISON - 03/08/2019                    Page 34

 1   clients at Reed Hein, you basically, give or take some
 2   percentages, we multiply the 588 by, what, 3?
 3       A.  Yeah, and that doesn't make any sense.
 4           Yes.
 5       Q.  Okay.  And then you said it "doesn't make any
 6   sense."  So help me understand your numbers and your
 7   percentages to figure out how to make it make sense.
 8       A.  Fair enough.  And that gets back to the -- what I
 9   would really like to see the -- the -- you know, the
10   actual numbers for the non-exited clients.  Because
11   mathematically, you're right.  The 588 represented
12   28 percent of the total retained.  And if you want to
13   get to 100 percent, you multiply it by 3 to 4, somewhere
14   in there.
15           So that would suggest 1500 to 2,000 clients just
16   through 2018, plus the 700-some-odd clients that are in
17   the unearned revenue.  And from what -- just generally
18   talking, that sounds like it's too high a number.
19       Q.  And I guess your words doesn't seem to make much
20   sense.
21       A.  It doesn't make much sense.
22       Q.  So you'd like to see all the backup so you could
23   figure that out?
24       A.  I would.  To determine that the -- the
25   unsuccessful percentage, yeah, I would want to see

 1   something else.  Or --

 2       Q.  The --

 3       A.  I'm sorry.  Or if I'm just interpreting the data

 4   incorrectly.

 5           MR. BACKMAN:  Go ahead and make your appearance

 6   real quick.  And then I'm going to keep going.

 7           MS. LIAS:  Sure.  Thank you.

 8           Natasha Lias with the law office of Grower

 9   Ketcham here on behalf of Defendant, Schroeter

10   Goldmark & Bender.

11           MR. BACKMAN:  Thanks for letting us start a

12   little early.

13           MS. LIAS:  Of course.  Okay.

14           MR. BACKMAN:  Appreciate it.

15   BY MR. BACKMAN:

16       Q.  So you said, "yeah, I'd like to see it, just to

17   make sure I'm not interpreting the data incorrectly,"

18   right, that's what you just said to me?

19       A.  Yes.

20       Q.  Okay.  Is this not your workpaper?

21       A.  Yes, it is.  It's my workpaper, correct.

22       Q.  And so it's your data?

23       A.  No, the data comes from the client.

24       Q.  Did the client also provide you with the

25   information relating to the percentages that we just

1    looked at?

2        A.   No.

3        Q.   Who did that?

4        A.   I did.

5        Q.   And how did you derive those percentages?

6        A.   Which one?

7        Q.   Let's start with the first line, with total

8    clients and run it across.

9        A.   Okay.  So if you -- if you see the column -- you

10   go down to where the main data is, the column total

11   clients.

12       Q.   Uh-huh.

13       A.   Okay.  So the -- the Orange Lake clients, as a

14   percent of total clients, would be the columns of Orange

15   Lake -- under retained clients, Orange Lake, under

16   exited clients, Orange Lake, those two combined divided

17   by total clients.

18       Q.   Okay.  So the math in -- in -- that is referenced

19   in the percentages at the top part of this first page of

20   Exhibit 3 is simply your math of the numbers that are

21   provided in the body of the spreadsheet?

22       A.   Correct.

23       Q.   Okay.  So you -- I got it.

24            Would you agree with me that 79.9 percent is a

25   pretty bad unsuccessful rate?

1          MS. BAKER:  Object to form.

2     A.  I have no idea.

3  BY MR. BACKMAN:

4     Q.  Did you ever -- did you look, in connection with

5  your report, at any of Reed Hein's advertisements?

6     A.  Advertisements?

7     Q.  Yeah.

8     A.  No.

9     Q.  Their website, marketing, anything of that?

10    A.  Looked at the website, just in general.

11    Q.  You know that Reed Hein professes to have a

12  100 percent success rate?

13         MS. BAKER:  Object to form.

14    A.  I was not aware of that.

15  BY MR. BACKMAN:

16    Q.  Okay.  Based upon your calculations and the

17  information that you've reviewed in connection with your

18  expert opinions, do you believe that Reed Hein has a

19  100 percent success rate?

20         MS. BAKER:  Object to form.

21    A.  Based on my analysis, no.

22  BY MR. BACKMAN:

23    Q.  Is it fair to say that 80 percent of all the --

24  sorry -- 79.9 percent of all of the Orange Lake clients

25  were not included in your revenue number?

1    A.  To the extent that there are 79.9 percent more

2    clients, in other words, to the extent that there were

3    2,000 clients during this time period, that any revenue

4    earned from that is not included -- well, I take that

5    back.

6        I'm -- I am accepting that the 3,077,611

7    represents the earned revenue from all Orange Lake

8    clients for this time period.  And the -- that that

9    represents 588 actual clients.

10       Whether the unsuccessful clients are one or a

11   million, is irrelevant in terms of what those

12   revenues -- earned revenues are to the company.  Because

13   the company cannot recognize revenue until it's earned.

14   Q.  Based upon the calculations that you ran and the

15   percentages that you reached that are reflected on that

16   first line item at the top of the first page --

17   A.  Yes.

18   Q.  -- how could it be that 588 does not represent

19   28 percent of the Orange Lake clients?

20       MS. BAKER:  Asked and answered.

21   A.  It's a mathematical --

22       MR. BACKMAN:  I don't think it has been.

23   A.  It's a mathematical calculation of the data

24   provided.  And -- and we've been talking about that it

25   seems that there's -- that I want -- that I need to see

 1   or I want to see the actual non-exited clients.  Because

 2   doing the extrapolation that we went through provides

 3   a -- a result that doesn't seem right.

 4   BY MR. BACKMAN:

 5       Q.  Sure.  But you haven't seen it, right?

 6       A.  I haven't seen?

 7       Q.  This analysis, this backup of the non-exited

 8   clients, correct?

 9       A.  That's correct.

10       Q.  We've talked about that.

11       A.  Yes.

12       Q.  Your -- the way you derived at the 28.1 percent

13   is to take the information that Reed Hein gave you?

14       A.  Correct.

15       Q.  That is also reflected in the same Exhibit 3?

16       A.  Yes.

17       Q.  That demonstrates which or how many Orange Lake

18   clients there were in total --

19       A.  Yes.

20       Q.  -- and how many were successfully exited,

21   correct?

22       A.  That's correct, yeah.

23       Q.  And your table on Page 3 that Reed Hein provided

24   you with gross figures reflects three million

25   seventy-seven six hundred ten thousand eighty-five

ROBERT B. MORRISON - 03/08/2019                    Page 40

```
1   dollars [sic] for only the Orange Lake clients that were

2   exited, correct?

3      A.  Correct.

4      Q.  So by your calculations and the information that

5   was -- actually provided to you, 588 clients and the

6   $3 million figure represents 28.1 percent of the Orange

7   Lake clients that Reed Hein had, correct?

8          MS. BAKER:  Object to form.

9   BY MR. BACKMAN:

10     Q.  Is there any other way to work your actual

11  workpaper?

12     A.  Well, it -- so it suggests, based on this data

13  and the methodology, that -- that it represents

14  28.1 percent.  But like we've been talking about, I'm

15  not -- I'm not sure that makes sense.  So that what the

16  total number of Orange Lake clients is -- total is --

17  proper grammar -- the total number of Orange Lake

18  clients is determined by simply doing that reverse

19  mathematics extrapolation.

20         So what I don't want -- I don't want to be on

21  record saying yes, in fact, there are 79 percent of

22  Orange Lake clients that were not successful -- that

23  were not successful.

24     Q.  What else does the math that you did represent?

25  That's what I'm confused about.
```

ROBERT B. MORRISON - 03/08/2019                    Page 41

1      A.  Right.  Right.  And as we've talked about,

2   there's something that doesn't make sense in that.  So I

3   am not going to sit here and say that it's my opinion

4   that 79 percent of the Orange Lake clients are

5   unsuccessful.

6      Q.  But you will say that 28.1 percent were the ones

7   that were successful?

8      A.  No.  No.  Because like I said, there's something

9   that doesn't make sense.  And I want to -- I want to get

10  into it so I can figure out why that didn't make sense.

11     Q.  When did you first figure out that something

12  doesn't make sense?  Was it when I just started asking

13  you these questions?

14     A.  Actually, last night.  I was thinking about it

15  last night.

16     Q.  And you were looking at the spreadsheet the same

17  way I'm now asking you questions, and it questioned

18  something in your mind?

19     A.  Yeah, just the fact when you start looking at

20  what Mr. Wolf said were the total number of clients and

21  what -- you take the 588 plus the ones in unearned, it

22  appeared as though we were pretty dang close.  And then

23  it dawned on me that the 588 did not include the

24  unsuccessful clients.  And so basically, that led me to

25  question that 28.1 percent as being representative of

ROBERT B. MORRISON - 03/08/2019                    Page 42

 1   the success factor -- the success rate.

 2       Q.  Regardless of how Reed Hein books it, from an

 3   accounting perspective --

 4       A.  Okay.

 5       Q.  -- how much total -- how much in total sales was

 6   paid to Reed Hein for Orange Lake-related clients?

 7           MS. BAKER:  Object to form.

 8       A.  I didn't look at that because that's not

 9   relevant.

10   BY MR. BACKMAN:

11       Q.  Why isn't it relevant?

12       A.  Because as long as there's a chance that they

13   have to pay back, they don't -- it's unearned.  It's not

14   revenue.  It's not -- it doesn't become profit.  It's

15   not profit until it's earned.

16       Q.  Sure.  If they take the money -- if Reed Hein

17   takes the money generated from a particular agreement

18   and uses that money in connection with its business, is

19   it still considered unearned?

20       A.  Sure.  It's working capital.

21       Q.  If Reed Hein takes that money and Brandon Reed

22   takes a distribution of a million dollars, is it still

23   considered unearned?

24       A.  Yes, absolutely.

25       Q.  That doesn't relate to profit at all?

1    A.  No, not at all.

2    Q.  Even if the owners are taking it out?

3        MS. BAKER:  Object to form.

4    A.  Yes, that's correct.  Because they have an

5  obligation to pay it back in if the -- if they're not

6  successful in the exits.

7        So let's take an example.  Let's assume that the

8  company either uses or one of the owners takes out as a

9  loan a million dollars worth of monies paid in that the

10  clients are not yet successful.  One of two things is

11  going to happen, either, A, it's going to be recognized

12  as earned later when they earn or, B, they're going to

13  have to pay it back.

14  BY MR. BACKMAN:

15    Q.  Do you know how much in total deferred revenue

16  there was in 2017 at Reed Hein?

17    A.  $70 million.

18    Q.  Does Reed Hein have $70 million sitting somewhere

19  in an account?

20    A.  No.

21    Q.  Do they have any money sitting in a reserve

22  account?

23    A.  I'd want to look at the tax return, the full

24  balance sheet to see, but -- and that's a big number.

25    Q.  Yeah, I appreciate it's a big number.  My

ROBERT B. MORRISON - 03/08/2019                    Page 44

1    question was:  Do they have any money sitting in an

2    account for reserves relating to this unearned revenue?

3        A.  Cash, I'm almost certain it's no, but let me

4    look.

5            In terms of cash, no.  As of -- as of

6    December 31, 2017, there was a basically unearned

7    liability -- unearned revenue liability of 70.6 million.

8    At that point, there was $4.5 million of cash,

9    2.9 million of receivables, 11.4 million of other

10   assets -- I have to look at what that is -- and then

11   16.7 million owed back to the company by the partners.

12       Q.  You're looking at a 2007 tax return?

13       A.  2017.

14       Q.  2017 tax return?

15       A.  Yes.

16       Q.  Thank you.

17           By booking that $70 million as unearned revenue,

18   does that mean that the company actually received from

19   clients $70 million?

20       A.  Yes.

21       Q.  And by reference to the tax return and the

22   statement that you just looked at, is it fair to say

23   that the company has spent or distributed $70 million?

24       A.  No.

25       Q.  What amount of the $70 million is it fair to say

 1  that the company has actually used in some form or

 2  another?

 3          MS. BAKER:  Object to form.

 4      A.  Cash gets commingled, right?  So there's -- like

 5  I just said, there's $70.6 million of unearned revenue.

 6  There's $4 1/2 million of cash.

 7          Okay.  So if -- if -- if all the money -- so

 8  somewhere between 66 and 70 million has been -- has been

 9  spent, has been loaned to the partners, or has been used

10  to invest in other assets.

11  BY MR. BACKMAN:

12      Q.  Is that 70 million just for the year 2017?

13      A.  No.  It's cumulative since the beginning of time.

14      Q.  Gotcha.

15          And that's -- again, I want to make sure I'm

16  understanding.  That's only the unearned revenue?

17      A.  That is correct.

18      Q.  So despite that revenue being unearned, Reed Hein

19  has still received the benefit of it?

20          MS. BAKER:  Object to form.

21      A.  They received the cash, yes.

22  BY MR. BACKMAN:

23      Q.  They're operating their business based upon that

24  money, correct?

25      A.  That and other assets, yes.

ROBERT B. MORRISON - 03/08/2019                    Page 46

1    Q.  If they only used the, quote, earned revenue,

2    right, those successful exits, they wouldn't have enough

3    money to operate their business, based upon the

4    financials you've seen; is that correct?

5            MS. BAKER:  Object to form.

6    A.  Actually, the -- the net profitability of the

7    company since 2013, based on earned revenues, is break

8    even.

9    BY MR. BACKMAN:

10   Q.  So where is the additional $70 million?

11   A.  It's in assets that haven't yet been turned into

12   cash.

13   Q.  What assets?

14   A.  A -- cash, 4 1/2 million, receivables of

15   2.9 million, amounts due from the partners of

16   16.7 million.  And let me look at this other current

17   assets.  There's some detail on it.  Let me go find it.

18            So prepaid expenses, which are -- that's the

19   opposite side of the unearned income, unearned revenue.

20   The prepaid expenses are expenses paid to service --

21   part of the expenses paid to service these clients.  But

22   since the income -- the revenue hasn't been earned yet,

23   you can't recognize the expense either.  So that's a

24   pre-investment in those expenses.

25   Q.  How much is that line?

1    A.  10 million.

2    Q.  Any other -- you're calling that an asset?

3    A.  Yes.

4    Q.  Okay.  Anything else?

5    A.  That -- that pretty much covers it.

6    Q.  Okay.  By my math, that's roughly 33 million.

7    A.  Okay.

8    Q.  All right.  Where's the other 37?

9    A.  Invested in previous year losses.

10   Q.  What does that mean?

11   A.  It means in a year, if you have a loss, a

12   deficit, you've got to fund it somehow.

13   Q.  And those would be losses relating to the amount

14   of money that the company is either taking out in the

15   form of distributions or spending to run its business,

16   correct?

17   A.  No.  Technically, it is in the form of the net

18   profit or loss, in this case, net loss experienced

19   because the earned revenue did not cover the expenses.

20   Q.  So then am I to understand that the company is

21   operating basically at a negative $30 million loss?

22   A.  Well, that's on a tax basis.  On a book basis,

23   it's operating right at break even.

24   Q.  Even with the unearned revenue?

25   A.  Yes.  Because remember, unearned revenue doesn't

1  get recognized as part of profit until it's earned.  And

2  so yes, even with the unearned revenue.

3      Q.  Do you know what this lawsuit is about?

4      A.  Generally.

5      Q.  Have you ever done a Lanham Act analysis before?

6      A.  Yes.

7      Q.  How many times?

8      A.  I would say half a dozen.

9      Q.  On which side?

10     A.  Both.

11     Q.  Did you testify in connection with any of those

12  cases?

13     A.  I'm just thinking about it.  I don't believe I

14  did, though.

15     Q.  Give any deposition testimony?

16         MS. BAKER:  Object to form.

17     A.  I can't recall any, though.

18  BY MR. BACKMAN:

19     Q.  Did you prepare any reports?

20     A.  I have no idea.

21     Q.  Did you provide us with a list of cases that you

22  have previously been an expert in?

23     A.  Yes.

24     Q.  Do you know the names of the cases where you

25  acted as an expert for purposes of Lanham Act

 1   calculations?

 2       A.  It was when I was with KPMG.  So that would have

 3   been 1997 to 1999.

 4       Q.  You haven't done one since?

 5       A.  No.

 6       Q.  Am I to assume from the length of time that you

 7   don't recall the case names?

 8       A.  No, I don't.

 9       Q.  Would they be in your report, though, as part of

10   this list of expert testimony?

11       A.  If I provided expert testimony, yes.

12       Q.  Is there something you could look at to figure

13   out which cases you've served as an expert relating to

14   Lanham Act damages?

15       A.  I could try just by looking at the cases, try to

16   remember.

17       Q.  Is there something back in your office, though?

18       A.  No.

19       Q.  If this case were to go to trial tomorrow and you

20   were to provide testimony to a jury, your testimony

21   would be -- strike that.

22           What would your testimony be as to the total

23   amount of revenue earned from Orange Lake clients?

24           MS. BAKER:  Object to form.

25       A.  If it were to go to trial tomorrow, it would be

ROBERT B. MORRISON - 03/08/2019                    Page 50

1  the 3 million and then roughly, based on the

2  calculations right now --

3  BY MR. BACKMAN:

4      Q.  Just revenue.  All I'm asking for is revenue.

5      A.  Right.  Okay.  3 million for the successful exits

6  through 2018 and then somewhere between a million,

7  million and a half and 5 million of the unearned

8  revenues.

9      Q.  Okay.  You just looked at something --

10     A.  Right.

11     Q.  -- that added a million to a million and a half

12  dollars on the revenue figure that's contained in your

13  report, correct?

14     A.  Correct.

15     Q.  Can I see what you just looked at, please?

16     A.  Yes.

17     Q.  This document that you've just handed to me that

18  says "estimate of future earned revenue from OL

19  clients," you agree with me that that's not part of

20  what -- that stack of materials that you just looked at?

21     A.  That's been done subsequent based on information

22  that's been provided subsequent to the report.

23     Q.  Sure.  But you agree with me that it's not part

24  of the stack of documents that you told me before was

25  everything that I would need --

ROBERT B. MORRISON - 03/08/2019                    Page 51

1     A.  Yes.

2     Q.  -- in order to understand and -- sorry --

3  everything that you did or relied upon in connection

4  with your opinions?

5     A.  In the report, correct.

6     Q.  Right.  So this is not in the report, what I'm

7  looking at?

8     A.  That's correct.

9     Q.  There's no reference to this opinion or report

10  anywhere?

11    A.  No, because the information was received

12  subsequent and I indicated in my report that I was

13  seeking that information.

14    Q.  And when did you receive this information that's

15  reflected on what I'm going to now mark as Exhibit 4?

16        (Whereupon, Plaintiff Exhibit 4 was marked for

17  identification.)

18    A.  It was this week sometime, I believe.

19  BY MR. BACKMAN:

20    Q.  What does Exhibit 4 represent?

21    A.  Exhibit 4 represents a summary of information and

22  then a calculation related to the unearned revenue that

23  was on the books as of February 28, 2019.

24    Q.  You get any source documents or backup materials

25  relating to these figures that are on Exhibit 4?

1    A.  Yes.  I'm handing you a document that was

2  provided to me -- I didn't make copies of this -- a

3  document that was provided to me by the client that

4  breaks down the unearned revenue between Orange Lake

5  clients and other clients.

6    Q.  The document that you just handed me, which I'll

7  mark as Exhibit 5, that also wasn't included in your

8  report?

9    A.  That's correct.

10    Q.  And that also wasn't provided in the materials

11  that were provided to me before we got here today?

12    A.  Unless counsel had sent them to you.

13    Q.  Did you see it in the materials that you went

14  through?

15    A.  No.

16       (Whereupon, Plaintiff Exhibit 5 was marked for

17  identification.)

18  BY MR. BACKMAN:

19    Q.  Tell me what -- here, I'll trade you again.  You

20  got a copy of this?

21    A.  No, I don't.

22    Q.  Tell me what that is again.

23    A.  This is a schedule provided by the client that

24  shows this unearned revenue balance and the dollars of

25  that unearned revenue that are Orange Lake clients

1   versus non-Orange Lake clients.  So these are -- these

2   are monies -- were cash received by the company, but not

3   yet earned because exits have not been finalized.

4       Q.  Okay.  Do you know where they got those figures?

5       A.  I assume from their accounting department.

6       Q.  Did you ask?

7       A.  I asked them to provide me with the unearned

8   revenue balances and those that are Orange Lake and

9   those that are not Orange Lake.

10      Q.  When you got this spreadsheet, did you ask who

11  prepared it?

12      A.  No.  Well, it says "prepared by Christine" --

13  that's Tina, -- Christine Cheney.

14      Q.  So Christine Cheney is Tina?

15      A.  Yes.

16      Q.  Did you talk to her about this spreadsheet?

17      A.  No.

18      Q.  Did you see any of the backup materials?

19      A.  No.

20      Q.  Did you ask for the backup materials?

21      A.  Not yet.

22      Q.  Are you going to ask for the backup materials?

23      A.  If the case goes forward, yes.

24      Q.  Would you like to see the backup materials?

25      A.  Would I like to see it, sure.

1    Q.   Okay.  Now, you took the spreadsheet that was

2   prepared by a Reed Hein representative.  And from that

3   spreadsheet, you created what we marked as Exhibit 4?

4    A.   Correct.

5    Q.   And here you are, again, using that 28.1 percent.

6    A.   This is the only place the 28.1 percent is used.

7   The only place.

8    Q.   I'm sorry.  We just looked at it --

9    A.   Right.

10    Q.   -- in connection with Exhibit 3.

11    A.   Exhibit 3 is derivation of the 28.1 percent.  It

12   wasn't used in Exhibit 3.

13    Q.   Okay.

14    A.   And it was derived for this purpose in

15   anticipation that I would be getting the unearned

16   revenue information.

17    Q.   Right.  Because you were going to take 28 percent

18   of the total number of Reed Hein clients and say that's

19   the anticipated amount that will ultimately be earned by

20   Orange Lake, correct?

21    A.   Well, let me clear --

22    Q.   I'm sorry.

23    A.   Let me clear that up for you, yeah.

24        So I was going to take that percentage, multiply

25   it by the unearned revenue attributed to Orange Lake

1    clients.  And that would give me the amount of expected

2    future earned revenue from the Orange Lake clients based

3    on historical success rate.

4        Q.  But if I'm understanding, you haven't done that

5    because you don't know how many total Orange Lake

6    clients there are?

7        A.  Well, I've done the calculation.  But as we've

8    talked about before, I'm concerned about that

9    28.1 percent, about whether that is representative of

10   the success rate or not.

11           So mathematically, that's why I said the -- I

12   would -- I would testify that the range is between

13   1.5 million and 5.4 million.  Because I -- I -- I need

14   to do further -- get further information and do further

15   work on that 28.1 percent.

16       Q.  Well, is this opinion -- is this your opinion or

17   not on Exhibit 4?

18       A.  I said my opinion would be the revenues are

19   somewhere between 1.5 million and 5.4 million.

20       Q.  There's a big spread there.

21       A.  Yeah, there is a big spread.

22       Q.  How am I to know which one I'm actually dealing

23   with?

24       A.  It's undetermined at this point because I need

25   the additional information.

1    Q.  So your opinion on the amount of future earned

2    revenue from Orange Lake clients is actually

3    undetermined?

4    A.  Correct.

5    Q.  Based upon your use of this 28.1 percent, you

6    would agree with me that 79.9 percent of the unearned

7    revenue relating to Orange Lake clients would not be

8    part of your damage calculation?

9    A.  That's correct.  Mathematically, that's correct.

10    Q.  And so if this case were to go to trial tomorrow

11    and you were to testify, Reed Hein would get to keep

12    79.9 percent of the sales it made off of Orange Lake

13    clients?

14        MS. BAKER:  Object to form.

15    A.  Well, as we talked about, I -- I couldn't be

16    intellectually honest and say that.  Because I just told

17    you, you know, that I -- there's something in that

18    28.1 percent.

19    BY MR. BACKMAN:

20    Q.  Well, again, all I can go on is what you've given

21    me.

22    A.  I understand.  You're --

23    Q.  So based -- I'm sorry.  Go ahead.

24    A.  You're asking me what -- you know, if it were --

25    if we were testifying tomorrow.  If court was tomorrow,

1   I would not get up in court and say that 79 -- that only

2   $1.5 million is -- was future earned.  Because I have a

3   concern about that calculation.

4      Q.  Okay.  Based upon this document that we marked as

5   Exhibit 4, 79.9 percent of Orange Lake-generated sales

6   is not included in your damage calculation, correct?

7      A.  Let me rephrase it so that the record is clear.

8         Based on this calculation, 70 -- 79.1 -- what's

9   the percentage you're talking about?  Seventy --

10     Q.  Am I doing it wrong?

11     A.  Yeah --

12     Q.  79.9?

13     A.  It's 71.9.

14     Q.  71.9.  Thank you.

15     A.  71.9 percent of the unearned revenue balance

16  associated with Orange Lake would not be earned, and

17  therefore would not be part of the profitability of the

18  company.

19     Q.  Right.  So if the case ended tomorrow, and then

20  Reed Hein earned all that revenue, they would get to

21  keep it.  It wouldn't be part of this damage analysis,

22  correct?

23     A.  That's correct.

24         MS. BAKER:  Can we have a bathroom break at a

25     convenient time?

1          MR. BACKMAN:  Sure, now's fine.

2          THE WITNESS:  Before we go off, I want to

3     clarify that.

4          Would you read back his characterization of my

5     testimony, please?

6          THE COURT REPORTER:  The last statement?

7          THE WITNESS:  Yeah.

8          (Whereupon, the requested portion was read back

9     by the stenographer.)

10     A.  Yes, so to clarify, part of this damage analysis

11     based on the 28.1 percent, yes.

12     BY MR. BACKMAN:

13     Q.  I don't understand the clarification.

14          I mean, part of the damage analysis that you're

15     doing and that we're here asking you questions about.

16     A.  I understand.  And I have multiple times

17     indicated that I have concerns with that 28.1 percent.

18     So, again, I will state very clearly:  It is not my

19     opinion that the future earned revenues is $1,529,000.

20          MR. BACKMAN:  Okay.  We're going to hold off on

21     that bathroom break just so we can finish this line

22     of questioning.

23     BY MR. BACKMAN:

24     Q.  So what is it that you need precisely to get

25     yourself to a point where you can make an actual

ROBERT B. MORRISON - 03/08/2019                    Page 59

1  conclusion?

2      A.  The data or information about the number of --

3  historically, the number of Orange Lake clients that

4  resulted in no exit and the dollars that were actually

5  paid back out of unearned revenue to Orange Lake clients

6  during that time period.

7      Q.  So for the first part of that, is that not

8  exactly what Reed Hein provided you and what we marked

9  as Exhibit 3?

10     A.  No.

11     Q.  What we marked as Exhibit 3 contains a table with

12  the total number of Orange Lake clients along with the

13  total number of Orange Lake exited clients.

14     A.  Correct.

15     Q.  What else do you need?

16     A.  I want the data that shows these are the clients

17  that left and we had to pay back.

18     Q.  You want the actual refunds?

19     A.  Or -- that would be helpful.  Not necessary, but

20  helpful.

21     Q.  Do you know that they have that?

22     A.  I don't know.

23     Q.  Did you ask for that?

24     A.  We have asked for it, yes.

25     Q.  They didn't provide it to you?

1    A.  Not yet.

2    Q.  Did they tell you they actually have it?

3    A.  No.

4    Q.  Okay.  So what else would you need?

5    A.  That's -- that's it.

6    Q.  Just the total number of actual refunds?

7    A.  No.  I've expressed the number of clients that

8    were unsuccessful and the actual dollars paid back.

9    Q.  So forgive me.  Again, on the first part, the

10   total number of clients that were unsuccessful, that is

11   what they gave you in this table that you utilized to

12   come up with the percentage in Exhibit 3.  So what else

13   could they give you to tell you that there's more or

14   less actual clients?

15   A.  So let me explain it to you this way:  What was

16   provided was retained clients.

17   Q.  You're looking at Exhibit 3, correct?

18   A.  Correct.

19   Q.  Okay.

20   A.  Retained clients versus exited clients.  What's

21   missing is a column that says "lost clients."

22   Q.  What do you mean by lost clients?

23   A.  Clients that they weren't able to exit and -- and

24   they paid back.

25   Q.  Wouldn't that be the difference of the two

ROBERT B. MORRISON - 03/08/2019                    Page 61

```
 1   categories that you just gave me?
 2       A.  Not necessarily, no.
 3       Q.  What else would fall within there?
 4       A.  Clients that were not retained and were not
 5   exited.
 6       Q.  If they weren't retained, they wouldn't be on
 7   this list?
 8       A.  Precisely.
 9       Q.  But if they weren't retained, then Reed Hein
10   wouldn't have earned any revenue from them at all,
11   whether it's earned or unearned.  There would have been
12   no sale if they're not retained.
13       A.  Remember, what are we talking about here?  We're
14   talking about the success rate, right?
15       Q.  Are you saying that somebody who may have spoken
16   with Reed Hein but didn't actually hire Reed Hein goes
17   into the success rate?
18       A.  No.  No.  No.
19       Q.  Let me ask you a question, sorry, just so we're
20   on the same page.
21       A.  Sure, yeah.
22       Q.  What does retained client mean?
23       A.  To me, retained client means a client that's
24   carried over that is -- is actually unearned.
25       Q.  But it's somebody who has paid money to Reed
```

1   Hein?

2       A.  Absolutely.  Absolutely.

3       Q.  Okay.  So we're only talking about people, for

4   your calculations, that actually paid money to Reed

5   Hein, right?  We're on the same page there?

6       A.  Right.

7       Q.  Okay.  I just want to make sure we're on the same

8   page.

9       A.  Yeah.

10      Q.  So if you have the total number of Orange Lake

11  retained clients, so Orange Lake owners that paid Reed

12  Hein, and you have the total number of those clients

13  that were successfully exited, the difference would be

14  those that weren't?

15      A.  No, that's incorrect.

16      Q.  Okay.

17      A.  That's incorrect.

18      Q.  I'm just not following.  I take full

19  responsibility.

20      A.  No, that's fine.  I mean, it isn't -- it isn't an

21  easy concept.

22          Retained clients, so let's say there's a hundred

23  clients that we're still working on at the beginning of

24  a month, a hundred Orange Lake clients.  And let's say

25  that during the month, we add -- I need to write this

ROBERT B. MORRISON - 03/08/2019                    Page 63

1  down so I remember -- five new contracts.  So now we

2  have 105.  And let's say that we successfully exit 25.

3  So that's 80 now.  100 plus 5 is 105, minus the exited

4  is 80.  And then let's say that we -- that there were

5  10, let's say, that were unsuccessful.  Okay.  So now

6  we're down to 70 retained, 25 exited.

7       What we're missing in here are the number of new

8  ones that came in and the ones that were -- that -- I

9  don't know if I should use the word "exited" -- that

10  left because of an unsuccessful exit.  You don't have

11  all of the information here.

12       Because the -- the retained is a function of --

13  again, a function of new ones that came in, of exited,

14  and of those who we had to pay back.  The only one of

15  those three variables that we have is those exited.  So

16  what we're missing are the new ones.  And we're missing

17  the ones that were paid back and -- and are gone.

18       And so I got to have that information to tell me

19  what the success rate was.

20  Q.  Why did you include in your report percentages

21  of, quote, successful exits relating to Orange Lake

22  clients if you don't know?

23  A.  Well, I thought I did know until, like I said,

24  last night I had an epiphany looking at that saying this

25  just doesn't make sense.  There's something missing

1   here.  And I went through this exact same analysis to

2   realize what I'm missing are the new people coming in

3   and the actual exits themselves.

4       Q.  I'm just not understanding when there's a column

5   that says the actual number of exits.

6       A.  I don't know how to help you.  I've explained

7   it --

8       Q.  Is that not -- is that not what this report says?

9   I mean, there's column heading, "total exit."

10      A.  Yeah.

11      Q.  That's what it says.

12      A.  We get to total exited.

13      Q.  And then there's an Orange Lake percentage of

14  total exited.  So they're telling you -- Reed Hein is

15  telling you, with their records, the number of Orange

16  Lake owners that were exited.

17      A.  Correct.

18      Q.  So everyone else that retained Orange Lake --

19  sorry -- Reed Hein was not exited?

20      A.  That's at the end of the month.  What you're

21  missing is in between how did you -- how did -- so the

22  question -- I don't know whether this will help you or

23  not.  Let's go to retained.  Let's just do total.

24  Forget about Orange Lake for now.

25          If the total retained went from, in January 2015,

1  288 to 302 in February, how do you know how many new

2  clients there are and how many clients exited?  How do

3  you differentiate that?

4      Q.  That's a great question.

5      A.  I'm sorry.  Not exited.  How many were

6  unsuccessful and had to be paid back.

7      Q.  How is an unsuccessful exit being defined by you

8  in your report?

9      A.  Have to repay the -- the fee.

10     Q.  Oh, it's only people -- okay.  Maybe that's my

11 disconnect here.  Unsuccessful exit is only people to

12 whom the refund is owed?

13     A.  Either to whom the refund -- yeah, it would have

14 to be that, to whom the refund is owed because of an --

15 because they did not exit.

16     Q.  Sure.  So if somebody signed up with Reed Hein --

17 if an Orange Lake signed up with Reed Hein -- when were

18 you retained?  Okay.  When was your report prepared?  I

19 just want to use the right date.

20     A.  The report -- report was prepared March 4.

21     Q.  Okay.  If somebody signed up -- strike -- strike

22 all of that.  I apologize.

23         If an Orange Lake owner retained Reed Hein on

24 February 1st --

25     A.  Okay.

1      Q.  -- with a provision in the agreement that said

2   Reed Hein has 9 to 18 months to, quote, exit that

3   person?

4      A.  Correct.

5      Q.  Would that person, in your report, be considered

6   an unsuccessful exit?

7          In other words -- let me try it differently.

8          In other words, are people who are simply waiting

9   for the services of Reed Hein to conclude considered,

10  quote, unsuccessful exits, end quote, as utilized in

11  your report?

12     A.  No.

13         MR. BACKMAN:  We can take a bathroom break now.

14         THE VIDEOGRAPHER:  Time is 11:34 a.m.  Off the

15     record.

16         (Whereupon, a break was taken from 11:34 a.m.

17     to 11:47 a.m.)

18         THE VIDEOGRAPHER:  The time is 11:47 a.m.  On

19     the record.

20  BY MR. BACKMAN:

21     Q.  Okay.  Maybe I understand.  Probably not.

22         But so there's -- there's three buckets, then, if

23  I'm looking at this maybe through my eyes.

24         There's the actual exits --

25     A.  Yes.

```
 1      Q.  -- for Orange Lake customers.  There's the actual
 2  refunds for Orange Lake customers.
 3      A.  Right.
 4      Q.  Then there's the people waiting.  Is that fair?
 5      A.  There's a fourth bucket, new people coming in.
 6      Q.  Okay.  Which of those buckets are not included in
 7  the analysis that you've done to date?
 8      A.  The new people coming in and those that received
 9  refunds.
10      Q.  And what do we do about those that are waiting
11  but may ultimately be entitled to a refund?
12      A.  That is the calculation I did on Exhibit 4.
13  People waiting, their monies would be in that unearned
14  revenue pot.  And so we take that unearned revenue pot
15  associated with Orange Lake and apply a success factor
16  to it based on the actual successful exits, and that
17  gives us, then, the revenues that will be earned -- or
18  estimated revenues that will be earned in the future.
19      Q.  And that's what you were trying to do with the
20  28.1 percent, but we've since determined that that's not
21  necessarily correct?
22      A.  That's correct.
23      Q.  Got it.
24          On Exhibit 4, how did you calculate the total
25  reflected for unearned OL client revenue?
```

ROBERT B. MORRISON - 03/08/2019Page 68

1    A.  That is from -- the exhibit you're holding, we

2  don't have a copy of it.  So --

3    Q.  Sorry.

4    A.  Yeah, that's fine.  Exhibit 5, you'll see that

5  there's two main sections here, one is actual cash

6  received and the other is clients that -- that basically

7  are paying over time.

8        And so the dollars that I used were the actual

9  cash received from the Orange Lake clients plus the

10  value of the receivable for those paying over time.

11    Q.  And the bottom line there says "total OL open

12  contracts."  Do you see that?

13    A.  Yes.

14    Q.  Are there any differentiations to be made with

15  respect to the OL open contracts, like the four

16  categories we just discussed, or is that all of them?

17    A.  That would be as of the -- as of the date

18  February 28, 2019, that would be all retained, if you

19  will.  You know, we would use the term "retained

20  clients" before.

21    Q.  Would that include retained clients that had

22  already been exited?

23    A.  No.  No.

24    Q.  Okay.  So is it fair to say to get the total

25  number of Orange Lake contracts, that we would add that

ROBERT B. MORRISON - 03/08/2019                    Page 69

 1   number to the 588 that we talked about earlier?

 2       A.  Plus those that were not -- those that received

 3   refunds and were not retained during that 2013 to

 4   2018 time period.

 5       Q.  And you haven't been provided with any

 6   information relating to actual refunds?

 7       A.  I have now.

 8       Q.  Okay.  Before --

 9           MR. BACKMAN:  Hold on one second.  We'll get

10       there.

11   BY MR. BACKMAN:

12       Q.  Before we took this last break, you had not been

13   provided with any information relating to actual

14   refunds, correct?

15       A.  That's correct.

16       Q.  Okay.  Now, ten minutes later, you say you have

17   been provided with that information?

18       A.  Correct.

19       Q.  Okay.  In what form?

20       A.  In the form of a two-page document that lists --

21   it's titled "Confidential RH-219331."  And it lists the

22   different customers, if you will, the date of refund,

23   and the amount of refund.

24       Q.  Do you know how long Reed Hein and your lawyers

25   have had that document?

ROBERT B. MORRISON - 03/08/2019                    Page 70

1      A.  I don't.

2      Q.  Did you ask?

3      A.  No.

4      Q.  Did you ask why you're just getting it handed to

5   you at a break an hour into your deposition?

6      A.  No.

7      Q.  Did it seem like a long time for them to be able

8   to go online and hit print to give you that document?

9          MS. BAKER:  Object to form.

10     A.  I don't understand the question.

11  BY MR. BACKMAN:

12     Q.  Do you know whether somebody had to go search for

13  that over the last few weeks that you've been asking for

14  it?

15     A.  I have no idea.

16     Q.  Do you know whether it was just found during the

17  break or they had been looking for it for three weeks?

18     A.  I have no idea.

19     Q.  And your position -- sorry.  Your testimony is

20  that that document that you're looking at that was

21  handed to you at the break reflects actual refunds paid

22  out by Reed Hein to Orange Lake owners through today?

23     A.  Actually, I need clari- -- no, it includes -- it

24  appears to include other -- more than just Orange Lake.

25  It includes other resorts, but also includes Orange

ROBERT B. MORRISON - 03/08/2019                    Page 71

1    Lake.

2        Q.  What do you understand that to reflect?

3        A.  I understand this to reflect the refunds that

4    they've had to pay out on their business.

5        Q.  Regardless of developer?

6        A.  Yes.

7        Q.  What is the total?

8        A.  $286,000 -- 287,000, rounded.

9        Q.  Does the total of actual refunds differ from the

10   numbers that you were getting based upon the percentage

11   calculations you were doing for your report?

12       A.  Yes.

13       Q.  Does it differ substantially?

14       A.  Yes.

15       Q.  How much does it differ by?

16       A.  I'd have to do the calculation.  It's material.

17   It's a lot.

18       Q.  It's pretty material, right?

19       A.  Yeah.  Yes.

20       Q.  It changes the essence of all of your

21   calculations in your report, does it not?

22           MS. BAKER:  Object to form.

23       A.  It does -- it does not.

24       Q.  Which -- does it change any of them?

25       A.  In my report?  Doesn't change anything in my

 1  report other than the percentage of unsuccessful in my

 2  report.

 3      Q.  So the percentage of unsuccessful is that

 4  28.1 percent we've been talking about?

 5      A.  Correct.

 6      Q.  So what would the percentage be now?

 7      A.  I'd have to do the calculation.

 8      Q.  You can do that right now?

 9      A.  Yes.

10      Q.  Okay.  Let me -- let me stop you real quick.  You

11  told me before that that is not limited to Orange Lake.

12  Does that matter?

13          MS. BAKER:  Object to form.  This is Holiday --

14      and these are all of the --

15          MR. BACKMAN:  Hold on.  You're not testifying.

16          MS. BAKER:  These are --

17          MR. BACKMAN:  You're not testifying.

18          MS. BAKER:  Misstates his testimony.  Improper

19      foundation.

20          MR. BACKMAN:  Should I read it back?

21  BY MR. BACKMAN:

22      Q.  Mr. Morrison, did you tell me before that you

23  don't believe that those are all Orange Lake refunds?

24      A.  The resort name on here includes Orange Lake and

25  includes other resorts.

1      Q.  Right.  I just want to know something real quick.

2   Did you tell me before that the document that's now in

3   front of you does not include only Orange Lake?

4           MS. BAKER:  Object to form.

5      A.  Resort, yes.

6   BY MR. BACKMAN:

7      Q.  Right.  It includes other developers, right?

8      A.  Other resorts, yes.

9      Q.  Okay.  Does it include only Orange Lake-related

10  resorts?

11     A.  That, I don't know.

12     Q.  Okay.  What information precisely do you need in

13  order to be able to fix the error in the prior

14  calculation relating to percentage of success?

15          MS. BAKER:  Object to form.

16     A.  Based on this -- those -- identifying those on

17  this list that are Orange Lake clients that are -- that

18  are clients for which Orange Lake has filed its lawsuit.

19  BY MR. BACKMAN:

20     Q.  Sure.  Who handed that -- those two pieces of

21  paper to you?

22     A.  Ms. Baker.

23     Q.  Did she tell you what it was?

24     A.  That it was a list of the refunds paid.  We

25  didn't discuss whether it was just Orange Lake or not.

1    Q.  Would you want to know that?

2    A.  Yes.

3    Q.  All right.  And would you want to know how that

4  spreadsheet was prepared?

5    A.  Yes.

6    Q.  Do you know how it was prepared?

7    A.  No.

8    Q.  Do you know from where the information in that

9  spreadsheet was derived?

10    A.  Not specifically, no.

11    Q.  Okay.  I take it, from what your attorney started

12  to say, that she contends that those are all Orange Lake

13  refunds.  So if you can go ahead and do whatever

14  calculation you were going to do.  We'll go with that --

15    A.  Under that assumption?

16    Q.  Under that assumption.

17    A.  Then the percentage is 9 -- I'm sorry.  The

18  percentage of unsuccessful is 90 -- no.  The percentage

19  of unsuccessful is 9.3 percent.

20    Q.  So then if we do it in the converse, for your --

21  for your Exhibit 4, this 28.1 -- you know my math skills

22  at this point.  So --

23    A.  I'll do it for you.  90.7.

24    Q.  Okay.  90.7?

25    A.  Correct.

ROBERT B. MORRISON - 03/08/2019                    Page 75

1    Q.  Is that what you're going to go with?  Is that

2    now a conclusive opinion as to the percentage?

3    A.  Yes.

4    Q.  90.7?

5    A.  Yes.

6    Q.  So I'm changing on Exhibit 4 the 28.1 to 90.7.

7        Are we on the same page with that?

8    A.  Yes.

9    Q.  And there were other references to this

10   28.1 percent in your report as well as on some of the

11   other documents.

12       Do I change it everywhere?

13   A.  Yes.

14   Q.  How do I change it to 90.7 percent on what we

15   marked as Exhibit 3 based upon your use of the actual

16   exits and total clients that Orange Lake provided to

17   you?

18   A.  You scratch through it and put 90.7.

19   Q.  But how does the math work?

20   A.  I told you, it can't because we're missing --

21   we're missing this information.  We're missing the -- to

22   do it on there, we would need to have either the

23   information now provided or the information related to

24   the number of new clients to do the math.

25   Q.  So we can't rely upon Exhibit 3 for anything in

ROBERT B. MORRISON - 03/08/2019                Page 76

1   your report?

2            MS. BAKER:  Object to form.

3        A.  That's incorrect.

4   BY MR. BACKMAN:

5        Q.  Okay.  What can I rely on it for?

6        A.  Everything except for the 28.1 percent.

7        Q.  Well, but you would agree that even the table

8   from which you derived the 28.1 percent is not accurate

9   because it's missing certain information?

10       A.  I disagree with that.  It's accurate for the

11   information presented.

12       Q.  Okay.  Solely as to the totals, you just can't

13   extrapolate a percentage?

14       A.  Correct.

15       Q.  Okay.  Does anything on the table on the third

16   page of Exhibit 3 need to change?

17       A.  No.

18       Q.  So if I take -- well, can you do the math for me

19   on Exhibit 4 to get to what your future earned revenue

20   from OL clients would be, please.

21       A.  So the -- what's showing as 1,529,575 would be

22   4,942,934.

23       Q.  And if I understand -- if you can keep that right

24   there, Exhibit 4 with the new numbers.

25       A.  Yes.

1      Q.   Okay.  And you could take your report.  If you
2   would go to Page 13 on your report, please.
3      A.   Yes.
4      Q.   Do you see on Page 13, 14, and 15, you have a
5   little box --
6      A.   Yes.
7      Q.   -- with three categories of -- of numbers, right?
8      A.   Yes.
9      Q.   And in each of those, the categories are
10   revenues, operating expenses, and profits, right?
11      A.   Yes.
12      Q.   Am I to add the 4,942,934 to the revenue line in
13   each of those reports?
14      A.   No.
15      Q.   Why not?
16      A.   Because those pages deal with the historical
17   earned revenue.  The -- I'm trying to find the section
18   in the report that deals with that unearned revenue.
19         Okay.  Go to Page 9, Roman numeral II.  Well,
20   I -- read the paragraph -- basically, what I'm saying
21   here in Roman numeral II, starting on Page 9 is that TET
22   has received and not yet earned the additional revenues.
23   Based on TET's history of successful exits, I will
24   ultimately earn additional revenue.  I requested
25   financial data needed to estimate additional revenue,

 1  but have not received it.  I reserve the right to amend

 2  this report when and if that data is received.

 3          So now the data is received.

 4          So go to Page 10, Number 21.  See at the top

 5  there, that's where the 28 percent comes in.  So now

 6  that is 90.7.

 7  Q.  Sure.  But what do I do with the 4.9 million to

 8  figure out what your actual conclusion is as to the

 9  amount of Lanham Act damages at issue?

10  A.  Okay.  Yeah.  Then you -- in terms of totality,

11  you add it to the 3 million.

12  Q.  I add it to those boxes, right?

13  A.  Right.

14  Q.  To the revenue line in each of those three boxes?

15  A.  Correct.

16  Q.  Does the math change on the operating expenses?

17  A.  No.

18  Q.  Okay.  So I'm going to add it -- so let's go to

19  the first one.  I just want to make sure I'm

20  understanding.

21          So on Page 13, we're going to add 3,077,611 to

22  4,942,934.

23          So then I should change, for purposes of your

24  report, that top line number --

25  A.  No, you shouldn't.

1    Q.  -- to 8 million -- I should not?

2    A.  No, because the way I dealt with it in the

3    report, because I didn't have the information to do the

4    unearned revenues, is I dealt with first the historical.

5    And then in that section we were just talking about,

6    then if I were to amend the report, I would amend it for

7    the fact that I now have the information and then -- to

8    indicate 4.9 million.

9    Q.  Plus 3 million?

10   A.  Yeah, and then ultimately 3 million, but

11   understanding that these sections are dealing with only

12   the historical, the ones you're referring to.

13   Q.  So then would you have just a fourth table that

14   says -- or three more tables, I guess?

15   A.  Well, actually -- I don't know how I -- I mean,

16   in -- in substance, you're correct.  In substance, it

17   would be adding the two together and then taking the

18   different percentage expenses against them.

19   Q.  And the -- the total of that, depending upon

20   which of these three methods you go with --

21   A.  Correct.

22   Q.  -- is going to be, quote, profits for purpose s

23   of the Lanham Act calculation that you were asked to

24   perform?

25   A.  Correct.

ROBERT B. MORRISON - 03/08/2019                    Page 80

1    Q.  Okay.  So I just want to make sure I'm right.  So
2    I get 8,020,545, subtract it from 2,871,411 --
3    A.  No.  No, you wouldn't do that.  You would -- the
4    2,871,000 would increase because of that additional
5    increased revenue.
6    Q.  Well, that's what I just asked you.
7         Do the operating expense amounts change?  Do any
8    other line items change?
9    A.  And we got hung up on the fact of the difference
10   because this was dealing solely with the 3 million.
11        So yes, the expenses would change if the revenue
12   changes.
13   Q.  Why do the expenses change if you're adding in
14   estimated future revenue that has yet to be earned?
15   A.  Because the expenses have not yet been recognized
16   against those.
17   Q.  So how are you going to recognize those against
18   the future unearned revenue?
19   A.  Based on the historical expense rate per dollar
20   earned.
21   Q.  And what's that amount?
22   A.  That'd be -- so let's go back to your -- the
23   Page 13 at the top.  What you -- so the -- the
24   3,077,611, if you're to add the estimated future revenue
25   to be earned of 4,942,934, we get to a number of

ROBERT B. MORRISON - 03/08/2019                    Page 81

 1   8,020,545.  The expense rate is 93.3 percent.  So you

 2   multiply that by 93.3 percent to get the expenses -- or

 3   the shortcut would be the profit rate of 6.7 percent.

 4   So multiply that by 6.7 percent, and it's profits of

 5   537,376.

 6      Q.  And that's what you would do for each of these

 7   boxes?

 8      A.  Correct.

 9      Q.  In connection with adding in this future unearned

10   revenue that's not otherwise calculated in the actual

11   report that you prepared?

12      A.  Correct.

13      Q.  So what you've just done in roughly 10,

14   15 minutes is now your expert opinion on the Lanham Act

15   damages in this case?

16      A.  Yes.

17      Q.  You want to look at anything else?

18      A.  Not at this point, no.

19      Q.  No, you're good?

20      A.  Yes.

21      Q.  You don't need any other documents?

22         MS. BAKER:  Object to form.

23      A.  At this point, no.

24   BY MR. BACKMAN:

25      Q.  You need any other communications with anyone

```
 1   from Reed Hein?

 2      A.  Not to my knowledge.

 3      Q.  Do you need to make any other changes to your

 4   report or exhibits?

 5      A.  Schedule 1, I think you were provided with an

 6   amended Schedule 1.

 7      Q.  Right.

 8          Anything else based upon the last hour and a half

 9   of testimony and the changes that have been made?

10      A.  Based on the last hour and a half of testimony,

11   no.

12      Q.  No?  You don't have to change any other

13   worksheets or sentences in your report based upon your

14   new calculation of the OL client successful exit

15   percentage?

16      A.  I would have to read through the report.  And I

17   mean, if I -- if I'm asked to prepare an amended report,

18   I'll prepare an amended report.

19      Q.  Do you consider what you just testified to, to be

20   an amendment to your report?

21      A.  Yes.

22      Q.  It changed your entire opinion, correct?

23          MS. BAKER:  Object to form.

24      A.  No, it didn't change my entire opinion.

25   BY MR. BACKMAN:
```

1    Q.  No?

2    A.  No, it changed a number that had not been used

3  yet to make any calculations.

4    Q.  Did it change the overall dollar amount of the

5  Lanham Act damages that you calculated?

6    A.  No, because I had not calculated the revenues yet

7  on the unearned revenues when I issued this report

8  because I didn't have the data.

9    Q.  Did it change the overall dollar amount that you

10  came to the conclusion was at issue for the Lanham Act?

11    A.  I did not come to conclusion -- any conclusion in

12  my report as to total dollar amount at issue.

13    Q.  Okay.  Which of the three methods that you

14  reference are you going with for purposes of the actual

15  Lanham Act damages at issue in this case?

16       MS. BAKER:  Object to form.

17    A.  The -- the second method, I think, is the -- the

18  more robust method.

19  BY MR. BACKMAN:

20    Q.  Why utilize or reference the first and the third?

21    A.  Because there is a -- an accounting conception

22  called "full absorption."  And full absorption is that

23  every dollar gets assigned -- every dollar of expense

24  gets assigned to revenue.

25       In looking at this, there are some fixed

1    components to expenses.  And -- while the regression

2    analysis is the best method to do this with, there

3    aren't enough data points, I think, to -- you know, to

4    make it determinative, but it's informative.

5         And looking at the -- the actual correlation of

6    the different expenses to the revenue, and those with --

7    as I mentioned in the report, those with high

8    correlations suggest they have high variability.  And so

9    for every new dollar of -- every new dollar of revenue

10   generated, there's a certain percentage of expenses that

11   would be incurred.  And so that -- I felt that based on

12   these three methods, that was probably the best method

13   to use because it recognizes the fact that there are

14   some fixed costs in the structure.

15        Q.  Did you break down or -- strike that.

16             Did you do any analysis to figure out which of

17   the operating expenses were fixed versus variable?

18        A.  Yes, I looked at the correlation and the R

19   squared, which is a statistical term, that basically

20   shows the correlation between each of the expense line

21   items and the revenue.  And those that are variable will

22   have a high correlation.

23        Q.  And where did you do that?

24        A.  On Schedule 1.

25        Q.  That's the new schedule that was provided to me?

1     A.  Yes.

2           MR. BACKMAN:  Let me mark that, please.

3           Oh, let me -- let me have what was handed to

4     you during the break.  We'll mark this one.

5           (Whereupon, Plaintiff Exhibit 6 was marked for

6     identification.)

7           MR. BACKMAN:  So I marked the spreadsheet that

8     was handed to you during the break as 6.  And I'll

9     mark your new schedule that you just gave me this

10    morning as Exhibit 7.

11          (Whereupon, Plaintiff Exhibit 7 was marked for

12    identification.)

13          THE WITNESS:  I think this was given to you

14    last night, if I'm not mistaken.

15          MR. BACKMAN:  No.

16    BY MR. BACKMAN:

17    Q.  That's a new one, right?  That's different from

18    the first schedule, correct?

19    A.  It's amended, yes.

20    Q.  Right.

21          MS. BAKER:  That's Schedule 1?

22          THE WITNESS:  Yes.

23          MS. BAKER:  Okay.  That was sent to you this

24    morning.

25

ROBERT B. MORRISON - 03/08/2019                    Page 86

```
 1  BY MR. BACKMAN:
 2     Q.  What is different from that Schedule 1 and the
 3  one that was originally utilized by you in connection
 4  with your report?
 5     A.  The only difference is, if you recall, the
 6  company was on a cash basis in 2013 and '14 and then
 7  went to accrual in 2015 forward.
 8         When you do that, you make an adjustment to catch
 9  up basically for the differences from 2013.  So -- '13
10  and '14.  So in 2015, there was a $3 million charge for
11  this catch-up.  And I -- I reallocated that back to 2013
12  and 2014 based on the information provided as to what
13  exactly the changes were.
14         When I originally did Schedule 1, I had the
15  journal entry backwards.  And so I amended it to correct
16  that journal entry and to put those dollars back in the
17  proper years.
18     Q.  So what changed?
19     A.  On --
20     Q.  Do you have a copy of that, by the way?  I think
21  you said you did.
22     A.  A copy of?
23     Q.  Exhibit 7.
24     A.  Yeah, I got 7 there.
25     Q.  No, do you have an extra copy?  I thought you
```

ROBERT B. MORRISON - 03/08/2019                    Page 87

1   said you did.

2       A.  Yeah, I do.

3           Do you have the original Schedule 1?

4       Q.  I do, yeah.

5       A.  Okay.  So if you look up at the top there,

6   operating revenues -- operating revenue, sales returns,

7   and then there's a blank.  And you see that there is

8   $675,000 positive in Schedule 1 and 2 million 797

9   positive in 2014?

10      Q.  Uh-huh.

11      A.  Okay.  Now look at amended.

12      Q.  Okay.

13      A.  Okay.  They're negative because on a cash basis,

14  you're recognizing that revenue when you received the

15  cash.  On an accrual, as we know, you don't recognize it

16  until you earn it.

17          And so the adjustment reduces those earlier years

18  of this cash that was received but not yet earned.

19      Q.  Okay.  Does anything else change?

20      A.  Yeah, there's one other place.  Page 2, see the

21  net operating income line with the double strike?

22      Q.  Yes.

23      A.  Go up above that to Section 481A, adjustment.

24  You see that?

25      Q.  Uh-huh.

1        A.  Section 481 is the cash to accrual adjustment.

2   So there were some expenses that were prepaid in -- in

3   certain years that had to be adjusted backwards as well.

4        Q.  Okay.  The end result there for total operating

5   expenses doesn't look like it changes much.

6        A.  It shouldn't.  No, it shouldn't change

7   dramatically.

8        Q.  Okay.  Anything else?

9        A.  That's it.

10       Q.  Who prepared Schedule 1?

11       A.  The -- just keying in the numbers was done by a

12   staff person.

13       Q.  Where did you get the numbers from?

14       A.  Tax returns.

15       Q.  Did you look at any other financial records of

16   Reed Hein aside from the tax returns?

17       A.  Looked at the trial balances and tried to -- to

18   reconcile between the two and could not reconcile them.

19   There's -- there's going to be adjustments that are made

20   by the accountant.  There's going to be what's called

21   book to tax adjustments.  So the tax returns, as filed,

22   provided a basis of consistent presentation.  And so we

23   relied on those.

24       Q.  Is there a best practices in terms of which

25   financial records of the company that you're analyzing

1  you should use?

2    A.  Is there a best practice?  I don't know whether

3  it's -- I mean, my best practice is whichever had --

4  whichever is more consistent and has the most assurance,

5  if you will.  Something filed with the IRS has some

6  assurance to it under threat of perjury or whatever the

7  threat is.

8        And also, I know, from being in the business for

9  30 years, that a trial balance may or may not reflect

10  the ultimate financial statements because a trial

11  balance, depending on when it's taken, what is actually

12  printed, literally printed, may not reflect the year end

13  adjustments of the accountant, may not reflect prior

14  period adjustments by the accountant.  And so -- and

15  also do not have the mapping from the general ledger and

16  trial balance and financial statements to the tax

17  return.

18        In fact, if you look at the -- if you look at

19  the -- there's something called a "book to tax

20  reconciliation" of the tax return.  If you look at the

21  profitability on a book basis, it's that negative

22  $37 million we were talking about earlier.  And that's

23  because there were adjustments that were made, there

24  were -- was revenue that wasn't recorded in the books

25  that was recorded by the accountant for tax return

ROBERT B. MORRISON - 03/08/2019                    Page 90

1  purposes.

2        And so it just became very clear that the tax

3  returns provided the best source of information.

4     Q.  Is that -- if it's added in after by the

5  accountant for certain purposes, is that an accurate

6  depiction of the particular year's earned revenue?

7        MS. BAKER:  Object to form.

8  BY MR. BACKMAN:

9     Q.  The example that you just gave, where revenue

10  wasn't recorded by the books, but then it was recorded

11  by the accountant for tax purposes, under that scenario,

12  would that be an accurate depiction of the year's

13  revenue?

14        MS. BAKER:  Object to form.

15     A.  The tax returns, yes.

16  BY MR. BACKMAN:

17     Q.  Yes?

18     A.  Absolutely.

19     Q.  Okay.  Did you look at any balance sheets?

20     A.  Yes.

21     Q.  Did you look at any profit and loss statements?

22     A.  Yes.  That's the trial balance, basically.

23     Q.  But you didn't use those?

24     A.  No.

25     Q.  Did you speak with anyone from Reed Hein or its

1    lawyers about the operating expenses?

2        A.  Generally, yes.

3        Q.  What did you talk about?

4        A.  One of the things we talked about was whether or

5    not there were any discretionary expenses in there.

6    And -- and, you know, we talked about the nature of

7    discretionary expenses.  Talked about whether or not

8    they were nonrecurring-type things.  We talked about

9    trying to reconcile between the financial statements and

10   the tax returns.  Talked about the unearned revenue.

11       Q.  You do any analysis or have any discussions

12   relating to whether specific operating expenses were

13   tied directly to Orange Lake sales?

14       A.  Yes, we did have that conversation.

15       Q.  What did you find out?

16       A.  Found out that they don't track the expenses

17   directly to a client.

18       Q.  Did you try to figure that out otherwise?

19       A.  Well, if they don't do it, how am I supposed to

20   try to figure it out?

21       Q.  Did you ask them if they had any records that

22   would demonstrate that a particular operating expense

23   relates specifically to an Orange Lake sale?

24           MS. BAKER:  Object to form.

25       A.  I asked whether or not they tracked that -- I

1  understand the difference of your question.  No, I

2  didn't look -- I didn't ask nor look at underlying

3  source documents to determine whether or not they were

4  included in there or that I could tell to which client

5  it specifically related.

6  BY MR. BACKMAN:

7     Q.  From the list of operating expenses that are set

8  forth on Schedule 1 that we marked as Exhibit 7, are you

9  able to tell me which of those operating expenses are

10  actually related to Orange Lake sales?

11     A.  Directly or indirectly?

12     Q.  We could start with directly.

13     A.  No.

14     Q.  What about indirect -- excuse me.  What about

15  indirectly?

16     A.  Actually, no.  No to both in terms of

17  specifically to Orange Lake clients.  Because it's not

18  tracked that way.  It's not recorded that way.

19     Q.  And you -- other than them telling you that they

20  don't track it that way, you didn't do anything to try

21  to figure it out for purposes of the schedule or your

22  report?

23          MS. BAKER:  Object to form.

24  BY MR. BACKMAN:

25     Q.  Is that correct?

1    A.  Well, I did what I said in my report to -- to

2  estimate what expenses related to Orange Lake clients.

3    Q.  So what analysis did you do to come to that

4  estimation?

5    A.  The three analyses we -- we've already talked

6  about.  Looking at a fully absorbed concept, looking at

7  those specific line items that had high correlation with

8  revenues, and then doing a regression analysis on the

9  total expenses.

10    Q.  Did you come to a conclusion as to the percent of

11  Orange Lake revenue to the total revenue for Reed Hein?

12    A.  Yes.

13    Q.  Do you agree with me that it's a pretty small

14  percentage?

15        MS. BAKER:  Object to form.

16    A.  Yes, it's 4 to 5 percent, somewhere in that

17  range.

18  BY MR. BACKMAN:

19    Q.  Do you think it's appropriate to utilize --

20  strike that.

21        To apply all the operating percentages that you

22  have done to such a small percentage of orange -- of

23  Reed Hein's business?

24    A.  Yes.

25    Q.  Why?

ROBERT B. MORRISON - 03/08/2019                    Page 94

1      A.  Because -- let's take advertising, which is a

2  huge, huge expense.  Some of that advertising was to

3  secure Orange Lake clients.  Labor, that was to secure

4  Orange Lake clients.  Even having to -- to -- paper

5  clips, that's for Orange Lake clients.  There's an

6  accepted way of allocating costs to revenue when you

7  don't have separately identifiable expense -- expense

8  categories you don't account for it separately.

9      Q.  All of those things that you just mentioned,

10  those are also attributable to the 95 percent of other

11  clients?

12      A.  Absolutely.

13      Q.  Reed Hein would have engaged in those advertising

14  activities regardless of Orange Lake customers, correct?

15      A.  If Orange Lake had just Reed Hein and not the

16  other customers, Reed Hein would have participated in

17  those advertising too.

18      Q.  I don't understand your answer.

19      A.  Okay.  Well, your -- your -- your posit was that

20  if Orange Lake customers weren't there, Reed Hein would

21  advertise, would have office space, would -- would do

22  all these things.  Well, I flip that around.  If it were

23  only Orange Lake clients, Reed Hein would advertise.

24  They'd have employees.  They would have rent.

25          And the question -- the question becomes so how

1    much?  You know, and, again, there's -- there's --

2    because when they pay the rent, they don't say, this

3    amount of the rent was for Reed Hein clients.  This

4    amount of the rent was for everybody else.  We use

5    methodologies -- accepted methodologies for trying to

6    parse that out.

7        Q.  Sure.  And I appreciate you trying to flip around

8    my -- my posit, but if you could just answer my

9    question, that would help us move along here.

10            Reed Hein would have done the advertising whether

11   or not they got any Orange Lake owners; is that correct?

12       A.  Would they have done advertising?  Yes, they

13   would have done advertising.

14       Q.  And they still would have spent -- what portion

15   of the nearly 12 million in 2017 would have been

16   attributable to Orange Lake?

17       A.  2017?  $222,000, more or less.

18       Q.  And is that percent -- how did you come up with

19   that?

20       A.  Because that is the percent -- the advertising

21   percent against all revenues and multiplied by Orange

22   Lake client exit revenues.

23       Q.  Okay.  Is that what you did in determining what

24   the total amount of operating expenses are going to be

25   to offset the total revenues?

1     A.  Yes.

2     Q.  You did that for each item of operating expense?

3     A.  No.  I -- as my report says, I took those

4  expenses that were 80 percent correlative and looked at,

5  as a group, what those 80 percent -- they were -- those

6  that were 80 percent correlative had expense -- the

7  expense ratio was 80.1 or 80.7 percent of the total.

8  And so I applied -- I allocated the expenses based on

9  the actual historical expense ratios to total revenues.

10    Q.  Where is that reflected on the schedule?

11    A.  It's reflected in my report.

12    Q.  Where in your report?

13    A.  Starting on Page 13, Paragraph 31 through 33 and

14  the following chart.

15    Q.  I'm not understanding.

16        What percentage did you use to come to that

17  calculation on the advertising that you just gave me?

18    A.  I took the advertising in 2017 divided by the

19  total revenues report -- earned revenues 2017,

20  multiplied it by the earned revenues from Orange Lake in

21  2017.

22    Q.  Did you put together any charts or spreadsheets

23  that reflect the math that you have explained in

24  Paragraphs 32 and 33?

25    A.  I --

1    Q.  How do I duplicate or test what it is you're

2    saying here?

3    A.  Okay.  Go to Exhibit 7.

4    Q.  Schedule 1, right?

5    A.  Yes.

6    Q.  Okay.

7    A.  And then, to be clear, Schedule 1 amended.

8    Q.  That's the one we marked?

9    A.  Yeah, exactly.

10   Q.  That's fine.

11   A.  True.  Okay.

12        So look at the top there, correlation with

13   operating revenue.

14   Q.  Okay.

15   A.  You see it?

16   Q.  Yes.

17   A.  Okay.  And you draw -- you look down there, it

18   starts at 98.9 and goes down, down, down to 82.3 and

19   then it becomes 79.1.  Right?

20   Q.  Uh-huh.

21   A.  Okay.  So draw an imaginary line between that

22   82.3 and 79.1 all the way across the page.

23   Q.  Okay.

24   A.  Okay.

25   Q.  Draw an actual line.  There we go.

1    A.  Got it?

2    Q.  Yep.

3    A.  Okay.  And so if you look at all those expenses

4  for all the years, add up all those expenses for all the

5  line items above that line.  Divide it by the sum of all

6  the reported -- the revenue, that gives you -- and

7  actually -- actually, this -- with the amended, it did

8  change a little bit.  But that gives you the percentage

9  of expenses that are 80 percent correlative to revenue

10 as a percentage of revenue.

11   Q.  Okay.

12   A.  And that is --

13   Q.  What does that have to do with Orange Lake

14 customers?

15   A.  It has to do with Orange Lake customers because

16 they share -- their revenue shares in paying these

17 expenses.

18   Q.  5 percent of it, right?

19   A.  Right.  Right.

20       And so when you apply that percentage to only

21 their revenue, you get their share of the expenses.

22   Q.  Okay.  So for advertising, you're multiplying

23 81 -- or -- where did the advertising go --

24 75.6 percent?  Which one are you using?  The 95.5, the

25 91.3, or the 75.6?

1    A.   Okay.  So let me explain these columns to you so

2   you understand.

3         Correlation is the correlation with revenue.  If

4   something is -- if an expense is 100 percent variable

5   cost, it's going to be 100 percent correlative.

6         R squared is a statistical measure.  And that

7   measure is how much in this case does a change in

8   revenues affect a change in the expense.  That's only

9   used for the regression.  We kind of talked about the

10  regression.  We put it aside.  Don't worry about

11  percentile.  I mean, just so you know, percentile is --

12  what percentile is the R squared for that particular

13  line item and the total -- and the total R squareds.

14  That's not used.

15        Your question to me was -- well, I guess the

16  recent question is -- I forget what his question was.

17  Do you remember what your question was?

18   Q.   I'm trying to figure out which percentage you

19  used to multiply by, for instance, the advertising

20  number to come to the conclusion that you just came to

21  of 222,000 relating to Orange Lake?

22   A.   Oh, okay.  Very simple.  Advertising line under

23  2017, 11,868,000 --

24   Q.   Uh-huh.

25   A.   -- divided by the total reported revenue of 44

1  million.  And I will redo it so you -- and give you the

2  number.

3        That's 26.66 percent.  So out of every dollar

4  they earn, they're spending 26.66 percent on

5  advertising.

6    Q.  For all --

7    A.  For everybody, correct.

8    Q.  -- clients?  Okay.

9    A.  Then go over -- we know that based on Exhibit 3,

10 third page, for 2018 -- sorry -- 2017 -- we're dealing

11 with 2017 -- the Orange Lake earned revenue was 833,842.

12 So you take that 26.66 percent, you multiply it by the

13 amount of earned revenue for Orange Lake, that gets you

14 to the $222,000 allocable -- allocated $222,000 of

15 advertising to the Orange Lake revenue.

16   Q.  And that's how it would have been done for each

17 and every one of the operating expenses?

18   A.  It was done in total.  So it -- it -- and it was

19 done not just based on 2017.  It was done based on the

20 total -- the total expenses above -- of 80 percent

21 correlation or above from 2013 to 2017, divided by the

22 total revenues.  So that tells me over that time period,

23 if you accept that these are the expenses that are

24 variable, that that percent of revenue is -- relates to

25 variable expenses to be allocated to a client, a hundred

ROBERT B. MORRISON - 03/08/2019          Page 101

1    clients, a thousand clients, a million clients.  Because

2    that is what they actually spent out of their dollar of

3    revenue for those -- for those expenses.

4        Q.  Again, that is what they spent to generate all of

5    their clients --

6        A.  That's correct.

7        Q.  -- not just Orange Lake's clients?

8        A.  That's correct.

9        Q.  And you can't tell me of these operating expenses

10   which of them actually relate to Orange Lake sales?

11           MS. BAKER:  Object to form.

12   BY MR. BACKMAN:

13       Q.  Is that correct?

14       A.  I answered that previously.  No, I can't.

15       Q.  Okay.  Did anything relating to Orange Lake sales

16   actually increase any of the operating expenses?

17       A.  I am not aware of anything, no.

18           Let me take that back.

19           Did -- yes.  Did -- the question, I believe, was:

20   Did anything related to Orange Lake actually increase

21   the expenses?

22       Q.  Yes.

23       A.  Okay.  On a dollar basis, yes.  You know, the --

24   it would have been personnel.  It would have been

25   their -- their employee benefits.  It would have been,

1   you know -- I mean, you go down the list there, in terms

2   of the impact or the -- the expenses and what they

3   are -- professional fees, you know, the expenses and

4   what they relate to, they relate to Orange Lake just as

5   much as they relate to anybody else.

6       Q.   Okay.  I don't -- I don't think that that was --

7   maybe my question was bad.

8       A.   Okay.

9       Q.   So we have these operating expenses.

10      A.   Yes.

11      Q.   Right?  They're reflected on your Schedule 1, as

12  amended?

13      A.   Right.  Right.

14      Q.   Is there anything relating to Orange Lake's

15  sales -- TET's sales relating to Orange Lake owners that

16  increased any of these operating expenses?

17      A.   Yes.  By dollar, yes.

18      Q.   Okay.  It's those examples that you gave me?

19      A.   Correct.

20      Q.   So how much personnel was hired just to deal with

21  Orange Lake?

22      A.   It's -- I don't -- I don't know the answer to

23  that.

24      Q.   How many benefits were provided dealing just with

25  Orange Lake sales?

ROBERT B. MORRISON - 03/08/2019                    Page 103

1      A.  I -- I don't know how they allocate their

2  people -- actual labor work and people.

3      Q.  What professional fees were spent relating just

4  to Orange Lake's -- excuse me -- Orange Lake sales?

5      A.  I don't know.

6      Q.  Which of the operating expenses, if any, would be

7  eliminated completely if there were no Orange Lake

8  sales?

9          MS. BAKER:  Object to form.

10     A.  I don't know the answer to that.

11  BY MR. BACKMAN:

12     Q.  Which of the operating expenses would decrease,

13  at all, if there were no Orange Lake sales?

14     A.  All of them.

15     Q.  How much would they decrease?

16     A.  They would decrease 80-something percent per

17  dollar of revenue.

18     Q.  They would decrease 80-something percent per

19  dollar of revenue, despite the fact that Orange Lake

20  only comprises 5 percent -- or less than 5 percent of

21  total sales?

22     A.  Based on accounting and based on allocation of

23  expenses, yes.

24     Q.  Okay.  Is your testimony that if -- if Reed Hein

25  was only generating sales from Orange Lake, that it

```
 1   would only be operating at a roughly 10 percent profit?

 2       A.  10 percent, I'm not sure where --

 3       Q.  I'm looking at your -- actually 6.7 on the first

 4   spreadsheet in Paragraph 13.

 5       A.  No, that's not my testimony.

 6       Q.  How would you figure that out if it was just

 7   Orange Lake sales?

 8       A.  You -- you would -- you're talking hypothetical.

 9       Q.  Yeah.

10       A.  You would look at the cost to open up the -- open

11   up the business, rent the space, hire the people,

12   advertise.  You would be looking at all of these

13   expenses for those particular clients.

14       Q.  So do you think the profit margin would be the

15   same whether it's just Orange Lake or it's every other?

16       A.  I have no idea.

17       Q.  But you're confident, when you look at it in the

18   converse, that these numbers are correct?

19       A.  I'm confident that based on accounting

20   procedures, based on allocation of expenses, that Orange

21   Lake's share of those expenses are as I have presented.

22       Q.  Are you able to tell me for each of the operating

23   expenses how they're necessary to generate Orange Lake

24   sales?

25       A.  No.  I didn't go into depth on that.
```

ROBERT B. MORRISON - 03/08/2019                    Page 105

1      Q.  Would all these operating expenses be incurred

2   regardless of Orange Lake sales?

3      A.  I don't know.  I think that's better left for the

4   client to answer.

5      Q.  Did you ask?

6      A.  No.

7      Q.  Do you know how any of these costs actually

8   contribute to the wrongful conduct alleged in the

9   lawsuit?

10     A.  No.

11     Q.  Did you try to do that analysis?

12     A.  No.

13     Q.  Did you ask the clients?

14     A.  No.

15     Q.  Should any advertising costs be deferred and

16  expensed later when the owner exits and deferred revenue

17  is finally recognized?

18     A.  They do defer -- they call it prepaid.  They --

19  they establish prepaid expenses, expenses paid up front.

20  They establish those as a prepaid asset, and then

21  they're expensed when the revenues are recognized.

22     Q.  What in the source documents show you that that's

23  how they do it?

24     A.  The prepaid balance on the balance sheet.

25     Q.  Is there anything in the tax returns?

ROBERT B. MORRISON - 03/08/2019                    Page 106

1      A.  That's on the balance sheet on the tax return.

2  Yeah, that's what I was talking about.

3      Q.  On the amended schedule --

4      A.  Yes, sir.

5      Q.  -- look at the sales.

6      A.  Yes.

7      Q.  Does that seem to be a small number compared to

8  the claimed exit rate that you calculated?

9      A.  Say that again.  I'm sorry.

10     Q.  Does that appear to be a small number compared to

11 the claimed exit rate that you calculated?

12     A.  I think we've established that the exit rate of

13 28.1 percent is wrong.  And even still, I -- I -- the --

14 the question is nonsensical because I don't understand

15 what it is.

16     Q.  What is the returns and allowances line item

17 there?

18     A.  It's whatever the returns and allowances line

19 item is on the tax returns.  It's revenues that were not

20 recognized for one reason or another.

21     Q.  Are those the refund amounts?

22     A.  No, I don't believe so.  I don't know the answer

23 to that.  That's not a fair answer.

24     Q.  Did you look into what constitutes the dollar

25 amount set forth in that line item?

ROBERT B. MORRISON - 03/08/2019                 Page 107

1      A.  No.

2      Q.  Does Reed Hein account for -- separately for a

3  line item that we usually see referenced as a cost of

4  goods sold?

5      A.  Not on the tax return.

6      Q.  You're familiar with cost of goods sold?

7      A.  I am.

8      Q.  What does that usually represent?

9      A.  Direct materials, direct labor.

10     Q.  As opposed to indirect?

11     A.  As opposed to indirect and overhead, yes.

12     Q.  From an accounting perspective, are you supposed

13  to separate those items out in conducting an analysis

14  like what you're doing?

15     A.  Depends on the basis of accounting.

16     Q.  The way that this spreadsheet is set up -- you

17  prepared this spreadsheet, right, or is this from --

18     A.  Yes, we prepared this spreadsheet, yes.

19     Q.  The way you have this laid out, is you have

20  operating revenue?

21     A.  Yes.

22     Q.  And that consists of sales minus returns -- and

23  returns and allowances, right?

24     A.  Yes.

25     Q.  And you have the total operating revenue, so

1  that's the math there, right?  We just subtract those

2  two?

3      A.  And the adjustments that's in the blank line.

4      Q.  That you --

5      A.  Yeah.

6      Q.  That you made for -- for the cash to accrual?

7      A.  Yes.

8      Q.  Got it.

9          And that gives you the total operating revenue,

10  right?

11      A.  Yes.

12      Q.  And then what's the net gain loss form, Form

13  47 --

14      A.  That's a sale of assets.  That's a loss from a

15  sale of assets.

16      Q.  Okay.  And then -- so you get to the total

17  reported revenue, right?

18      A.  Correct.

19      Q.  That would be the total gross sales of Reed Hein

20  for each year?

21      A.  Gross sales would be the sales.  So that's the --

22  that would be the net revenues left over after returns

23  and allowances and adjustment for gain or loss on sale.

24      Q.  Got it.  So you've got gross sales and then minus

25  the others.  And then you get to a line item that you

ROBERT B. MORRISON - 03/08/2019          Page 109

```
 1   call gross profit.

 2         You see that?

 3   A.  Correct, yes.

 4   Q.  And basically, what you did there is took gross

 5   sales subtract it from whatever the returns and

 6   allowances comprise and some other adjustments, and you

 7   get your gross profit, right?

 8   A.  Well, yeah, gross because there's no reported

 9   cost of revenue.  Gross profit equals that -- that net

10   revenues.

11   Q.  Right.  And then underneath that you have

12   operating expenses?

13   A.  Correct.

14   Q.  Okay.  Why do you lay out the report this way?

15   A.  Because this is how the tax return laid it out.

16   Q.  They analyzed their gross profit before

17   considering the operating expenses?

18   A.  I don't know what they analyzed.  It's reported

19   on the tax return this way.  These are numbers right off

20   the tax returns.

21   Q.  Sure.  But they start with the gross profit line.

22   Then they do the -- then they include whatever they want

23   to include with respect to the operating expenses.  Is

24   that how they accounted for it?

25   A.  How they account for it -- this is how it was
```

ROBERT B. MORRISON - 03/08/2019                    Page 110

1  reported on the tax return.

2      Q.  Is there a reason to do it this way?

3      A.  Because that's the way the tax return's laid out.

4      Q.  Why is the tax return laid out that way?  Why

5  does it include -- why does it -- why does it categorize

6  gross profit before analyzing operating expenses?

7          MS. BAKER:  Object to form.

8      A.  You'd have to ask the IRS.

9  BY MR. BACKMAN:

10     Q.  Why is this gross profit number not the number

11 that we should use for purposes of analyzing the profit

12 of the company?

13     A.  Because it's -- my understanding of the Lanham

14 Act, it's not the gross profit, it's the profitability

15 of the revenues.  And gross profit -- assuming they put

16 numbers in there for gross profit or for expenses,

17 wouldn't necessarily reflect the true variable

18 profitability of the Orange Lake clients.  The fact that

19 it put zero in there, even more -- would make it even

20 more absurd to use the gross profit as profitability.

21     Q.  Which of these operating expenses are fixed?

22     A.  Some -- some have fixed components.  Some have

23 variable components.

24     Q.  Can you tell me which ones are fixed?

25     A.  By doing the analysis, I have -- I have carved

ROBERT B. MORRISON - 03/08/2019                Page 111

```
 1  out those that appear to be more fixed than others.  And
 2  that is by taking the 80 percent correlation -- if they
 3  were fixed, the correlation would be very low.  Okay?
 4  High correlation means there's a high degree of
 5  variability -- variable in it.
 6       I think the other thing that is kind of
 7  interesting is when you -- like I said, the regression
 8  analysis suggested that there's $2 million of fixed
 9  costs in this cost structure.
10       Q.  Are fixed and overhead sometimes used
11  interchangeably?
12       A.  No.  Well, fixed and overhead are sometimes
13  confused by people who don't understand the difference
14  of them.
15       Q.  Okay.  Is rent a fixed --
16       A.  Not necessarily.
17       Q.  -- expense?
18       A.  No.
19       Q.  No.
20       Insurance, is that a fixed expense?
21       A.  Not necessarily.
22       Q.  Do you know to whom the advertising fees are
23  paid?
24       A.  No, I don't.
25       Q.  Does that matter to you?
```

1      A.  No.

2      Q.  If the advertising fees were paid in the millions

3   to a company solely owned by one of the principals of

4   Reed Hein, would that change your analysis with respect

5   to including advertising as an offset expense here?

6      A.  No.

7      Q.  Are the distributions taken by principals

8   included as expenses?

9      A.  No.

10     Q.  Do you know how much in distributions have been

11  taken over the years that you have conducted this

12  analysis from the owners?

13     A.  It's about 3 million, as I recall.  I mean, I'd

14  need to look back at the tax returns.  But there was one

15  year it was 2.8 million and then the other years were

16  pretty minor.

17     Q.  How is that accounted for in your analysis?

18     A.  It's not.

19     Q.  It's just excluded?

20     A.  Yeah, it's not an expense.  I'd be happy to put

21  it in there if you want me to.

22     Q.  So then -- but it is still included in the gross

23  sales number?  There's nothing deducted for those

24  distributions?

25     A.  There is no -- that's correct.  There is no

 1    deduction as an expense and there's no reduction in the

 2    earned revenue for it.

 3        Q.  Other than the raw numbers relating to

 4    advertising, were you provided with any other statistics

 5    that the company may utilize in determining how much

 6    marketing they need to do, what advertising expenses

 7    they need to incur, anything like that?

 8        A.  No.

 9        Q.  Are you able to determine what necessary

10    marketing costs are for every new account exited?

11        A.  No.

12        Q.  Did you try to determine that?

13        A.  No.

14        Q.  Do the advertising costs that are shown on the

15    amended Schedule 1 that we marked as Exhibit 7 --

16        A.  7.

17        Q.  -- reflect the actual spend that year?

18        A.  No.  It reflects what was charged against the

19    revenue that year.  I mentioned earlier about we had the

20    unearned revenues, and as the revenues are earned,

21    they're recorded.  Same with expenses.  Expenses are --

22    as they're incurred, they're put on the balance sheet

23    and then they're relieved as the revenue's earned.

24        Q.  If you could go back to the workpaper.

25        A.  Yes, got it.

ROBERT B. MORRISON - 03/08/2019                    Page 114

1    Q.  If you look at that third page, the one right --

2    A.  Yes, sir.

3    Q.  For 2013, it says OL revenue.  That's -- that's

4    $10,995?

5    A.  Yes.

6    Q.  Is that what that reflects?

7    A.  Yes.

8    Q.  If you could go back to the first page for me.

9    A.  Yes.

10   Q.  There's nothing listed there for OL, Orange Lake

11   exits --

12   A.  Uh-huh.  Yes.

13   Q.  -- for the year 2013.

14   A.  Yes.

15   Q.  You agree with me?

16   A.  Well --

17   Q.  How do you get $10,995?

18   A.  As it's clearly marked missing information, so

19   excluded from analysis.  So I didn't have -- they were

20   unable to provide me with the information of the number

21   of OL clients retained, the number of OL clients exited.

22   Q.  Right.  And one of the things we talked about

23   when we looked at your table -- and that's on Page 3 of

24   that workpaper -- was that you wanted to see the source

25   document so you could independently verify the numbers,

 1   correct?

 2      A.  That would be something that would be nice to

 3   have, yeah.

 4      Q.  So one of the things, though, that you could have

 5   done was looked at the first two pages -- really the

 6   first page of the very same workpaper that this table is

 7   reflecting and seeing that there's no basis to conclude

 8   that there's $10,995 in revenue?

 9          MS. BAKER:  Object to form.

10      A.  I disagree.

11   BY MR. BACKMAN:

12      Q.  Okay.  What is the basis to leave in 10,995 when

13   the very same client information does not reflect a

14   single exit in 2013?

15      A.  The client information -- you're incorrect.  You

16   misstated.  The client information does not not [sic]

17   suggest there weren't any exited clients that year.

18      Q.  Can you show me a single client that was exited

19   in 2013?

20      A.  A single client?  No.

21      Q.  Can you show me a single piece of paper

22   associated with your report that reflects that an exit

23   was accomplished?

24      A.  Page 3 of Exhibit 3.

25      Q.  Right.  The raw -- sorry -- the basic number, the

 1   totality of the OL revenue as taken from your client's
 2   mouth and put on that spreadsheet, that's your --
 3          MS. BAKER:  Object to form.
 4   BY MR. BACKMAN:
 5      Q.  That's it?
 6      A.  That's correct.
 7      Q.  Okay.  But that's what I'm trying to reconcile,
 8   is that same client gave you the information that's
 9   reflected on the first page and it doesn't support
10   what's reflected on the third.
11      A.  How could -- how can you say that missing
12   information doesn't support something else?
13          It doesn't con -- it doesn't conflict with what
14   was provided on Page 3.  It simply wasn't available.
15      Q.  Sure.  On Page 3, it says "OL number of cases."
16          You see that?
17      A.  Yes.
18      Q.  It says two.
19      A.  Yes.
20      Q.  How do they know that if they can't even put it
21   on the first page?
22      A.  You'd have to ask them that.
23      Q.  But you don't know?
24      A.  I don't know.
25      Q.  On that same document there, there's a note,

```
 1   Note 1 -- Note 1 right under your percentage.

 2       A.  Yes.

 3       Q.  And it refers to a source.

 4       A.  Yes.

 5       Q.  January 2013 through February 2019, Salesforce

 6   data.

 7           Do you see that?

 8           On the first page there.  Right under your

 9   percentages, there's a little -- it says "Note 1."

10       A.  I see Note 1, yes.

11       Q.  You go across.

12       A.  Oh.  Oh.  No, that's not the note.  The

13   "Historical Client Detail," that's the title of the

14   chart.

15       Q.  Gotcha.

16       A.  And Note 1 refers you to Page 3 as a source of

17   the data.

18       Q.  Okay.  So the source of the data is something

19   from Salesforce; is that right?

20       A.  That's correct.

21       Q.  And I just want to make sure I'm clear.  You told

22   me you didn't look at Salesforce, but did you look at

23   the actual source here?

24       A.  It was those graphs with the data in the graphs,

25   embedded in the graphs.
```

ROBERT B. MORRISON - 03/08/2019                    Page 118

1    Q.  Okay.  And they were able to give you data

2    through February of 2019; is that correct?

3    A.  For -- on this information, that's correct.

4    Q.  And for the table on -- on Page 3, you have

5    revenue that they provided relating to 2018; is that

6    right?

7    A.  Yes.

8    Q.  But they didn't give you any tax returns or

9    financial statements or anything?

10   A.  Well, tax returns wouldn't be done yet.

11   Q.  Right.

12   A.  Financial statements, I think we've already

13   determine -- or I determined or concluded that you

14   really can't rely on the financial statements before

15   they've been adjusted by the accountants.

16   Q.  Do your opinions in this case run through

17   December 31, 2018, or December 31, 2017?

18   A.  2018.  And, in fact, because we're taking that

19   unearned income projected forward, until that unearned

20   income gets earned.

21   Q.  Can you help me understand why Exhibit 7 only

22   reports revenue and expenses through December 31, 2017?

23   A.  For the same reason we just discussed, there's no

24   tax return available yet.  And the financial statements

25   are not in a condition to -- to be reliable before they

ROBERT B. MORRISON - 03/08/2019              Page 119

1   go to the accountants.

2       Q.  What is your basis for including 2018 in the

3   expenses to set off revenue?

4       A.  Because those -- it's an -- the -- the revenue

5   is -- is known.  It's actual.  Based on -- I'm sorry --

6   Exhibit 3, third page.  And the expenses that are

7   applied to that were based on historical analysis that I

8   did and the three methodologies for applying expenses.

9       Q.  Do you agree with me that if I don't have any of

10  the 2018 financials for Reed Hein, that I can't test the

11  veracity of the 2018 column on Table 3 -- I'm sorry --

12  on the table of Page 3 of Exhibit 3?

13      A.  Okay.  I'm sorry.  Say that again.

14      Q.  You said the revenues you know because Reed Hein

15  gave them to you, and they're reflected on the table on

16  the third page of Exhibit 3, correct?

17      A.  Right.  Right.

18      Q.  That's what you told me?

19      A.  Yes.

20      Q.  Do you agree that I can't test that information

21  without the actual financials of the company?

22      A.  That's correct.

23          MS. BAKER:  Counsel, when do you want to decide

24      how to handle lunch?

25          MR. BACKMAN:  Yeah, whenever everybody is

```
 1    hungry and they want to take a break, we can run
 2    downstairs and get some sandwiches or whatever they
 3    have down there and we'll eat.
 4         MS. BAKER:  Okay.  So it's almost 1 o'clock.
 5    When do you want to --
 6         MR. BACKMAN:  We can stop now.
 7         You guys hungry?
 8         Why don't we do it now, perfect.
 9         MS. BAKER:  Still think you'll go to 5:00.
10         MR. BACKMAN:  Yes.
11         THE VIDEOGRAPHER:  The time is 12:53 p.m.  Off
12    the record.
13         (Whereupon, a break was taken from 12:52 p.m.
14    to 1:36 p.m.)
15         THE VIDEOGRAPHER:  The time is 1:36 p.m.  On
16    the record.
17  BY MR. BACKMAN:
18    Q.  You understand you're still under oath, Mr. --
19  Bob?
20    A.  Yes.  Yes, sir.  Yeah.  Thank you.
21    Q.  Are you a CPA?
22    A.  No.
23    Q.  Did you ever take the exam?
24    A.  No, sir.
25    Q.  I want to go back, if you can, to some of the new
```

ROBERT B. MORRISON - 03/08/2019                    Page 121

1   things that came up --

2       A.  Yes, sir.

3       Q.  -- during the course of today.  So if you could

4   take your report and go to Page 14.

5       A.  Okay.  I'm there.

6       Q.  You remember, if you flip back a page, we looked

7   at the first box.  And you talked about how you would

8   include the new information that you calculated on

9   Exhibit 4, as amended, again, based upon your change of

10  the 28 percent -- 28.1 percent to 90.7 percent.

11          You remember that?

12      A.  Yes.  Yes.

13      Q.  And then I asked you which of the methods you

14  prefer.  And you had told me, of the three, that you

15  would actually prefer the second one; is that accurate?

16      A.  Correct.

17      Q.  So is the second one the one that's reflected in

18  the box on the top of Page 14?

19      A.  Yes.

20      Q.  Can you tell me how your mathematical calculation

21  would change in light of your new testimony this

22  morning -- or this afternoon, whenever it was?

23      A.  Sure.  Yeah, sure.  So the -- the amended would

24  adjust the revenues for the unearned revenues that I

25  would expect to be earned.  And then the percentages,

ROBERT B. MORRISON - 03/08/2019                Page 122

1    the 81 1/2 percent and the 18.5 percent, would not

2    change.

3        Q.  Does Reed Hein accounting book any expenses

4    differently to account for the unearned revenue?

5        A.  They -- they are on an accrual basis.  And for

6    that, any expenditures -- a lot of expenditures that are

7    incurred before the revenue is earned, rather than

8    expensed, is put on the balance sheet as a prepaid

9    expense.  And then when the revenue, then, is reflected

10   as earned, then the expense, based on some type of an

11   allocation procedure, is then applied to it.

12       Q.  And you're using that word "earned" in the form

13   of some sort of accounting principle, right?

14       A.  Yes.

15       Q.  I think we talked about this.  But we agree that

16   the money is actually taken by Reed Hein at -- basically

17   at or around the time of point of sale, correct?

18           MS. BAKER:  Object to form.

19       A.  Yes, either in cash or in a note from the client

20   to be paid over time.

21   BY MR. BACKMAN:

22       Q.  And how much were those notes that you referenced

23   before?

24       A.  How -- well, I think the balance -- and it's --

25   let me refer to this --

ROBERT B. MORRISON - 03/08/2019                    Page 123

1      Q.  You said there was some tens of millions of

2   dollars owed to the owners --

3      A.  No.

4      Q.  -- I thought?

5      A.  Okay.  That's a different note.

6      Q.  Sorry.  That's what I'm referring to.

7      A.  You're referring to the loans or the advances

8   from the company to the owners.

9      Q.  Uh-huh.

10     A.  Okay.  That has nothing to do with what we just

11  talked about.

12     Q.  Sure.  But you just said that, and it triggered

13  my mind.

14     A.  Okay.  Fair enough.

15     Q.  I'm trying to remember what that number was.

16     A.  Fair enough.

17     Q.  Do you remember?

18     A.  It was about 16.7 million as of December 31,

19  2017.  I don't know what it was as of the end of '18.

20     Q.  And just because I'm a common sense kind of guy,

21  I'm not really a numbers guy, but from the perspective

22  of the booking on a piece of paper of $70 million in

23  unearned revenue, the paper that reflects the money of

24  $16 million owed from the partners, based upon

25  advancements to those partners by the company, those

ROBERT B. MORRISON - 03/08/2019          Page 124

1  reflect actually $16 million handed to the partners,

2  correct?

3      A.  Of cash, yes.

4      Q.  Handed to the partners?

5      A.  Yes.

6      Q.  The partners have those dollars?

7      A.  Have or had.

8      Q.  Right.  $16 million?

9      A.  Yes.

10     Q.  Do you know when those advancements were made?

11     A.  Well, if you look at the tax returns, it reports

12  that balance at the end of every year.  So you can see

13  each year, the movement.  Because some years it went

14  down, which means that they paid money back in more than

15  they were advanced back out.

16         But if you were to look at the tax returns and

17  look at that -- the line item I think is loans to

18  partners, it would tell you each year the net what's

19  left owed.

20     Q.  But as you sit here today, the partners owe Reed

21  Hein $16 million?

22     A.  As of the end of 2017.

23     Q.  As of the end of 2017?

24     A.  Right.  I don't have that balance for now or as

25  of the end of 2018.

1    Q.  Okay.  So back to those expenses that we talked

2  about, you were trying to explain to me how, because

3  it's an accrual basis, that they don't have to book the

4  expenses differently in light of the unearned revenue?

5  Is that basically what you're saying?

6    A.  They do.  Under accrual basis, you book the

7  expenses at the time -- you book the expenses at the

8  time you recognize the revenue.  Let me take a step

9  back.

10          Like in the unearned revenue, if I signed up with

11  Reed Hein and paid $7,000, cash comes in the door, but

12  then there's this unearned revenue of $7,000.  Only when

13  I exit do they recognize my 7,000 as earned -- as

14  revenue.

15          So with expenses, like when they're paying these

16  law firms and other expenses, the cash goes out the door

17  now, but because the revenue hasn't been earned yet, it

18  goes on the balance sheet as a prepaid expense and only

19  gets recognized as an expense when the revenue gets

20  recognized.

21    Q.  Do they delineate which of the operating expenses

22  are considered to be prepaid expenses?

23    A.  You would have to get into the general ledger,

24  probably, to ask -- either ask them or get into the

25  general ledger to determine that.

ROBERT B. MORRISON - 03/08/2019          Page 126

1    Q.  Did you look?

2    A.  No, I didn't.

3    Q.  Do you know, as you sit here, whether they

4  segregate anything out?  Do they separate certain

5  expenses as prepaid versus not?

6    A.  I don't know the answer to that.

7    Q.  Much of the expenses would be incurred in

8  connection with the sale, if you will --

9         MS. BAKER:  Object --

10 BY MR. BACKMAN:

11   Q.  -- the initial retention of the customer,

12 correct?

13         MS. BAKER:  Object to form.

14   A.  Some.  I -- I'm not going to use the word "much"

15 because I don't know.

16 BY MR. BACKMAN:

17   Q.  The marketing is directed to obtain sales?  Do

18 you agree with me?

19   A.  Yes.

20   Q.  So the marketing expense would have been incurred

21 at the point of sale, such that it should be reported

22 that way, correct?

23   A.  Well, you say "point of sale."  You're talking

24 about when they actually signed up a client?

25   Q.  Yes.

ROBERT B. MORRISON - 03/08/2019          Page 127

1     A.  I don't know what the accounting would be for

2  that.

3     Q.  Because of the amount of the unearned revenue,

4  are the operating expenses as reflected in Exhibit 4

5  overstated compared to the actual revenues that you

6  calculated?

7     A.  Say that again.

8     Q.  So the revenues reflected on Page 14 --

9     A.  Yes.

10    Q.  -- in that box --

11    A.  Yes.

12    Q.  -- at the top that we looked at that you're going

13 to find in a second.

14    A.  Yes, I'm familiar with it, yeah.

15    Q.  That's all right.  I'll wait for you.

16    A.  Okay.  Page 14, box at the top.  Got it.

17    Q.  Those are revenues relating to Orange Lake

18 clients, yes?

19    A.  That's correct.

20    Q.  Okay.  And the operating expenses are the amount

21 that you calculated using your -- I'll call it the

22 correlation method -- is that a fair way to categorize

23 it?

24    A.  Incremental cost method.

25    Q.  Okay.

ROBERT B. MORRISON - 03/08/2019          Page 128

1          -- your incremental cost method, based upon all

2     of the operating expenses of the company, correct?

3          A.  The portion that are variable to the revenues,

4     yes.

5          Q.  Because you don't know whether or not certain

6     expenses are taken out until such time as the exit is

7     completed such as the unearned revenue would be earned,

8     is it fair to say that the operating expenses, as

9     reflected, are overstated compared to the revenues

10    because you're not including the unearned revenue?

11         A.  So let me -- so if you're giving me basically a

12    hypothetical that there are some expenses that are

13    not -- that are recognized right away, I think is what

14    you're saying, and -- and not relieved or not applied to

15    the revenues, would the 81 percent be overstated for the

16    unearned revenues?

17         Q.  No, for the revenues as currently in existence

18    for purposes of that calculation.

19         A.  No.

20         Q.  No.

21          Is it appropriate to utilize the same formula

22    that you utilized to derive at the expenses for purposes

23    of the calculation as reflected on Page 14 when you then

24    add in the unearned revenue?

25          MS. BAKER:  Object to form.

ROBERT B. MORRISON - 03/08/2019                Page 129

1      A.  Yes.

2    BY MR. BACKMAN:

3      Q.  Are you not double dipping there?

4      A.  No.

5      Q.  No?

6      A.  No.

7      Q.  Okay.  With the unearned revenues computed as

8    part of the accounting, is the company operating at a

9    loss?

10     A.  I will answer that, I guess, this way:  The --

11   the unearned revenue does not get recorded as revenue,

12   as we talked about.

13        So if you look at 2013 through 2017, based on the

14   recognized revenue, the earned revenue, and the expenses

15   against those revenues, the company has basically broken

16   even or lost a little bit of money.

17        And I think to help your thinking, recalling that

18   the unearned revenue hasn't been recognized yet.

19     Q.  Is it fair to say that Reed Hein needs to

20   continue bringing in new clients, make new sales in

21   order to be able to pay the expenses associated with the

22   old ones?

23        MS. BAKER:  Object to form.

24     A.  Not necessarily.

25

1   BY MR. BACKMAN:

2      Q.  Based upon the numbers that you've seen as

3   reflected in the accounting, in the tax returns, or

4   whatever other financials you may have looked at, does

5   it appear that they have money to be able to pay --

6   continue to pay these expenses that are reflected on

7   Exhibit 7?

8           MS. BAKER:  Object to form.

9      A.  Yes.

10  BY MR. BACKMAN:

11     Q.  Where -- where is that money?

12     A.  It comes from closing exits and earning that

13  income.  Let's --

14     Q.  But that money, in reality, the actual dollars

15  have already been spent?

16     A.  You're talking cash.

17     Q.  Yeah.

18     A.  Income and cash are two different things.

19     Q.  So to pay the rent, they have to actually write a

20  check, right?

21     A.  Correct.

22     Q.  And there's got to be money in that bank account

23  when the landlord goes to deposit that check, correct?

24     A.  Correct.

25     Q.  Presumably, presumably, when they spend

ROBERT B. MORRISON - 03/08/2019          Page 131

1  $12 million in advertising, they're actually paying

2  somebody real dollars, 12 million worth, for the

3  advertising, correct?

4       A.  Either that or they -- there is an obligation to

5  pay.  There may be a timing difference in cash, but

6  ultimately, yeah, there's got to be cash that's paid.

7       Q.  Right.  And the company is owed $16 million due

8  from partners.  So that money's not sitting in an

9  operating cash account, correct, for the company?

10      A.  Not within the company, no.

11      Q.  Right.  And really, I think what you told me is

12 there's only $4 1/2 million in cash available?

13      A.  Correct.

14      Q.  My simple math, $4 1/2 million doesn't come close

15 to covering the operating expenses that you have

16 reflected on Exhibit 7.

17          MS. BAKER:  Is that a question?

18 BY MR. BACKMAN:

19      Q.  So do they need to continue signing people up in

20 order to be able to pay the bills and operate their

21 business?

22      A.  On a cash -- on a cash flow basis is what you're

23 really asking.  So to pay -- to continue to operate,

24 they would use their existing cash.  They would use the

25 receivables they collect from their loans.  They would

 1  use -- they would -- maybe the partners have to

 2  contribute money back in like they have in the past, you

 3  know, put money back in to pay off basically what's been

 4  advanced to them.

 5      Q.  Sure.  And I don't -- I'm not looking for maybes.

 6  I understand the hypothetical -- or the speculation.

 7  What I'm curious about is based on the actual documents

 8  you've seen, where is the money coming from?

 9          MS. BAKER:  Please let him finish his answer.

10      A.  The cash, collecting receivables, the partners

11  putting money back in, loans, equity capital put in, all

12  kinds of -- and -- and future cash received from -- from

13  customers, from clients.

14  BY MR. BACKMAN:

15      Q.  And so that last category is the new -- new

16  clients, correct?

17      A.  Yes, it would be new -- cash-wise, it would be a

18  new client, correct.

19      Q.  What loans has the company taken out?

20      A.  I don't know.

21      Q.  Did you see any in the documents?

22      A.  No, you asked me where they'd get the money from.

23  That's a source of capital.

24      Q.  I'm asking you, based upon the actual records

25  that you've seen, what money exists right now where this

ROBERT B. MORRISON - 03/08/2019          Page 133

1  company can continue to pay its bills if no new clients
2  come in?
3      A.  The cash in the bank --
4      Q.  Okay.
5      A.  -- collection of the receivables, partners
6  putting their money back in, and the new clients.
7      Q.  Okay.  Have you seen any money being put back
8  in -- or strike that.
9          When was the last time you saw money being put
10 back in by the partners?
11     A.  So the -- what they owed to the company went from
12 20 million in 2016 to 16 million in 2017.  So they put
13 $4 million in, a net of $4 million in, in 2017.
14     Q.  Does it say where that money came from?
15     A.  Partners.
16     Q.  That's all it said?
17     A.  Yeah.  It said -- there's a line item called
18 "loans to partners," and it goes up and down each year.
19     Q.  Who makes up the partners of Reed Hein?
20     A.  There's two individuals.
21     Q.  Do you know their names?
22     A.  There's, I guess, a corporate owner.
23     Q.  Who is the corporate owner?
24     A.  Makaymax, Inc.  I know there's 40 percent
25 owner -- ultimately, it's Mr. Reed, Mr. Hein.  Beyond

ROBERT B. MORRISON - 03/08/2019          Page 134

1  that, I -- I don't know what -- what else to tell you.

2     Q.  Okay.  I want to go back to look at some of these

3  percentages that we initially started the day with.

4        So if you can look at the schedule and the

5  workpaper -- actually, just the -- the workpaper.  I

6  think it's Exhibit 3.  Am I right?

7     A.  Exhibit 3, yes.

8     Q.  If you could look at Exhibit 4 for me --

9     A.  Yes.

10    Q.  -- as well.

11        Understanding that Exhibit 4, the percentage

12  should now be 90.7, where it otherwise says 28.1,

13  correct?

14    A.  Correct.

15    Q.  And I think we agreed that the future -- the

16  bottom line number is now $4,942,934.

17    A.  I'm going to assume that your recollection and

18  scribblings are correct.

19    Q.  Okay.  So here is my question:  Do you remember

20  earlier we looked at the 588 Orange Lake numbers of

21  cases as reflected on Page 3 of that workpaper?

22    A.  Yes.

23    Q.  And you had told me you thought that the total

24  number of Orange Lake customers was between 1200 and

25  1300, right?

1      A.  But I told you that that -- because of that

2  28 percent thing, that -- that probably wasn't right.

3      Q.  Yeah, I'm going to come back -- that's where I'm

4  going with this.  Okay?

5      A.  Okay.

6      Q.  So I had done just basic numbers in my head,

7  which we all in this room know I'm not too good at.  But

8  588 of the 12 to 1300 is somewhere short of 50 percent,

9  45 percent, somewhere around there.  Okay?

10     A.  588 divided by 1200 and somewhere sort of

11  40 percent.  I agree with that.

12     Q.  Okay.  So if we replace the 28.1 percent on the

13  front page with 90.7 percent --

14     A.  Yes.

15     Q.  -- I'm still confused.  Because the numbers, I

16  would think, should match up.  Am I wrong?  Can you

17  explain that to me.  Because now I'm just confused in

18  the opposite direction.

19     A.  So let me -- let me try to explain it to you this

20  way:  The 28.1 percent was a calculation I did based on

21  this data to try to estimate the percentage

22  successful -- of successful exits.  The data on this

23  page, as we talked about, isn't sufficient to do that,

24  period.

25     Q.  Right.  Your percentage was off by, I mean,

ROBERT B. MORRISON - 03/08/2019                     Page 136

1   candidly, 60-something percent.

2       A.  Right.

3       Q.  Right.

4       A.  Yes.

5       Q.  But it's still now disparate the other direction.

6   So before, it looked weird because it was 47 percent,

7   but yet you were saying 28.  But now it's 47 percent,

8   but you're saying 90.

9           So it's still confusing, just in the other

10  direction.

11      A.  No, because you're taking the -- you're referring

12  to the 588.

13      Q.  Yeah.

14      A.  Okay.  That is -- 588 is -- is the successful

15  exits.  If you go to Exhibit 6 and you count the number

16  of unsuccessful exits, all right, that total, I think it

17  was -- I calculated it -- 53.

18          So the total number of customers during the 2013

19  to 2018 time period was 588 plus 53.

20      Q.  Okay.

21      A.  So it's 630-some-odd.

22          The successful exits were 588 divided by that

23  number, six -- 641 it is.  8.3 percent versus, in

24  dollars, 9.3 percent.

25          So in other words -- well, ask your question.  I

ROBERT B. MORRISON - 03/08/2019          Page 137

1    don't --

2       Q.  Well, I'm still confused.  So if you could go

3    with me in other words.

4       A.  Yeah.  I could tell.  I could tell.

5            There's 588 successful exits during those years.

6    There are 53 unsuccessful exits.

7       Q.  Okay.

8       A.  So the total number of customers, then, excluding

9    the retained customers, right, was 641.

10      Q.  Retained and not exited?

11      A.  Yeah.  That are still in unearned revenue, still

12   out there.  641.  The 53 that were -- well, let's do it

13   the other way.  The 588 that were successful divided by

14   the 641 total is 93.7 percent success based on the

15   number of customers.

16           Again, using Exhibit 6, it also gives us the

17   dollars.  $286,000, 287 rounded, were refunds.  Okay?

18   That was just adding up all of the numbers on that

19   Exhibit 6.

20           So the unsuccessful dollars that were in unearned

21   revenue but were paid out were $287.  The amount of

22   successful exits, which resulted in earned revenue,

23   based on Page 3 of Exhibit 3, were 3,077,611.  So the

24   total dollars available are the 3 million plus the

25   $286,000 for a total of -- total of 3,364,382.

1          So those are the total dollars from those 641

2    Orange Lake clients.

3      Q.  Are you able to tell me now how many total Orange

4    Lake clients there were?

5      A.  That would be the 641 plus the 872 that are in

6    deferred revenue.  So that would be 1523.

7      Q.  Are you sure about that?

8      A.  Yeah.

9      Q.  You didn't prepare the exhibit -- what is that

10   one?

11     A.  5.

12     Q.  5, you did prepare that, right?  That was

13   provided to you?

14     A.  No, I didn't.  That was provided to me.

15     Q.  Okay.  And same thing with Table 3 -- I'm

16   sorry -- Table 1 on Page 3 of Exhibit 3, that was also

17   provided to you?

18     A.  Yeah.  On Page 3 of Exhibit 3 the table that's in

19   there, correct.

20     Q.  Have you seen an actual list of Orange Lake

21   owners?

22     A.  No.

23     Q.  In light of your new testimony, what am I to do

24   or what should be done with Exhibit 3?

25          MS. BAKER:  Object to form.

1      A.  Which is something you've already done, which is

2   on Page 1 of Exhibit 3, the exited percent of total,

3   cross through it, and for OL clients, put, because it's

4   based on the number, 8.3 percent -- yeah, exited -- no,

5   it's -- I'm sorry.  It's 100 percent minus 8.3 percent

6   or 91.7 percent.

7   BY MR. BACKMAN:

8      Q.  Right.  But that math only works now that you've

9   figured out the total number of actual refunds, right?

10     A.  Now that I have all of the information, yes.

11     Q.  Right.  But this mouth was calculated based upon

12  your multiplication or division or what have you of the

13  actual numbers reflected in this table on Exhibit 3,

14  correct?

15     A.  The 21.8 percent was based on the data provided

16  in that table, that's correct.

17     Q.  Right.  So should I eliminate this table?

18  Because I can't just put 91.7 percent there because the

19  math doesn't work --

20     A.  No, this --

21     Q.  -- in the table.

22     A.  This table accurately reflects what it presents,

23  retained clients, exited clients, and total clients

24  starting in January 2015.

25     Q.  And you used that table to figure out the line

ROBERT B. MORRISON - 03/08/2019          Page 140

1  item that was originally reflected as total clients on

2  the top with the various percentages, correct?

3      A.  Yes.

4      Q.  So if I continue to use this same table and I do

5  the same exact math computation that you did to come up

6  with the information set forth in that first line item,

7  I'm still going to get the 28.1 percent.  That doesn't

8  change because you haven't added any new information to

9  this table, have you?

10     A.  No, I have not added any new information to the

11 table.

12     Q.  Right.  So I'm just trying to figure out what

13 value this has, what use does this have if what the

14 ultimate percentage was that you calculated from the

15 information contained in this table is not accurate

16 based upon the actual information that you've now been

17 provided.

18         MS. BAKER:  Object to form.

19         Is that a question?  It's not phrased as a

20     question.

21 BY MR. BACKMAN:

22     Q.  Go ahead.  Because you know it's a question.  So

23 go ahead.

24     A.  Well, it wasn't a question, but I know what

25 you're asking.

ROBERT B. MORRISON - 03/08/2019                    Page 141

1          It provides the information that it states it
2     provides, period.
3     Q.  So I shouldn't change it to 91.7 percent, then,
4     because the math still equals 28.1 percent?
5     A.  It provides the data that it presents to provide.
6     And we've talked about the 28.1 percent that -- that --
7     that -- the calculation is based on this data and this
8     data, while accurate, does not have the additional data
9     necessary to get to what the true success rate was.
10    Q.  I just need to be clear about it.  I just need to
11    know what these documents are.  Okay?
12         So you came up with the 91.7 percent based upon
13    your new review of information that Ms. Baker handed you
14    at a break, correct?
15    A.  That's correct.
16    Q.  That we've marked as Exhibit 6?
17    A.  That's correct.
18    Q.  Right.  So the calculation that is done on the
19    top line, total clients, of Exhibit 3, utilizing the
20    information contained in the table, as calculated on
21    that document, is, in fact, accurate?  You're just
22    saying it doesn't represent the actual number that you
23    want to use for your calculations?
24         MS. BAKER:  Object to form.
25    A.  Well, let's separate the section that says "OL

1    clients as an average percent of."  That information

2    doesn't change based on what I've received.

3          The section that says "exited percent of total,"

4    that's the only thing that changes.  But calculation --

5    yeah, you're right.  If you were to do the exact same

6    calculation, you get the exact same answer --

7    BY MR. BACKMAN:

8      Q.  Right.  There's --

9      A.  -- because there's nothing that's changed.

10     Q.  There's nothing that you're changing in this

11   table to change the 28.1 percent?

12     A.  That's correct.

13     Q.  Thank you.  That's all I was trying to figure

14   out.

15     A.  Okay.

16     Q.  But you don't want to use this figure anymore

17   because you have an accurate figure, as you've testified

18   earlier, based upon the new information that was

19   provided to you during the deposition?

20     A.  Correct.  I'm not going to use the 28.1 percent

21   because I have the additional information that I needed.

22     Q.  You said it's been roughly 20 years since you've

23   done a Lanham Act damage calculation; is that right?

24     A.  Yeah, about that.

25     Q.  When was the last time you looked at the statute?

ROBERT B. MORRISON - 03/08/2019          Page 143

1      A.  Probably 20 years ago.

2      Q.  Do you know whether Reed Hein, in its financial

3  statements or accounting records, breaks down direct

4  versus indirect cost of sale?

5          MS. BAKER:  Object to form.

6          Asked and answered.

7      A.  I know it doesn't in the tax return.  I forget

8  whether it does in the financial statements or not.

9  BY MR. BACKMAN:

10     Q.  But you didn't --

11     A.  And by -- I'm sorry.  And by financial

12  statements, those are internal unaudited financial

13  statements.

14     Q.  Did you break out direct versus indirect at all

15  in looking at the operating expenses?

16     A.  Not in format, no.

17     Q.  And just so I make sure I understand the -- the

18  formula that you ran, you ran it across all operating

19  expenses, correct?

20     A.  No.

21     Q.  Did you subtract any operating expenses?

22     A.  Yes.

23     Q.  Completely?

24     A.  Yes.

25     Q.  Which ones?

ROBERT B. MORRISON - 03/08/2019                Page 144

1      A.  Those that had a correlation ratio of less than

2   80 percent.  I eliminated those.  I did not include

3   those.

4      Q.  Okay.  So everything where you told me to draw

5   that line down is not included in your expense figure

6   that is set forth in your report?

7      A.  That is correct.

8          And let's be clear, that's on -- that's second --

9   Page 13 -- I'm sorry -- Page 14, the -- the box at the

10  top.

11     Q.  Uh-huh.

12         Do you know what the amount was that you

13  ultimately excluded as compared to the total amount of

14  operating expenses?

15     A.  For which year?

16     Q.  2017.

17     A.  I will have to round it.  Just rough it.  Looks

18  like it's about 2 to 3 million dollars, which

19  corresponds exactly with the regression analysis, what

20  the fixed component is.

21     Q.  But those aren't necessarily the actual fixed

22  costs that you excluded, are they?

23     A.  They're the ones that, because of the correlation

24  relationship, suggest they're more fixed than variable.

25     Q.  Tell me about this correlation relationship.

1    What goes into determining what's correlated or not?

2        A.  It's a statistical measure.  I mean, correlation

3    coefficients, it's a statistical measure that measures

4    how -- how symmetrically two things move together.

5        Q.  Is it -- is there any subjectivity to it?

6        A.  Not in the calculation, no.

7        Q.  How do you determine that marketing expenses, for

8    example, are a higher correlation to the sales of Reed

9    Hein as compared to their website, which for some reason

10   has a separate line item?  That's not a good one.

11           Their bank service charges.

12       A.  Because the -- you calculate the correlation

13   coefficient.  And if you look on Page 1 of Exhibit 7,

14   for advertising, it's a 95.5 percent correlation.  So in

15   other words, as revenues increase and decrease, so do

16   advertising expenses almost 1 to 1.

17       Q.  So that's compared solely to the total revenues?

18       A.  Yes.

19       Q.  Has nothing to do with Orange Lake?

20       A.  No.  Other than the fact that Orange Lake's

21   contribution to those expenses is in there, but it's for

22   the entire company.

23       Q.  Okay.  If we could, the stack on your left -- so

24   what's that there on the top?

25       A.  That's my engagement letter.

ROBERT B. MORRISON - 03/08/2019                Page 146

1     Q.  Who engaged you?

2     A.  Mr. Benford -- Mr. Benford's firm did on behalf

3  of the client.

4     Q.  This copy isn't signed.  Do you have a signed

5  copy?

6     A.  We would -- if we had a signed copy back, you

7  would have received a signed copy.

8     Q.  Have you been paid anything so far?

9     A.  No, not yet.

10     Q.  Did you get the retainer that's reflected in this

11  document?

12     A.  Yes.

13     Q.  So you have been paid, at least the $7,500?

14     A.  Yes.

15     Q.  Have you received any other money?

16     A.  No.

17     Q.  Have you invoiced the client?

18     A.  No.

19     Q.  Do you have an invoice prepared?

20     A.  No.

21     Q.  Have you billed any time to this file?

22     A.  To the file -- we've recorded the time, yes.

23  We -- I just haven't billed it yet.

24     Q.  How much time have you recorded?

25     A.  It would be a pure guess.  I have no idea.

ROBERT B. MORRISON - 03/08/2019                    Page 147

1    Q.  How many people in your office are working on it?

2    A.  Two primarily, and then a third, possibly.

3    Q.  And have -- plus you?

4    A.  No.  That's -- includes me.

5    Q.  Okay.  Have you been working on it since being

6    retained on or around January 14th?

7    A.  No, we really didn't get started on it until the

8    week of February 26th.

9    Q.  What took place between January 14th and

10   February 26th?

11   A.  Waiting to get records.

12   Q.  From who?

13   A.  From the client.  Well, from -- from counsel.

14   Q.  You didn't get those records until February 26th?

15   A.  We got -- we got -- no, that's not fair.  We did

16   get them the week of February 14th -- I'm sorry --

17   February 4th, I believe.  Some of them.

18   Q.  The retention agreement, this letter dated

19   January 4, 2019, talks about hiring you in your capacity

20   as a consultant.

21   A.  Yes.

22   Q.  When did your -- when did your engagement change

23   from consultant to testifying?

24   A.  When I was disclosed as an expert.

25   Q.  Do you know when that was?

ROBERT B. MORRISON - 03/08/2019          Page 148

1      A.  I don't.  I know that John had called and said

2   I'm going to, but I don't know when that was.

3      Q.  What exactly were you retained to do?

4      A.  Analyze the most -- the Lanham claim, basically,

5   and determine what the total revenues were associated

6   with Orange Lake -- Orange Lake clients, and then what

7   the expenses would be against those revenues.

8      Q.  Were you asked to do anything else?

9      A.  No.

10     Q.  Were you asked to rebut the expert report of

11  Steve Wolf?

12     A.  Well, it was -- it was in that that I -- I was

13  asked to rebut the -- his Lanham claim, basically, his

14  Lanham calculation.

15         I have not yet been asked to rebut any of the

16  other calculations he did.

17     Q.  Were you asked to provide or did you do anything

18  to provide expert -- strike that.

19         Are you providing any expert opinions on the

20  damages associated with unpaid principal balances?

21     A.  No.

22     Q.  Have you been asked to rebut any portion of

23  Mr. Wolf's report relating to those issues?

24     A.  No.

25     Q.  Are you making or going to make any comment or

ROBERT B. MORRISON - 03/08/2019                    Page 149

```
 1   criticism of the way in which he did that analysis?

 2       A.  At this point, I have not been asked to do that.

 3       Q.  There's nothing in your report relating to that,

 4   correct?

 5       A.  That's correct.

 6       Q.  As it relates to the Lanham Act, were you asked

 7   to derive your own calculation or were you asked to

 8   specifically rebut something that Mr. Wolf did?

 9           MS. BAKER:  Object to form.

10       A.  Both.  To look at what he did -- and then,

11   obviously, he didn't do the expenses, which, from my

12   understanding of the statute, the plaintiff doesn't have

13   to provide testimony.

14           And so in -- in rebuttal to his claim of damages

15   of the 8 million, or whatever it was, you know, to

16   determine what the expenses were.  That's number one.

17   The number two is to look at his approach to the

18   determining of the total revenues and independently

19   determine, you know, whether or not those were accurate.

20   BY MR. BACKMAN:

21       Q.  Let me make sure I understand.

22           You agree with me that Mr. Wolf did not do any

23   analysis whatsoever of expenses or deductions, costs of

24   sale relating to his gross revenue number, correct?

25       A.  That's correct.
```

1    Q.  So then are you rebutting any calculation he did

2    with respect to that, if he didn't do one?

3         MS. BAKER:  Object to form.

4    BY MR. BACKMAN:

5    Q.  I'm confused as to the terminology.

6    A.  With respect to expenses?

7    Q.  Yeah.

8    A.  Not directly related to expenses, but related to

9    the claim of damages of the $8 million because there are

10   expenses that go against that.

11   Q.  When did you review -- when was the first time

12   you reviewed Mr. Wolf's report?

13   A.  We received it February -- probably 18th.  It was

14   February 20th, probably.  February 20 or 21.

15   Q.  Is that when you would have read it?

16   A.  Yes.

17   Q.  Do you know that Mr. Wolf was deposed?

18   A.  I'm aware of that, yes.

19   Q.  Were you provided with a copy of his deposition

20   transcript?

21   A.  No.

22   Q.  Is that something you would want to see in

23   rebutting his opinions?

24   A.  Yes.

25   Q.  Are you aware that there's a -- did you ask for

ROBERT B. MORRISON - 03/08/2019          Page 151

1    the deposition transcript?

2        A.  I just became aware of it last night.

3        Q.  That's the first time you found out he was

4    deposed?

5        A.  Yes.

6        Q.  Are you aware that there's a whole bunch of

7    source documents and spreadsheets and things of that

8    nature that Mr. Wolf had prepared that go along with his

9    report?

10            MS. BAKER:  Object to form.

11        A.  I saw that he listed -- are you talking documents

12    or his work product?

13    BY MR. BACKMAN:

14        Q.  Both.

15        A.  I saw that his -- there are a bunch of documents

16    listed, and he referred to several schedules in his

17    report.

18        Q.  And did you ask for those?

19        A.  Yes.

20        Q.  Have those been provided to you?

21        A.  No.

22        Q.  Do you know that one of the things that is part

23    of Mr. Wolf's materials is an actual list that was

24    provided from Reed Hein of the 483 Orange Lake owners,

25    along with who knows how many columns, one of which

ROBERT B. MORRISON - 03/08/2019                    Page 152

```
 1   includes the actual amount that the Orange Lake owners
 2   paid to Reed Hein?
 3           MS. BAKER:  Object to --
 4   BY MR. BACKMAN:
 5       Q.  Are you aware of that?
 6           MS. BAKER:  Object to form.
 7       A.  That was part -- that was attached to his
 8   report -- or an exhibit to his report.
 9   BY MR. BACKMAN:
10       Q.  Have you seen anything that looks like that?
11       A.  Yeah.
12       Q.  When was the first time you saw that?
13       A.  When we received the report.
14       Q.  Can you show me where in your materials you have
15   that particular document?
16       A.  It's attached as Exhibit C to Mr. Wolf's report.
17       Q.  You see anything in Exhibit E --
18       A.  C.
19       Q.  I'm sorry.
20           -- C that tells you how much each particular
21   owner paid to Reed Hein?
22       A.  No.  No, I don't.
23       Q.  Have you seen a document from Reed Hein, from the
24   Salesforce database or a document in connection with
25   Mr. Wolf's report, that actually provides the exact
```

ROBERT B. MORRISON - 03/08/2019          Page 153

 1  dollar amount that individuals paid to Reed Hein?

 2      A.  No.

 3      Q.  Wouldn't the exact number that an individual paid

 4  to Reed Hein be the best source of information to figure

 5  out the total amount of dollars paid by an Orange Lake

 6  customer to Reed Hein?

 7          MS. BAKER:  Object to form.

 8      A.  I wasn't interested in the total dollar amount

 9  paid to Reed Hein.

10          The issue is what are the profits, and the

11  profits are based on earned revenue.  And so the fact

12  that there's a certain dollar amount that was supposedly

13  paid doesn't necessarily mean it was earned yet.

14  BY MR. BACKMAN:

15      Q.  Does gross sales include both earned and unearned

16  revenue?

17      A.  No.

18      Q.  When do you decide to take something out as

19  unearned revenue, from an accounting perspective?

20      A.  Take it out as unearned revenue or recorded as

21  unearned revenue?

22      Q.  Well, the sale, you agree with me, is the point

23  in time in which Reed Hein would sign someone up and

24  that person would make payment under its agreement to

25  Reed Hein?

 1          MS. BAKER:  Object to form.

 2      A.  I disagree.

 3  BY MR. BACKMAN:

 4      Q.  What is a sale?

 5      A.  A sale, as recorded in this business under an

 6  accrual basis, is when a client successfully exits.

 7      Q.  And by sale in this business, you're referring to

 8  what?

 9      A.  To the -- the accounting treatment of their

10  business on an accrual basis and when you record the

11  revenues associated with that transaction.

12      Q.  Gotcha.

13          I just want to understand your -- when you say

14  "this business," you just mean TET or Reed Hein.  You

15  don't mean the industry, in general, do you?

16      A.  Any business that has a -- a time period or --

17  the timing such as this where it may be several -- at

18  least one year, let's say, at least one year between the

19  time that some cash is paid and you actually earn it on

20  an accrual basis would be treated this way.

21      Q.  Is there anything that you -- well, strike that.

22          You said you haven't looked at that statute in

23  20 years.  Did you do any research into the damage

24  analysis under the Lanham Act in preparation of your

25  report?

ROBERT B. MORRISON - 03/08/2019                    Page 155

1      A.  No.

2      Q.  Is there anything you saw that said under the

3  Lanham Act, you don't calculate all sales?

4      A.  I -- I object to your use of the word "sales."

5      Q.  Okay.

6      A.  Because sales is an accounting term.

7      Q.  How about all revenues generated at the point in

8  which somebody pays that money to the business?

9      A.  That's not revenue.  That's cash.

10      Q.  Did you do any research to figure out whether

11  your method of accounting is applicable to the Lanham

12  Act damage calculation?

13          MS. BAKER:  Object to form.

14      A.  It's not my method of accounting.  It is the --

15  the accrual method to be applied in a situation like

16  this.  And if your question is whether under the Lanham

17  Act, you use cash accounting or accrual accounting, I

18  don't know.

19  BY MR. BACKMAN:

20      Q.  If they were still using cash accounting, would

21  you apply all of the sales --

22          MS. BAKER:  Object to form.

23  BY MR. BACKMAN:

24      Q.  -- to the front end part of the calculation?

25      A.  Probably not.

ROBERT B. MORRISON - 03/08/2019                    Page 156

1     Q.  Why not?

2     A.  Because under accounting, income is based on when

3  you earn that income.  And so if -- if these were all

4  cash basis, either I would get the client to or we would

5  convert it to an accrual basis.

6     Q.  Do you know whether the statute refers to income?

7     A.  No.

8     Q.  Do you think it's fair for you to criticize or

9  rebut Mr. Wolf's report when you haven't seen the

10  entirety of it and all of his source documents?

11        MS. BAKER:  Object to form.

12     A.  It is absolutely fair for me to rebut the things

13  I've been asked to rebut.

14  BY MR. BACKMAN:

15     Q.  What precisely in Mr. Wolf's report were you

16  asked to rebut?

17     A.  His calculation of the damages associated with

18  the Lanham claim.

19     Q.  Including the way he calculated the -- the gross

20  revenues?

21     A.  Yes.

22     Q.  And did you see his actual accounting and

23  workpapers relating to how he did that?

24     A.  I didn't see his workpapers yet, but he explained

25  what he did in his -- in his report.

ROBERT B. MORRISON - 03/08/2019          Page 157

1    Q.  Do you think it's -- and you think it's improper

2  for him to use the actual monies that were paid?

3    A.  That's not what I said.

4    Q.  It's not?  So was it proper for him to use the

5  actual monies paid?

6    A.  Actual monies paid -- it's improper for him to

7  use the actual monies paid at the time they were paid

8  and not recognize the difference between earned and

9  unearned income -- earned and unearned profits.

10    Q.  Is that the only discrepancy you have with the

11  way in which he calculated gross revenue?

12    A.  Well, I think that he used -- determined an

13  average of the $6,200 per client based on the 483

14  observations he had and then applied that to some

15  additional -- I forget the exact number -- for which

16  there was no actual information.  And so, you know, the

17  concern I would have there is that he's applying it to a

18  number that was given to him by counsel.

19    Q.  How do you know it's a number given to him by

20  counsel?

21    A.  He says in his report.

22    Q.  Where did he say that?

23    A.  Page 18, I noted that the TET schedule contains

24  data for only 483 unique timeshare account owner names,

25  whereas the list of effective accounts originally

1    provided to me by counsel contains 1,235 unique

2    timeshare holders.

3        Q.  Okay.

4        A.  So he's relying on a document that was provided

5    to him by counsel.

6        Q.  Okay.  Any other problem?

7        A.  The -- I believe -- I believe his refunds number

8    is low, you know, especially based on the information we

9    have now.  So that would be the other area.

10       Q.  Okay.  Do you see the refund amount is related

11   solely to that first bucket of $4 million with respect

12   to the actual account owners and account payments that

13   he had available to him?

14       A.  Yes.  I understand that's where -- the source of

15   that, yes.

16       Q.  Do you know whether TET's records, at the time

17   that they produced them in this lawsuit, reflected for

18   the first 483 only $651 in refunds?

19       A.  I have no idea.

20       Q.  You haven't seen any records from TET, right?

21            MS. BAKER:  Object to form.

22       A.  I have not seen the TET schedule he's relying on.

23   BY MR. BACKMAN:

24       Q.  Okay.  And just so I'm clear, the document that

25   you got at a break today, that was given to you by

ROBERT B. MORRISON - 03/08/2019                Page 159

```
 1   counsel, right?

 2      A.  Yes.

 3      Q.  And you're relying on it, right?

 4      A.  It was given to me by the client through counsel.

 5      Q.  It was handed to you by Ms. Baker, correct?

 6      A.  It was emailed to her by the client, yes, but

 7   handed -- yes, you're right, handed to me by counsel.

 8      Q.  And you're relying on that, right?

 9      A.  Yes, I am.

10      Q.  You don't see anything wrong with that, do you?

11          MS. BAKER:  Object to form.

12      A.  It came from the client.  So I'm -- as I said

13   throughout, I'm assuming that the information provided

14   by the client is accurate.

15   BY MR. BACKMAN:

16      Q.  If the information that was handed -- if the list

17   that was handed to Mr. Wolf by its counsel, as he states

18   in this report, was actually information that came from

19   Reed Hein, would that change your criticism?

20      A.  It's fair to rely on the information.  Whether

21   it's accurate or not is a different question.

22      Q.  Have you seen this document?

23      A.  I have said no.  I testified to that.

24      Q.  So you don't know whether it's accurate or not,

25   do you?
```

ROBERT B. MORRISON - 03/08/2019                    Page 160

1    A.  No, I don't.

2    Q.  And if there is no information for the remaining

3  752 owners that Reed Hein had told Orange Lake exists,

4  what else is Mr. Wolf supposed to do to calculate, other

5  than perhaps extrapolate an average amount?

6    A.  I didn't --

7        MS. BAKER:  Object to form.

8    A.  I didn't criticize his application of how he

9  determined the average.  It's just that there's 700 --

10  these 752 that did not have actual information and the

11  fact that -- that this assumes the very low percentage

12  of unsuccessful exits based on that 651 or 451 dollars.

13  BY MR. BACKMAN:

14    Q.  And how much was the total refunds again on the

15  document that you have this morning?

16    A.  $286,000.

17    Q.  All right.  And we -- we did this earlier, but

18  let me -- let me just see how this adds up.

19        So the way Mr. Wolf did it, without knowing the

20  total refund document that you looked at this morning,

21  was to --

22        MS. BAKER:  Object to form.  It was produced in

23    discovery.

24  BY MR. BACKMAN:

25    Q.  He derived a total estimated net fees of

1   $8,664,960, right?

2       A.  Correct.

3       Q.  And I think when we added up your numbers this

4   morning, we get pretty close to that, do we not?

5       A.  We do.  We do.

6       Q.  Do we, right?

7       A.  Yes.

8       Q.  So what other criticisms do you have with the way

9   in which he calculated total net fees?

10          MS. BAKER:  Object to form.

11      A.  That's it.

12  BY MR. BACKMAN:

13      Q.  All right.  Does your inclusion and reference to

14  Orange Lake clients include folks who owned at

15  Silverleaf Resorts?

16      A.  It includes whatever the client defines as Orange

17  Lake clients.  And -- well, yeah.  So, I mean, that's

18  the answer.  It -- when we asked for Orange Lake clients

19  related to this lawsuit, it includes whatever the client

20  defined as Orange Lake clients.

21      Q.  Do you know how the client is defining that?

22      A.  No.

23      Q.  And the client -- has the client provided you a

24  list of all the, quote, Orange Lake clients?

25      A.  No, not to my knowledge.

ROBERT B. MORRISON - 03/08/2019          Page 162

1    Q.  Okay.  So we looked at your engagement agreement.

2         What is the next document?

3    A.  The next document is just printouts from the --

4    from the website, just background information.

5    Q.  Where did you get those?

6    A.  From the website.

7    Q.  You got them or somebody gave those to you?

8    A.  No, my analyst pulled them down.

9    Q.  Were those provided to you from Reed Hein or its

10   counsel?

11   A.  No.

12   Q.  Did you read those and look at those?

13   A.  Looked at them, yeah.

14   Q.  What relevance do those have to your report?

15   A.  To the report, just to understand the -- the

16   business.  I think in my background section of the

17   report, I laid out kind of -- as I understand the

18   business and the background, the different exits, the --

19   the steps taken, those kinds of things.

20   Q.  Other than those, I don't know, half a dozen or

21   so printouts from the website, do you have any actual

22   first-hand knowledge of how this company operates?

23        MS. BAKER:  Object to form.

24   A.  Define "first-hand knowledge."

25

ROBERT B. MORRISON - 03/08/2019                    Page 163

1   BY MR. BACKMAN:

2       Q.  What does it do?  I mean, did you go there?

3       A.  No.

4       Q.  Did you speak to any Reed Hein representative

5   about what it actually does?

6       A.  Yes.

7       Q.  Who?

8       A.  It would have been a combination of Panda,

9   Stephanie, Tina, counsel in -- in terms of speaking to

10  people about it.

11      Q.  Sure.  And are those people the basis for the ten

12  paragraphs set forth in your -- sorry -- 11 paragraphs

13  set forth in your background summary section of your

14  report?

15      A.  A combination of them and the information on the

16  website, and it's referenced, the -- the exit

17  agreements.

18      Q.  Do these facts matter to your ultimate analysis

19  and conclusions?

20      A.  I think they help the reader of the report gain

21  perspective.

22      Q.  Okay.  So let's look at them, then.  Let's look

23  at Paragraph 6, please.

24          It says:  "TET offers timeshare exit services to

25  owners seeking to safely and legally end their timeshare

ROBERT B. MORRISON - 03/08/2019                Page 164

```
 1   ownership."

 2        Do you see that?

 3   A.  Uh-huh.  Yes.

 4   Q.  And what basis do you have to conclude that

 5   that's true?

 6   A.  It's not a conclusion.  It's a presentation of

 7   facts and allegations as I understand them.

 8   Q.  What basis do you have to even make that

 9   allegation?

10   A.  The website, discussions with the client,

11   discussions with counsel.

12   Q.  Have you spoken to any owners --

13   A.  No.

14   Q.  -- that hired Orange Lake?

15   A.  No.

16   Q.  Have you read any deposition transcripts in this

17   case?

18   A.  No.

19   Q.  Have you seen any sworn statements from owners in

20   this case?

21   A.  No.

22   Q.  Have you been told about the deposition testimony

23   of representatives of Reed Hein?

24   A.  No.

25   Q.  Have you been told about the deposition testimony
```

ROBERT B. MORRISON - 03/08/2019                    Page 165

```
 1   of former employees of Reed Hein?

 2      A.  No.

 3      Q.  Do you know that there's an abundance of

 4   testimony or documents that Reed Hein does not actually

 5   exit people safely or legally?

 6      A.  No.

 7          MS. BAKER:  Object to form.

 8          THE WITNESS:  Sorry.

 9   BY MR. BACKMAN:

10      Q.  So other than in your conversations with whoever

11   it was you were on the phone with, you have no reason to

12   believe that that sentence is actually truthful?

13          MS. BAKER:  Object to form.

14   BY MR. BACKMAN:

15      Q.  Correct?

16      A.  It's the facts and allegations as I understand

17   them.

18      Q.  As you understand them, according to the people

19   that you spoke with on the telephone?

20      A.  That's correct.

21      Q.  Got it.

22          And I notice in some spaces in your background

23   section, you have footnotes and references to documents;

24   is that correct?

25      A.  Correct.
```

ROBERT B. MORRISON - 03/08/2019                    Page 166

1      Q.  But for that sentence, you don't have any

2  reference?

3      A.  That sentence does not have a reference.

4      Q.  Does that mean anything that you don't have a

5  citation to any document or evidence?

6      A.  An oversight.

7      Q.  What would you cite to there?

8      A.  Just either the website or discussions with --

9  with client.

10     Q.  And you would cite to the website because the

11  website says that they can do this safely and legally?

12         MS. BAKER:  Object to form.

13     A.  These are the facts and allegations as I

14  understand them.  I'm not saying this is my opinion or

15  my conclusions.  I'm saying these are the facts as I

16  understand them.

17  BY MR. BACKMAN:

18     Q.  Sure.  And I'm just trying to make sure I exhaust

19  exactly where it is you get these facts from.

20     A.  You've exhausted it.

21     Q.  All right.  If there were other things, you would

22  have put it in this report, right --

23     A.  I would.

24     Q.  -- other bases for that sentence?

25     A.  Correct.

ROBERT B. MORRISON - 03/08/2019                    Page 167

1      Q.  Got it.

2           In -- how many times have you acted as an expert?

3      A.  I don't know.  What do you mean "acted as an

4   expert"?  Consulted --

5      Q.  I don't mean anything by that word other than

6   being retained by an expert -- as an expert.

7      A.  Consulting expert?  Testifying expert?

8      Q.  All of it.

9      A.  Hundreds of times.

10     Q.  When you are retained in that capacity in

11  connection with an ongoing litigation, is it normal for

12  your practice to get deposition transcripts?

13     A.  We will ask the counsel for deposition

14  transcripts from testifying fact witnesses and experts

15  that -- that impart information on the issues we're

16  being asked to address.

17     Q.  Or items that are contained within your report?

18     A.  Correct.

19     Q.  Right.  Like the factual background relating to

20  the case, right?

21          If there were witnesses who testified as to the

22  factual background allegations in your report, you would

23  like to see that deposition testimony, wouldn't you?

24          MS. BAKER:  Object to form.

25     A.  No.  Well, the fact -- the whole purpose of the

 1   background is to give the reader the perspective from

 2   where I'm coming, from the facts as I understand them.

 3   I'm not saying that these are the -- all the facts.  I'm

 4   not saying these are all correct.  I'm just saying these

 5   are the facts as I understand them.

 6   BY MR. BACKMAN:

 7       Q.  As an expert, you're intended to look at this

 8   objectively, correct?

 9       A.  Correct.

10       Q.  Not viewed from one perspective or the other just

11   because you're hired by the defendant, right?

12       A.  Correct.

13       Q.  And you should look at the facts from the same

14   perspective, correct?

15       A.  These facts have absolutely nothing to do with my

16   calculations.

17       Q.  So I asked you that before, before I went into

18   this line of questioning, whether these facts have

19   anything to do with your conclusions and your opinions

20   in this case.  And you --

21       A.  What was my answer?

22       Q.  -- said yes.

23       A.  No, I did not.

24       Q.  You did, which is why we're doing this.

25       A.  We'll go back and we'll read the transcript.

ROBERT B. MORRISON - 03/08/2019                Page 169

 1  Because my response was:  They're there to provide the

 2  reader with some background as I understand the facts.

 3      Q.  Sure.  But if they have nothing to do with your

 4  report, your ultimate conclusions and opinions, then we

 5  don't need them, do we?

 6          MS. BAKER:  Misstates his testimony.

 7      Argumentative.  I mean, are we really going to spend

 8      five, ten minutes going over the same thing over and

 9      over again?

10  BY MR. BACKMAN:

11      Q.  You can answer my question.

12      A.  You may not need them because you -- you may not

13  need them, but these are the facts, as I understand

14  them, so that the reader understands the facts as I

15  understand them.

16      Q.  Sure.  But they're not a fair, objective analysis

17  of the facts that you've actually seen in this case.

18  They are the regurgitation of information that was

19  provided by your client?

20          MS. BAKER:  Object to form.

21      A.  That is incorrect.

22  BY MR. BACKMAN:

23      Q.  Okay.

24      A.  Because I have provided on a lot of them where

25  the information came from.  They -- so they're not

ROBERT B. MORRISON - 03/08/2019                    Page 170

1   regurgitation.  Some absolutely came from the client.

2   It is normal and customary for us to talk to the client,

3   read the complaint, things like that.

4        The -- to hopefully put your mind at ease,

5   nothing in my opinions were swayed one way or the other

6   by the facts as I understand them.

7        Q.  In Paragraph 8, you reference certain terms from

8   some exit agreements that you looked at.

9        A.  Yes.

10       Q.  Who gave you the exit agreements?

11       A.  They came to us through counsel.

12       Q.  Did you ask for exit agreements?

13       A.  Yes.

14       Q.  Why did you ask for exit agreements?

15       A.  So I could read them.

16       Q.  Do you know whether you got a -- whether you got

17   a version of -- strike that.

18       Do you know whether the exit agreements have

19   changed over time?

20       A.  Yes.

21       Q.  Do you know whether you got an accurate version

22   of the form that was in place during each applicable

23   time period?

24       A.  We received six.  The idea was at least one for

25   each year -- one for each version.  And then there are a

ROBERT B. MORRISON - 03/08/2019                 Page 171

```
 1   couple of others, too, just because of variations in
 2   perhaps how the agreements were put together.
 3       Q.  What do the terms that you pulled out of those
 4   exit agreements in Paragraphs 8A through 8C have to do
 5   with your opinions and conclusions?
 6       A.  I've answered that question.  I have said that
 7   the facts, as I understand them, have no bearing or
 8   impact on my opinions and conclusions.
 9       Q.  Okay.
10       A.  They're purely to help me and the reader
11   understand certain things.
12       Q.  Did your analysis relating to revenues and
13   expenses vary based upon the date that a particular
14   Orange Lake owner would have retained Reed Hein?
15       A.  No.
16       Q.  The fact that they were previously cash and now
17   are accrual, should you have looked at those first two
18   years on a cash basis as opposed to an accrual basis?
19       A.  No.
20       Q.  Why not?
21       A.  Because the idea -- the -- the key is
22   consistency.  And so, in fact, as you -- as we talked
23   about earlier, I recast those two years on an accrual
24   basis.  An accrual basis for this business is more
25   indicative of when the revenues are earned and when the
```

ROBERT B. MORRISON - 03/08/2019                    Page 172

```
 1   expenses against those revenues are recognized.  It's
 2   more indicative of the profit -- profitability of this
 3   business.
 4       Q.  And I just want to make sure I understand this
 5   concept.  Because I just struggle with it from a common
 6   sense perspective.
 7           Jeff Backman hires Reed Hein.
 8       A.  Okay.
 9       Q.  And I sign an exit agreement and I pay Reed Hein
10   $12,000.
11       A.  Okay.
12       Q.  Reed Hein says they're going to get me out of my
13   timeshare.  Okay?  That's what they do, right?
14       A.  Yes.
15       Q.  My $12,000 gets deposited in Reed Hein's bank
16   account?
17       A.  That's correct.
18       Q.  My $12,000 gets used by Reed Hein?
19       A.  Correct.
20       Q.  But then Reed Hein, on a piece of paper, says
21   that my $12,000 is, quote, unearned, despite the fact
22   that they put it in their pocket, because my exit hasn't
23   been accomplished?
24           MS. BAKER:  Object to form.
25
```

1  BY MR. BACKMAN:

2      Q.  Do I have this right?

3      A.  Yeah, because they still have an obligation to

4  you --

5      Q.  Right.

6      A.  -- to complete the exit.  And if they don't

7  complete the exit, they got to pay you back the 12,000,

8  regardless of whether they spent it or not.

9      Q.  So if today, Jeff Backman and, man, who knows how

10 many others that comprise this $70 million in unearned

11 revenue, call up Reed Hein and say, "I want my money

12 back," Reed Hein can't pay us, can they?

13         MS. BAKER:  Object to form.

14     A.  I don't know the answer to that.  Because Reed

15 Hein -- with -- and this goes back to earlier

16 discussion.  With the assets they currently have, no.

17         They would have to either put money back in.

18 They would have to borrow money.  They would have to do

19 something.  But with the assets they currently have, no.

20 BY MR. BACKMAN:

21     Q.  Got it.

22     A.  And currently, we're talking about the end of

23 2017 because we don't have the 2018 information.

24     Q.  Do you know how many people have asked Reed Hein

25 for a refund, but it hasn't been provided?

ROBERT B. MORRISON - 03/08/2019                Page 174

1    A.  No.

2    Q.  Does that matter to you in your opinions?

3    A.  No.

4    Q.  Can you look at Paragraph 10 for me, please.

5    A.  Okay.

6    Q.  Who provided you with the information that sets

7  forth the six ways in which you identify somebody could

8  be -- sorry -- the potential outcomes from TET services?

9    A.  The client.

10    Q.  And same answer there, right, these facts have

11  nothing to do with your conclusions or opinions?

12    A.  No, other than the -- other than to recognize

13  that not all deals are successful, but we know that

14  already.

15    Q.  But who you put in the unsuccessful category is

16  really who Reed Hein put in the unsuccessful category,

17  correct?

18    A.  Yes.  Based on their -- the data they provided,

19  that's correct.

20    Q.  You didn't do any independent analysis of the

21  underlying individuals and the circumstances relating to

22  their exits that comprise the calculation of roughly

23  $5.4 million in unsuccessful exits, correct?

24    A.  That's -- the $5.4 million is not unsuccessful

25  exits.  Those are --

ROBERT B. MORRISON - 03/08/2019                    Page 175

1      Q.  That's the unearned revenue?

2      A.  Right.

3      Q.  So that's the unsuccessful exits?

4      A.  Let's get back to nomenclature.  Unsuccessful

5   exit to me is, I'm done with Reed Hein.  I want my money

6   back.

7          You're talking about retained.  Clients that

8   still -- there's been no resolution, but haven't

9   gotten -- haven't gotten their money back yet.

10     Q.  Okay.

11     A.  Okay?  So now rephrase your question if --

12     Q.  So who -- let's go with each bucket.

13     A.  Okay.

14     Q.  You have three buckets.  You've successful,

15   unsuccessful, as you've just defined it, and those folks

16   that have actually been refunded.

17     A.  No.  We'll have successful, those that are

18   ongoing -- can we call them ongoing?

19     Q.  Okay.

20     A.  Okay.  Successful, ongoing, and unsuccessful.

21     Q.  And refunded?

22     A.  Refunded is unsuccessful.  Let's call them

23   refunded.

24     Q.  Let's call them refunded.

25     A.  Okay.

ROBERT B. MORRISON - 03/08/2019                    Page 176

1    Q.  All right.  So successful, Reed Hein determined

2    that and gave you the number, correct?

3    A.  Yes.

4    Q.  You didn't do any independent analysis to figure

5    out whether somebody was successfully exited, correct?

6    A.  That's correct.

7    Q.  Refunded/unsuccessful, you were just provided

8    with the -- with that information this morning, correct?

9    A.  That's correct.  It came from Reed Hein.

10   Q.  And what we marked as exhibit whatever, the list

11   of folks who have been refunded, that's the only list

12   that you were provided of actual refunds?

13   A.  That's correct.

14   Q.  And you haven't done any independent analysis

15   into anybody or any account listed in that document?

16   A.  That's correct.  That's Exhibit 6.

17   Q.  Okay.  And then there's the pending?

18   A.  Correct.

19   Q.  And you haven't done any analysis into who is

20   pending and whether or not it's successful,

21   unsuccessful, in limbo, what have you?

22   A.  Well, it's --

23   Q.  Well, that's right, we used unsuccessful

24   interchangeably.

25   A.  By definition, it's -- we don't know the outcome

ROBERT B. MORRISON - 03/08/2019                    Page 177

```
 1  yet.
 2      Q.  But you don't know who those people are?
 3      A.  No.
 4      Q.  You don't know how long they've been clients of
 5  Reed Hein?
 6      A.  No.
 7      Q.  You don't know whether they've asked for a
 8  refund?
 9      A.  No.
10      Q.  You don't know whether their -- the time period
11  that they were promised to be exited had expired or not?
12      A.  No, I don't know.
13      Q.  You don't know any of that stuff?
14      A.  No.
15      Q.  Go to Page 7 of your report, please.
16      A.  Okay.
17      Q.  Before we do that, so you showed me the websites,
18  right, the source documents on your left?
19      A.  Right.
20      Q.  Okay.  What's next?
21      A.  These are profit and loss statements for various
22  years just right off of -- right off of their internal
23  accounting software, and trial balances.
24      Q.  Okay.  So let's look at these.  It looks like
25  there's basically three groups, if we broke it apart,
```

ROBERT B. MORRISON - 03/08/2019          Page 178

```
 1   right?  You've got the first dozen or so pages that are
 2   various trial balances or P&Ls.
 3         Do you see that?
 4   A.  Okay.  Your -- okay.  Yes.  Yes.  I'm there with
 5   you.
 6   Q.  Okay.  So if you flip through and you just look
 7   at the dates on them.  Okay?
 8   A.  Yes.
 9   Q.  It's 2014 profit and loss, right?  Is that what
10   that is?
11   A.  Yes.
12   Q.  The second page as of December 31, 2014, balance
13   sheet, right?
14   A.  Yes.
15   Q.  Same thing with the third page?
16   A.  Yes.
17   Q.  And the fourth page is 2014 profit and loss
18   again?
19   A.  Yes.
20   Q.  As is the fifth page?  Yes?
21   A.  Yes.
22   Q.  And then it looks like it's a duplicate copy of
23   the same group that we just looked at?  Do I have that
24   right?
25   A.  Yes.
```

ROBERT B. MORRISON - 03/08/2019                    Page 179

1      Q.  Why were you not provided the other years'
2   balance sheets and P&Ls?
3      A.  They are provided on that next page, after that
4   section.  You can see there's a one page that shows a --
5   what we call comparative balance sheet and income
6   statement.
7      Q.  I know it's kind of obvious.  But that one page
8   is not the same thing as the handful of pages we just
9   looked at for 2014, is it?
10     A.  Not the same thing?  I don't know what you mean
11   by not the same.
12     Q.  So that single page that you're looking at that
13   says "Reed Hein & Associates unaudited balance sheet for
14   years ending 12/31/13 through 12/13/17, that is a
15   summary for those five years, correct?
16     A.  Yes, it is.
17     Q.  As opposed to the actual for the individual years
18   like what we -- you were provided for 2014?
19     A.  Correct.
20     Q.  Right.  Why weren't you provided the same
21   information from -- the 2014 records for the other
22   years?
23     A.  We are.  It -- we did get provided that same
24   information on that page that I just told you about and
25   the following trial balances.  It all comes from the

ROBERT B. MORRISON - 03/08/2019                    Page 180

1    accounting records, the same accounting records.

2        Q.  Do you know that Reed Hein has those balance

3    sheets and profit and losses for every year?

4        A.  Based on 2014, that is a QuickBooks printout.

5    Assuming they were still on QuickBooks in 2015, '16,

6    '17, they should be able to print them out.

7        Q.  Did you ask for them?

8        A.  No.  We -- we got the trial balances because

9    of -- I don't know exactly why we got trial balances

10   instead of the P&Ls and balance sheets.  But then we ran

11   into the -- what I discussed earlier about looking at

12   the trial balances and trying to reconcile those back to

13   the tax returns, and we couldn't do that.  So we just

14   relied on the tax returns.

15       Q.  Do you know who prepared that summary page with

16   the five years on it?

17       A.  I don't know who specifically prepared it, no.

18       Q.  Do you know whether that was a document that was

19   maintained in the normal course of Reed Hein's business

20   in its QuickBooks?

21       A.  I have no idea.

22       Q.  Or is that something that was prepared just for

23   you for your purposes in this case?

24       A.  I don't know.

25       Q.  Would you want to compare those numbers to the

ROBERT B. MORRISON - 03/08/2019                Page 181

1    actual P&Ls and balance sheets that Reed Hein maintained

2    in QuickBooks on an annual basis?

3        A.  No.

4        Q.  Let me just ask you a question so I can

5    understand what I'm looking at here.  I'm going to hand

6    you RH005740.  That is a P&L for 2017 that was produced

7    by Reed Hein in this case.

8            Do you see that?

9        A.  Yes.

10       Q.  So I'm trying to understand when I look at that

11   summary of the five years that you referred me to --

12       A.  Yes.

13       Q.  -- I'm trying to understand where I would find --

14   happens at least once -- where I would find the

15   information that supports the gross exit revenue that's

16   reflected on Reed Hein 5740.

17       A.  It's the income -- so the -- what I'm going to

18   call the comparative income statement versus Reed Hein

19   005740.  If you look at the net revenue on Reed Hein

20   005740, 22,636,846, which is .23, which is exactly the

21   same number on exits revenue on the comparative income

22   statement.

23       Q.  Okay.  So I find it on that middle income line?

24   That's how I match that up?

25       A.  Yes.

ROBERT B. MORRISON - 03/08/2019                    Page 182

1    Q.  The way you just did?

2    A.  Yes.

3    Q.  Okay.  But that's -- you agree with me that on

4  the P&L, that's the net revenue number, right?

5    A.  Well, on the -- on the comparative income

6  statement, it is net of refunds.

7    Q.  So help me out.  Here's what I'm looking for on

8  that summary sheet, the one with all five years --

9    A.  The comparative.

10   Q.  Okay.  That's what we call it, the comparative?

11   A.  Call it comparative.

12   Q.  Got it.

13        Where on the comparative does it give me the

14  gross exit revenue?

15   A.  It doesn't list that separately.  It gives the

16  exits revenue after the refunds are deducted.

17   Q.  Where on the comparative does it identify the

18  refunds?

19   A.  I -- it doesn't.  On the comparative, it is net

20  of those revenues -- net of those refunds.

21   Q.  Okay.  So it's not on that document -- on the

22  comparative?

23   A.  The line items gross exit revenue and the line

24  item refunds are not on the comparative schedule.

25   Q.  If I -- if I didn't show you RH5740 and I just

ROBERT B. MORRISON - 03/08/2019          Page 183

 1  asked you to look at the comparative and tell me what

 2  the gross revenues were, would you be able to do that?

 3      A.  The comparatives, if you -- if you want to know

 4  what that net exits revenue was made of, no.

 5      Q.  No, not the net.  The gross exit revenue line

 6  that's contained at the top of 5740.  If I did not show

 7  you that document and you were looking only at the

 8  comparative and I said, Bob, for 2017, tell me what the

 9  gross exit revenue was, are you able to do that?

10      A.  From just looking at the comparative sheet, no.

11  It's --

12      Q.  Okay.

13      A.  It's presented in a summary format.

14      Q.  That's what I was trying to understand.

15          Do you have the backup detail for this

16  comparative?

17      A.  It's RH005740.

18      Q.  But you didn't have that document until I just

19  gave it to you, right?

20      A.  Right.

21      Q.  That wasn't part of what you looked at in

22  connection with rendering your opinions and conclusions?

23      A.  That's correct.

24      Q.  Okay.

25          MS. BAKER:  We've been going for an hour and a

ROBERT B. MORRISON - 03/08/2019          Page 184

```
 1    half.  Can we take a break?

 2           MR. BACKMAN:  Yeah, we can take a break

 3    whenever you'd like.

 4           We're going to take a break.

 5           THE VIDEOGRAPHER:  The time is 2:52 p.m.  Off

 6    the record.

 7           (Whereupon, a break was taken from 2:52 p.m.

 8    to 3:00 p.m.)

 9           THE VIDEOGRAPHER:  The time is 3 o'clock p.m.

10    On the record.

11    BY MR. BACKMAN:

12      Q.  The 2014 info that we just looked at in that

13    comparative document that we just looked at, did you use

14    those in connection with reaching any of the conclusions

15    or opinions in your report?

16      A.  No.

17      Q.  So the next document that was in that little --

18    that one paper -- it looks like it's called a trial

19    balance?

20      A.  Yes.

21      Q.  And it says "period ending 12/31/17"?

22      A.  Yes.

23      Q.  So is this a trial balance for all five years

24    starting in 2013?

25      A.  Yes.
```

ROBERT B. MORRISON - 03/08/2019                Page 185

1    Q.  What is -- what is this showing me?

2    A.  It shows you the assets, liabilities, income, and

3  expenses -- revenues and expenses for the company based

4  on the books that they kept.

5    Q.  Cumulative for the five years?

6    A.  So balance sheets are cumulative.  Income

7  statements are year to year.

8    Q.  So this is going to provide in the description

9  every single category of operating expense that this

10  company has ever categorized -- for lack of a better

11  word -- since 2013?

12    A.  Yes.

13    Q.  And then the amounts associated with it for each

14  year running forward through the cumulative number in

15  the 2017 column?

16    A.  Correct.  And remember, from an income statement

17  standpoint, it's not cumulative.  It's just for the year

18  2017.

19    Q.  What is this document used for?

20    A.  The -- so the trial -- what is it used for or

21  what did I use it for?

22    Q.  Well, I'm going to get there in a second.

23        What is it used for by the company?

24    A.  A trial balance is a representation of -- or a

25  summary, if you will, of the general ledger.  The

1  general ledger's where all the transactions are put

2  into.

3      Q.  Does Reed Hein utilize a general ledger?

4      A.  Yes, absolutely.

5      Q.  Did you see the general ledger?

6      A.  No.

7      Q.  What did you rely upon this trial balance for?

8      A.  I asked for the trial balance to try to get into

9  some of those expenses, and received the trial balance

10  and started looking at the recorded information on the

11  trial balance and noted that it was vastly different

12  than the tax returns.

13          And that's when, discussing this with the client,

14  we realized there was a lot of adjustments that are made

15  between the general ledger/trial balance and the tax

16  returns.  And those come in two main forms, like I

17  testified earlier.  One is there are what's called book

18  to tax differences, book/tax differences that are

19  recorded on the tax return.  And the other are year end

20  adjusting journal entries that the tax accountant might

21  suggest.

22          And so picking up -- and -- and if I may, the

23  other in this group of documents, that 2014 balance

24  sheet, et cetera, et cetera, that comes from the general

25  ledger as well.  All of that comes from the general

ROBERT B. MORRISON - 03/08/2019                    Page 187

1   ledger.  And so it is actually a summary of the trial

2   balance.  So a general ledger, trial balance, financial

3   statement.  And it suffers from the same issues that the

4   trial balance does, because that's where it's getting

5   its information, in terms of it not being the complete

6   picture because of those things that I just mentioned.

7      Q.  So when the accountant gets ahold of the books

8   and records and starts talking to the principals,

9   figuring out how to make the principals as much money as

10  possible, sometimes things get moved around --

11     A.  That's not what accountants do.

12         MS. BAKER:  Object to form.

13  BY MR. BACKMAN:

14     Q.  -- from a numbers perspective?

15     A.  That's not what accountants do.

16     Q.  Okay.  Forget my -- forget my characterization.

17         Once the books and records get to the accountant,

18  things sometimes get rebooked, reclassified, changed?

19  Yes?

20     A.  To comply with either GAAP and/or tax code, yes.

21     Q.  Did you analyze the tax returns to see whether

22  they comply with either the tax code or GAAP?

23     A.  They -- they may or not comply with GAAP.  They

24  don't have to.  They are on an accrual basis.  And I am

25  assuming they comply with tax code because they were

ROBERT B. MORRISON - 03/08/2019                    Page 188

1   submitted to the IRS under -- under possible penalty of

2   perjury.

3       Q.  And if they weren't, would that be the first time

4   that that happened?

5       A.  If they weren't?

6       Q.  Compliant with the tax code.

7            MS. BAKER:  Object to form.

8   BY MR. BACKMAN:

9       Q.  Would that be the first time that somebody signed

10  one and sent it in, and it turns out it's not accurate?

11      A.  I have no idea.

12      Q.  You've seen that before, though?

13      A.  No, I haven't, actually.  But I can imagine it

14  happens.

15      Q.  Lots of people get in trouble for tax fraud,

16  right?

17      A.  Yes, they do.

18            MS. BAKER:  Object to form.

19  BY MR. BACKMAN:

20      Q.  Some famous cases sitting out there right now.

21      A.  Sentenced yesterday.

22      Q.  Yes.

23            Are you familiar with GAAP principles?

24      A.  Yes.

25      Q.  Did you utilize any GAAP principles in connection

ROBERT B. MORRISON - 03/08/2019          Page 189

```
 1   with your opinions and conclusions?
 2       A.  Generally speaking, the presentation of the
 3   information on an accrual basis is in compliance with
 4   GAAP.  What I can't tell you is that everything they --
 5   everything reported was in compliance with GAAP.
 6       Q.  Let me ask it differently.  I'm sorry.
 7           Did you have to utilize any particular GAAP
 8   principles, G-A-A-P principles, in reaching any of your
 9   conclusions?
10       A.  I utilized the knowledge that on an accrual
11   basis, it is a GAAP principle of matching revenues with
12   what -- not recognizing revenues until they're earned --
13   that's a big deal in accounting in GAAP -- and matching
14   the expenses associated with those revenues at the
15   appropriate time.  I did not make adjustments to GAAP.
16       Q.  In light of what you talked to me about with the
17   trial balance and then ultimately what things looked
18   like on the tax returns, did you utilize this trial
19   balance in connection with your opinions and
20   conclusions?
21       A.  I couldn't use it, no.
22       Q.  Is there any legal standard that you're aware of
23   in determining how to calculate the starting point of
24   gross sales under the Lanham Act?
25       A.  I'm not aware of any.
```

1    Q.  Is there any legal standard you're aware of in

2    terms of how to calculate any cost deductions from

3    whatever the starting point ends up being under the

4    Lanham Act?

5    A.  I'm aware -- well, I'm aware that those are

6    addressed in the Lanham Act and in case law subsequent.

7    But I'm not a lawyer, so I don't interpret that stuff.

8    Q.  All right.  Are you familiar with any type of

9    standard that you're supposed to apply for purposes of

10   the calculation?

11   A.  No.

12   Q.  Have you been retained as an expert, consultant,

13   or testifying by Wilson Elser in the past?

14   A.  No.

15   Q.  John Benford?

16   A.  Yes.

17   Q.  How many times?

18   A.  Two or maybe three.  And then I was against him

19   in a case.

20   Q.  Do you -- is your primary business expert witness

21   work?

22   A.  No.  Year in and year out it varies a little bit.

23   We do forensic accounting.  Well, I serve as a trustee

24   and receiver in bankruptcy court, in federal and state

25   court.  We do valuation, what I would call a

ROBERT B. MORRISON - 03/08/2019                    Page 191

1  non-adversarial valuation work for tax purposes and for

2  financial reporting purposes.

3        So those are kind of the three main areas.  And,

4  again, year in and year out it changes a little bit.

5  Roughly 60 percent is litigation.  And some of that is

6  doing just like shareholder disputes, doing a valuation

7  of -- for a dissolution or descending shareholder-type

8  action.

9     Q.  Are you able to tell me generally over your years

10 as acting as an expert witness which side of the "V"

11 you're on more than others?

12    A.  It's -- it varies back and forth.

13    Q.  Can you go to Page 7, Paragraph 12 of your

14 report, please.

15    A.  Yes.

16    Q.  One second.

17        So in Paragraph 12, and then you have subparts A

18 through D.

19        You see that?

20    A.  Yes.

21    Q.  And I know we talked about some of this, but not

22 in connection with your report.  Are those the only

23 opinions that you're giving in this case?

24    A.  Yes.  At this point, that's all I have been asked

25 to do.

ROBERT B. MORRISON - 03/08/2019                    Page 192

1      Q.  I guess -- I guess to be fair, you have -- would

2  you add another line item?  Where would what we talked

3  about this morning with the future earned revenue --

4      A.  That's B.

5      Q.  -- fall into this?

6      A.  That's 12B.

7      Q.  Okay.  And I saw there you asked for 2018 and

8  2019 financial data.

9          You see that?

10     A.  Yes.

11     Q.  Did you get that?

12     A.  No.

13     Q.  Do you need 2018 and 2019 financial data for 12C?

14     A.  Probably not.  And 12C, let me clarify that.

15  Because reading it here, it isn't exactly what I'm

16  saying.

17          The issue is whether there are other sources of

18  revenue, other than exit services, that they generate.

19  And therefore, some expenses would be assigned to those.

20  But in looking at 2013 to 2017, there aren't other

21  sources of revenue.  So all the expenses would be

22  related to the generation of exit services revenue.

23          To your point, if 2018 shows that they've got a

24  separate business line now all of a sudden that they're

25  generating money from, then we would need to take the

ROBERT B. MORRISON - 03/08/2019                Page 193

 1   expenses in 2018 and first separate those related to the
 2   other business line before looking at the expenses
 3   related to the exit services.
 4       Q.  And just so I understand -- I don't want to
 5   rehash everything as we go through this -- but when you
 6   reference here a hundred percent of TET's adjusted
 7   operating expenses, that just means you're utilizing
 8   every category of expense?
 9           MS. BAKER:  Object to form.
10       A.  I'm considering every category of expense and
11   that it -- but more importantly, what I'm saying here
12   is, every category of expense relates to exit services.
13   BY MR. BACKMAN:
14       Q.  Correct.  And we talked about it earlier, you
15   don't know whether every category of expense directly
16   relates to Orange Lake?
17       A.  Specifically, no.  But to correct your statement,
18   I'm not saying that I used a hundred percent of all
19   expenses.
20       Q.  Okay.  I was talking about the category.
21       A.  Fair enough.
22       Q.  So the amounts are based upon the correlation
23   that we looked at --
24       A.  Correct.  Correct.
25       Q.  -- in Exhibit 7?

ROBERT B. MORRISON - 03/08/2019                    Page 194

1      A.  Yes, Exhibit 7, yes.  Yeah, we're on the same

2  page.

3      Q.  Okay.  And then for D, that's the three tables we

4  looked at on pages 13, 14, and 15?

5      A.  That's correct.

6      Q.  And you said that if you were picking one of

7  those methods, you would pick the second?

8      A.  That's correct.

9      Q.  Should we disregard the first and the third?

10      A.  Well, in terms of my opinion will be that, but

11  the -- my opinion will be the second.  The third

12  confirms the second in terms of the percentage.  And the

13  first is if for some reason the court determines that

14  all of the expenses fully absorbed should be implied.

15          But my opinion is the second.

16      Q.  When did you ask for that 2018 and '19 financial

17  data?

18      A.  So that would have been in that February 20th.

19      Q.  Have you been given a reason why it wasn't

20  provided?

21      A.  No.

22      Q.  You said you asked for the trial balance that we

23  looked at?

24      A.  Yes.

25      Q.  Was that something you asked for after you had

ROBERT B. MORRISON - 03/08/2019                    Page 195

1    gotten some initial documents?

2       A.  Yes.

3       Q.  And how long did it take them to give you the

4    trial balance?

5       A.  I don't recall.

6       Q.  Were there other documents that you asked for

7    that you actually received?

8       A.  Yes.  You know, the -- the exit agreements, I

9    think, were one that we asked for.  You know, there

10   would have been initially a -- a discussion about we're

11   going to need these documents in kind of the initial

12   document request, if you will, from us.

13          And there were -- as I have -- as I have

14   testified throughout here today, some of the things

15   we've asked for and haven't received and some we have.

16      Q.  And for the various categories of things that

17   you've asked for and haven't received, have you been

18   given an explanation as to why you haven't received

19   them?

20      A.  No.

21      Q.  And anywhere noted in your report, where you say

22   you've asked for documents, but haven't been provided

23   them, and therefore reserve the right to amend your

24   report --

25      A.  Yes.

ROBERT B. MORRISON - 03/08/2019                    Page 196

1      Q.  -- as you sit here now, are you intending, once

2    you get those documents, to go back and make changes to

3    your report?

4      A.  Depends on what those documents are showing.

5      Q.  It does, doesn't it?

6      A.  Yes, it does.

7      Q.  What is forensic accounting certainty?

8      A.  Well, accounting is accounting -- accounting is

9    financial, it's assets, liabilities, income, and

10   expenses.  Forensic accounting is doing accounting

11   within the administration of a court proceeding or

12   something like that.

13        In accounting, we have a term we call "more

14   likely than not."  And that is what I -- what I kind of

15   interpret as certainty, reasonable certainty.

16     Q.  Did you do any forensic analysis in this case?

17     A.  Well, this is all forensic analysis.  Because

18   remember, again, the term "forensic" is wide ranged, but

19   it literally is providing whatever profession you

20   provide for the court, for administrative proceedings,

21   things like that.

22     Q.  For the revenues, for the revenue number that you

23   came to, the 3,077,611, is it fair to say you didn't

24   actually do any type of analysis?

25     A.  That would be -- yeah, that would be fair.  It

1  was what is -- what is the reported revenue for the

2  Orange Lake clients --

3      Q.  The clients said X.

4      A.  -- as of -- as of -- for those years.

5      Q.  And the client said X, and you reported X in your

6  report as the total revenue?

7      A.  That's correct.

8      Q.  Do you think that requires an expert opinion?

9          MS. BAKER:  Object to form.

10     A.  The expert opinion is taking that into the

11  ultimate opinions that I gave.

12  BY MR. BACKMAN:

13     Q.  Do you think you did anything from an expert

14  analysis to derive at that -- to derive that $3 million

15  number?

16     A.  That number, no.

17     Q.  Before coming to the conclusion that something

18  was done to a reasonable degree of certainty, is it best

19  practices to have all of the information that you want

20  to have?

21          MS. BAKER:  Object to form.

22     A.  Want and need are two different things.

23          I had the information that I needed to form the

24  opinions I formed.

25

ROBERT B. MORRISON - 03/08/2019                    Page 198

```
 1   BY MR. BACKMAN:
 2      Q.  Your conclusion -- I'm sorry.  That -- your
 3   statement that your opinions in your report dated
 4   March 4, 2019, so just a few days ago, that the opinions
 5   have been determined within a reasonable degree of
 6   forensic accounting certainty included your opinion that
 7   28.1 percent of Orange Lake clients were successfully
 8   exited as a percentage of total Orange Lake clients,
 9   correct?
10      A.  Yes.
11      Q.  And it turns out that that's wrong, right?
12      A.  That's correct.
13      Q.  Wrong by roughly 60 percent?
14      A.  The percentage difference is 60 percent, yes.
15      Q.  Do you still think your opinion in your report,
16   where you came to the conclusion that it was
17   28.1 percent, was determined within a reasonable degree
18   of forensic accounting certainty?
19      A.  Yes, it was, based on what I had at the time.
20      Q.  Had you had the additional information, you would
21   not have made the error, correct?
22      A.  If I had the additional information, that
23   28 percent would be different.
24      Q.  Right.  And there's additional information that
25   you're asking for that you haven't been provided?
```

ROBERT B. MORRISON - 03/08/2019            Page 199

1    A.  That's correct.

2    Q.  And so that information may change some of your

3  other opinions, correct?

4    A.  May or may not.

5    Q.  You can hold that page because we're going to

6  come back to it.

7        If you could just flip over to Paragraph 24,

8  please.

9    A.  Yes.

10   Q.  That first sentence, it says:  "I was unable to

11  conduct an in-depth analysis of the company's reported

12  expenses in order to search for discretionary expenses.

13  The client did respond when asked that there were no

14  such expenses of any materiality from 2013 to the

15  present."

16       Do you see that?

17   A.  Yes.

18   Q.  If you weren't able to conduct an in-depth

19  analysis, how could you come to a reasonable degree of

20  forensic accounting certainty?

21   A.  Because the client was representing that there

22  weren't any.

23   Q.  Would you want to verify whether the client's

24  providing accurate information to you?

25   A.  If the client's going to testify under oath that

 1  there weren't any, that's testimony under oath that I

 2  accept.

 3      Q.  Did you see any testimony under oath to that

 4  effect?

 5      A.  Not yet, no.

 6      Q.  How do you know that there's going to be any?

 7      A.  The client said that that's what -- the client

 8  said that is the -- that is the -- a fact and feel free

 9  to depose him or her.  And, you know, I assume, then,

10  that they would testify under oath that that is exactly

11  what the fact is.

12      Q.  Yeah, I just want to understand, your reliance is

13  on a blanket statement, not something that you read that

14  was actually taken under oath?

15      A.  That's correct.

16      Q.  Right.  Okay.  The -- go back to Page 8.  Thanks.

17          The Table 1 that's reflected there --

18      A.  Yes.

19      Q.  -- that is identical to what we looked at and

20  discussed at length in the third page of Exhibit 3,

21  correct?

22      A.  That's correct.

23      Q.  All right.  So we can agree that our testimony

24  relating to that, when we were talking about it in the

25  exhibit, would be the same as it exists on this page?

1    A.  Correct.

2    Q.  Did you ask why there was no revenue in 2014 for

3  Orange Lake?

4    A.  No.

5    Q.  I probably asked you that.  But in Photograph 16,

6  you say:  "I was unable to test or confirm the

7  information in Table 1 and have assumed it to be

8  accurate."

9        Did you ask for the backup?

10   A.  Yes, that's one of the things I've asked for that

11 I don't have yet.

12   Q.  So Section 2, Page 9 --

13   A.  Yes.

14   Q.  -- in bold:  "TET has received, but not yet

15 earned, additional revenues from OL clients.  Based on

16 TET's history of successful exits for OL clients, I

17 expect TET will ultimately earn additional revenue from

18 those unfinished cases."

19        Do you see that?

20   A.  Yes.

21   Q.  So I'm clear and we're all on the same page, so

22 your Section 2, your opinion on the numbers relating to

23 your statement in Section 2 is what is reflected on

24 Exhibit 4 as changed with the new percentage of

25 successful exits compared to total clients, correct?

ROBERT B. MORRISON - 03/08/2019                Page 202

1      A.  That's correct.

2      Q.  Are there any additional -- because you make a

3  statement there that you need more data, are there any

4  additional documents that you still think you need in

5  order to be able to justify that opinion?

6      A.  What I needed was that schedule, which is

7  Exhibit 6, that shows the actual exits.  And the --

8  there could have been two different ways to go about it.

9  One would be to complete -- remember, we talked about

10  the missing information in the one exhibit that we

11  talked quite a bit about.  One way would be to get that

12  information and back into it, but this, providing the

13  actual -- the actual refunds -- the actual refunds, was

14  the more direct way.

15          And so that was really what I was looking for to

16  complete this section too.

17      Q.  Look at Paragraph 20 for me, please.

18      A.  I was waiting for you to ask that.

19      Q.  "OL clients represented approximately 4 to

20  4.3 percent of total TET clients."

21          Where is that?

22      A.  That's on --

23      Q.  Is that this one, Exhibit 3?

24      A.  You're getting better with the exhibits than I

25  am.  Yes, exhibit 3.

ROBERT B. MORRISON - 03/08/2019                     Page 203

1      Q.  My favorite table?

2      A.  Yes, your favorite table.

3           And let me put you at ease on 20 for a second.  I

4  was asking for that unearned revenue detail.  I was

5  concerned that all I would get -- from the client -- I

6  was concerned all I would get was a total unearned

7  revenue number for everybody.  And so that would require

8  that I determine, of that unearned revenue, how much of

9  that was Orange Lake clients.

10          And I was going to use a historical relationship

11 of it being -- for the last year, because it had

12 actually gone up the last year, of 5.8 percent.  So if I

13 had the total, 70-something million -- actually it was

14 80-something million, I would first say, okay.  How much

15 of that is Orange Lake?  If I didn't have the detail

16 that was provided today, I would have had to have

17 estimated, out of that 80 million, how much of that was

18 Orange Lake and then estimate how many of those would

19 close.

20     Q.  So you're not doing anything with this 4 --

21     A.  Correct.

22     Q.  -- percent or 5.8 percent?

23     A.  I don't have to now because I have the actual

24 refund clients for Orange Lake from the client.  So yes,

25 so this becomes a moot point.

ROBERT B. MORRISON - 03/08/2019                    Page 204

1     Q.  You want to tell me why the percentage of

2  customers is going up?

3     A.  Well, I mean, the -- the obvious, just by

4  interpreting the calculations, is that out of their

5  total client base, the number of Orange Lake clients has

6  increased -- increased relative to the total clients.

7     Q.  Could it also be because they're not exiting?

8        MS. BAKER:  Object to form.

9     A.  That -- that could be part of it, that their exit

10 isn't as -- their -- their exit percentage isn't as high

11 as the other clients, yes.

12 BY MR. BACKMAN:

13    Q.  Am I to ignore Paragraph 21 now?

14    A.  Except that -- so you --

15    Q.  And let me just be clear so I don't run into any

16 problems here.

17    A.  Yeah.

18    Q.  Paragraph 20, should I -- should we cross it out?

19    A.  You can cross 20 out.

20    Q.  Nothing to do with your opinions, conclusions --

21    A.  Correct.  Paragraph 20 was replaced by an actual

22 list of -- of successful cases.

23    Q.  Right.  You got the real thing, so you don't have

24 to guess?

25    A.  Correct.

1    Q.  Got it.

2    A.  Estimate.

3    Q.  Tomato, tomato.

4        All right.  Paragraph 21, what do we do with that

5    one?

6    A.  So Paragraph 21, just get rid of the reference to

7    the 5.8 percent because that came from Paragraph 20.

8    So --

9    Q.  But you've still got 28.1 percent in there.

10   A.  That becomes now the 9. -- I'm sorry --

11   90.7 percent.  Let me get the exact number.  I need to

12   grab something over here, which is -- so this is

13   Exhibit 6 that I did some hand calculations on.

14       So the -- yeah, 90.7 percent successful exits

15   instead of 28.1 percent.

16   Q.  Is the 90.7 percent calculated, or you had to run

17   those numbers in --

18   A.  I ran the numbers.

19   Q.  So let's -- let's mark yours.  We'll mark that as

20   8.  That way we have it, if you don't mind.

21   A.  Sure.

22       (Whereupon, Plaintiff Exhibit 8 was marked for

23   identification.)

24   BY MR. BACKMAN:

25   Q.  Thank you.

1      A.  So yes, Exhibit 8 is a replica of Exhibit 6.  But

2    I, after receiving it, did some hand calculations and,

3    based on this, determined that the historical failure

4    rate was 9.3 percent.  So the historical success rate is

5    90.7 percent instead of, in Paragraph 21, 28.1 percent.

6      Q.  So I'm changing 28.1 percent to 90.7?

7      A.  Correct.

8      Q.  And I'm crossing out the sentence after that?

9    Yes or no?

10     A.  So cross out -- so put 90.7 percent in that third

11   line.  Just cross out 5.8 percent of.

12     Q.  Well, I think I'm going to help you here.

13         The sentence says:  "I therefore assumed that

14   28.1."  I mean, you're not -- it doesn't sound like

15   you're assuming anything anymore on this particular

16   issue.  It sounds like you're saying as a matter of

17   fact, based upon the information that was provided by

18   Reed Hein as to Orange Lake revenue, in that table that

19   we keep looking at --

20     A.  Yes.

21     Q.  -- along with the exact amount of refunds for --

22   the exact amount of refunds equals your dollar amount

23   for purposes of Section 2 of your report?

24     A.  So let's not use the word "assume."  Let's use

25   "estimated."  Because it's a future thing.  And so yes,

ROBERT B. MORRISON - 03/08/2019               Page 207

1    I'm using these numbers to calculate an estimate of what

2    I believe will be earned revenue in the future.

3         Q.  So you tell me what you want that sentence to say

4    to make it accurate.

5         A.  Estimated.

6         Q.  I therefore estimated?

7         A.  That 94.7 percent of the -- scratch through

8    5.8 percent of.

9         Q.  Okay.

10        A.  So it now reads:  "I therefore assume that

11   90.7 percent of the OL client unearned revenue would

12   eventually be earned by TET."

13        Q.  Does Paragraph 22 need to change?

14        A.  No.

15        Q.  Okay.  I want to -- let's take a break from that

16   for a second.  Go back to the stack on your left.

17            So we've looked at the engagement agreement.

18   We've looked at the website printouts, the trial

19   balance, the comparative, the P&L.  Then you've got

20   Steve Wolf's report with the exhibits, correct?

21        A.  Yes.

22        Q.  So you didn't get the source documents that you

23   asked for, right?

24        A.  Correct.

25        Q.  Okay.  And then underneath that is the -- it's

1   actually part of the clip, right, the third amended

2   complaint?  The binder clip there.

3       A.  Yes.  Yes.

4       Q.  We looked at that before, right?

5       A.  Yes.

6       Q.  Okay.  And then there's a paper clip there with

7   some additional information.  What is that?

8       A.  Okay.  So here -- there's several documents in

9   here.  One is -- one of the things that I asked from the

10  client was what are the possible outcomes for that

11  background section?  And this is what was provided to

12  me.

13      Q.  Do you know where that came from?

14      A.  It -- other than from the client, no.

15      Q.  Do you know who prepared it?

16      A.  No.

17      Q.  Do you know whether it was prepared just to

18  provide to you in connection with your work?

19      A.  I don't know the answer to that.  The -- the

20  pagination -- I don't know the answer to that.

21      Q.  Okay.  So that document that you're looking at

22  provided by the client is what you utilized in

23  summarizing Paragraphs 10A through F?

24      A.  Or more specifically, 10 -- yes, I'm sorry.  Yes,

25  10A through F.  Yes.

ROBERT B. MORRISON - 03/08/2019                    Page 209

1      Q.  Okay.  That's that.  What's next?

2      A.  Okay.  So next is a -- an email from Stephanie

3   Lusco to people, including my -- my analyst, which I'm

4   going to read -- I'm going to reshuffle these because --

5      Q.  That's what I was talking about earlier.

6      A.  Yeah.

7          Because really -- so on this schedule -- I'm

8   sorry.  On this email is a hyperlink, the same

9   hyperlink.  And the hyperlink is these graphs.

10     Q.  I thought I saw it.

11     A.  You're right, you did see those earlier.

12     Q.  Okay.  And what you're saying, though, is when

13  you -- when you scroll over those on the hyperlink, you

14  get the additional detail that's reflected in your

15  Exhibit 3?

16     A.  That's correct.  You'll notice that this top

17  chart has blue bars and orange bars.  The blue bars are

18  non-OL clients; the orange ones are OL clients.  And,

19  again, if you move the cursor over, it will tell you the

20  number that's represented there.

21     Q.  Do you know who prepared those bar graphs?

22     A.  Other than coming from Tina, I don't know who

23  actually pushed the button to make it happen.

24     Q.  Do you know where the underlying source of that

25  data comes from?

1    A.  It's from that --

2    Q.  Salesforce?

3    A.  Salesforce is what I have been told.

4    Q.  Did you ever speak with -- well, does Reed Hein

5  have an outside accountant?

6    A.  Well, they'll have a tax accountant.  I don't

7  know -- I haven't seen anything that suggests they do

8  anything other than the tax work.

9    Q.  And those are the tax returns that you have that

10  you looked at?  There's an outside accounting firm that

11  does that?

12    A.  Correct.

13    Q.  Did you speak with that accounting firm?

14    A.  I did not.

15    Q.  Do you know if Reed Hein has a CFO?

16    A.  I don't believe they do have a CFO.  They've got

17  an individual, a gentleman who I referred to earlier as

18  more of a controller.  But candid, I don't know what his

19  title is, what his role is.

20    Q.  You don't remember his name?

21    A.  No, I don't.

22    Q.  Does Thomas Parenteau sound familiar?

23    A.  No.  No.  He didn't say a whole lot.  Tina was

24  the one who was providing most of the -- the financial

25  information.

ROBERT B. MORRISON - 03/08/2019          Page 211

1    Q.  If they did have a CFO and that CFO was deposed
2  in this lawsuit, would you want to read that CFO's
3  deposition?
4    A.  It depends on whether he addresses the revenues,
5  revenue recognition, and variable expenses.
6        As to some of the other matters, it wouldn't be
7  relevant.
8    Q.  And then you have the exit agreements that you
9  refer to in your report, right?
10   A.  Correct.
11   Q.  Okay.  All right.  So let's put that one to the
12  side.  Don't forget that email.
13   A.  Yeah, thank you.
14   Q.  Try to keep everything in order.
15       And then I believe the way it was provided to us,
16  all that would be left is the tax returns, I believe as
17  filed, with any appropriate addenda or schedules --
18   A.  Correct.
19   Q.  -- for the years 2013, '14, '15, '16, and '17.
20       Is that what you have there --
21   A.  Yes.
22   Q.  -- remaining?
23   A.  Yes.
24   Q.  All right.  So you can flip that over too.
25       So the stack on your left that we've been going

1   through as we've been taking this deposition, coupled

2   with the documents that you've provided to me either

3   last night or this morning that we've marked as exhibits

4   here today, that is the total of reliance materials that

5   you used in support of and creating your report,

6   correct?

7       A.  Yes.

8       Q.  And I'm not trying to trick you.  You also talked

9   to the client?

10      A.  Yes.

11      Q.  Got it.

12          Is there anything else?  Any new documents?

13  Anything waiting?  Any -- you know, other than what

14  we've talked about?

15      A.  At one point this morning we started going

16  through the list of documents to see what was here and

17  what wasn't.  So let me finish doing that.

18      Q.  Sure.

19      A.  No, there's nothing else.

20      Q.  Okay.  And let me make sure I understand

21  everything that you've listed versus what we've looked

22  at, now that we've looked at everything.  Okay?  We

23  should be able to do this fairly quickly.  So go back to

24  that same page, Page 17.

25          The tax returns, I know what those are.

1    A.  Yes.

2    Q.  B, we understand that.  C, unaudited financial

3  statements for each year, what was that?  Was that the

4  comparative?

5    A.  That was the comparative.

6    Q.  Okay.  D, TET monthly customers retained/exited

7  report?

8    A.  Exhibit 3.

9    Q.  Okay.  E, the TET internal schedule of annual

10  revenues from Orange Lake and all other customers?

11    A.  That's that Table 1 in my report and the table on

12  Page 3 of Exhibit 3.

13    Q.  All right.  This website listed in that?

14    A.  Say that again.  I'm sorry.

15    Q.  F, the website reference?

16    A.  Yeah, that's for the website materials.

17    Q.  Okay.  Talked about the expert report, the

18  amended complaint, the agreements, the trial balance.

19  Got it.

20       Did you do any analysis into the individual

21  operating expenses to see if they were justified?

22    A.  That's what I asked for the trial balances for,

23  to try to do that.  Because they were so different, I

24  didn't know if I had all of the information.  I -- I

25  have asked for more detail to do that, but that's where,

1  if you recall, I made the statement that I ended up

2  having the discussions with the client about

3  discretionary expenses and had relied on her -- I

4  imagine it was Tina -- representation that there are no

5  discretionary expenses.

6      Q.  Tell me what a normal discretionary expense would

7  be.

8      A.  A jet.  It depends on the industry too.  But

9  things that a -- a profit-maximizing owner wouldn't

10  incur.  Having the kids on the payroll and not doing

11  anything.  There are some other common ones, common

12  obvious ones.  If -- it really depends on the industry.

13  Because some would say autos, but, you know, in some

14  industries, auto expense and meals and entertainment

15  expense are necessary, you know, for the business

16  operation.

17        Yeah, it really is kind of one of those things

18  where you go through and you say, wait, what's this?

19  What's this for?  What's the business purpose of it?

20  And you move on to the next.

21      Q.  But you didn't do that for each of the operating

22  expenses?

23      A.  No, I did not, no.

24      Q.  Aside from just looking to figure out whether

25  something is discretionary or not, is it also proper to

ROBERT B. MORRISON - 03/08/2019                Page 215

1   look into whether or not the actual expense was paid?

2       A.  Not on an accrual basis, no.

3       Q.  Why not?

4       A.  On an accrual basis, it, again, is reflecting the

5   expenses that are -- that are incurred, paid or not,

6   just like we're considering the unearned revenues, some

7   of which haven't been received yet.  You know, the --

8   the fact that there may be an unpaid expense as a

9   payable, that's a liability of the company.

10          But I think, you know, kind of to your point, to

11   the extent that there are payables that ultimately

12   aren't paid doesn't diminish what the profitability is

13   of the clients.

14          Go ahead.  I'm sorry.

15      Q.  I asked a -- I asked a question badly as I'm

16   listening to you answer it.

17          I mean in a different context.  I guess for a

18   lack of a better way for me to actually ask the

19   question, let's say they're just fake expenses.

20      A.  Okay.

21      Q.  Just hypothetically, that -- let's just -- we'll

22   pick one, a small one, whatever, recruiting.  They have

23   67 -- that would be 67,000, it looks like, for

24   recruiting.  Let's say there was no such thing as

25   recruiting.

ROBERT B. MORRISON - 03/08/2019                    Page 216

1      A.  Okay.

2      Q.  And they didn't actually pay $67,000 to anyone.

3  They just wanted to book additional operating expenses

4  on their records --

5      A.  I understand.

6      Q.  -- for -- sometimes that can be helpful from an

7  accounting perspective.

8          Let's just say that type of funny business was

9  going on.  Is that something that your independent

10  review into the operating expenses would show?

11          MS. BAKER:  Object to form.

12      A.  Not what I've done to date, no.

13  BY MR. BACKMAN:

14      Q.  But if you had looked further, that's something

15  that you would look for or otherwise see?

16          MS. BAKER:  Object to form.

17      A.  Again, I'm somewhat relying on -- in fact, I'm

18  relying a lot on the fact that the -- that the expenses

19  that were deducted and taken, that's what was

20  represented to the IRS.  And so I'm accepting that,

21  absent something that suggests otherwise, as being

22  therefore bonafide business expense.

23  BY MR. BACKMAN:

24      Q.  Okay.  And if -- and I think I may have said this

25  to you before or asked you about this, but in a

 1   different context.  If, let's say, the advertising costs

 2   are simply getting moved from Brandon Reed's Reed Hein

 3   company to Brandon Reed's marketing agency where he's

 4   taking a substantial amount of the paid marketing costs

 5   from Reed Hein, is that still a deduction that should be

 6   applied in setting off the revenues when, in fact, it's

 7   just the owner funneling money through another company

 8   to himself?

 9           MS. BAKER:  Objection.

10           MR. BACKMAN:  It's a hypothetical.

11           MS. BAKER:  Improper hypothetical.

12           MR. BACKMAN:  Okay.

13      A.  The -- the mere fact that a company is paying an

14   insider doesn't necessarily mean it isn't a proper

15   expense.  The question is what are the services provided

16   in return for that payment.

17   BY MR. BACKMAN:

18      Q.  Let's say there were none.

19           MS. BAKER:  Object to form.

20      A.  If there were none?

21   BY MR. BACKMAN:

22      Q.  Yeah, under my hypothetical.

23      A.  Under your hypothetical, if there were none, then

24   that would be a discretionary expense.

25      Q.  Got it.

ROBERT B. MORRISON - 03/08/2019                    Page 218

1          What if only a portion of the funds are actually

2     going toward real services?

3          A.  Again, that would be an adjustment for

4     discretionary expenses.

5          Q.  Okay.  I understand.  In Section 3 of your

6     report, Page 10, a hundred percent of TET's adjusted

7     operating expenses from 2013 through 2017 are directly

8     allocable to TET's revenue generated from timeshare exit

9     services provided.

10          Your revenue -- your starting revenue point runs

11     through December 31, 2018; is that correct?

12          A.  No, it's through 2017.

13          Q.  On the table that we've been looking at, there's

14     a line item for 2018 revenue.

15          A.  Yeah, that -- okay.  So for determination of

16     Orange Lake clients earned revenue, I have information

17     through 2018.  For doing the expense allocation

18     analysis, I only have information through 2017.

19          Q.  That's what I was asking.

20          So you talk here about expenses from 2013 to

21     2017, but then you're comparing those expenses to

22     revenue starting points that end in December of 2018.

23          A.  Fair enough.

24          So yes, I'm using the historical expense

25     experience and applying that to 2018 earned revenue

```
 1   because I don't have 2018's actual expenses.  Plus, if
 2   you look at the way I did it, because of the issue of --
 3   of cash to accrual, I didn't calculate each one each
 4   year.  I took it over the entire time period.
 5        Q.  Are there -- sorry.
 6        A.  It's a weighted average.  Go ahead.
 7        Q.  Are the 2018 expenses something that you've asked
 8   for?
 9        A.  Yes.
10        Q.  The advancements -- the $16 million that's
11   currently due from partners as a result of advancements
12   from Reed Hein to those partners, is that number in any
13   way accounted for in the calculations that you've done?
14        A.  In what respect?
15            Okay.  So --
16        Q.  Does it fall under revenue?  Is it excluded on
17   purpose?  Does it fall under an expense?  I mean, where,
18   if anywhere, does that come in?
19        A.  Okay.  So portions of that are accounted for in
20   the revenues to the extent that the people who actually
21   paid the dollars that ended up being advanced to the
22   shareholders or to the partners exited, and the revenue
23   was recognized, the revenue was earned.
24        Q.  Do you know who those people would be?
25        A.  No.
```

1    Q.  Is there any way for you to figure that out?

2    A.  Well, if -- if the client has accounting for

3    specifically who those customers were that exited, yes.

4    But we would not be able to then say, okay, Jeff's

5    $12,000 was then distributed -- or was then advanced out

6    to the principals.  Because once it goes in the pot,

7    it's in the pot.

8    Q.  It's somebody's money that paid Reed Hein was

9    advanced out to the principals?

10   A.  Yes.

11       MS. BAKER:  Object to form.

12   BY MR. BACKMAN:

13   Q.  Quite a few people to get up to $16 million,

14   right?

15   A.  I have no idea how many people.

16   Q.  Do you know what those advancements were for?

17   A.  What they did with the cash, I don't know.

18   Q.  Do you know, does the company book the purpose of

19   the advancement?

20   A.  No.

21   Q.  They don't have to explain it in any way?

22   A.  No.

23   Q.  Do you know what kind of house Brandon Reed lives

24   in?

25   A.  No.

ROBERT B. MORRISON - 03/08/2019                    Page 221

1    Q.  What kind of car he drives?

2    A.  No.

3    Q.  Can you go to Paragraph 25 for me, please.

4    A.  Yes, sir.

5    Q.  Is that the adjustment that you explained to me

6    with respect to the amended Schedule 1?

7    A.  Yes.

8    Q.  And what workpapers did you obtain from the

9    client that provided you with that information?

10   A.  It would have been a -- I thought I saw it here.

11   It would have been a workpaper that shows that journal

12   entry that I know I -- yeah, I didn't list it here.

13   Yeah, so what it is, it's basically a journal entry.

14   Q.  Just that single journal entry?

15   A.  Yeah, because the journal entry shows you what --

16   whether it was revenue or expense and how they adjusted

17   it.

18   Q.  Was that journal entry part of a larger document?

19   A.  No, it was just the journal entry.

20       I thought I saw that in all this information.

21   Q.  Would it be a schedule or a document included

22   with the 2015 report -- I mean tax return?

23   A.  No.  Because it's an -- it's an adjustment for

24   book purposes.  Well, and for tax purposes.  But no, it

25   would not be included in the tax return.  The IRS

ROBERT B. MORRISON - 03/08/2019              Page 222

1  doesn't care about stuff like that.

2      Q.  It's all right.

3          In Section 4 --

4      A.  Yes.

5      Q.  -- of your report --

6      A.  Yes.

7      Q.  -- this spread there, 80.7 percent to

8  93.3 percent of revenues, that's the starting point and

9  the ending point of your three methods in the later

10 pages?

11     A.  Correct.

12     Q.  When you refer to revenues there, are you only

13 talking about earned revenues?

14     A.  Yes.

15     Q.  Have you been told when you're going to get the

16 2019 -- I'm sorry -- the 2018 information that you asked

17 for?

18     A.  No.

19     Q.  All right.  So some more confusion.  So let's go

20 to Page 12.

21         What's this box?  What are we looking at?

22     A.  This is just -- it's exhibit -- well, it's

23 amended Schedule 1 summarized, but -- yeah, amended

24 Schedule 1 summarized is what it is.

25         And rather than providing every detail, it's just

ROBERT B. MORRISON - 03/08/2019          Page 223

1    a summary, these are the revenues, these are the

2    expenses, these are the profits.

3        Q.  So -- so if you can grab amended Schedule 1 for

4    me, please.

5        A.  Yes.

6        Q.  The first thing I want to know -- I meant to ask

7    this before -- but when you go to the second page there,

8    so you did whatever you do, you got your revenue, your

9    cost of revenue, your profit, your operating expenses

10   with your correlation to the right-hand side.

11       A.  Right.

12       Q.  You come up with your net operating income at the

13   bottom and your total operating revenue.  And then

14   underneath the total operating revenue on the second

15   page, you have operating expenses with R squared greater

16   than 70 percent.

17           Do you see that?

18       A.  Yes.

19       Q.  What is -- what is that?

20       A.  Well, that should be operating expenses with

21   correlation greater than 80 percent.  It's just a label

22   that's wrong.

23       Q.  What is the significance of that portion of this

24   document?

25       A.  Remember we talked about that I took -- all those

ROBERT B. MORRISON - 03/08/2019                    Page 224

1    expenses had a correlation of 80 or more.  Well, I'm

2    taking the detail from above and pulling down only those

3    that have correlation of 80 percent or greater.

4        Q.  For what purpose?

5        A.  For determining that variable percent of

6    80.7 percent.

7        Q.  So show me that percentage on Schedule 1.

8        A.  Well, so this is Schedule 1, amended.  We have to

9    go to Schedule 1.

10       Q.  Schedule 1, amended, yes.

11       A.  We have to go back to Schedule 1.  Because after

12   changing that allocation of the journal entry, it -- it

13   adjusted revenues, adjusted expenses, and so you get a

14   slightly different calculation because of that.

15       Q.  So now the table that we're looking at on the top

16   of Page 12 and the other opinions that are reflected in

17   Section 4 of your report are all going to have to

18   change?

19       A.  What is Section 4?

20           No.

21       Q.  No, they don't --

22       A.  Wait.  I'm sorry.  Yes, some of the numbers

23   are -- are -- will be different.  That table at the top

24   of Page 12 will end up showing, over this time period,

25   on a weighted average basis, no profit, actually

ROBERT B. MORRISON - 03/08/2019          Page 225

1  negative profit.  And so the 93 percent becomes over a

2  hundred percent.

3     Q.  How are we figuring that out?

4     A.  Just from -- from looking at the -- the amended

5  Schedule 1.

6     Q.  All right.  Well, we got to walk through it

7  because I got to know what your opinions are, so...

8        You've got to do it for me.  I don't know.

9  You've got to show me the math.  What's the change?

10 What numbers changed?  Where did they come from?

11    A.  Well, why don't -- you want me to do it just on

12 the face of here?

13    Q.  Yeah.  I mean...

14    A.  Okay.  So here, let me show you --

15    Q.  Don't write on a depo exhibit.

16    A.  Oh, okay.

17    Q.  So here, I've got another copy of your report.

18 We'll have a clean one and then we'll have one that you

19 write on.

20        Tell me where you're at so I can follow along.

21    A.  Right.  So on Page 1 of amended Schedule 1 and on

22 Page 12 of the report, adjusted revenues on Page 12 of

23 the report will be on Schedule 7, which is amended --

24 Exhibit 7, amended Schedule 1, for 2013 will be 231,000

25 instead of 1.554 million.

ROBERT B. MORRISON - 03/08/2019                    Page 226

1     Q.  Okay.

2     A.  Got that?

3     Q.  Basically copying this top part and putting it

4  there?

5     A.  Correct.

6     Q.  That begs a question, because before you gave me

7  this one, the new one, I looked at the old one because I

8  thought that it should be the same, and it didn't match

9  up.

10    A.  I'd have to go back and look at it.

11    Q.  Sure.  It's in front of you.  I thought it was,

12  at least.

13    A.  It's not an exhibit, though, is it?

14    Q.  It should be part of those materials.

15        MS. BAKER:  The original Schedule 1?

16        THE WITNESS:  Yeah.

17        MS. BAKER:  No, it's not part of that stack.

18        THE WITNESS:  I've got it over here.

19    A.  Okay.  It's off about $5,000, or something like

20  that, in 2013.

21        Is that the problem you're having with it?

22  BY MR. BACKMAN:

23    Q.  I mean, I put them next to each other.  I tried

24  to match them up, and they didn't match up.  So how much

25  they were off, I didn't do the math, but they weren't

```
 1   the same.
 2            Is your testimony that they should have been?
 3       A.  Yeah, so there's a difference, it looks like,
 4   about a $5,000 -- a 5 to 10,000 dollar difference,
 5   which, I mean, I'd have to go all the way back in to see
 6   why it's -- why there's that difference.  And I would
 7   actually have to look at my -- the schedule in native
 8   format.
 9       Q.  Did you prepare one of these first?  So I'm
10   looking at the original Schedule 1 and then the table
11   that's in the report.  Did you prepare one first and
12   then cut and paste?
13       A.  Correct.
14       Q.  Do you know which one you prepared first?
15       A.  Table 1.
16       Q.  You can't figure out what happened when you --
17       A.  Yeah, I don't know why -- because it would have
18   been -- not even cut and paste, probably, just literally
19   keyed in.
20       Q.  Okay.  Any event, so it didn't match up
21   completely with the original Schedule 1, but now you're
22   saying we shouldn't even look at the original Schedule 1
23   anyway.  We should look at the amended Schedule 1?
24       A.  Yes.
25            Yes, the amended Schedule 1.
```

ROBERT B. MORRISON - 03/08/2019                    Page 228

1     Q.  Okay.

2     A.  So if you take the total reported --

3     Q.  Go ahead.

4     A.  -- total reported revenue on schedule -- on

5  Exhibit 7 for each year, then that's what should be

6  showing as adjusted revenues after -- after adjusting

7  that journal entry to -- to blow back the -- the cash to

8  accrual adjustment that was made in 2015.

9     Q.  Okay.

10    A.  And then you go down to the second page of

11  Exhibit 7 -- actually be the third page of Exhibit 7,

12  and go down to the bottom line there, total -- wait.

13  I'm sorry.  I'm sorry.  For this -- for this schedule,

14  this is -- this is without any adjustment for fixed

15  cost.

16       So it would be Page 2 of Exhibit 7, the total

17  operating expenses on Exhibit 7 would lay in here as

18  adjusted expenses.

19    Q.  Okay.

20    A.  Okay?  And then that would provide us with an

21  adjusted profit.  And then for each year -- you could

22  calculate the expenses percent of revenue, the profit

23  percent of revenue.  And then the weighted average would

24  be, rather than looking at individual years or taking a

25  simple average, you take all of the expenses that are in

ROBERT B. MORRISON - 03/08/2019          Page 229

1    this time period divided by all of the revenues during

2    this time period.

3         And I can very quickly tell you what the -- what

4    the end result is.

5    Q.  Sure.

6    A.  Okay.  So using amended Schedule 1, which is

7    Exhibit 7, the weighted average profit on Page 12 in the

8    box, rather than 6.7 percent, it's minus 0.5 percent.

9    Q.  And the way you figured that out is you took for

10   each year whatever the profit percentage ended up being

11   and you, what, added them up and divided by 5?

12   A.  No.  I took --

13   Q.  More scientific than that?

14   A.  I took the net operating income, the profit each

15   year, summed all those up, so for that five-year period,

16   the net -- the net profit was --

17   Q.  What line is that?

18   A.  It's on Exhibit 7, Page 2.

19   Q.  It doesn't say "net profit."  So what should I

20   actually --

21   A.  Net operating income.

22   Q.  Okay.  So you added those up?

23   A.  Add all those up.  And add up all the revenues

24   for the years.

25   Q.  The revenues reflected in the top line, the

ROBERT B. MORRISON - 03/08/2019                    Page 230

1  adjusted revenues?

2      A.  Correct.  Or in Exhibit 7.

3      Q.  Right.  The new adjusted revenues that you guys

4  gave me this morning?

5      A.  Correct.  Correct.

6      Q.  Gotcha.

7      A.  And you divide -- the expenses divided by -- I'm

8  sorry.  Gross profit or net operating income divided by

9  revenue -- total reported revenue.  And that gives you a

10 negative .5 percent.

11         So over this five-year period, they lost money.

12     Q.  The revenue term that you keep using for these

13 analyses is solely those successful exits, correct?

14     A.  It's the earned revenue, yeah, which would be

15 based on:  They don't earn the revenue until they have a

16 successful exit.

17     Q.  Great.  So let me ask you this, unless I'm still

18 confused.

19         Can you get -- I don't know what it is --

20 Exhibit 3, the other chart over there on your left.

21     A.  Yes.

22     Q.  Is that it?  No.  You know which one I'm talking

23 about?

24     A.  Yes, I do.  It's buried here somewhere.  Here it

25 is.

1    Q.  All right.  Let's go to your table there on

2    Page 3.

3    A.  Page 3?

4    Q.  Yep.

5         Again, unless I just misunderstand everything

6    that you're saying, which is quite possible, I would

7    think that the closed exit total revenue for 2017, as

8    reflected in that table, should match your adjusted

9    revenue number in the table that we're looking at on

10   Page 12, but it's off by $22 million.

11        So am I wrong?  Or can you explain why they're

12   different?

13   A.  For 2017 --

14   Q.  Let me start here:  Should the two numbers match

15   up, based upon your understanding of what was provided

16   to you by the client?

17   A.  Well, that's where I need that -- the tax

18   workpapers to see what the adjustments were between --

19   between the books and the tax returns.

20   Q.  Which you asked for and weren't provided?

21   A.  Correct.

22   Q.  Okay.  But let me go back to my question.

23        Based upon your understanding of what you asked

24   the client to give you and what the client did give you,

25   from a numbers perspective, do you believe that the

ROBERT B. MORRISON - 03/08/2019                    Page 232

1  numbers in the table on Page 3 of Exhibit 3 should match

2  the revenue number on Page 12 of your report?

3      A.  As I understand it, yes.

4      Q.  Why don't they?

5      A.  I don't know.

6      Q.  All right.  Let's look at 2016.  Do you agree

7  with me that they don't match up for that year either?

8      A.  That's correct.

9      Q.  And the year before --

10     A.  Correct.

11     Q.  -- '15?

12         Same thing with 2014, they don't match, correct?

13     A.  Correct.

14     Q.  And they don't match for 2013, correct?

15     A.  That's correct.

16     Q.  What should I do with that in terms of your

17  opinions?

18     A.  You tell me.

19     Q.  Well, what does that mean to your opinions?  Does

20  that change them?  Does it make them inconclusive?

21     A.  Well, I -- no, I'm going -- I'm going back to

22  the -- the his -- the historical -- from the tax returns

23  because the tax returns are prepared by an accountant.

24  And, again, under -- under the potential penalty of

25  perjury or whatever, you know, they -- they reflect the

```
 1   income and expenses of the company.
 2        The -- what I would need to find out is on --
 3   Q.  So which number -- I don't mean to interrupt you,
 4   but I just want to make sure we're on the same page.
 5        Which number?  The one in the table in Exhibit 3
 6   or the one in the table on Page 12 is the number that
 7   you took from the tax returns?
 8   A.  On Exhibit 3.  I'm sorry.
 9   Q.  I don't think that's right.
10   A.  Exhibit 7.  On Exhibit 7, which is Schedule 1,
11   amended.
12   Q.  Right.  Which is -- I understand it's amended,
13   but it's what's in Page 12 of your report?
14   A.  Correct.
15   Q.  So that is something that you took from the tax
16   returns that is a -- a spreadsheet that you prepared
17   looking at the tax returns?
18   A.  Correct.
19   Q.  The other one, as we've talked about, is just
20   summary numbers that the client gave you and they didn't
21   provide the backup, right?
22   A.  That's correct.
23   Q.  You want to disregard the numbers in the table on
24   the last page of Exhibit 3 and go with your numbers as
25   reflected in amended Schedule 1?
```

1     A.  For -- for calculating the expense ratio, yes.

2     Q.  But your number is supposed to be the total

3  amount of revenue for exited Reed Hein clients, correct?

4          MS. BAKER:  Object to form.

5     A.  Yes, that's what -- I understand how they

6  recognize their revenue, yes.

7  BY MR. BACKMAN:

8     Q.  That's what you understand when you prepared your

9  spreadsheet that we're looking at as Exhibit 7 --

10    A.  Right.

11    Q.  -- adjusted revenues --

12    A.  Right.

13    Q.  -- sorry -- sales --

14    A.  Right.

15    Q.  -- is only successfully exited clients, correct?

16    A.  That's correct.

17    Q.  All right.  So then based upon your review of the

18  tax returns in your preparation of Exhibit 7, for 2017,

19  the table with the summary information that your client

20  gave you should match, correct?

21    A.  Based on my understanding, correct.

22    Q.  Okay.  Is this the first time you're noting the

23  discrepancy?

24    A.  Yes.

25    Q.  Can I rely on any opinions that you're making in

ROBERT B. MORRISON - 03/08/2019                Page 235

1   your report that are in any way based upon the table

2   that is reflected on Page 3 of Exhibit 3?

3      A.  Yes.

4      Q.  In what way should I rely upon it since it

5   doesn't match up to the numbers that you pulled directly

6   from the tax return?

7      A.  Well, I'm not using the total revenue.  I'm using

8   the Orange Lake revenue.

9      Q.  Does it call into question the amounts that are

10  in the first column there that the second -- the third

11  column, the one for total revenue, is drastically off to

12  the actual accounting records of the company?

13         MS. BAKER:  Object to form.

14     A.  I would want to have a conversation with the

15  client to find out what impact that has on the -- what

16  was provided to me and what I asked for was the Orange

17  Lake revenue.

18  BY MR. BACKMAN:

19     Q.  Is this precisely why, as an expert, particularly

20  a financial one, you ask for the backup --

21         MS. BAKER:  Object to form.

22  BY MR. BACKMAN:

23     Q.  -- and you want to see it, so that you can ensure

24  that the numbers that you're relying upon in an expert

25  report and now a sworn deposition are accurate?

ROBERT B. MORRISON - 03/08/2019                    Page 236

1          MS. BAKER:  Object to form.

2      A.  I will say what I said before, that

3  representations by the client, unless there's something

4  that contradicts it, are, for me and for my profession

5  and for what we do, are -- are evidence or information

6  of that -- of whatever that data point is.  And only if

7  we are presented with something that might suggest a

8  discrepancy, that do -- does it cause concern and want

9  to go back behind it.

10  BY MR. BACKMAN:

11      Q.  But you didn't figure out the discrepancy?

12      A.  I didn't see it, no.

13      Q.  Had you done -- had you had all the backup source

14  documents and you done your own analysis of the figures

15  reflected in the table on Page 3 of Exhibit 3, you

16  wouldn't have had to rely on the client at all?

17          MS. BAKER:  Object to form.

18  BY MR. BACKMAN:

19      Q.  Correct?

20      A.  If I had the source documents, that's correct.

21      Q.  And presumably, you wouldn't have made whatever

22  mistake was made, right?

23      A.  You're assuming there was a mistake made.

24      Q.  Well, can you explain to me the difference in the

25  revenue on table -- on the table on Page 3 compared to

1    your table that you say you derived from a review of the

2    tax returns?

3        A.  No, I can't at this point.

4            And there were some book to tax differences --

5    significance book to tax differences, but -- like

6    20 million that year, as I recall.  But I don't know

7    what impact that has -- would have, if at all, on the

8    Orange Lake revenue.

9        Q.  But we're not talking about just this that year.

10   I'm using 2017 as an example.  But we're talking about

11   every year it doesn't match.

12       A.  Understood.

13       Q.  Right?

14       A.  Yes.  Yes.

15           MS. BAKER:  Can we have a break when you're at

16   a good point just to stretch, get a drink?

17           MR. BACKMAN:  Yeah.  Let me finish this up.

18           MS. BAKER:  Okay.

19   BY MR. BACKMAN:

20       Q.  So I'm looking at Page 12, that box, that same

21   one we've been looking at, and I'm understanding what

22   you said.  I didn't write it all down, but I'm

23   basically -- for the adjusted profit, adjusted expenses,

24   adjusted revenue s, I understand you want me to use

25   what's now reflected in the top part of amended

1    Schedule 1, yes?

2       A.  Well, yeah, top and middle, correct.  For the

3    revenues, yes.  Top, yes.

4       Q.  All right.  So when you get to percentage of

5    revenues --

6       A.  Yes.

7       Q.  -- and you've got expenses and profit, can you

8    tell me how you came to that -- to those percentages?

9    What's the math?

10      A.  The math is -- for expenses is adjusted expense

11   divided by adjusted revenue.

12      Q.  That's it?

13      A.  Yes.

14      Q.  Okay.  And what about for profit?

15      A.  Profit is going to be adjusted profit divided by

16   adjusted revenues.

17      Q.  On the amended Schedule 1, there's that gross

18   profit line that we talked about before --

19      A.  Yes.

20      Q.  -- right there in the middle.  Why don't you use

21   that for the profit?

22      A.  Because that's not the profit from generating

23   these revenues.

24      Q.  You just call it gross profit, but it's not

25   actually the profit?

1          MS. BAKER:  Object to form.

2    BY MR. BACKMAN:

3      Q.  I guess I don't understand the terminology.

4      A.  I don't know why the -- the IRS decides to call

5    it gross profit on the tax return.  But the gross

6    profit, based on this presentation of information, is

7    not -- is really revenues.  It's not profit.

8      Q.  Despite the terminology?

9      A.  Right.

10     Q.  Yeah?

11     A.  Okay.

12     Q.  I got it.

13         All right.  No, I'm asking, despite the

14    terminology, it's not actually profit?

15     A.  No, it's not.

16     Q.  Okay.  In the middle, for 2015, you get an

17    expense percentage of 205.6 percent?

18     A.  Correct.

19     Q.  And a profit percentage, as that term is used in

20    that -- on that page, negative of 105.6 percent?

21     A.  Correct.

22     Q.  How do you account for that?

23     A.  Well, that's the year, remember, that it was --

24    it was converted from tax to -- sorry -- cash to

25    accrual.  And so even though I took their journal entry

ROBERT B. MORRISON - 03/08/2019                    Page 240

1  and adjusted that out, there's probably some of that

2  flushing through.  And that's the reason why I said need

3  to use a weighted average as opposed to using a straight

4  average or something like that.  Because it kind of

5  spreads that out.

6      Q.  It's sort of an aberration, right?  The outlier,

7  if you will?

8      A.  No, not an outlier, necessarily.  It -- there was

9  some type of adjustment or catch-up or something that

10  was done in the expenses that year versus the revenue

11  generated.

12     Q.  Do you know what was done?

13     A.  No.

14     Q.  Do you think it's appropriate, because they made

15  that change from cash to accrual, that you should

16  utilize such a -- an obviously out-of-place percentage

17  in coming to your conclusion as to the actual profit

18  percentage to be applied to the revenues in this case?

19         MS. BAKER:  Object to form.

20     A.  As I just mentioned, I used the weighted average

21  for the entire period.  And so to the extent that there

22  were adjustments in there between cash and accrual, then

23  by using a weighted average, it spreads it out.

24  BY MR. BACKMAN:

25     Q.  You think your weighted average would account for

ROBERT B. MORRISON - 03/08/2019              Page 241

1    the 205.6 in expenses that year?  I mean, you're still

2    doing a weighted average utilizing the 205.6 figure.

3         A.  I'm doing a weighted average based on the

4    reported expenses and reported revenues for the entire

5    five-year time period.

6         Q.  Do you know whether they booked all actual

7    expenses that year?

8         A.  Booked all actual expenses?  Booked -- well,

9    booked in what way?  On the balance sheet or on the

10   income statement?

11        Q.  Where would you put them?

12        A.  In depends on the nature of the expense and

13   whether it's regarding revenue being generated and

14   earned now or revenue that would be earned later.

15        Q.  Do you know how they did it?

16        A.  Do I know how they did it?  No.

17        Q.  Do you know whether, when they switched from cash

18   to accrual, if they recharacterized any prior items that

19   were otherwise reported?

20        A.  Yes, they did.  That was the journal entry.

21        Q.  That was the only thing that was recharacterized?

22        A.  That was the only -- that was the only single

23   line item adjustment they made on the tax return.

24        Q.  Did they recharacterize anything that may have

25   previously been recognized as profit?

ROBERT B. MORRISON - 03/08/2019          Page 242

1     A.  They -- one of the -- they didn't recharacterize

2   anything.  The -- the entry is based on the cash basis

3   for those two years.  This is the adjustment we have to

4   make to convert those two years of cumulative

5   performance to an accrual basis now.  And -- and it

6   ended up being a net debit, if you will, or a cost

7   because there were revenues that were recognized in

8   those earlier years that hadn't been earned yet.

9     Q.  Just another question on these.

10        I'm going to show you what is Bates labeled

11   RH5733 to 5734.  You can take a quick look.

12        MS. BAKER:  Will it interfere with the video if

13   I open either of the doors?

14        THE VIDEOGRAPHER:  Oh, no.  Go right ahead.

15        MR. BACKMAN:  Let me just finish with the

16   document, we can take that break.

17   BY MR. BACKMAN:

18     Q.  So adding more to my confusion:  This is the Reed

19   Hein & Associates profit and loss January through

20   December 2015.

21        Do you see that?

22     A.  Yes.

23     Q.  And it talks about income, that first column --

24     A.  Yes.

25     Q.  -- and total income, but there's a line item on

ROBERT B. MORRISON - 03/08/2019                    Page 243

```
 1   the first one, it's timeshare exit.
 2          Do you see that?
 3      A.  Yes.
 4      Q.  Fair to say that should be the total amount of
 5   earned revenue for their exit services?
 6          MS. BAKER:  Object to form.
 7      A.  On an unaudited book basis it's however they
 8   recorded it.
 9   BY MR. BACKMAN:
10      Q.  Okay.  So let's look at your schedule for the
11   year ended December 2015.
12          You have 8,805,000, correct?
13      A.  Correct.
14      Q.  And RH5733 has 7,345,000 correct?
15      A.  Correct.
16      Q.  Do you know why there's a difference?
17      A.  The same reasons we've been discussing all day.
18      Q.  Should it match?
19      A.  Not necessarily, no.
20      Q.  Why not?
21      A.  Because you've got the two factors that I
22   mentioned earlier.  You got book to tax adjustments
23   and -- oh, the accountant's journal entries.
24      Q.  Do you know whether there was a book to tax
25   adjustment for the 2015 timeshare exit revenue?
```

1    A.  There was a -- there was a $1.4 million book to

2  tax adjustment on the tax return for 2015.

3    Q.  Okay.  So that gets us close; right?  That gets

4  us close to the profit and loss number, though, right?

5    A.  That gets us close to the earned revenue number,

6  the sale number.

7    Q.  The one that you've reported in the amended

8  Schedule 1?

9    A.  The one that's reported on the tax return.

10    Q.  Got it.

11        So you would add the 1.4 million to the 7.3

12  that's reflected in the P&L?

13    A.  Yes.

14    Q.  Got it.

15        Does that add further confusion to the raw -- the

16  summary numbers that were provided to you by the client

17  on Page 3 of Exhibit 3?

18        MS. BAKER:  Object to form.

19    A.  No.  No.

20  BY MR. BACKMAN:

21    Q.  Should it be hard -- should it be hard for Reed

22  Hein to know exactly how much money that they made from

23  sales?

24        MS. BAKER:  Object to form.

25    A.  You'd have to ask them.  I mean, it depends on

1  how sophisticated their accounting is and was.  It

2  depends on what accounting bases they've been using.  It

3  depends on how sophisticated they were when they started

4  the business in terms of accounting.

5  BY MR. BACKMAN:

6      Q.  Do you know any of that?

7      A.  No.

8      Q.  Did you ask about any of that?

9      A.  Well, actually, we talked a little bit about it,

10 that there wasn't a whole lot of sophistication, as is

11 evidenced by the cash basis versus accrual basis.  You

12 know, the proper accounting for something like this

13 would be on an accrual basis.

14     Q.  How about once they fixed it?

15     A.  How about it?

16     Q.  Did it get better?  Did it get more robust?

17     A.  You'd have to ask them that.  Certainly, being

18 able to account for revenue when earned and the expenses

19 against that revenue when the revenue is earned, it is

20 much -- it's more proper than doing it on a cash basis.

21     Q.  If you could look at 5734, so the next page of

22 that same document.

23     A.  Yes.

24     Q.  Net income of negative $10 million.

25     A.  Yes.

ROBERT B. MORRISON - 03/08/2019                    Page 246

1    Q.  You see that?

2    A.  Yes.

3    Q.  Can you explain to me how they have such massive

4    negative earnings?

5    A.  Because they have payroll of 4 million.  They had

6    advertising of 6 million.  They had exit lawyers of

7    1.7 million, subcontractors 1.8 million.  I mean, beyond

8    what's written on this page, no.

9    Q.  I'm not an accountant or CPA.  I'm just trying to

10   understand, as a layperson, when you're reporting

11   negative earnings in the tens of millions of dollars on

12   an annual basis, how do you stay in business?

13   A.  On an annual basis, that's -- this is one year.

14   As I mentioned, this is not a complete financial picture

15   because of the book to tax and because of the -- any

16   adjusting journal entries that were made.

17   Q.  Didn't you just tell me that without you doing

18   your weighted average, that your summary of the five

19   years is negative?

20   A.  Yes.  Yes, it is.

21   Q.  Okay.

22   A.  You said how do they lose $10 million a year.

23   They didn't lose $10 million a year.

24   Q.  I can show you some where it's 12, 14.

25   A.  Because now you're understanding why I couldn't

ROBERT B. MORRISON - 03/08/2019                    Page 247

```
 1   rely on the financial statements or the -- the trial
 2   balance.
 3       Q.  So they're wrong?
 4       A.  No, they're not wrong; they're just incomplete.
 5       Q.  Are they better than the words that you got out
 6   of the client's mouth for this table on Page 3 that we
 7   can't match up to anything?
 8           MS. BAKER:  Object to form.
 9       A.  I'm not sure how to answer that.
10       Q.  Okay.
11           MR. BACKMAN:  We can take that break now.
12           MS. BAKER:  How's it looking for time?
13           MR. BACKMAN:  I don't know.  You guys keep
14       changing everything, so kind of hard.
15           THE VIDEOGRAPHER:  The time is 4:29 p.m.
16           (Whereupon, a break was taken from 4:28 p.m.
17       to 4:40 p.m.)
18           THE VIDEOGRAPHER:  The time is 4:40 p.m.  On
19       the record.
20   BY MR. BACKMAN:
21       Q.  All set?
22       A.  Sure.  Yeah.
23       Q.  Okay.  The revenue figures that you pulled from
24   the tax returns --
25       A.  Yes.
```

ROBERT B. MORRISON - 03/08/2019          Page 248

1     Q.  -- and are reflected in amended Schedule 1 --

2     A.  Yes.

3     Q.  -- in light of what we looked at with that table

4  on Page 3 of Exhibit 3 that was specifically provided to

5  you from Reed Hein as closed exit revenue, is it

6  possible that they're reporting all of their revenue not

7  just closed exits?  Could that account for the

8  $20 million difference?

9     A.  I don't know.  I want to find out why.  But on an

10 accrual basis and the fact that they have unearned

11 revenue, it shouldn't be.

12    Q.  Understood.

13        I think you still have those P&Ls in front of

14 you.

15    A.  Yes, I do.

16    Q.  Yeah.  Just go to the last page for me.

17    A.  The last page?

18    Q.  Yeah.

19    A.  Okay.

20    Q.  So it has -- it has gross exit revenue and then

21 refunds.  You see that?

22    A.  Yes.

23    Q.  Why would refunds need to be offsetting revenue

24 if revenue is recognized only after a successful exit

25 occurs?

ROBERT B. MORRISON - 03/08/2019                    Page 249

1        A.   I would have to find out.  If that's -- if those

2   refunds are, in fact, the refunds were the guarantee

3   we're talking about.

4        Q.   So then you don't know?

5        A.   Yeah, I don't know.

6        Q.   It shouldn't be there, though, if it's what you

7   understand it to be, correct?

8        A.   If those refunds on this schedule are paying back

9   clients that didn't have successful exits, that's

10  contrary to -- to how the unearned revenue function

11  works.

12       Q.   Yeah.

13       A.   Yes.

14       Q.   Did you ask anybody about that?

15       A.   No.

16       Q.   You didn't -- you didn't have this document?

17       A.   I did not have this document, no.

18       Q.   You didn't have anything, until we took that

19  first break, relating to any refunds?

20       A.   That's correct.

21       Q.   So in light of some of the changes that had to be

22  made to amended Schedule 1 and now the table reflected

23  on the top of Page 12, and you just did some math before

24  we took the last break to account for those changes,

25  correct?

1    A.  Yes.

2    Q.  So from a percentage basis, as we look at

3  Paragraphs 29, 30 --

4    A.  That's it.

5    Q.  -- 29 and 30, what -- what needs to change?

6    A.  It -- the -- the overall expense ratio is 100 --

7  100.5, as I recall, after making those adjustments.

8    Q.  So help me out with these sentences here.

9  What -- to make your opinion on this particular topic

10  accurate, what -- what should we be saying in

11  Paragraphs 29 and 30?

12    A.  The last sentence that shows that from 2013 to

13  '17, the company incurred $100.50 of expense for every

14  $100 or 100.5 percent.

15    Q.  My curiosity is getting the best of me here.

16        So if the numbers that were provided to you

17  directly from the client that are reflected on Page 3 of

18  Exhibit 3 are the -- the real numbers for revenue for

19  closed exits as opposed to ones that you used from the

20  tax returns, how is that going to change this analysis?

21    A.  It would increase the expense ratio, decrease the

22  profit ratio.

23    Q.  Right.  Substantially, right?

24    A.  Yes.

25    Q.  Almost double, if we just use 2017 as a figure?

ROBERT B. MORRISON - 03/08/2019                    Page 251

1             MS. BAKER:  Object to form.

2        A.  Yeah.  Yes.

3   BY MR. BACKMAN:

4        Q.  In Paragraph 30, do we have to change any of

5   the --

6        A.  Yes.  So if operating expenses are 100.5 percent

7   of earned revenues, then the profit is actually a loss

8   of 0.5 percent.

9        Q.  Okay.  The 3 million number, that doesn't change,

10  correct?

11       A.  No.

12       Q.  So now what changes on that top box?

13       A.  The operating expense line would be 100.5 percent

14  of those revenues and whatever the calculation comes out

15  to be.

16       Q.  And now we have to bear in mind the first change

17  that we made to this document, where we have to take

18  into account the future unearned revenue, correct?

19       A.  Well, yeah, again, I did that in a separate

20  section of the report.  But yeah, to get the overall

21  picture, correct.

22       Q.  That's what your opinion's ultimately going to

23  be, right?  It's going to be --

24       A.  Correct.

25       Q.  -- this revenue number plus the future unearned

ROBERT B. MORRISON - 03/08/2019                    Page 252

1    revenue number multiplied by the operating expense

2    percentage, and that's going to give you your profit?

3        A.  Correct.

4        Q.  In this instance, it's going to go to negative

5    .05 percent?

6        A.  Correct.  Negative .5 percent.

7        Q.  .5?

8        A.  Yeah.

9        Q.  I thought you said .05.  So it's .5?

10       A.  Yeah, .5 -- negative .5 percent, a half a

11   percent.

12       Q.  Got it.

13       A.  As I recall.

14       Q.  All right.  So Paragraph 31, tell me, I guess in

15   your own words, what this second method consists of.

16       A.  This is taking the expenses that were -- had an

17   80 percent correlation with revenues.  So taking those

18   expenses as a block and looking at those expenses as a

19   percent of revenues.

20       Q.  Is it fair to say that that block of expenses is

21   what's reflected in the bottom of page -- starting at

22   the bottom of Page 2 of Exhibit 7 --

23       A.  Yes.

24       Q.  -- where it says operating expenses with R

25   squared greater than 70 percent?

1     A.  Yes, and it should -- rather than saying with

2  R squared greater than 70 percent, it's with correlation

3  greater than 80 percent.

4     Q.  So correlation.

5         Was that just an error in the wording?

6     A.  Yes.

7     Q.  Are there expenses in here that fall within that

8  70 to 79 percent?

9     A.  No.

10    Q.  Sorry -- yeah, that's right.

11        Do any of those numbers have to change now based

12  upon some of the other changes that you've been making

13  throughout the day?

14    A.  Yeah, because of the -- let me think for a

15  second.  The reallocation of the -- yes, they will.

16  Because the reallocation of the journal entry now will

17  result in lower revenues during this time period, and

18  therefore the expense percentages will go up.

19    Q.  So do you need to recalculate all of the

20  operating expense percentages reflected in Exhibit 7?

21  Is that what you're saying?

22    A.  Actually -- it's actually on -- look at Page 3 of

23  Exhibit 7.

24    Q.  Uh-huh.

25    A.  Let me think for a second here.

 1          So the -- the expense ratios at the very last

 2   number there, 87.9 percent.  Because there are fewer

 3   revenues -- because I had switched the revenue

 4   adjustment, there are fewer revenues to spread the

 5   expenses across.

 6      Q.  So what changes to what?

 7      A.  81.5 changes to 87.9 -- I'm sorry.  81.5 percent

 8   changes to 87.9 percent, and therefore the profit is

 9   12.1 percent, not 18.5 percent.

10      Q.  One more time.

11      A.  The profit, rather than being 18.5 percent, is

12   12.1 percent.

13      Q.  And even under the second method, you would add

14   the unearned future revenue calculation that you

15   provided me with today to this revenue number as well?

16      A.  Correct, to get back to the roughly $8 million, I

17   believe it was.

18      Q.  And you'd multiply it by 12.1 percent, and that

19   would be your profit?

20      A.  Correct.

21      Q.  As you sit here, are you comfortable utilizing

22   the revenue figures in amended Schedule 1?

23      A.  Yes.

24      Q.  Are you going to go back and figure out what the

25   difference is between the numbers provided to you by

1   Reed Hein on Page 3 of Table 3 and understand why

2   they're different than the figures you used in amended

3   Schedule 1?

4      A.  More so for the $3 million of revenues from

5   Orange Lake clients.  But then in that discussion and in

6   that -- you know, I'll learn what the difference is,

7   whether it's to just the Orange Lake exits or it's to

8   the total revenue.

9          Because I'm relying on the tax return to develop

10  the cost estimate.  I'm relying on that Table 1 and

11  Schedule 3 for the historical earned revenue from Orange

12  Lake clients.

13     Q.  So despite what we've talked about and some of

14  the discrepancies that we've pointed out, you still are

15  comfortable with the calculations that you've done that

16  we've discussed so far, as reflected using amended

17  Schedule 1?

18     A.  Yes.

19     Q.  To a reasonable degree of forensic --

20     A.  Forensic accounting?

21     Q.  -- accounting certainty?

22     A.  Yes.

23     Q.  With the -- with the unearned revenue --

24     A.  Yes.

25     Q.  -- is there -- to not include it, as part of the

1   overall revenue calculation from a sales perspective, as

2   I've discussed it -- so to include it in the total

3   revenue number that we've been talking about, to not

4   include it presumes that Reed Hein is absolutely going

5   to refund anyone who fits within the refund criteria,

6   correct?

7           MS. BAKER:  Object to form.

8       A.  It -- it -- it -- if you -- it assumes that Reed

9   Hein will be refunding based on its historical refunding

10  experience.

11  BY MR. BACKMAN:

12      Q.  But you have to have an assumption there that

13  Reed Hein is actually going to write those checks back

14  to people who request or otherwise deserve a refund?

15      A.  Yes.

16      Q.  If they don't, then they just keep the money

17  without having to account for it, at least for purposes

18  of this lawsuit, correct?

19      A.  Well, if -- if they don't repay it, they keep it.

20      Q.  And it's not part of the calculation that you did

21  to derive the total profit number under the Lanham Act?

22      A.  That is correct.  I did not include revenues that

23  I estimate will have to be returned.

24      Q.  What is the statistical regression model?

25      A.  It is a statistical model that compares a

ROBERT B. MORRISON - 03/08/2019                    Page 257

```
 1   dependent variable, which in this case is revenues, with
 2   an independent variable -- I'm sorry -- a dependent
 3   variable, which is expenses, with an independent
 4   variable, which is revenues.  And it -- in performing
 5   the regression analysis, you're left with an idea of how
 6   much that -- those expenses are fixed and how much are
 7   variable.
 8        And the -- the equation also provides you with an
 9   idea of how much the change in those expenses results
10   from changes in revenue.  And it's -- how tight the fit
11   is.
12   Q.  I need to go back a second.  If you look at
13   Page 3 of Exhibit 7.
14   A.  Page?
15   Q.  3 of Exhibit 7.
16   A.  Okay.
17   Q.  I'm trying to understand -- I don't think I asked
18   you this, how did you come up with 87.9 percent?
19   A.  It is the total dollars -- what you see as
20   total --
21   Q.  Okay.
22   A.  -- divided by the -- I'm sorry -- for those five
23   years, divided by the total revenue for those five
24   years.
25   Q.  What -- what's the significance of the percentage
```

ROBERT B. MORRISON - 03/08/2019                    Page 258

 1  of revenue line?

 2      A.  Expenses as a percent of revenue.

 3      Q.  Is there any significance as to why it's going

 4  down so much?  Does that tell you anything?

 5      A.  I know I -- I mean, it could be a multitude of

 6  things, one of which could be efficiencies.  But the

 7  more -- I mean, it's -- because the real crux of the

 8  revenues were in the last couple years anyway, it's --

 9  that's why I did a weighted.  It's more heavily weighted

10  toward those last two years as opposed to those earlier

11  years.

12      Q.  You know, I asked you this differently, sort of

13  in the converse.

14          If you add in the unearned revenue that you don't

15  think is included, what happens to all these

16  percentages?

17      A.  They go way down.

18      Q.  Greater profit?

19      A.  Yeah, but you have to also add in the expenses

20  that haven't been recognized too.

21      Q.  And I think I asked you about that, but I --

22      A.  Go ahead.

23      Q.  Do you know what those expenses are?

24      A.  Well, there's prepaid expenses.  There's also

25  expenses going forward that you would have to charge

ROBERT B. MORRISON - 03/08/2019          Page 259

1  against it.

2     Q.  Right.  You mentioned the prepaid expenses.  I

3  think there's a line item of 10 million?

4     A.  Yes.

5     Q.  Do you agree with me that the 70 million in

6  unearned revenue far exceeds the 10 million of prepaid

7  expense?

8     A.  Yes.

9     Q.  Okay.  And I think I asked you this, but since it

10  came up again, I want to make sure.  Do you know the

11  breakdown of the prepaid expenses?

12     A.  No.

13     Q.  Have you seen anything in support of the prepaid

14  expenses other than the line item itself?

15     A.  On the tax return, no.

16     Q.  Anywhere else?

17     A.  No.  Well, I mean, there is -- if you look at the

18  financial statements and the trial balance, there will

19  be a line that says "prepaid."  But, I mean, to show

20  you -- I didn't even look at that number because I'm

21  relying on the tax return.

22     Q.  Gotcha.

23        So with the percentage of revenue going down, why

24  is it proper to use the 87.9 percent?

25     A.  Because it takes into account -- it allows for

ROBERT B. MORRISON - 03/08/2019                    Page 260

 1  five years' worth of actual experience.  It weights more
 2  heavily those years with highest revenues, which are the
 3  last two years.  And that way, you're not subject or
 4  suspect to any one year that might be extremely high or
 5  low due to whatever circumstances.
 6      Q.  All right.  Back to the regression.  So if we
 7  start looking at Paragraph 35 and 36 and then to the
 8  chart underneath Paragraph 36, are there -- are there
 9  numbers in those paragraphs that need to change?
10      A.  Well, probably when I -- again, when I adjust
11  those revenues, those first two-year revenues, it
12  will -- it will impact the regression equation, but I
13  don't know what that impact is.
14      Q.  You can't opine on that at the moment?
15      A.  No.  And as I mentioned earlier, I'm not really
16  relying on -- on the -- on the regression.
17      Q.  So you just want to take any references of the
18  third method out?
19      A.  No, because I if get quarterly information, then
20  that would make the regression more relevant.
21      Q.  Did you ask for quarterly information?
22      A.  I asked for monthly.  And I've been advised that
23  perhaps we can get quarterly.
24      Q.  Your plan is to get the monthly or the quarterly
25  and come back and change this and keep this -- keep this

```
 1  report moving?

 2      A.  My plan is to, if I get the information, look at

 3  it and see what it tells me.

 4      Q.  Without that information, is this a proper method

 5  to utilize?

 6      A.  Sure, it's a proper method, but I'm not -- I'm

 7  not placing as much weight on it because of the few

 8  number of observations in the regression.

 9      Q.  All right.

10      A.  There's only five years' worth of data, five data

11  points in regression.

12      Q.  Yeah, I understand that part of it.

13          Okay.  So going back, though, I mean, you've

14  changed various percentages, you've moved some numbers

15  around in amended Schedule 1, which is the document that

16  you utilized for purposes of all three of the methods,

17  correct?

18      A.  I'm sorry.  Say it again.

19      Q.  You utilized your Schedule 1?

20      A.  Correct.

21      Q.  The original one?

22      A.  Yes.

23      Q.  For purposes of all three of the methods that you

24  outline in your report that we've been talking about?

25      A.  That's correct.
```

1    Q.  Okay.  So you then amended Schedule 1 last night,

2  I believe you said, yes?

3    A.  Yes.

4    Q.  You gave it to me this morning.  And we've been

5  talking about the differences?

6    A.  Correct.

7    Q.  And for the first two methods, because of the

8  differences in the amended Schedule 1, you've had to

9  change some numbers and percentages, yes?

10    A.  That's correct.

11    Q.  What numbers and percentages need to change for

12  this third method, in light of the new amended

13  Schedule 1?

14    A.  I need to do the regression analysis, which I

15  have not done yet.

16    Q.  So the current regression analysis that the

17  conclusion that is reached from the current analysis

18  that is contained in your report is no longer accurate,

19  in light of the changes you made to the amended

20  Schedule 1?

21    A.  Mathematically, correct.  Now, if it ends up the

22  same place, it ends up the same place.  But

23  mathematically, there would be a different equation that

24  would result.

25    Q.  And as we sit here now, you're unable to do that?

ROBERT B. MORRISON - 03/08/2019                    Page 263

1    A.  That's correct.

2        THE WITNESS:  I need to be out of here within

3    ten minutes.

4        MS. BAKER:  Okay.

5        MR. BACKMAN:  I have more than ten minutes'

6    worth of questions.

7        MS. BAKER:  I was going to ask, do you want to

8    stop now or --

9        MR. BACKMAN:  I don't want to stop at all.  So

10   if you guys --

11       MS. BAKER:  In light of the fact that we're

12   going to have to stop, do you want to --

13       MR. BACKMAN:  Let me just say and then you guys

14   can do whatever you got to do.  Understood.

15       I object to stopping if I'm not done.  If you

16   guys intend to stop anyway, and stopping now is more

17   helpful to whatever reasons it is that you-all have

18   to stop, then we can stop now.  Either way, I'm not

19   done in ten minutes.  So that's totally up to you

20   guys.

21       MS. BAKER:  I don't think it's a matter of

22   that.  I think it was more that it was scheduled from

23   10:00 until 5:00, and he has to go.  And I mean,

24   that's a seven-hour deposition day.

25       MR. BACKMAN:  Yeah.  Actually not, and you know

1    that, but that's okay.

2         MS. BAKER:  Well, it is, actually.

3         MR. BACKMAN:  I get seven hours of questioning.

4    And you guys walked in here with all sorts of new

5    documents.  He has had to change virtually every

6    statistical number in here.  You know --

7         MS. BAKER:  One new document.  And I'm not --

8    look, I'm not -- I understand that there's more

9    deposition testimony to be taken.  So I don't really

10   think that we need to waste time going back and

11   forth.

12        MR. BACKMAN:  Yeah, but I just want the record

13   to be clear.  Because I'm going to ask for all the

14   costs and expenses associated with having to come

15   back and do this again.  I am telling you now, we

16   object, as much as we could possibly object, to any

17   more changes being made to the moving target that is

18   the report and the supporting data.  And quite

19   frankly, part of me thinks that this is being --

20   trying to be kept open so that your client can get

21   the information that Mr. Morrison wants to look at --

22        MS. BAKER:  No, he's answered --

23        MR. BACKMAN:  -- so he can continue to

24   supplement and provide information --

25        MS. BAKER:  -- all of your questions.

ROBERT B. MORRISON - 03/08/2019                    Page 265

1          MR. BACKMAN:  -- and find answers to the

2     various discrepancies that I've pointed out

3     throughout the day.  It's completely improper.  We

4     should finish the deposition now.  I'm the only one,

5     quite frankly, that's been prejudiced because I had

6     to prepare for a deposition based upon documents and

7     information that no longer are accurate.

8          So I am here --

9          MS. BAKER:  There was one document that was

10    supplemented for today.

11         MR. BACKMAN:  I am from Fort Lauderdale.

12         MS. BAKER:  The rest of the information --

13         MR. BACKMAN:  I have --

14         MS. BAKER:  -- you have had during the

15    deposition, as we did.  He's answered all of your

16    questions.  I have not --

17         MR. BACKMAN:  He has.

18         MS. BAKER:  -- interfered at all.  It has gone

19    through deposition testimony.  It's definitely not

20    the same thing as last time we were together.

21         So we understand -- we understand your need for

22    further questioning.  Given that you can't finish in

23    ten minutes --

24         MR. BACKMAN:  See, but I shouldn't be put on

25    that.  I get seven hours of deposition time.  I am

1    not there.

2          MS. BAKER:  Including reasonable breaks.

3          MR. BACKMAN:  That is not true.  I get seven

4    hours of deposition time; that's what I get.

5          MS. BAKER:  You scheduled it from 10:00 to

6    5:00.

7          MR. BACKMAN:  Well, it was actually supposed to

8    start at 11:00.  I tried to move it up to 10:00, and

9    we --

10          MS. BAKER:  And we agreed.

11          MR. BACKMAN:  -- cooperated on that.  And we

12    did that.

13          MS. BAKER:  Yeah.

14          MR. BACKMAN:  And I'm not done.  And now you

15    want me to drive home three hours to have to come

16    back another day to do this again --

17          MS. BAKER:  We understand.

18          MR. BACKMAN:  -- for less than probably an

19    hour's worth of additional questions.

20          MS. BAKER:  He has to go.  I don't know what

21    you want me to tell you.  You can set up a

22    video conference.  You don't have to see him.  You

23    don't have to drive up three hours again.

24          MR. BACKMAN:  That's not the way this works.

25          MS. BAKER:  It can be easily worked out.

1          MR. BACKMAN:  You guys are going to stop over

2      my objection, that is your choice.

3          MS. BAKER:  Are you having this transcribed or

4      are you waiting?

5          MR. BACKMAN:  Don't know yet.

6          MS. BAKER:  Okay.

7          Do you need that on the record?

8          THE COURT REPORTER:  Well, I guess if you --

9      you can email us if you decide you need it.

10          MR. BACKMAN:  Okay.  So you guys are leaving?

11          MS. BAKER:  Yes.  As you were advised hours

12      ago, we need to stop at 5:00.

13          MR. BACKMAN:  All right.

14          THE VIDEOGRAPHER:  Time is 5:07 p.m.  Off the

15      record.

16          (Whereupon, a discussion was held off the

17      record.)

18          THE VIDEOGRAPHER:  Time is 5:07 p.m.  On the

19      record.

20          MR. BACKMAN:  Can you tell me why you have to

21      leave?

22          THE WITNESS:  I have commitments.  I have

23      family commitments.

24          MR. BACKMAN:  What's the commitment.

25          THE WITNESS:  Dinner with my mother and my

ROBERT B. MORRISON - 03/08/2019                    Page 268

1    family.

2          MS. BAKER:  I've also told you that at 5:15, I

3    have to go for childcare arrangements, and you were

4    aware of that hours ago.

5          MR. BACKMAN:  You think by telling me something

6    on the morning of the deposition that I traveled for

7    is somehow noticed and putting me on notice that I

8    need to get it done by a certain time?

9          MS. BAKER:  That is more than seven hours.  And

10   you didn't say to me, Amy, you need to go make other

11   arrangements.  And you know that.  This is totally

12   unprofessional.  This is totally unprofessional.

13         MR. BACKMAN:  I'm unprofessional trying to

14   finish my deposition that I'm taking in Orlando?

15         MS. BAKER:  What you're doing is

16   unprofessional.

17         MR. BACKMAN:  Tell me.  No, please, elaborate.

18         MS. BAKER:  I don't need to elaborate.

19         MR. BACKMAN:  What is unprofessional about me

20   wanting to finish this before I have to drive home

21   three hours and presumably now come up another day

22   for three more hours?  Please.

23         MS. BAKER:  You understand the circumstances of

24   what's going on, and yet you're continuing to go on

25   and on about it.  That's unprofessional.

1          MR. BACKMAN:  Listen, I have family and

2     childcare obligations too.  You have no idea what I

3     have to deal with.  Okay?

4          MS. BAKER:  And I'm not --

5          MR. BACKMAN:  And I'm out of town and I've got

6     to drive home three hours.  And I'm saying I'm

7     staying here to take this deposition.  So I don't

8     understand it --

9          MS. BAKER:  I told you that we can accommodate

10    you another time --

11         MR. BACKMAN:  -- it's another hour.  That's it.

12         MS. BAKER:  -- so that you don't incur any

13    additional travel time by having to come back and do

14    this again for an hour.

15         MR. BACKMAN:  That's now -- that's not how this

16    works.

17         MS. BAKER:  It's how it's going to work, so...

18         THE VIDEOGRAPHER:  Time is 5:08 p.m.  Off the

19    record.

20         (Whereupon, Plaintiff Exhibit 9 was marked for

21    identification.)

22         (Thereupon, the proceedings concluded at

23    5:08 p.m.)

24

25

ROBERT B. MORRISON - 03/08/2019                Page 270

```
 1                     CERTIFICATE OF OATH

 2

 3    STATE OF FLORIDA:

 4    COUNTY OF ORANGE:

 5

 6       I, Jazzmin A. Musrati, RPR, Notary Public, State of

 7    Florida, do hereby certify that BOB MORRISON personally

 8    appeared before me on March 8, 2019, and was duly sworn

 9    and produced driver's license/I.D. as identification.

10

11                     Signed on March 25, 2019.

12

13

14    _____

          Jazzmin A. Musrati, RPR
15        Notary Public - State of Florida
          My Commission No. FF984627
16        My Commission Expires: April 21, 2020

17

18

19

20

21

22

23

24

25
```

ROBERT B. MORRISON - 03/08/2019                    Page 271

```
 1                  CERTIFICATE OF REPORTER

 2   STATE OF FLORIDA:

 3   COUNTY OF ORANGE:

 4

 5      I, Jazzmin A. Musrati, RPR, Notary Public, State of

 6   Florida, certify that I was authorized to and did

 7   stenographically report the deposition of BOB MORRISON;

 8   that a review of the transcript was requested; and that

 9   the foregoing transcript, Page 1 through 273, is a true

10   and accurate record of my stenographic notes.

11      I further certify that I am not a relative, employee,

12   or attorney, or counsel of any of the parties, nor am I

13   a relative or employee of any of the parties' attorneys

14   or counsel connected with the action, nor am I

15   financially interested in the action.

16

17                  DATED:  March 25, 2019.

18

19

20   _____
                Jazzmin A. Musrati, RPR
21

22

23

24

25
```

ROBERT B. MORRISON - 03/08/2019          Page 272

```
 1                        ERRATA SHEET

 2           DO NOT WRITE ON TRANSCRIPT-ENTER CHANGES HERE

 3              IN RE: ORANGE LAKE V. REED HEIN, ET AL.
                CASE NO:  17-CV-01542-GAP-DCI
 4              DATE:     MARCH 8, 2019
                DEPONENT: BOB MORRISON
 5

 6   PAGE NO.    LINE NO.  CORRECTION & REASON

 7   _____    _____  _____

 8   _____    _____  _____

 9   _____    _____  _____

10   _____    _____  _____

11   _____    _____  _____

12   _____    _____  _____

13   _____    _____  _____

14   _____    _____  _____

15   _____    _____  _____

16   _____    _____  _____

17   _____    _____  _____

18   _____    _____  _____

19   _____    _____  _____

20   _____    _____  _____

21   _____    _____  _____

22   Under penalties of perjury, I declare that I have read
     the foregoing document and that the facts stated in it
23   are true."

24
     _____
25   DATE                               BOB MORRISON
```

ROBERT B. MORRISON - 03/08/2019          Page 273

```
 1   03/25/2019

 2   BOB MORRISON
     c/o AMY L. BAKER, Esq.
 3   Wilson, Elser, Moskowitz, Edelman & Dicker, LLP
     111 North Orange Avenue
 4   Suite 1200
     Orlando, Florida 32801
 5   Amy.baker@wilsonelser.com

 6   In Re:  March 8, 2019, Deposition of BOB MORRISON

 7   Dear BOB MORRISON:

 8       This letter is to advise that the transcript for the
     above-referenced deposition has been completed and is
 9   available for review.  Please contact our office at
     954.315.3848 to make arrangements for read and sign or
10   sign below to waive review of this transcript.

11       It is suggested that the review of this transcript be
     completed within 30 days of your receipt of this letter,
12   as considered reasonable under Federal Rules*; however,
     there is no Florida Statute to this regard.
13
         The original of this transcript has been forwarded to
14   the ordering party and your errata, once received, will
     be forwarded to all ordering parties for inclusion in
15   the transcript.

16                          Sincerely,

17
                            Jazzmin A. Musrati, RPR
18                          Epiq Global

19   cc:  JEFFREY A. BACKMAN, Esquire
          AMY L. BAKER, Esquire
20
     Waiver:
21
     I,_____, hereby waive the reading and signing
22   of my deposition transcript.

23   EP
     _____    _____
24   Deponent Signature               Date

25   *Federal Civil Procedure Rule 30(e)/Florida Civil
     Procedure Rule 1.310(e)
```

ROBERT B. MORRISON - 03/08/2019                    i1

| | | | |
|---|---|---|---|

**$**

**$1,529,000**
  58:19

**$1.4**
  244:1

**$1.5**
  57:2

**$10**
  245:24 246:22,23

**$10,995**
  114:4,17 115:8

**$100**
  250:14

**$100.50**
  250:13

**$12**
  131:1

**$12,000**
  172:10,15,18,21 220:5

**$16**
  123:24 124:1,8,21
  131:7 219:10 220:13

**$2**
  111:8

**$20**
  248:8

**$22**
  231:10

**$222,000**
  95:17 100:14

**$286,000**
  71:8 137:17,25 160:16

**$287**
  137:21

**$3**
  40:6 86:10 197:14
  255:4

**$3,077,610.85**
  27:6

**$30**
  47:21

**$37**
  89:22

**$4**
  45:6 131:12,14 133:13
  158:11

**$4,942,934**
  134:16

**$4.5**
  44:8

**$5,000**
  226:19 227:4

**$5.4**
  174:23,24

**$6,200**
  157:13

**$651**
  158:18

**$67,000**
  216:2

**$675,000**
  87:8

**$7,000**
  125:11,12

**$7,500**
  146:13

**$70**
  43:17,18 44:17,19,23,
  25 46:10 123:22 173:10

**$70.6**
  45:5

**$8**
  150:9 254:16

**$8,664,960**
  161:1

**0**

**0.5**
  229:8 251:8

**005740**
  181:19,20

**05**
  252:5,9

**1**

**1**

5:5 6:23 7:1,5 82:5,6
84:24 85:21 86:2,14
87:3,8 88:10 92:8 97:4,
7 102:11 113:15 117:1,
9,10,16 120:4 138:16
139:2 145:13,16 200:17
201:7 213:11 221:6
222:23,24 223:3 224:7,
8,9,10,11 225:5,21,24
226:15 227:10,15,21,
22,23,25 229:6 233:10,
25 238:1,17 244:8
248:1 249:22 254:22
255:3,10,17 261:15,19
262:1,8,13,20

**1,235**
  158:1

**1,529,575**
  76:21

**1.4**
  244:11

**1.5**
  55:13,19

**1.554**
  225:25

**1.7**
  246:7

**1.8**
  246:7

**1/2**
  45:6 46:14 122:1
  131:12,14

**10**
  47:1 63:5 78:4 81:13
  104:1,2 174:4 208:24
  218:6 259:3,6

**10,000**
  227:4

**10,995**
  115:12

**100**
  34:13 37:12,19 63:3
  99:4,5 139:5 250:6

**100.5**
  250:7,14 251:6,13

**105**
  63:2,3

**105.6**
  239:20

**1099**
  20:22

**10:00**
  263:23 266:5,8

**10:21**
  5:4,11

**10A**
  208:23,25

**11**
  163:12

**11,868,000**
  99:23

**11.4**
  44:9

**11:00**
  266:8

**11:34**
  66:14,16

**11:47**
  66:17,18

**12**
  28:9 30:19 31:3,9,21
  95:15 131:2 135:8
  191:13,17 222:20
  224:16,24 225:22 229:7
  231:10 232:2 233:6,13
  237:20 246:24 249:23

**12,000**
  173:7

**12.1**
  254:9,12,18

**12/13/17**
  179:14

**12/31/13**
  179:14

**12/31/17**
  184:21

**1200**
  31:15,18 134:24 135:10

**12:52**
  120:13

**12:53**
  120:11

ROBERT B. MORRISON - 03/08/2019                    i2

**12B**
192:6

**12C**
192:13,14

**13**
77:2,4 78:21 80:23 86:9
96:13 104:4 144:9
194:4

**1300**
28:9 30:19 31:3,9,21
134:25 135:8

**14**
77:4 86:6,10 121:4,18
127:8,16 128:23 144:9
194:4 211:19 246:24

**14th**
147:6,9,16

**15**
77:4 81:14 194:4
211:19 232:11

**1500**
34:15

**1523**
138:6

**16**
133:12 180:5 201:5
211:19

**16.7**
44:11 46:16 123:18

**17**
11:7 180:6 211:19
212:24 250:13

**18**
66:2 123:19 157:23

**18.5**
122:1 254:9,11

**18th**
150:13

**19**
194:16

**1997**
49:3

**1999**
49:3

**1:36**
120:14,15

**1st**
65:24

---

**2**

**2**
11:2,4 87:8,20 144:18
201:12,22,23 206:23
228:16 229:18 252:22

**2,000**
34:15 38:3

**2,871,000**
80:4

**2,871,411**
80:2

**2.8**
112:15

**2.9**
44:9 46:15

**20**
133:12 142:22 143:1
150:14 154:23 202:17
203:3 204:18,19,21
205:7 237:6

**2007**
44:12

**2013**
12:12 13:25 28:7 31:23
32:2 46:7 69:3 86:6,9,
11 100:21 114:3,13
115:14,19 117:5 129:13
136:18 184:24 185:11
192:20 199:14 211:19
218:7,20 225:24 226:20
232:14 250:12

**2014**
86:12 87:9 178:9,12,17
179:9,18,21 180:4
184:12 186:23 201:2
232:12

**2015**
64:25 86:7,10 139:24
180:5 221:22 228:8
239:16 242:20 243:11,
25 244:2

**2016**
133:12 232:6

**2017**

12:13 43:16 44:6,13,14
45:12 95:15,17 96:18,
19,21 99:23 100:10,11,
19,21 118:17,22 123:19
124:22,23 129:13
133:12,13 144:16
173:23 181:6 183:8
185:15,18 192:20
218:7,12,18,21 231:7,
13 234:18 237:10
250:25

**2018**
12:18,21,23,24,25 13:3,
6,8,25 32:3 34:16 50:6
69:4 100:10 118:5,17,
18 119:2,10,11 124:25
136:19 173:23 192:7,
13,23 193:1 194:16
218:11,14,17,22,25
219:7 222:16

**2018's**
219:1

**2019**
5:10 51:23 68:18 117:5
118:2 147:19 192:8,13
198:4 222:16

**205.6**
239:17 241:1,2

**20th**
150:14 194:18

**21**
78:4 150:14 204:13
205:4,6 206:5

**21.8**
139:15

**22**
207:13

**22,636,846**
181:20

**222,000**
99:21

**23**
181:20

**231,000**
225:24

**24**
199:7

**25**

**63:2,6 221:3**

**26.66**
100:3,4,12

**26th**
23:22,24,25 147:8,10,
14

**28**
33:21 34:12 38:19
51:23 54:17 68:18 78:5
121:10 135:2 136:7
198:23

**28.1**
33:13 39:12 40:6,14
41:6,25 54:5,6,11 55:9,
15 56:5,18 58:11,17
67:20 72:4 74:21 75:6,
10 76:6,8 106:13
121:10 134:12 135:12,
20 140:7 141:4,6
142:11,20 198:7,17
205:9,15 206:5,6,14

**287**
137:17

**287,000**
71:8

**288**
65:1

**29**
250:3,5,11

**2:52**
184:5,7

---

**3**

**3**
26:14,18 34:2,13 36:20
39:15,23 50:1,5 54:10,
11,12 59:9,11 60:12,17
75:15,25 76:16 78:11
79:9,10 80:10 100:9
112:13 114:23 115:24
116:14,15 117:16 118:4
119:6,11,12,16 134:6,7,
21 137:23,24 138:15,
16,18,24 139:2,13
141:19 144:18 184:9
200:20 202:23,25
209:15 213:8,12 218:5
230:20 231:2,3 232:1
233:5,8,24 235:2

ROBERT B. MORRISON - 03/08/2019                    i3

236:15,25 244:17 247:6
248:4 250:17,18 251:9
253:22 255:1,11
257:13,15

**3,077,611**
38:6 78:21 80:24
137:23 196:23

**3,364,382**
137:25

**30**
89:9 250:3,5,11 251:4

**302**
65:1

**31**
12:12 44:6 96:13
118:17,22 123:18
178:12 218:11 252:14

**32**
96:24

**33**
47:6 96:13,24

**35**
260:7

**36**
260:7,8

**37**
47:8

**3:00**
184:8

---
                    **4**
---

**4**
34:13 46:14 51:15,16,
20,21,25 54:3 55:17
57:5 65:20 67:12,24
74:21 75:6 76:19,24
93:16 121:9 127:4
134:8,11 147:19 198:4
201:24 202:19 203:20
222:3 224:17,19 246:5

**4,942,934**
76:22 77:12 78:22
80:25

**4.3**
202:20

**4.9**

78:7 79:8

**40**
133:24 135:11

**40-something**
30:22

**44**
99:25

**44A**
12:8

**45**
135:9

**451**
160:12

**47**
108:13 136:6,7

**481**
88:1

**481A**
87:23

**483**
151:24 157:13,24
158:18

**4:28**
247:16

**4:29**
247:15

**4:40**
247:17,18

**4th**
147:17

---
                    **5**
---

**5**
50:7 52:7,16 63:3 68:4
93:16 98:18 103:20
138:11,12 227:4 229:11
230:10 252:6,7,9,10

**5.4**
55:13,19

**5.8**
203:12,22 205:7 206:11
207:8

**50**
135:8

**53**
136:17,19 137:6,12

**537,376**
81:5

**5734**
242:11 245:21

**5740**
181:16 183:6

**588**
28:14,15,23 29:6,9,19
30:14,16 31:1,9 33:21
34:2,11 38:9,18 40:5
41:21,23 69:1 134:20
135:8,10 136:12,14,19,
22 137:5,13

**5:00**
120:9 263:23 266:6
267:12

**5:07**
267:14,18

**5:08**
269:18,23

**5:15**
268:2

---
                    **6**
---

**6**
85:5,8 136:15 137:16,
19 141:16 163:23
176:16 202:7 205:13
206:1 246:6

**6.7**
81:3,4 104:3 229:8

**60**
191:5 198:13,14

**60-something**
136:1

**630-some-odd**
136:21

**641**
136:23 137:9,12,14
138:1,5

**651**
160:12

**66**
45:8

**67**
215:23

**67,000**
215:23

---
                    **7**
---

**7**
85:10,11 86:23,24 92:8
97:3 113:15,16 118:21
130:7 131:16 145:13
177:15 191:13 193:25
194:1 225:23,24 228:5,
11,16,17 229:7,18
230:2 233:10 234:9,18
252:22 253:20,23
257:13,15

**7,000**
125:13

**7,345,000**
243:14

**7.3**
244:11

**70**
45:8,12 57:8 63:6
223:16 252:25 253:2,8
259:5

**70-something**
203:13

**70.6**
44:7

**700**
160:9

**700-some-odd**
34:16

**71.9**
57:13,14,15

**742**
31:13

**75.6**
98:24,25

**752**
160:3,10

**79**
40:21 41:4 57:1 253:8

**79.1**
57:8 97:19,22

ROBERT B. MORRISON - 03/08/2019                                      i4

**79.9**
36:24 37:24 38:1 56:6,
12 57:5,12

**797**
87:8

**8**

**8**
5:10 79:1 149:15 170:7
200:16 205:20,22 206:1

**8,020,545**
80:2 81:1

**8,805,000**
243:12

**8.3**
136:23 139:4,5

**80**
37:23 63:3,4 96:4,5,6
98:9 100:20 111:2
144:2 203:17 223:21
224:1,3 252:17 253:3

**80-something**
103:16,18 203:14

**80.1**
96:7

**80.7**
96:7 222:7 224:6

**81**
98:23 122:1 128:15

**81.5**
254:7

**82.3**
97:18,22

**833,842**
100:11

**87.9**
254:2,7,8 257:18
259:24

**872**
138:5

**8A**
171:4

**8C**
171:4

**9**

**9**
66:2 74:17 77:19,21
201:12 205:10 269:20

**9.3**
74:19 136:24 206:4

**90**
74:18 136:8

**90.7**
74:23,24 75:4,6,14,18
78:6 121:10 134:12
135:13 205:11,14,16
206:5,6,10 207:11

**91.3**
98:25

**91.7**
139:6,18 141:3,12

**93**
225:1

**93.3**
81:1,2 222:8

**93.7**
137:14

**94.7**
207:7

**95**
94:10

**95.5**
98:24 145:14

**98.9**
97:18

**A**

**a.m.**
5:4,11 66:14,16,17,18

**aberration**
240:6

**able**
7:23 9:19 15:22 17:16
23:6 28:14 29:8 60:23
70:7 73:13 92:9 104:22
113:9 118:1 129:21
130:5 131:20 138:3
180:6 183:2,9 191:9

199:18 202:5 212:23
220:4 245:18

**absent**
216:21

**absolutely**
42:24 62:2 90:18 94:12
156:12 168:15 170:1
186:4 256:4

**absorbed**
93:6 194:14

**absorption**
83:22

**absurd**
110:20

**abundance**
165:3

**accept**
100:23 200:2

**accepted**
94:6 95:5

**accepting**
30:16 38:6 216:20

**access**
15:23 24:24 25:4,12

**accommodate**
269:9

**accomplished**
115:23 172:23

**account**
43:19,22 44:2 94:8
107:2 109:25 113:10
122:4 130:22 131:9
157:24 158:12 172:16
176:15 239:22 240:25
245:18 248:7 249:24
251:18 256:17 259:25

**accountant**
21:1,2,3 88:20 89:13,
14,25 90:5,11 186:20
187:7,17 210:5,6
232:23 246:9

**accountant's**
243:23

**accountants**
118:15 119:1 187:11,15

**accounted**

109:24 112:17 219:13,
19

**accounting**
20:16 21:4,5 24:3 42:3
53:5 83:21 103:22
104:19 107:12,15
122:3,13 127:1 129:8
130:3 143:3 153:19
154:9 155:6,11,14,17,
20 156:2,22 177:23
180:1 189:13 190:23
196:7,8,10,13 198:6,18
199:20 210:10,13 216:7
220:2 235:12 245:1,2,4,
12 255:20,21

**accounts**
28:24 157:25

**accrual**
86:7 87:15 88:1 108:6
122:5 125:3,6 154:6,10,
20 155:15,17 156:5
171:17,18,23,24 187:24
189:3,10 215:2,4 219:3
228:8 239:25 240:15,22
241:18 242:5 245:11,13
248:10

**accurate**
18:19 19:11,19,22
30:17 76:8,10 90:5,12
121:15 140:15 141:8,21
142:17 149:19 159:14,
21,24 170:21 188:10
199:24 201:8 207:4
235:25 250:10 262:18
265:7

**accurately**
139:22

**Act**
48:5,25 49:14 78:9
79:23 81:14 83:5,10,15
110:14 142:23 149:6
154:24 155:3,12,17
189:24 190:4,6 256:21

**acted**
48:25 167:2,3

**acting**
191:10

**action**
191:8

**actions**

6:17

**activities**
94:14

**actual**
13:2,12 19:3 27:17,24
32:8 34:10 38:9 39:1
40:10 58:25 59:18 60:6,
8,14 64:3,5 66:24 67:1,
16 68:5,8 69:6,13 70:21
71:9 75:15 78:8 81:10
83:14 84:5 96:9 97:25
103:2 113:17 117:23
119:5,21 127:5 130:14
132:7,24 138:20 139:9,
13 140:16 141:22
144:21 151:23 152:1
156:22 157:2,5,6,7,16
158:12 160:10 162:21
176:12 179:17 181:1
202:7,13 203:23 204:21
215:1 219:1 235:12
240:17 241:6,8 260:1

**add**
10:6 62:25 68:25 77:12
78:11,12,18,21 80:24
98:4 128:24 192:2
229:23 244:11,15
254:13 258:14,19

**added**
31:3 50:11 90:4 140:8,
10 161:3 229:11,22

**addenda**
211:17

**adding**
79:17 80:13 81:9
137:18 242:18

**additional**
8:1 18:12 31:13 46:10
55:25 77:22,24,25 80:4
141:8 142:21 157:15
198:20,22,24 201:15,17
202:2,4 208:7 209:14
216:3 266:19 269:13

**address**
167:16

**addressed**
190:6

**addresses**
211:4

**adds**
160:18

**adjust**
121:24 260:10

**adjusted**
88:3 118:15 193:6
218:6 221:16 224:13
225:22 228:6,18,21
230:1,3 231:8 234:11
237:23,24 238:10,11,
15,16 240:1

**adjusting**
186:20 228:6 246:16

**adjustment**
86:8 87:17,23 88:1
108:23 218:3 221:5,23
228:8,14 240:9 241:23
242:3 243:25 244:2
254:4

**adjustments**
88:19,21 89:13,14,23
108:3 109:6 186:14
189:15 231:18 240:22
243:22 250:7

**administration**
196:11

**administrative**
196:20

**advanced**
124:15 132:4 219:21
220:5,9

**advancement**
220:19

**advancements**
123:25 124:10 219:10,
11 220:16

**advances**
123:7

**advertise**
94:21,23 104:12

**advertisements**
37:5,6

**advertising**
94:1,2,13,17 95:10,12,
13,20 96:17,18 98:22,
23 99:19,22 100:5,15
105:15 111:22 112:2,5
113:4,6,14 131:1,3

145:14,16 217:1 246:6

**advised**
260:22 267:11

**affect**
99:8

**affiliations**
5:15

**afternoon**
121:22

**agency**
217:3

**ago**
143:1 198:4 267:12
268:4

**agree**
28:22 33:2 36:24 50:19,
23 56:6 76:7 93:13
114:15 119:9,20 122:15
126:18 135:11 149:22
153:22 182:3 200:23
232:6 259:5

**agreed**
134:15 266:10

**agreement**
29:12 32:22 42:17 66:1
147:18 153:24 162:1
172:9 207:17

**agreements**
29:19,22,23 30:5
163:17 170:8,10,12,14,
18 171:2,4 195:8 211:8
213:18

**ahead**
16:12 35:5 56:23 74:13
140:22,23 215:14 219:6
228:3 242:14 258:22

**ahold**
187:7

**allegation**
164:9

**allegations**
164:7 165:16 166:13
167:22

**alleged**
105:8

**allocable**
100:14 218:8

**allocate**
103:1

**allocated**
96:8 100:14,25

**allocating**
94:6

**allocation**
103:22 104:20 122:11
218:17 224:12

**allow**
25:7

**allowances**
106:16,18 107:23
108:23 109:6

**allows**
259:25

**amend**
78:1 79:6 195:23

**amended**
11:17 12:5 82:6,17,18
85:19 86:15 87:11 97:7
98:7 102:12 106:3
113:15 121:9,23 208:1
213:18 221:6 222:23
223:3 224:8,10 225:4,
21,23,24 227:23,25
229:6 233:11,12,25
237:25 238:17 244:7
248:1 249:22 254:22
255:2,16 261:15 262:1,
8,12,19

**amendment**
82:20

**amount**
27:17 28:13 32:8 44:25
47:13 49:23 54:19 55:1
56:1 69:23 78:9 80:21
83:4,9,12 95:3,4,24
100:13 106:25 127:3,20
137:21 144:12,13 152:1
153:1,5,8,12 158:10
160:5 206:21,22 217:4
234:3 243:4

**amounts**
46:15 80:7 106:21
185:13 193:22 235:9

**Amy**
5:18 7:2 23:10 268:10

ROBERT B. MORRISON - 03/08/2019                    i6

**analyses**
93:5 230:13

**analysis**
9:16,17 13:21 30:6 33:3
37:21 39:7 48:5 57:21
58:10,14 64:1 67:7
84:2,16 91:11 93:3,8
105:11 107:13 110:25
111:8 112:4,12,17
114:19 119:7 144:19
149:1,23 154:24 163:18
169:16 171:12 174:20
176:4,14,19 196:16,17,
24 197:14 199:11,19
213:20 218:18 236:14
250:20 257:5 262:14,
16,17

**analyst**
162:8 209:3

**analyze**
148:4 187:21

**analyzed**
109:16,18

**analyzing**
88:25 110:6,11

**and/or**
24:5 187:20

**annual**
181:2 213:9 246:12,13

**answer**
10:20 18:14 19:12
31:25 94:18 95:8
102:22 103:10 105:4
106:22,23 126:6 129:10
132:9 142:6 161:18
168:21 169:11 173:14
174:10 208:19,20
215:16 247:9

**answered**
38:20 101:14 143:6
171:6 264:22 265:15

**answers**
265:1

**anticipated**
54:19

**anticipation**
18:16 19:10 54:15

**anybody**
22:17 102:5 176:15

249:14

**anymore**
142:16 206:15

**anyway**
227:23 258:8 263:16

**apart**
177:25

**apologize**
65:22

**appear**
16:17 106:10 111:1
130:5

**appearance**
35:5

**appeared**
41:22

**appearing**
5:19

**appears**
15:10 70:24

**applicable**
155:11 170:22

**application**
160:8

**applied**
96:8 119:7 122:11
128:14 155:15 157:14
217:6 240:18

**apply**
67:15 93:21 98:20
155:21 190:9

**applying**
119:8 157:17 218:25

**appreciate**
35:14 43:25 95:7

**approach**
149:17

**appropriate**
17:22 93:19 128:21
189:15 211:17 240:14

**approximately**
202:19

**area**
158:9

**areas**
191:3

**aren't**
84:3 144:21 192:20
215:12

**argumentative**
18:4 169:7

**arrangements**
268:3,11

**arrested**
6:21

**articulated**
14:18

**aside**
8:23 22:1 88:16 99:10
214:24

**asked**
12:18 17:15 19:11 25:2,
11,12 32:3,10 38:20
53:7 59:24 79:23 80:6
82:17 91:25 121:13
132:22 143:6 148:8,10,
13,15,17,22 149:2,6,7
156:13,16 161:18
167:16 168:17 173:24
177:7 183:1 186:8
191:24 192:7 194:22,25
195:6,9,15,17,22
199:13 201:5,10 207:23
208:9 213:22,25 215:15
216:25 219:7 222:16
231:20,23 235:16
257:17 258:12,21 259:9
260:22

**asking**
41:12,17 50:4 56:24
58:15 70:13 131:23
132:24 140:25 198:25
203:4 218:19 239:13

**asset**
47:2 105:20

**assets**
44:10 45:10,25 46:11,
13,17 108:14,15
173:16,19 185:2 196:9

**assigned**
83:23,24 192:19

**associated**
57:16 67:15 115:22

129:21 148:5,20 154:11
156:17 185:13 189:14
264:14

**Associates**
5:9 12:12 13:20 179:13
242:19

**assume**
43:7 49:6 53:5 134:17
200:9 206:24 207:10

**assumed**
201:7 206:13

**assumes**
160:11 256:8

**assuming**
110:15 159:13 180:5
187:25 206:15 236:23

**assumption**
74:15,16 256:12

**assurance**
89:4,6

**attached**
152:7,16

**attachment**
11:21

**attorney**
74:11

**attorneys**
22:15

**attributable**
94:10 95:16

**attributed**
54:25

**auto**
214:14

**autos**
214:13

**available**
116:14 118:24 131:12
137:24 158:13

**average**
17:1 33:11 142:1
157:13 160:5,9 219:6
224:25 228:23,25 229:7
240:3,4,20,23,25 241:2,
3 246:18

ROBERT B. MORRISON - 03/08/2019                    i7

**aware**
37:14 101:17 150:18,25
151:2,6 152:5 189:22,
25 190:1,5 268:4

---

**B**

---

**back**
10:15 22:6,7 28:17
31:24 32:11 34:8 38:5
42:13 43:5,13 44:11
49:17 58:4,8 59:5,17
60:8,24 63:14,17 65:6
72:20 80:22 86:11,16
101:18 112:14 113:24
114:8 120:25 121:6
124:14,15 125:1,9
132:2,3,11 133:6,7,10
134:2 135:3 146:6
168:25 173:7,12,15,17
175:4,6,9 180:12
191:12 196:2 199:6
200:16 202:12 207:16
212:23 224:11 226:10
227:5 228:7 231:22
232:21 236:9 249:8
254:16,24 256:13
257:12 260:6,25 261:13
264:10,15 266:16
269:13

**background**
21:18 162:4,16,18
163:13 165:22 167:19,
22 168:1 169:2 208:11

**Backman**
5:16,22 6:25 7:4 8:6,16
9:6,18 10:4 11:6,23
17:17 18:1,3,7,10,13
19:13 20:8 22:23 25:10
26:16 28:2 29:2 31:4
33:8 35:5,11,14,15
37:3,15,22 38:22 39:4
40:9 42:10 43:14 45:11,
22 46:9 48:18 50:3
51:19 52:18 56:19 58:1,
12,20,23 66:13,20 69:9,
11 70:11 72:15,17,20,
21 73:6,19 76:4 81:24
82:25 83:19 85:2,7,15,
16 86:1 90:8,16 92:6,24
93:18 101:12 103:11
110:9 115:11 116:4
119:25 120:6,10,17
122:21 126:10,16 129:2

130:1,10 131:18 132:14
139:7 140:21 142:7
143:9 149:20 150:4
151:13 152:4,9 153:14
154:3 155:19,23 156:14
158:23 159:15 160:13,
24 161:12 163:1 165:9,
14 166:17 168:6
169:10,22 172:7 173:1,
9,20 184:2,11 187:13
188:8,19 193:13 197:12
198:1 204:12 205:24
216:13,23 217:10,12,
17,21 220:12 226:22
234:7 235:18,22
236:10,18 237:17,19
239:2 240:24 242:15,17
243:9 244:20 245:5
247:11,13,20 251:3
256:11 263:5,9,13,25
264:3,12,23 265:1,11,
13,17,24 266:3,7,11,14,
18,24 267:1,5,10,13,20,
24 268:5,13,17,19
269:1,5,11,15

**backup**
14:9,13 17:19 19:20
24:2 34:22 39:7 51:24
53:18,20,22,24 183:15
201:9 233:21 235:20
236:13

**backwards**
86:15 88:3

**bad**
36:25 102:7

**badly**
215:15

**Baker**
5:18 7:3 8:3,13,25 9:13
10:2 11:21 17:14,25
18:2,4,8,11 19:6 20:6
22:18 25:8 28:1,25
30:24 33:6 37:1,13,20
38:20 40:8 42:7 43:3
45:3,20 46:5 48:16
49:24 56:14 57:24 70:9
71:22 72:13,16,18 73:4,
15,22 76:2 81:22 82:23
83:16 85:21,23 90:7,14
91:24 92:23 93:15
101:11 103:9 110:7
115:9 116:3 119:23
120:4,9 122:18 126:9,

13 128:25 129:23 130:8
131:17 132:9 138:25
140:18 141:13,24 143:5
149:9 150:3 151:10
152:3,6 153:7 154:1
155:13,22 156:11
158:21 159:5,11 160:7,
22 161:10 162:23
165:7,13 166:12 167:24
169:6,20 172:24 173:13
183:25 187:12 188:7,18
193:9 197:9,21 204:8
216:11,16 217:9,11,19
220:11 226:15,17 234:4
235:13,21 236:1,17
237:15,18 239:1 240:19
242:12 243:6 244:18,24
247:8,12 251:1 256:7
263:4,7,11,21 264:2,7,
22,25 265:9,12,14,18
266:2,5,10,13,17,20,25
267:3,6,11 268:2,9,15,
18,23 269:4,9,12,17

**balance**
12:22 43:24 52:24
57:15 89:9,11,16 90:19,
22 105:24 106:1 113:22
122:8,24 124:12,24
125:18 178:12 179:2,5,
13 180:2,10 181:1
184:19,23 185:6,24
186:7,8,9,11,15,23
187:2,4 189:17,19
194:22 195:4 207:19
213:18 241:9 247:2
259:18

**balances**
53:8 88:17 148:20
177:23 178:2 179:25
180:8,9,12 213:22

**bank**
130:22 133:3 145:11
172:15

**bankruptcy**
6:16 190:24

**bar**
16:21,23,24,25 17:9
209:21

**bars**
209:17

**base**
204:5

**based**
9:10,20 19:4,19 28:8,
10,11 29:25 30:14,23
33:23 37:16,21 38:14
40:12 45:23 46:3,7
50:1,21 55:2 56:5,23
57:4,8 58:11 67:16
71:10 73:16 75:15
77:23 80:19 82:8,10,13
84:11 86:12 96:8 100:9,
19 103:22 104:19,20
119:5,7 121:9 122:10
123:24 128:1 129:13
130:2 132:7,24 135:20
137:14,23 139:4,11,15
140:16 141:7,12 142:2,
18 153:11 156:2 157:13
158:8 160:12 171:13
174:18 180:4 185:3
193:22 198:19 201:15
206:3,17 230:15
231:15,23 234:17,21
235:1 239:6 241:3
242:2 253:11 256:9
265:6

**bases**
166:24 245:2

**basic**
115:25 135:6

**basically**
34:1 41:24 44:6 47:21
68:6 77:20 84:19 86:9
90:22 109:4 122:16
125:5 128:11 129:15
132:3 148:4,13 177:25
221:13 226:3 237:23

**basis**
27:5 47:22 86:6 87:13
88:22 89:21 101:23
107:15 115:7,12 119:2
122:5 125:3,6 131:22
154:6,10,20 156:4,5
163:11 164:4,8 171:18,
24 181:2 187:24 189:3,
11 215:2,4 224:25
242:2,5 243:7 245:11,
13,20 246:12,13 248:10
250:2

**Bates**
242:10

**bathroom**
57:24 58:21 66:13

ROBERT B. MORRISON - 03/08/2019                    i8

**bear**
251:16

**bearing**
171:7

**began**
5:3

**beginning**
45:13 62:23

**begins**
5:5

**begs**
226:6

**behalf**
5:19 35:9 146:2

**believe**
19:2 23:23,24 24:13
37:18 48:13 51:18
72:23 101:19 106:22
147:17 158:7 165:12
207:2 210:16 211:15,16
231:25 254:17 262:2

**Bender**
35:10

**benefit**
45:19

**benefits**
101:25 102:24

**Benford**
146:2 190:15

**Benford's**
146:2

**best**
10:3 84:2,12 88:24
89:2,3 90:3 153:4
197:18 250:15

**better**
33:3 105:3 185:10
202:24 215:18 245:16
247:5

**beyond**
133:25 246:7

**big**
43:24,25 55:20,21
189:13

**billed**
146:21,23

**bills**
131:20 133:1

**binder**
12:2 208:2

**bit**
98:8 129:16 190:22
191:4 202:11 245:9

**blank**
87:7 108:3

**blanket**
200:13

**block**
252:18,20

**blow**
228:7

**blue**
209:17

**Bob**
5:6 6:2,4 120:19 183:8

**body**
36:21

**bold**
201:14

**bonafide**
216:22

**book**
47:22 88:21 89:19,21
122:3 125:3,6,7 186:17
216:3 220:18 221:24
237:4,5 243:7,22,24
244:1 246:15

**book/tax**
186:18

**booked**
241:6,8,9

**booking**
44:17 123:22

**books**
42:2 51:23 89:24 90:10
185:4 187:7,17 231:19

**borrow**
173:18

**bottom**
33:4 68:11 134:16
223:13 228:12 252:21,
22

**box**
77:5 121:7,18 127:10,
16 144:9 222:21 229:8
237:20 251:12

**boxes**
78:12,14 81:7

**Brandon**
42:21 217:2,3 220:23

**bravo**
13:25

**break**
17:7 46:7 47:23 57:24
58:21 66:13,16 69:12
70:5,17,21 84:15 85:4,8
120:1,13 141:14 143:14
158:25 184:1,2,4,7
207:15 237:15 242:16
247:11,16 249:19,24

**breakdown**
259:11

**breaks**
52:4 143:3 266:2

**bring**
7:17,19,20

**bringing**
129:20

**broke**
177:25

**broken**
129:15

**bucket**
67:5 158:11 175:12

**buckets**
66:22 67:6 175:14

**bunch**
151:6,15

**buried**
230:24

**business**
13:20 20:15,24 42:18
45:23 46:3 47:15 71:4
89:8 93:23 104:11
131:21 154:5,7,10,14,
16 155:8 162:16,18
171:24 172:3 180:19
190:20 192:24 193:2
214:15,19 216:8,22

245:4 246:12

**button**
24:7 209:23

**C**

**calculate**
67:24 145:12 155:3
160:4 189:23 190:2
207:1 219:3 228:22

**calculated**
31:12 81:10 83:5,6
106:8,11 121:8 127:6,
21 136:17 139:11
140:14 141:20 156:19
157:11 161:9 205:16

**calculating**
234:1

**calculation**
38:23 51:22 55:7 56:8
57:3,6,8 67:12 71:16
72:7 73:14 74:14 79:23
82:14 96:17 121:20
128:18,23 135:20
141:7,18 142:4,6,23
145:6 148:14 149:7
150:1 155:12,24 156:17
174:22 190:10 224:14
251:14 254:14 256:1,20

**calculations**
27:10 29:25 37:16
38:14 40:4 49:1 50:2
62:4 71:11,21 83:3
141:23 148:16 168:16
204:4 205:13 206:2
219:13 255:15

**call**
6:4 13:4 30:1 105:18
109:1 127:21 173:11
175:18,22,24 179:5
181:18 182:10,11
190:25 196:13 235:9
238:24 239:4

**called**
83:22 88:20 89:19
133:17 148:1 184:18
186:17

**calling**
18:5 47:2

ROBERT B. MORRISON - 03/08/2019                    i9

**can't**
10:20 31:24 46:23
48:17 75:20,25 76:12
101:9,14 116:20 118:14
119:10,20 139:18
173:12 189:4 227:16
237:3 247:7 260:14
265:22

**candid**
210:18

**candidly**
136:1

**capabilities**
24:14

**capacity**
6:10,17 147:19 167:10

**capital**
42:20 132:11,23

**car**
221:1

**care**
222:1

**carried**
61:24

**carved**
110:25

**case**
26:21,22 28:18 47:18
49:7,19 53:23 56:10
57:19 81:15 83:15 99:7
118:16 164:17,20
167:20 168:20 169:17
180:23 181:7 190:6,19
191:23 196:16 240:18
257:1

**cases**
14:12,13 48:12,21,24
49:13,15 116:15 134:21
188:20 201:18 204:22

**cash**
44:3,5,8 45:4,6,21
46:12,14 53:2 68:5,9
86:6 87:13,15,18 88:1
108:6 122:19 124:3
125:11,16 130:16,18
131:5,6,9,12,22,24
132:10,12 133:3 154:19
155:9,17,20 156:4
171:16,18 219:3 220:17

228:7 239:24 240:15,22
241:17 242:2 245:11,20

**cash-wise**
132:17

**catch**
86:8

**catch-up**
86:11 240:9

**categories**
12:8 61:1 68:16 77:7,9
94:8 195:16

**categorize**
110:5 127:22

**categorized**
185:10

**category**
132:15 174:15,16 185:9
193:8,10,12,15,20

**cause**
236:8

**certain**
11:25 44:3 76:9 84:10
88:3 90:5 126:4 128:5
153:12 170:7 171:11
268:8

**certainly**
16:2 245:17

**certainty**
196:7,15 197:18 198:6,
18 199:20 255:21

**cetera**
186:24

**CFO**
210:15,16 211:1

**CFO's**
211:2

**chance**
42:12

**change**
71:24,25 75:12,14
76:16 78:16,23 80:7,8,
11,13 82:12,24 83:4,9
87:19 88:6 98:8 99:7,8
112:4 121:9,21 122:2
140:8 141:3 142:2,11
147:22 159:19 199:2
207:13 224:18 225:9

232:20 240:15 250:5,20
251:4,9,16 253:11
257:9 260:9,25 262:9,
11 264:5

**changed**
82:22 83:2 86:18 142:9
170:19 187:18 201:24
225:10 261:14

**changes**
71:20 80:12 82:3,9
86:13 88:5 142:4 191:4
196:2 249:21,24 251:12
253:12 254:6,7,8
257:10 262:19 264:17

**changing**
75:6 142:10 206:6
224:12 247:14

**characterization**
58:4 187:16

**charge**
86:10 258:25

**charged**
113:18

**charges**
145:11

**Charlie**
13:25

**chart**
16:20,23,24,25 28:5
96:14 117:14 209:17
230:20 260:8

**charts**
16:21 17:9 96:22

**check**
15:24 17:21 130:20,23

**checks**
256:13

**Cheney**
53:13,14

**childcare**
268:3 269:2

**choice**
267:2

**Christine**
53:12,13,14

**circumstances**

174:21 260:5 268:23

**citation**
166:5

**cite**
166:7,10

**claim**
148:4,13 149:14 150:9
156:18

**claimed**
106:8,11

**clari-**
70:23

**clarification**
58:13

**clarify**
58:3,10 192:14

**clean**
225:18

**clear**
16:8,13 54:21,23 57:7
90:2 97:7 117:21
141:10 144:8 158:24
201:21 204:15 264:13

**clearly**
58:18 114:18

**client**
9:3,8,11,21 13:7 14:5
15:25 17:24 19:21,23
23:7 24:6 35:23,24
52:3,23 61:22,23 67:25
82:14 91:17 92:4 95:22
100:25 105:4 115:13,
15,16,18,20 116:8
117:13 122:19 126:24
132:18 146:3,17 147:13
154:6 156:4 157:13
159:4,6,12,14 161:16,
19,21,23 164:10 166:9
169:19 170:1,2 174:9
186:13 197:5 199:13,21
200:7 203:5,24 204:5
207:11 208:10,14,22
212:9 214:2 220:2
221:9 231:16,24 233:20
234:19 235:15 236:3,16
244:16 250:17 264:20

**client's**
116:1 199:23,25 247:6

ROBERT B. MORRISON - 03/08/2019                    i10

**clients**
13:8,21,22 14:1,2,22,23
16:24,25 17:2 21:25
25:20 28:13,14 29:1,4,
6,23 30:10,11,17,20
31:8,22 32:2,13 33:11,
13,22,24 34:1,10,15,16
36:8,11,13,14,15,16,17
37:24 38:2,3,8,9,10,19
39:1,8,18 40:1,5,7,16,
18,22 41:4,20,24 42:6
43:10 44:19 46:21
49:23 50:19 52:5,25
53:1 54:18 55:1,2,6
56:2,7,13 59:3,5,12,13,
16 60:7,10,14,16,20,21,
22,23 61:4 62:11,12,22,
23,24 63:22 65:2 68:6,
9,20,21 73:17,18 75:16,
24 76:20 92:17 93:2
94:3,4,5,11,23 95:3
100:8 101:1,5,7 104:13
105:13 110:18 114:21
115:17 127:18 129:20
132:13,16 133:1,6
138:2,4 139:3,23 140:1
141:19 142:1 148:6
161:14,17,18,20,24
175:7 177:4 197:2,3
198:7,8 201:15,16,25
202:19,20 203:9,24
204:5,6,11 209:18
215:13 218:16 234:3,15
249:9 255:5,12

**clip**
11:20 12:1,2 208:1,2,6

**clips**
94:5

**close**
41:22 131:14 161:4
203:19 244:3,4,5

**closed**
14:11,13 26:22 231:7
248:5,7 250:19

**closing**
130:12

**cloud**
25:4

**Club**
5:7

**code**

187:20,22,25 188:6

**coefficient**
145:13

**coefficients**
145:3

**collect**
131:25

**collecting**
132:10

**collection**
133:5

**column**
26:20 27:4 36:9,10
60:21 64:4,9 119:11
185:15 235:10,11
242:23

**columns**
36:14 99:1 151:25

**combination**
163:8,15

**combined**
36:16

**come**
26:3,5 27:10,13 60:12
83:11 93:3,10 95:18
96:16 99:20 131:14
133:2 135:3 140:5
186:16 199:6,19 219:18
223:12 225:10 257:18
260:25 264:14 266:15
268:21 269:13

**comes**
18:8 35:23 78:5 125:11
130:12 179:25 186:24,
25 209:25 251:14

**comfortable**
254:21 255:15

**coming**
64:2 67:5,8 132:8 168:2
197:17 209:22 240:17

**comment**
148:25

**commingled**
45:4

**commitment**
267:24

**commitments**
267:22,23

**common**
18:15 19:9 123:20
172:5 214:11

**communication**
9:21

**communications**
9:3,7,11,25 81:25

**company**
14:3 20:19,21 38:12,13
43:8 44:11,18,23 45:1
46:7 47:14,20 53:2
57:18 86:6 88:25
110:12 112:3 113:5
119:21 123:8,25 128:2
129:8,15 131:7,9,10
132:19 133:1,11 145:22
162:22 185:3,10,23
215:9 217:3,7,13
220:18 233:1 235:12
250:13

**company's**
199:11

**comparative**
179:5 181:18,21 182:5,
9,10,11,13,17,19,22,24
183:1,8,10,16 184:13
207:19 213:4,5

**comparatives**
183:3

**compare**
10:22 11:13 180:25

**compared**
25:22 106:7,10 127:5
128:9 144:13 145:9,17
201:25 236:25

**compares**
256:25

**comparing**
218:21

**Comparison**
13:21

**complaint**
11:17 12:5 170:3 208:2
213:18

**complete**
19:12,22 173:6,7 187:5

202:9,16 246:14

**completed**
128:7

**completely**
103:7 143:23 227:21
265:3

**compliance**
189:3,5

**Compliant**
188:6

**comply**
187:20,22,23,25

**component**
144:20

**components**
84:1 110:22,23

**comprise**
29:9 109:6 173:10
174:22

**comprised**
28:15

**comprises**
103:20

**computation**
140:5

**computed**
129:7

**con**
116:13

**concept**
62:21 93:6 172:5

**conception**
83:21

**concern**
57:3 157:17 236:8

**concerned**
55:8 203:5,6

**concerns**
58:17

**conclude**
66:9 115:7 164:4

**concluded**
118:13 269:22

**concluding**

27:6

**conclusion**
27:11,14 59:1 78:8
83:10,11 93:10 99:20
164:6 197:17 198:2,16
240:17 262:17

**conclusions**
8:11,22 9:12 163:19
166:15 168:19 169:4
171:5,8 174:11 183:22
184:14 189:1,9,20
204:20

**conclusive**
75:2

**condition**
118:25

**conduct**
105:8 199:11,18

**conducted**
112:11

**conducting**
107:13

**conduit**
20:3

**conference**
266:22

**confident**
104:17,19

**Confidential**
69:21

**confirm**
15:8 18:17 201:6

**confirming**
15:7

**confirms**
194:12

**conflict**
116:13

**confused**
40:25 111:13 135:15,17
137:2 150:5 230:18

**confusing**
136:9

**confusion**
222:19 242:18 244:15

**connection**
16:6 33:4 37:4,17 42:18
48:11 51:3 54:10 81:9
86:3 126:8 152:24
167:11 183:22 184:14
188:25 189:19 191:22
208:18

**consider**
82:19

**considered**
42:19,23 66:5,9 125:22

**considering**
109:17 193:10 215:6

**consistency**
171:22

**consistent**
88:22 89:4

**consists**
107:22 252:15

**constitutes**
106:24

**consultant**
20:20 21:7 147:20,23
190:12

**Consulted**
167:4

**Consulting**
167:7

**consults**
21:25

**contained**
7:18 10:21 13:9 18:25
50:12 140:15 141:20
167:17 183:6 262:18

**contains**
59:11 157:23 158:1

**contends**
28:19 74:12

**context**
215:17 217:1

**continue**
129:20 130:6 131:19,23
133:1 140:4 264:23

**continuing**
268:24

**contract**
32:19

**contractor**
20:23

**contracts**
63:1 68:12,15,25

**contradicts**
236:4

**contrary**
249:10

**contribute**
105:8 132:2

**contribution**
145:21

**controller**
22:19 210:18

**controller's**
22:24

**convenient**
57:25

**conversation**
91:14 235:14

**conversations**
23:14 165:10

**converse**
74:20 104:18 258:13

**convert**
156:5 242:4

**converted**
239:24

**cooperated**
266:11

**copies**
7:20 13:17 52:2

**copy**
11:3 15:20 52:20 68:2
86:20,22,25 146:4,5,6,7
150:19 178:22 225:17

**copying**
226:3

**corner**
12:3

**corporate**
133:22,23

**correct**
7:13 8:4 11:9 14:20
25:24 26:20 27:2,9
28:3,21 29:18 30:3
33:23 35:21 36:22 39:8,
9,14,21,22 40:2,3,7
43:4 45:17,24 46:4
47:16 50:13,14 51:5,8
52:9 54:4,20 56:4,9
57:6,22,23 59:14 60:17,
18 64:17 66:4 67:21,22
69:14,15,18 72:5 74:25
76:14 78:15 79:16,21,
25 81:8,12 82:22 85:18
86:15 92:25 94:14
95:11 100:7 101:6,8,13
102:19 104:18 108:18
109:3,13 112:25 115:1
116:6 117:20 118:2,3
119:16,22 121:16
122:17 124:2 126:12,22
127:19 128:2 130:21,
23,24 131:3,9,13
132:16,18 134:13,14,18
138:19 139:14,16 140:2
141:14,15,17 142:12,20
143:19 144:7 149:4,5,
24,25 159:5 161:2
165:15,20,24,25 166:25
167:18 168:4,8,9,12,14
172:17,19 174:17,19,23
176:2,5,6,8,9,13,16,18
179:15,19 183:23
185:16 193:14,17,24
194:5,8 197:7 198:9,12,
21 199:1,3 200:15,21,
22 201:1,25 202:1
203:21 204:21,25 206:7
207:20,24 209:16
210:12 211:10,18 212:6
218:11 222:11 226:5
227:13 230:2,5,13
231:21 232:8,10,12,13,
14,15 233:14,18,22
234:3,15,16,20,21
236:19,20 238:2
239:18,21 243:12,13,
14,15 249:7,20,25
251:10,18,21,24 252:3,
6 254:16,20 256:6,18,
22 261:17,20,25 262:6,
10,21 263:1

**correctly**
25:19 33:10

ROBERT B. MORRISON - 03/08/2019                                    i12

**correlated**
145:1

**correlation**
84:5,18,20,22 93:7
97:12 99:3 100:21
111:2,3,4 127:22 144:1,
23,25 145:2,8,12,14
193:22 223:10,21
224:1,3 252:17 253:2,4

**correlations**
84:8

**correlative**
96:4,6 98:9 99:5

**corresponds**
144:19

**cost**
99:5 104:10 107:3,6
109:9 111:9 127:24
128:1 143:4 190:2
223:9 228:15 242:6
255:10

**costs**
84:14 94:6 105:7,15
111:9 113:10,14 144:22
149:23 217:1,4 264:14

**couldn't**
56:15 180:13 189:21
246:25

**counsel**
5:14 52:12 119:23
147:13 157:18,20
158:1,5 159:1,4,7,17
162:10 163:9 164:11
167:13 170:11

**count**
136:15

**Country**
5:7

**couple**
171:1 258:8

**coupled**
212:1

**course**
35:13 121:3 180:19

**court**
6:17 56:25 57:1 58:6
190:24,25 194:13
196:11,20 267:8

**cover**
47:19

**covering**
131:15

**covers**
47:5

**CPA**
120:21 246:9

**create**
9:17

**created**
54:3

**creating**
212:5

**criteria**
256:5

**criticism**
149:1 159:19

**criticisms**
161:8

**criticize**
156:8 160:8

**CRM**
24:9,10,12

**cross**
139:3 204:18,19
206:10,11

**cross-examination**
23:18

**crossing**
206:8

**crux**
258:7

**cumulative**
45:13 185:5,6,14,17
242:4

**curiosity**
250:15

**curious**
132:7

**current**
46:16 262:16,17

**currently**
128:17 173:16,19,22
219:11

**cursor**
15:17 16:3,14 209:19

**customary**
170:2

**customer**
24:6 27:17,21 126:11
153:6

**customers**
25:15,23 28:6,19 31:15,
16 67:1,2 69:22 94:14,
16,20 98:14,15 132:13
134:24 136:18 137:8,9,
15 204:2 213:6,10
220:3

**cut**
227:12,18

_____

**D**

**damage**
56:8 57:6,21 58:10,14
142:23 154:23 155:12

**damages**
11:18 49:14 78:9 81:15
83:5,15 148:20 149:14
150:9 156:17

**dang**
41:22

**data**
13:6 15:17 16:13 24:21
25:13,14 27:24 28:8,10
30:9 35:3,17,22,23
36:10 38:23 40:12 59:2,
16 77:25 78:2,3 83:8
84:3 117:6,17,18,24
118:1 135:21,22 139:15
141:5,7,8 157:24
174:18 192:8,13 194:17
202:3 209:25 236:6
261:10 264:18

**database**
25:1,5 152:24

**date**
5:10 25:9 65:19 67:7
68:17 69:22 171:13
216:12

**dated**
147:18 198:3

**dates**
178:7

**dawned**
41:23

**day**
134:3 243:17 253:13
263:24 265:3 266:16
268:21

**days**
23:23 198:4

**deal**
13:18 77:16 102:20
189:13 269:3

**dealing**
55:22 79:11 80:10
100:10 102:24

**deals**
77:18 174:13

**dealt**
79:2,4

**debit**
242:6

**December**
12:12 44:6 118:17,22
123:18 178:12 218:11,
22 242:20 243:11

**decide**
119:23 153:18 267:9

**decides**
239:4

**decrease**
103:12,15,16,18 145:15
250:21

**deducted**
112:23 182:16 216:19

**deduction**
113:1 217:5

**deductions**
149:23 190:2

**defendant**
5:18 35:9 168:11

**defer**
105:18

**deferred**
43:15 105:15,16 138:6

**deficit**
47:12

**define**
21:2 162:24

**defined**
65:7 161:20 175:15

**defines**
161:16

**defining**
161:21

**definitely**
265:19

**definition**
176:25

**degree**
111:4 197:18 198:5,17
199:19 255:19

**delineate**
125:21

**demonstrate**
91:22

**demonstrates**
39:17

**department**
53:5

**dependent**
257:1,2

**depending**
79:19 89:11

**depends**
107:15 196:4 211:4
214:8,12 241:12 244:25
245:2,3

**depiction**
90:6,12

**depo**
225:15

**depose**
200:9

**deposed**
6:6 150:17 151:4 211:1

**deposit**
130:23

**deposited**
172:15

**deposition**
5:6,13 7:13 8:10 48:15
70:5 142:19 150:19
151:1 164:16,22,25
167:12,13,23 211:3
212:1 235:25 263:24
264:9 265:4,6,15,19,25
266:4 268:6,14 269:7

**depth**
104:25

**derivation**
54:11

**derive**
36:5 128:22 149:7
197:14 256:21

**derived**
39:12 54:14 74:9 76:8
160:25 237:1

**descending**
191:7

**describing**
17:4

**description**
185:8

**deserve**
256:14

**despite**
45:18 103:19 172:21
239:8,13 255:13

**detail**
25:18 46:17 117:13
183:15 203:4,15 209:14
213:25 222:25 224:2

**detailed**
12:24

**determination**
218:15

**determinative**
84:4

**determine**
34:24 92:3 113:9,12
118:13 125:25 145:7
148:5 149:16,19 203:8

**determined**
30:13 32:18 40:18
67:20 118:13 157:12
160:9 176:1 198:5,17

206:3

**determines**
30:4 194:13

**determining**
27:19 95:23 113:5
145:1 149:18 189:23
224:5

**develop**
255:9

**developer**
71:5

**developers**
73:7

**didn't**
7:20 15:8,12 21:12,16
22:20 25:7 31:7 41:10
42:8 52:2 59:25 61:16
73:25 79:3 82:24 83:8
90:23 92:2,20 104:25
114:19 117:22 118:8
126:2 138:9,14 143:10
147:7,14 149:11 150:2
156:24 160:6,8 174:20
176:4 182:25 183:18
196:23 203:15 207:22
210:23 213:24 214:21
216:2 219:3 221:12
226:8,24,25 227:20
233:20 236:11,12
237:22 242:1 246:17,23
249:9,16,18 259:20
268:10

**differ**
71:9,13,15

**difference**
60:25 62:13 80:9 86:5
92:1 111:13 131:5
157:8 198:14 227:3,4,6
236:24 243:16 248:8
254:25 255:6

**differences**
86:9 186:18 237:4,5
262:5,8

**different**
8:17 69:22 79:18 84:6
85:17 86:2 123:5
130:18 159:21 162:18
186:11 197:22 198:23
202:8 213:23 215:17
217:1 224:14,23 231:12

255:2 262:23

**differentiate**
65:3

**differentiations**
68:14

**differently**
8:20 66:7 122:4 125:4
189:6 258:12

**difficult**
25:3

**difficulty**
24:4

**diminish**
215:12

**Dinner**
267:25

**dipping**
129:3

**direct**
107:9 143:3,14 202:14

**directed**
126:17

**direction**
135:18 136:5,10

**directly**
9:21 91:13,17 92:11,12
150:8 193:15 218:7
235:5 250:17

**disagree**
76:10 115:10 154:2

**disclose**
10:13

**disclosed**
147:24

**disconnect**
65:11

**discovery**
160:23

**discrepancies**
255:14 265:2

**discrepancy**
157:10 234:23 236:8,11

**discretionary**
91:5,7 199:12 214:3,5,
6,25 217:24 218:4

ROBERT B. MORRISON - 03/08/2019                    i14

**discuss**
73:25

**discussed**
68:16 118:23 180:11
200:20 255:16 256:2

**discussing**
186:13 243:17

**discussion**
23:9 173:16 195:10
255:5 267:16

**discussions**
9:14,15 23:14 91:11
164:10,11 166:8 214:2

**disparate**
136:5

**disputes**
191:6

**disregard**
194:9 233:23

**dissolution**
191:7

**distributed**
44:23 220:5

**distribution**
42:22

**distributions**
47:15 112:7,10,24

**divide**
98:5 230:7

**divided**
36:16 96:18 99:25
100:21 135:10 136:22
137:13 229:1,11 230:7,
8 238:11,15 257:22,23

**division**
139:12

**document**
10:19 13:12,16,19,23
14:16,17 15:5,7,10,15
23:20 28:11,12 29:14
33:9 50:17 52:1,3,6
57:4 69:20,25 70:8,20
73:2 114:25 116:25
141:21 146:11 152:15,
23,24 158:4,24 159:22
160:15,20 162:2,3
166:5 176:15 180:18

182:21 183:7,18
184:13,17 185:19
195:12 208:21 221:18,
21 223:24 242:16
245:22 249:16,17
251:17 261:15 264:7
265:9

**documentation**
17:15

**documents**
8:1,21,23 9:4,25 10:24
11:8,13 12:2,14 13:2,14
14:9 19:3,14 23:19
27:13 50:24 51:24
75:11 81:21 92:3
105:22 132:7,21 141:11
151:7,11,15 156:10
165:4,23 177:18 186:23
195:1,6,11,22 196:2,4
202:4 207:22 208:8
212:2,12,16 236:14,20
264:5 265:6

**doesn't**
34:3,5,19,21 39:3 41:2,
9,12 42:14,25 47:25
63:25 71:25 88:5 116:9,
12,13 131:14 139:19
140:7 141:22 142:2
143:7 149:12 153:13
182:15,19 196:5 206:14
215:12 217:14 222:1
229:19 235:5 237:11
251:9

**doing**
13:20 18:21 39:2 40:18
57:10 58:15 71:11 93:8
107:14 110:25 168:24
191:6 196:10 203:20
212:17 214:10 218:17
241:2,3 245:20 246:17
268:15

**dollar**
80:19 83:4,9,12,23 84:9
100:3 101:2,23 102:17
103:17,19 106:24
153:1,8,12 206:22
227:4

**dollars**
14:12 20:18 40:1 42:22
43:9 50:12 52:24 59:4
60:8 68:8 86:16 123:2
124:6 130:14 131:2

136:24 137:17,20,24
138:1 144:18 153:5
160:12 219:21 246:11
257:19

**don't**
9:2 12:7,22 16:2 18:17
19:25 20:6,7,25 21:23
22:2,25 24:13 31:6,25
32:1 38:22 40:20 42:13
48:13 49:7,8 52:21 55:5
58:13 59:22 63:9,10,22
64:6,22 68:2 70:1,10
72:23 73:11 79:15
81:21 82:12 87:15 89:2
91:16,19 92:20 94:7,8,
18 95:2 99:10 102:6,22
103:1,5,10 105:3
106:14,22 109:18
111:13,24 116:23,24
119:9 120:8 123:19
124:24 125:3 126:6,15
127:1 128:5 132:5,20
134:1 137:1 142:16
148:1,2 152:22 154:15
155:3,18 159:10,24
160:1 162:20 166:1,4
167:3,5 169:5 173:6,14,
23 176:25 177:2,4,7,10,
12,13 179:10 180:9,17,
24 187:24 190:7 193:4,
15 195:5 201:11 203:23
204:15,23 205:20
208:19,20 209:22
210:6,16,18,20,21
211:12 219:1 220:17,21
224:21 225:8,11,15
227:17 230:15,19
232:4,5,7,12,14 233:3,9
237:6 238:20 239:3,4
247:13 248:9 249:4,5
256:16,19 257:17
258:14 260:13 263:9,21
264:9 266:20,22,23
267:5 268:18 269:7,12

**door**
125:11,16

**doors**
242:13

**double**
87:21 129:3 250:25

**downstairs**
120:2

**dozen**
48:8 162:20 178:1

**Dozens**
6:9

**dramatically**
88:7

**drastically**
235:11

**draw**
97:17,21,25 144:4

**drink**
237:16

**drive**
266:15,23 268:20 269:6

**drives**
221:1

**duces**
8:14

**due**
46:15 131:7 219:11
260:5

**duplicate**
97:1 178:22

---

**E**

**earlier**
69:1 87:17 89:22
113:19 134:20 142:18
160:17 171:23 173:15
180:11 186:17 193:14
209:5,11 210:17 242:8
243:22 258:10 260:15

**early**
35:12

**earn**
43:12 77:24 87:16
100:4 154:19 156:3
201:17 230:15

**earned**
13:7 20:17 27:8,19
28:13 38:4,7,12,13
42:15 43:12 46:1,7,22
47:19 48:1 49:23 50:18
53:3 54:19 55:2 56:1
57:2,16,20 58:19 61:10,
11 67:17,18 76:19
77:17,22 80:14,20,25

ROBERT B. MORRISON - 03/08/2019                    i15

87:18 90:6 96:19,20
100:11,13 113:2,20,23
118:20 121:25 122:7,
10,12 125:13,17 128:7
129:14 137:22 153:11,
13,15 157:8,9 171:25
189:12 192:3 201:15
207:2,12 218:16,25
219:23 222:13 230:14
241:14 242:8 243:5
244:5 245:18,19 251:7
255:11

**earning**
130:12

**earnings**
246:4,11

**ease**
170:4 203:3

**easily**
15:14 266:25

**easy**
62:21

**eat**
120:3

**economics**
20:15

**effect**
200:4

**effective**
157:25

**efficiencies**
258:6

**eighty-five**
39:25

**either**
19:2 43:8,11 46:23
47:14 65:13 75:22
122:19 125:24 131:4
156:4 166:8 173:17
187:20,22 212:2 232:7
242:13 263:18

**elaborate**
268:17,18

**eliminate**
139:17

**eliminated**
103:7 144:2

**Elser**
190:13

**email**
209:2,8 211:12 267:9

**emailed**
159:6

**embedded**
117:25

**employee**
20:22 101:25

**employees**
94:24 165:1

**ended**
57:19 214:1 219:21
229:10 242:6 243:11

**ends**
190:3 262:21,22

**engaged**
94:13 146:1

**engagement**
145:25 147:22 162:1
207:17

**ensure**
235:23

**entertainment**
214:14

**entire**
82:22,24 145:22 219:4
240:21 241:4

**entirety**
156:10

**entitled**
67:11

**entries**
186:20 243:23 246:16

**entry**
86:15,16 221:12,13,14,
15,18,19 224:12 228:7
239:25 241:20 242:2
253:16

**epiphany**
63:24

**equals**
109:9 141:4 206:22

**equation**

257:8 260:12 262:23

**equity**
132:11

**error**
73:13 198:21 253:5

**especially**
158:8

**essence**
71:20

**establish**
105:19,20

**established**
106:12

**estimate**
50:18 77:25 93:2
135:21 203:18 205:2
207:1 255:10 256:23

**estimated**
67:18 80:14,24 160:25
203:17 206:25 207:5,6

**estimation**
93:4

**et**
186:24

**et al**
5:8,9

**event**
227:20

**eventually**
207:12

**everybody**
95:4 100:7 119:25
203:7

**evidence**
19:8 166:5 236:5

**evidenced**
245:11

**exact**
64:1 140:5 142:5,6
152:25 153:3 157:15
205:11 206:21,22

**exactly**
21:7 22:9 59:8 86:13
97:9 144:19 148:3
166:19 180:9 181:20
192:15 200:10 244:22

**exam**
120:23

**example**
13:7 43:7 90:9 145:8
237:10

**examples**
102:18

**exceeds**
259:6

**excluded**
112:19 114:19 144:13,
22 219:16

**excluding**
137:8

**excuse**
5:8 92:14 103:4

**exhaust**
166:18

**exhausted**
166:20

**exhibit**
6:23 7:1,5,11,12 8:2,15
11:2,4 16:15 26:14,18
36:20 39:15 51:15,16,
20,21,25 52:7,16 54:3,
10,11,12 55:17 57:5
59:9,11 60:12,17 67:12,
24 68:1,4 74:21 75:6,
15,25 76:16,19,24 85:5,
10,11 86:23 92:8 97:3
100:9 113:15 115:24
118:21 119:6,12,16
121:9 127:4 130:7
131:16 134:6,7,8,11
136:15 137:16,19,23
138:9,16,18,24 139:2,
13 141:16,19 145:13
152:8,16,17 176:10,16
193:25 194:1 200:20,25
201:24 202:7,10,23,25
205:13,22 206:1 209:15
213:8,12 222:22
225:15,24 226:13
228:5,11,16,17 229:7,
18 230:2,20 232:1
233:5,8,10,24 234:9,18
235:2 236:15 244:17
248:4 250:18 252:22
253:20,23 257:13,15
269:20

ROBERT B. MORRISON - 03/08/2019                    i16

**exhibits**
82:4 202:24 207:20
212:3

**existence**
128:17

**existing**
131:24

**exists**
132:25 160:3 200:25

**exit**
13:3,20 17:1 27:22
29:5,12,19 30:1,4,14
32:17,20,24,25 33:12
59:4 60:23 63:2,10 64:9
65:7,11,15 66:2,6 82:14
95:22 106:8,11,12
115:14,22 125:13 128:6
163:16,24 165:5 170:8,
10,12,14,18 171:4
172:9,22 173:6,7 175:5
181:15 182:14,23
183:5,9 192:18,22
193:3,12 195:8 204:9,
10 211:8 218:8 230:16
231:7 243:1,5,25 246:6
248:5,20,24

**exited**
14:23 16:25 25:21,23
28:20 30:8,23 32:14
36:16 39:20 40:2 59:13
60:20 61:5 62:13 63:3,
6,9,13,15 64:12,14,16,
19 65:2,5 68:22 113:10
114:21 115:17,18
137:10 139:2,4,23
142:3 176:5 177:11
198:8 219:22 220:3
234:3,15

**exiting**
204:7

**exits**
12:24 14:2,3 20:17,18
26:22 43:6 46:2 50:5
53:3 63:21 64:3,5
66:10,24 67:16 75:16
77:23 105:16 114:11
130:12 135:22 136:15,
16,22 137:5,6,22 154:6
160:12 162:18 174:22,
23,25 175:3 181:21
182:16 183:4 201:16,25
202:7 205:14 230:13

248:7 249:9 250:19
255:7

**expect**
121:25 201:17

**expected**
55:1

**expenditures**
122:6

**expense**
46:23 80:7,19 81:1
83:23 84:20 91:22 94:2,
7 96:2,6,7,9 99:4,8
111:17,20 112:5,20
113:1 122:9,10 125:18,
19 126:20 144:5 185:9
193:8,10,12,15 214:6,
14,15 215:1,8 216:22
217:15,24 218:17,24
219:17 221:16 234:1
238:10 239:17 241:12
250:6,13,21 251:13
252:1 253:18,20 254:1
259:7

**expensed**
105:16,21 122:8

**expenses**
24:5 46:18,20,21,24
47:19 77:10 78:16
79:18 80:11,13,15 81:2
84:1,6,10,17 88:2,5
91:1,5,7,12,16 92:7,9
93:2,9 95:24 96:4,8
98:3,4,9,17,21 100:17,
20,23,25 101:3,9,16,21
102:2,3,9,16 103:6,12,
23 104:13,20,21,23
105:1,19 109:12,17,23
110:6,16,21 112:8
113:6,21 118:22 119:3,
6,8 122:3 125:1,4,7,15,
16,21,22 126:5,7 127:4,
20 128:2,6,8,12,22
129:14,21 130:6 131:15
143:15,19,21 144:14
145:7,16,21 148:7
149:11,16,23 150:6,8,
10 171:13 172:1 185:3
186:9 189:14 192:19,21
193:1,2,7,19 194:14
196:10 199:12,14 211:5
213:21 214:3,5,22
215:5,19 216:3,10,18

218:4,7,20,21 219:1,7
223:2,9,15,20 224:1,13
228:17,18,22,25 230:7
233:1 237:23 238:7,10
240:10 241:1,4,7,8
245:18 251:6 252:16,
18,20,24 253:7 254:5
257:3,6,9 258:2,19,23,
24,25 259:2,11,14
264:14

**experience**
218:25 256:10 260:1

**experienced**
47:18

**expert**
6:10,13 17:22 37:18
48:22,25 49:10,11,13
81:14 147:24 148:10,
18,19 167:2,4,6,7 168:7
190:12,20 191:10
197:8,10,13 213:17
235:19,24

**experts**
18:15 19:9 167:14

**expired**
177:11

**explain**
60:15 99:1 125:2
135:17,19 220:21
231:11 236:24 246:3

**explained**
64:6 96:23 156:24
221:5

**explanation**
195:18

**expressed**
60:7

**extent**
38:1,2 215:11 219:20
240:21

**extra**
86:25

**extracted**
15:6

**extrapolate**
76:13 160:5

**extrapolation**
39:2 40:19

**extremely**
260:4

**eyes**
66:23

---

**F**

**face**
225:12

**fact**
6:11 15:1 24:19 40:21
41:19 79:7 80:9 84:13
89:18 103:19 110:18
118:18 141:21 145:20
153:11 160:11 167:14,
25 171:16,22 172:21
200:8,11 206:17 215:8
216:17,18 217:6,13
248:10 249:2 263:11

**factor**
42:1 67:15

**factors**
243:21

**facts**
163:18 164:7 165:16
166:13,15,19 168:2,3,5,
13,15,18 169:2,13,14,
17 170:6 171:7 174:10

**factual**
167:19,22

**failure**
206:3

**fair**
34:8 37:23 44:22,25
67:4 68:24 106:23
123:14,16 127:22 128:8
129:19 147:15 156:8,12
159:20 169:16 192:1
193:21 196:23,25
218:23 243:4 252:20

**fairly**
212:23

**fake**
215:19

**fall**
61:3 192:5 219:16,17
253:7

**familiar**

24:9 29:12 107:6
127:14 188:23 190:8
210:22

**family**
267:23 268:1 269:1

**famous**
188:20

**Fantastic**
6:6

**far**
146:8 255:16 259:6

**favorite**
203:1,2

**February**
23:22 51:23 65:1,24
68:18 117:5 118:2
147:8,10,14,16,17
150:13,14 194:18

**federal**
190:24

**fee**
65:9

**feel**
12:2 200:8

**fees**
102:3 103:3 111:22
112:2 160:25 161:9

**felt**
84:11

**fewer**
254:2,4

**fifth**
178:20

**figure**
30:6 34:7,23 40:6
41:10,11 49:12 50:12
78:8 84:16 91:18,20
92:21 99:18 104:6
139:25 140:12 142:13,
16,17 144:5 153:4
155:10 176:4 214:24
220:1 227:16 236:11
241:2 250:25 254:24

**figured**
25:20 27:5 139:9 229:9

**figures**
14:7,10 17:23 26:25

39:24 51:25 53:4
236:14 247:23 254:22
255:2

**figuring**
187:9 225:3

**file**
146:21,22

**filed**
73:18 88:21 89:5
211:17

**finalized**
53:3

**finally**
105:17

**financial**
12:20 13:2,4 20:18
77:25 88:15,25 89:10,
16 91:9 118:9,12,14,24
143:2,8,11,12 187:2
191:2 192:8,13 194:16
196:9 210:24 213:2
235:20 246:14 247:1
259:18

**financials**
13:5 46:4 119:10,21
130:4

**find**
46:17 77:17 91:15
127:13 181:13,14,23
233:2 235:15 248:9
249:1 265:1

**fine**
33:20 58:1 62:20 68:4
97:10

**finish**
58:21 132:9 212:17
237:17 242:15 265:4,22
268:14,20

**firm**
146:2 210:10,13

**firms**
125:16

**first**
14:19 33:10 36:7,19
38:16 41:11 59:7 60:9
78:19 79:4 83:20 85:18
104:3 114:8 115:5,6
116:9,21 117:8 121:7
140:6 150:11 151:3

152:12 158:11,18
171:17 178:1 188:3,9
193:1 194:9,13 199:10
203:14 223:6 227:9,11,
14 234:22 235:10
242:23 243:1 249:19
251:16 260:11 262:7

**first-hand**
162:22,24

**fit**
257:10

**fits**
256:5

**five**
26:20 63:1 169:8
179:15 180:16 181:11
182:8 184:23 185:5
246:18 257:22,23 260:1
261:10

**five-year**
229:15 230:11 241:5

**fix**
73:13

**fixed**
83:25 84:14,17 110:21,
22,24 111:1,3,8,10,12,
15,20 144:20,21,24
228:14 245:14 257:6

**Fleming**
5:12

**flip**
94:22 95:7 121:6 178:6
199:7 211:24

**Florida**
5:13

**flow**
131:22

**flushing**
240:2

**folders**
11:25

**folks**
161:14 175:15 176:11

**follow**
31:5,7 225:20

**following**
62:18 96:14 179:25

**footnotes**
165:23

**forensic**
190:23 196:7,10,16,17,
18 198:6,18 199:20
255:19,20

**forget**
14:24 21:21 64:24
99:16 143:7 157:15
187:16 211:12

**forgive**
60:9

**form**
8:3,13,25 9:13 10:2
13:6 17:14,25 18:1,3
19:6 25:8 28:1,25 30:24
33:6 37:1,13,20 40:8
42:7 43:3 45:1,3,20
46:5 47:15,17 48:16
49:24 56:14 69:19,20
70:9 71:22 72:13 73:4,
15 76:2 81:22 82:23
83:16 90:7,14 91:24
92:23 93:15 101:11
103:9 108:12 110:7
115:9 116:3 122:12,18
126:13 128:25 129:23
130:8 138:25 140:18
141:24 143:5 149:9
150:3 151:10 152:6
153:7 154:1 155:13,22
156:11 158:21 159:11
160:7,22 161:10 162:23
165:7,13 166:12 167:24
169:20 170:22 172:24
173:13 187:12 188:7,18
193:9 197:9,21,23
204:8 216:11,16 217:19
220:11 234:4 235:13,21
236:1,17 239:1 240:19
243:6 244:18,24 247:8
251:1 256:7

**format**
143:16 183:13 227:8

**formed**
197:24

**former**
165:1

**forms**
186:16

ROBERT B. MORRISON - 03/08/2019                    i18

**formula**
128:21 143:18

**Fort**
265:11

**forth**
22:7 32:23 92:8 106:25
140:6 144:6 163:12,13
174:7 191:12 264:11

**forward**
53:23 86:7 118:19
185:14 258:25

**found**
70:16 91:16 151:3

**foundation**
18:6 72:19

**four**
20:13 68:15

**fourth**
67:5 79:13 178:17

**frankly**
264:19 265:5

**fraud**
188:15

**free**
12:2 200:8

**Friday**
23:24

**front**
7:5 73:3 105:19 135:13
155:24 226:11 248:13

**full**
43:23 62:18 83:22

**fully**
93:6 194:14

**function**
63:12,13 249:10

**fund**
47:12

**funds**
218:1

**funneling**
217:7

**funny**
216:8

**further**
55:14 216:14 244:15
265:22

**future**
50:18 55:2 56:1 57:2
58:19 67:18 76:19
80:14,18,24 81:9
132:12 134:15 192:3
206:25 207:2 251:18,25
254:14

---

**G**

**G-A-A-P**
189:8

**GAAP**
187:20,22,23 188:23,25
189:4,5,7,11,13,15

**gain**
108:12,23 163:20

**general**
37:10 89:15 125:23,25
154:15 185:25 186:1,3,
5,15,24,25 187:2

**generally**
34:17 48:4 91:2 189:2
191:9

**generate**
101:4 104:23 192:18

**generated**
42:17 84:10 155:7
218:8 240:11 241:13

**generating**
103:25 192:25 238:22

**generation**
192:22

**gentleman**
22:20 210:17

**germane**
23:16

**getting**
20:16 24:7 54:15 70:4
71:10 187:4 202:24
217:2 250:15

**give**
16:1 34:1 48:15 55:1
60:13 70:8 100:1 118:1,
8 168:1 182:13 195:3

231:24 252:2

**given**
10:12 24:5 26:8 56:20
85:13 157:18,19 158:25
159:4 194:19 195:18
265:22

**gives**
67:17 98:6,8 108:9
137:16 182:15 230:9

**giving**
128:11 191:23

**glad**
31:24

**go**
6:2 7:9 9:19 10:15 12:6,
7 15:1,11,22 16:12,18
19:7 26:19 35:5 36:10
46:17 49:19,25 56:10,
20,23 58:2 64:23 70:8,
12 74:13,14 75:1 77:2,
19 78:4,18 79:20 80:22
87:23 97:3,25 98:23
100:9 102:1 104:25
113:24 114:8 117:11
119:1 120:9,25 121:4
134:2 136:15 137:2
140:22,23 150:10 151:8
163:2 168:25 175:12
177:15 191:13 193:5
196:2 200:16 202:8
207:16 212:23 214:18
215:14 219:6 221:3
222:19 223:7 224:9,11
226:10 227:5 228:3,10,
12 231:1,22 233:24
236:9 242:14 248:16
252:4 253:18 254:24
257:12 258:17,22
263:23 266:20 268:3,
10,24

**goes**
53:23 61:16 97:18
125:16,18 130:23
133:18 145:1 173:15
220:6

**going**
11:2 12:1 22:14 25:17
32:21 35:6 41:3 43:11,
12 51:15 53:22 54:17,
24 58:20 74:14 75:1
78:18,21 79:22 80:17
83:14 88:19,20 95:24

99:5 126:14 127:12
134:17 135:3,4 140:7
142:20 148:2,25 169:7,
8 172:12 181:5,17
183:25 184:4 185:8,22
195:11 199:5,25 200:6
203:10 204:2 206:12
209:4 211:25 212:15
216:9 218:2 222:15
224:17 232:21 238:15
242:10 250:20 251:22,
23 252:2,4 254:24
256:4,13 258:3,25
259:23 261:13 263:7,12
264:10,13 267:1 268:24
269:17

**Goldmark**
35:10

**good**
81:19 135:7 145:10
237:16

**goods**
107:4,6

**Gotcha**
45:14 117:15 154:12
230:6 259:22

**gotten**
175:9 195:1

**grab**
205:12 223:3

**grammar**
40:17

**graph**
15:18,21 16:4,5,8,14
17:9 24:23

**graphs**
15:17 16:2,20 117:24,
25 209:9,21

**great**
65:4 230:17

**greater**
223:15,21 224:3 252:25
253:2,3 258:18

**gross**
39:24 108:19,21,24
109:1,4,7,8,9,16,21
110:6,10,14,15,16,20
112:22 149:24 153:15
156:19 157:11 181:15

ROBERT B. MORRISON - 03/08/2019                    i19

182:14,23 183:2,5,9
189:24 230:8 238:17,24
239:5 248:20

**group**
23:9,14 96:5 178:23
186:23

**groups**
177:25

**Grower**
35:8

**guarantee**
32:5,12 249:2

**guess**
13:17 17:4 22:4 34:19
79:14 99:15 129:10
133:22 146:25 192:1
204:24 215:17 239:3
252:14 267:8

**guy**
123:20,21

**guys**
120:7 230:3 247:13
263:10,13,16,20 264:4
267:1,10

---

**H**

**hadn't**
242:8

**half**
48:8 50:7,11 82:8,10
162:20 184:1 252:10

**hand**
6:25 11:2 181:5 205:13
206:2

**handed**
8:9 50:17 52:6 70:4,21
73:20 85:3,8 124:1,4
141:13 159:5,7,16,17

**handful**
179:8

**handing**
52:1

**handle**
119:24

**happen**
43:11 209:23

**happened**
188:4 227:16

**happens**
181:14 188:14 258:15

**happy**
112:20

**hard**
7:20 15:19 244:21
247:14

**hasn't**
46:22 125:17 129:18
172:22 173:25

**haven't**
24:1 39:5,6 46:11 49:4
55:4 69:5 140:8 146:23
154:22 156:9 158:20
175:8,9 176:14,19
188:13 195:15,17,18,22
198:25 210:7 215:7
258:20

**he's**
157:17 158:4,22 217:3
264:22 265:15

**head**
135:6

**heading**
64:9

**headings**
26:20

**heard**
24:15

**heavily**
258:9 260:2

**Hein**
5:9,18,19 12:11 13:3,19
21:10,14,20 22:1,11
24:11,17 25:21,22 26:2,
8 27:4,16,23 28:7,19
29:4,12,14,16 31:23
32:1,7 33:4 34:1 37:11,
18 39:13,23 40:7 42:2,
6,16,21 43:16,18 45:18
54:2,18 56:11 57:20
59:8 61:9,16 62:1,5,12
64:14,19 65:16,17,23
66:2,9 69:24 70:22 82:1
88:16 90:25 93:11
94:13,15,16,20,23 95:3,
10 103:24 107:2 108:19

112:4 119:10,14 122:3,
16 124:21 125:11
129:19 133:19,25 143:2
145:9 151:24 152:2,21,
23 153:1,4,6,9,23,25
154:14 159:19 160:3
162:9 163:4 164:23
165:1,4 171:14 172:7,9,
12,18,20 173:11,12,15,
24 174:16 175:5 176:1,
9 177:5 179:13 180:2
181:1,7,16,18,19 186:3
206:18 210:4,15 217:2,
5 219:12 220:8 234:3
242:19 244:22 248:5
255:1 256:4,9,13

**Hein's**
17:11 32:23 37:5 93:23
172:15 180:19

**held**
267:16

**help**
34:6 64:6,22 95:9
118:21 129:17 163:20
171:10 182:7 206:12
250:8

**helpful**
59:19,20 216:6 263:17

**here's**
13:8 22:6 182:7

**high**
34:18 84:7,8,22 93:7
111:4 204:10 260:4

**higher**
31:8,9,15,18 145:8

**highest**
260:2

**hire**
61:16 104:11

**hired**
102:20 164:14 168:11

**hires**
172:7

**hiring**
147:19

**historical**
55:3 77:16 79:4,12
80:19 96:9 117:13
119:7 203:10 206:3,4

218:24 232:22 255:11
256:9

**historically**
59:3

**history**
77:23 201:16

**hit**
70:8

**hold**
58:20 69:9 72:15 199:5

**holders**
158:2

**holding**
68:1

**Holiday**
72:13

**home**
266:15 268:20 269:6

**honest**
56:16

**hopefully**
8:5 170:4

**hour**
22:8 70:5 82:8,10
183:25 269:11,14

**hour's**
266:19

**hours**
264:3 265:25 266:4,15,
23 267:11 268:4,9,21,
22 269:6

**house**
220:23

**How's**
247:12

**huge**
94:2

**hundred**
39:25 62:22,24 100:25
193:6,18 218:6 225:2

**Hundreds**
167:9

**hung**
80:9

ROBERT B. MORRISON - 03/08/2019                    i20

**hungry**
120:1,7

**hyperlink**
15:3,16,21,23 209:8,9,
13

**hypothetical**
104:8 128:12 132:6
217:10,11,22,23

**hypothetically**
215:21

---

                    I

**I'D**
35:16 43:23 71:16 72:7
112:13,20 226:10 227:5

**I'LL**
8:20 52:6,19 74:23
82:18 85:8 127:15,21
255:6

**I'M**
11:2 15:22 22:9,14
23:22 25:19 31:5,24
32:21 33:9,17 35:3,6,17
38:6 40:14,15,25 41:17
44:3 45:15 48:13 50:4
51:6,15 52:1 54:8,22
55:4,8,22 56:23 62:18
64:2,4 65:5 66:23 74:17
75:6 77:17,20 78:18,19
80:1 82:17 85:14 96:15
99:18 104:2,3,19 106:9
116:7 117:21 119:5,11,
13 121:5 123:6,15,20,
21 126:14 127:14
132:5,7,24 134:17
135:3,7,15,17 137:2
138:15 139:5 140:7,12
142:20 143:11 144:9
147:16 148:2 150:5,18
152:19 158:24 159:12,
13 166:14,15,18 168:2,
3,4 175:5 178:4 181:5,
10,13,17 182:7 185:22
189:6,25 190:5,7
192:15 193:10,11,18
198:2 201:21 205:10
206:6,8,12 207:1
208:24 209:3,4,7 212:8
213:14 215:14,15
216:17,20 218:24
222:16 224:1,22 227:9

228:13 230:7,17,22
232:21 233:8 235:7
237:10,20,21,22 239:13
241:3 242:10 246:9
247:9 254:7 255:9,10
257:2,17,22 259:20
260:15 261:6,18
263:15,18 264:7,8,13
265:4 266:14 268:13,14
269:4,5,6

**I'VE**
24:19 25:2,12 26:17
29:21 30:9 32:3 55:7
60:7 64:6 142:2 156:13
171:6 201:10 216:12
225:17 226:18 256:2
260:22 265:2 268:2
269:5

**idea**
25:6 37:2 48:20 70:15,
18 104:16 146:25
158:19 170:24 171:21
180:21 188:11 220:15
257:5,9 269:2

**identical**
200:19

**identifiable**
94:7

**identification**
6:24 11:5 26:15 51:17
52:17 85:6,12 205:23
269:21

**identified**
9:4

**identify**
5:14 7:23 174:7 182:17

**identifying**
73:16

**ignore**
204:13

**II**
77:19,21

**imaginary**
97:21

**imagine**
188:13 214:4

**immediately**
23:22

**impact**
102:2 171:8 235:15
237:7 260:12,13

**impart**
167:15

**implied**
194:14

**importantly**
193:11

**impression**
21:3

**improper**
72:18 157:1,6 217:11
265:3

**in-depth**
199:11,18

**include**
41:23 63:20 68:21
70:24 73:3,9 109:22,23
110:5 121:8 144:2
153:15 161:14 255:25
256:2,4,22

**included**
16:14 17:12 30:14
37:25 38:4 52:7 57:6
67:6 92:4 112:8,22
144:5 198:6 221:21,25
258:15

**includes**
70:23,25 72:24,25 73:7
147:4 152:1 161:16,19

**including**
8:4 112:5 119:2 128:10
156:19 209:3 266:2

**inclusion**
161:13

**income**
12:11 46:19,22 87:21
118:19,20 130:13,18
156:2,3,6 157:9 179:5
181:17,18,21,23 182:5
185:2,6,16 196:9
223:12 229:14,21 230:8
233:1 241:10 242:23,25
245:24

**incomplete**
247:4

**inconclusive**

232:20

**incorporated**
5:8 9:12 23:2

**incorporating**
9:16

**incorrect**
62:15,17 76:3 115:15
169:21

**incorrectly**
35:4,17

**increase**
80:4 101:16,20 145:15
250:21

**increased**
80:5 102:16 204:6

**incremental**
127:24 128:1

**incur**
113:7 214:10 269:12

**incurred**
84:11 105:1 113:22
122:7 126:7,20 215:5
250:13

**independent**
14:6 30:6 174:20 176:4,
14 216:9 257:2,3

**independently**
14:21 17:11 27:1
114:25 149:18

**indicate**
79:8

**indicated**
9:2 51:12 58:17

**indicative**
171:25 172:2

**indirect**
92:14 107:10,11 143:4,
14

**indirectly**
92:11,15

**individual**
6:18 153:3 179:17
210:17 213:20 228:24

**individually**
23:7,8

ROBERT B. MORRISON - 03/08/2019                    i21

**individuals**
29:9,20 133:20 153:1
174:21

**industries**
214:14

**industry**
154:15 214:8,12

**info**
184:12

**information**
8:1,21,23 11:8 12:20,23
13:9 14:22 15:6,7
18:19,25 19:15,18,24
20:2,4,17,18 22:5,12,22
23:1,10,13 24:7 26:8
27:3 32:4,10,15 35:25
37:17 39:13 40:4 50:21
51:11,13,14,21 54:16
55:14,25 59:2 63:11,18
69:6,13,17 73:12 74:8
75:21,23 76:9,11 79:3,7
86:12 90:3 114:18,20
115:13,15,16 116:8,12
118:3 119:20 121:8
139:10 140:6,8,10,15,
16 141:1,13,20 142:1,
18,21 153:4 157:16
158:8 159:13,16,18,20
160:2,10 162:4 163:15
167:15 169:18,25
173:23 174:6 176:8
179:21,24 181:15
186:10 187:5 189:3
197:19,23 198:20,22,24
199:2,24 201:7 202:10,
12 206:17 208:7 210:25
213:24 218:16,18
221:9,20 222:16 234:19
236:5 239:6 260:19,21
261:2,4 264:21,24
265:7,12

**informative**
84:4

**initial**
126:11 195:1,11

**initially**
134:3 195:10

**initiate**
6:17

**injunctive**
11:18

**insider**
217:14

**instance**
99:19 252:4

**Insurance**
111:20

**intellectually**
56:16

**intend**
263:16

**intended**
168:7

**intending**
196:1

**interchangeably**
111:11 176:24

**interested**
153:8

**interesting**
111:7

**interfere**
242:12

**interfered**
265:18

**internal**
143:12 177:22 213:9

**Internet**
25:4

**interpret**
190:7 196:15

**interpretation**
32:22

**interpreting**
35:3,17 204:4

**interrupt**
233:3

**invest**
45:10

**Invested**
47:9

**invoice**
146:19

**invoiced**
146:17

**involved**
6:14 22:15,16

**irrelevant**
38:11

**IRS**
89:5 110:8 188:1
216:20 221:25 239:4

**isn't**
42:11 62:20 135:23
146:4 192:15 204:10
217:14

**issue**
78:9 83:10,12,15
153:10 192:17 206:16
219:2

**issued**
83:7

**issues**
20:16 21:4,6 23:16
148:23 167:15 187:3

**it's**
7:9,12 9:10,22 11:19
12:4,18 13:12,13,16,17,
18,19,24 14:15 15:16
16:15,19,20 17:5 18:4
19:10 22:5,7 24:6 25:3
32:21 34:18 35:21,22
38:13,21,23 41:3 42:13,
14,15,20 43:11,25 44:3
45:13 46:11 47:23 48:1
50:23 55:24 57:13
61:11,25 65:10 69:21
71:16,17,18 76:9,10
81:4 84:4 85:19 89:3,
11,21 90:4 92:17,18
93:13,16,19 96:11 99:5
102:18,22 104:15
106:18,19 109:18
110:13,14 112:13,18,
19,20 114:18 119:4,5
120:4 122:24 125:3
133:25 134:6 136:5,7,9,
21 139:3,5 140:19,22
142:22 144:18 145:2,3,
14,21 152:16 155:14
156:8 157:1,4,6,19
159:20,21,24 160:9
163:16 164:6 165:16
172:1 176:20,22,25
178:9,22 179:7 181:17
182:21 183:11,13,17
184:18 185:17 187:4

188:10 191:12 196:9
206:25 207:25 210:1
217:6,10 218:12 219:6
220:7,8 221:13,23
222:2,22,25 223:21
226:11,13,17,19 227:6
229:8,18 230:14,24
231:10 233:12,13
238:24 239:7,14,15
240:6,14 241:13 243:1,
7 245:20 246:24 249:6
251:23 252:4,9 253:2,
22 255:7 256:20 257:10
258:3,7,8,9 261:6
263:21 265:3,19
269:11,17

**item**
33:10 38:16 96:2 99:13
106:16,19,25 107:3
108:25 124:17 133:17
140:1,6 145:10 182:24
192:2 218:14 241:23
242:25 259:3,14

**items**
80:8 84:21 93:7 98:5
107:13 167:17 182:23
241:18

**its**
24:14 42:18 47:15
73:18 90:25 133:1
143:2 153:24 159:17
162:9 180:20 187:5
256:9

---

**J**

**January**
64:25 117:5 139:24
147:6,9,19 242:19

**Jeff**
172:7 173:9

**Jeff's**
220:4

**Jeffrey**
5:16

**jet**
214:8

**John**
148:1 190:15

ROBERT B. MORRISON - 03/08/2019                    i22

**Johnson**
  5:20

**journal**
  86:15,16 186:20
  221:11,13,14,15,18,19
  224:12 228:7 239:25
  241:20 243:23 246:16
  253:16

**jumping**
  10:18

**jury**
  49:20

**justified**
  213:21

**justify**
  202:5

**K**

**keep**
  12:1 25:14 35:6 56:11
  57:21 76:23 206:19
  211:14 230:12 247:13
  256:16,19 260:25

**kept**
  185:4 264:20

**Ketcham**
  35:9

**key**
  171:21

**keyed**
  227:19

**keying**
  88:11

**kids**
  214:10

**kind**
  15:15 22:7 99:9 111:6
  123:20 162:17 179:7
  191:3 195:11 196:14
  214:17 215:10 220:23
  221:1 240:4 247:14

**kinds**
  132:12 162:19

**know**
  7:21 9:2 10:9 19:8,25
  20:7,16,25 21:18,20

22:2,5 24:8,10,11,13,17
25:3 28:6 31:25 32:1,
17,23 34:9 37:11 43:15
48:3,24 53:4 55:5,22
56:17,24 59:21,22 63:9,
22,23 64:6,22 65:1
68:19 69:24 70:12,16
73:1,11 74:1,3,6,8,21
79:15 84:3 87:15 89:2,8
91:6 95:1 99:11 100:9
101:23 102:1,3,22
103:1,5,10 105:3,7
106:22 109:18 111:22
112:10 116:20,23,24
119:14 123:19 124:10
126:3,6,15 127:1 128:5
132:3,20 133:21,24
134:1 135:7 140:22,24
141:11 143:2,7 144:12
147:25 148:1,2 149:15,
19 150:17 151:22
155:18 156:6 157:16,19
158:8,16 159:24 161:21
162:20 165:3 167:3
170:16,18,21 173:14,24
174:13 176:25 177:2,4,
7,10,12,13 179:7,10
180:2,9,15,17,18,24
183:3 191:21 193:15
195:8,9 200:6,9 208:13,
15,17,19,20 209:21,22,
24 210:7,15,18 212:13,
25 213:24 214:13,15
215:7,10 219:24
220:16,17,18,23 221:12
223:6 225:7,8 227:14,
17 230:19,22 232:5,25
237:6 239:4 240:12
241:6,15,16,17 243:16,
24 244:22 245:6,12
247:13 248:9 249:4,5
255:6 258:5,12,23
259:10 260:13 263:25
264:6 266:20 267:5
268:11

**knowing**
  160:19

**knowledge**
  82:2 161:25 162:22,24
  189:10

**knowledgeable**
  21:5

**known**

119:5

**knows**
  151:25 173:9

**KPMG**
  49:2

**Kroll**
  5:20

**L**

**label**
  223:21

**labeled**
  242:10

**labor**
  94:3 103:2 107:9

**lack**
  185:10 215:18

**laid**
  18:6 107:19 109:15
  110:3,4 162:17

**Lake**
  5:7 13:8,21 14:1,2 17:2
  25:20 26:3,6,21 27:7,8
  28:6,13,19 29:23 30:7,
  10,19 31:16,22 32:2,9,
  13 33:22,25 36:13,15,
  16 37:24 38:7,19 39:17
  40:1,7,16,17,22 41:4
  49:23 52:4,25 53:1,8,9
  54:20,25 55:2,5 56:2,7,
  12 57:16 59:3,5,12,13
  62:10,11,24 63:21
  64:13,16,18,24 65:17,
  23 67:1,2,15 68:9,25
  70:22,24 71:1 72:11,23,
  24 73:3,17,18,25 74:12
  75:16 91:13,23 92:10,
  17 93:2,11 94:3,4,5,14,
  15,20,23 95:11,16,22
  96:20 98:13,15 99:21
  100:11,13,15 101:10,
  15,20 102:4,15,21,25
  103:4,7,13,19,25 104:7,
  15,23 105:2 110:18
  114:10 127:17 134:20,
  24 138:2,4,20 145:19
  148:6 151:24 152:1
  153:5 160:3 161:14,17,
  18,20,24 164:14 171:14

193:16 197:2 198:7,8
201:3 203:9,15,18,24
204:5 206:18 213:10
218:16 235:8,17 237:8
255:5,7,12

**Lake's**
  101:7 102:14 103:4
  104:21 145:20

**Lake-generated**
  57:5

**Lake-related**
  42:6 73:9

**landlord**
  130:23

**Lanham**
  48:5,25 49:14 78:9
  79:23 81:14 83:5,10,15
  110:13 142:23 148:4,
  13,14 149:6 154:24
  155:3,11,16 156:18
  189:24 190:4,6 256:21

**large**
  10:6,8

**larger**
  221:18

**Lauderdale**
  265:11

**law**
  35:8 125:16 190:6

**lawsuit**
  6:14 48:3 73:18 105:9
  158:17 161:19 211:2
  256:18

**lawyer**
  190:7

**lawyers**
  69:24 91:1 246:6

**lay**
  109:14 228:17

**layperson**
  246:10

**learn**
  255:6

**learned**
  9:20

**leave**

115:12 267:21

**leaving**
267:10

**led**
41:24

**ledger**
89:15 125:23,25 185:25
186:3,5,25 187:1,2

**ledger's**
186:1

**ledger/trial**
186:15

**left**
12:3 59:17 63:10 105:3
108:22 124:19 145:23
177:18 207:16 211:16,
25 230:20 257:5

**legal**
189:22 190:1

**legally**
163:25 165:5 166:11

**length**
16:25 17:1 49:6 200:20

**let's**
10:5 12:7 26:11 28:17
36:7 43:7 62:22,24
63:2,4,5 64:23 78:18
80:22 94:1 130:13
137:12 141:25 144:8
154:18 163:22 175:4,
12,22,24 177:24 205:19
206:24 207:15 211:11
215:19,21,24 216:8
217:1,18 222:19 231:1
232:6 243:10

**letter**
145:25 147:18

**letting**
35:11

**liabilities**
185:2 196:9

**liability**
44:7 215:9

**Lias**
35:7,8,13

**light**
121:21 125:4 138:23

189:16 248:3 249:21
262:12,19 263:11

**limbo**
176:21

**limited**
72:11

**line**
33:5,10 36:7 38:16
46:25 58:21 68:11
77:12 78:14,24 80:8
84:20 87:21 93:7 97:21,
25 98:5 99:13,22
106:16,18,25 107:3
108:3,25 109:21 124:17
133:17 134:16 139:25
140:6 141:19 144:5
145:10 168:18 181:23
182:23 183:5 192:2,24
193:2 206:11 218:14
228:12 229:17,25
238:18 241:23 242:25
251:13 258:1 259:3,14,
19

**link**
15:11 16:18

**list**
10:21 48:21 49:10 61:7
73:17,24 92:7 102:1
138:20 151:23 157:25
159:16 161:24 176:10,
11 182:15 204:22
212:16 221:12

**listed**
114:10 151:11,16
176:15 212:21 213:13

**Listen**
269:1

**listening**
215:16

**lists**
69:20,21

**literally**
89:12 196:19 227:18

**litigation**
167:11 191:5

**little**
26:10 35:12 77:5 98:8
117:9 129:16 184:17
190:22 191:4 245:9

**lives**
220:23

**LLC**
5:9 13:20

**loan**
43:9

**loaned**
45:9

**loans**
123:7 124:17 131:25
132:11,19 133:18

**long**
21:20 22:3,9 42:12
69:24 70:7 177:4 195:3

**longer**
262:18 265:7

**look**
7:2 10:6,8,15 11:12
12:3,17 14:14 27:13
37:4 42:8 43:23 44:4,10
46:16 49:12 81:17 87:5,
11 88:5,15 89:18,20
90:19,21 92:2 97:12,17
98:3 104:10,17 106:5,
24 112:14 114:1 117:22
124:11,16,17 126:1
129:13 134:2,4,8
145:13 149:10,17
162:12 163:22 168:7,13
174:4 177:24 178:6
181:10,19 183:1 202:17
215:1 216:15 219:2
226:10 227:7,22,23
232:6 242:11 243:10
245:21 250:2 253:22
257:12 259:17,20 261:2
264:8,21

**looked**
10:19,24 12:15 29:22
30:9,11 36:1 37:10
44:22 50:9,15,20 54:8
84:18 88:17 96:4
114:23 115:5 121:6
127:12 130:4 134:20
136:6 142:25 154:22
160:20 162:1,13 170:8
171:17 178:23 179:9
183:21 184:12,13
189:17 193:23 194:4,23
200:19 207:17,18 208:4
210:10 212:21,22

216:14 226:7 248:3

**looking**
13:10 14:17 19:20
26:18 41:16,19 44:12
49:15 51:7 60:17 63:24
66:23 70:17,20 83:25
84:9 93:6 104:3,12
132:5 143:15 179:12
180:11 181:5 182:7
183:7,10 186:10 192:20
193:2 202:15 206:19
208:21 214:24 218:13
222:21 224:15 225:4
227:10 228:24 231:9
233:17 234:9 237:20,21
247:12 252:18 260:7

**looks**
144:17 152:10 177:24
178:22 184:18 215:23
227:3

**lose**
246:22,23

**loss**
47:11,18,21 90:21
108:12,14,23 129:9
177:21 178:9,17 242:19
244:4 251:7

**losses**
47:9,13 180:3

**lost**
60:21,22 129:16 230:11

**lot**
24:6 25:17 71:17 122:6
169:24 186:14 210:23
216:18 245:10

**Lots**
188:15

**low**
111:3 158:8 160:11
260:5

**lower**
253:17

**lunch**
119:24

**Lusco**
5:20 209:3

ROBERT B. MORRISON - 03/08/2019                    i24

## M

**ma'am**
5:21

**main**
36:10 68:5 186:16
191:3

**maintained**
180:19 181:1

**Makaymax**
133:24

**making**
148:25 234:25 250:7
253:12

**man**
173:9

**management**
19:9,10

**mapping**
89:15

**March**
5:10 65:20 198:4

**margin**
104:14

**mark**
51:15 52:7 85:2,4,9
205:19

**marked**
6:23 7:1 11:2,4 26:14,
17 51:16 52:16 54:3
57:4 59:8,11 75:15
85:5,7,11 92:8 97:8
113:15 114:18 141:16
176:10 205:22 212:3
269:20

**marketing**
37:9 113:6,10 126:17,
20 145:7 217:3,4

**massive**
246:3

**match**
135:16 181:24 226:8,24
227:20 231:8,14 232:1,
7,12,14 234:20 235:5
237:11 243:18 247:7

**matching**

189:11,13

**material**
71:16,18

**materiality**
199:14

**materials**
8:7 10:9,11 12:14 13:10
50:20 51:24 52:10,13
53:18,20,22,24 107:9
151:23 152:14 212:4
213:16 226:14

**math**
36:18,20 40:24 47:6
74:21 75:19,24 76:18
78:16 96:23 108:1
131:14 139:8,19 140:5
141:4 225:9 226:25
238:9,10 249:23

**mathematical**
38:21,23 121:20

**mathematically**
33:7 34:1 55:11 56:9
262:21,23

**mathematics**
40:19

**matter**
5:7 72:12 111:25
163:18 174:2 206:16
263:21

**matters**
211:6

**maybes**
132:5

**meals**
214:14

**mean**
18:20 19:8 32:21 33:21
44:18 47:10 58:14
60:22 61:22 62:20 64:9
79:15 82:17 89:3 99:11
102:1 112:13 135:25
145:2 153:13 154:14,15
161:17 163:2 166:4
167:3,5 169:7 179:10
204:3 206:14 215:17
217:14 219:17 221:22
225:13 226:23 227:5
232:19 233:3 241:1
244:25 246:7 258:5,7

259:17,19 261:13
263:23

**means**
47:11 61:23 111:4
124:14 193:7

**meant**
223:6

**measure**
99:6,7 145:2,3

**measures**
145:3

**mentioned**
21:21,23 84:7 94:9
113:19 187:6 240:20
243:22 246:14 259:2
260:15

**mere**
217:13

**met**
5:25

**method**
83:17,18 84:2,12
127:22,24 128:1
155:11,14,15 252:15
254:13 260:18 261:4,6
262:12

**methodologies**
95:5 119:8

**methodology**
40:13

**methods**
79:20 83:13 84:12
121:13 194:7 222:9
261:16,23 262:7

**middle**
26:9,10 181:23 238:2,
20 239:16

**midweek**
23:24

**million**
38:11 39:24 40:6 42:22
43:9,17,18 44:7,8,9,11,
17,19,23,25 45:5,6,8,12
46:10,14,15,16 47:1,6,
21 50:1,5,6,7,11 55:13,
19 57:2 78:7,11 79:1,8,
9,10 80:10 86:10 87:8
89:22 95:15 100:1

101:1 111:8 112:13,15
123:18,22,24 124:1,8,
21 131:1,2,7,12,14
133:12,13 137:24
144:18 149:15 150:9
158:11 173:10 174:23,
24 197:14 203:13,14,17
219:10 220:13 225:25
231:10 237:6 244:1,11
245:24 246:5,6,7,22,23
248:8 251:9 254:16
255:4 259:3,5,6

**millions**
112:2 123:1 246:11

**mind**
18:8 41:18 123:13
170:4 205:20 251:16

**minor**
112:16

**minus**
63:3 107:22 108:24
139:5 229:8

**minutes**
69:16 81:14 169:8
263:3,19 265:23

**minutes'**
263:5

**missing**
10:17 60:21 63:7,16,25
64:2,21 75:20,21 76:9
114:18 116:11 202:10

**misstated**
115:16

**Misstates**
72:18 169:6

**mistake**
236:22,23

**mistaken**
85:14

**misunderstand**
231:5

**model**
256:24,25

**moment**
17:5 260:14

**money**
29:15 42:16,17,18,21

43:21 44:1 45:7,24 46:3
47:14 61:25 62:4
122:16 123:23 124:14
129:16 130:5,11,14,22
132:2,3,8,11,22,25
133:6,7,9,14 146:15
155:8 173:11,17,18
175:5,9 187:9 192:25
217:7 220:8 230:11
244:22 256:16

**money's**
131:8

**money-back**
32:12

**monies**
43:9 53:2 67:13 157:2,
5,6,7

**monitor**
5:11

**month**
62:24,25 64:20

**monthly**
213:6 260:22,24

**months**
66:2

**moot**
203:25

**morning**
8:9 10:7 85:10,24
121:22 160:15,20 161:4
176:8 192:3 212:3,15
230:4 262:4 268:6

**Morrison**
5:6,24 72:22 264:21

**mother**
267:25

**mouth**
116:2 139:11 247:6

**move**
16:3 95:9 145:4 209:19
214:20 266:8

**moved**
187:10 217:2 261:14

**movement**
124:13

**moving**
16:13 261:1 264:17

**multiple**
13:17 58:16

**multiplication**
139:12

**multiplied**
26:2 95:21 96:20 252:1

**multiply**
34:2,13 54:24 81:2,4
99:19 100:12 254:18

**multiplying**
98:22

**multitude**
258:5

---

## N

**name**
5:23 14:24 19:25 20:5
22:24 72:24 210:20

**names**
22:14 48:24 49:7
133:21 157:24

**Natasha**
35:8

**native**
227:7

**nature**
91:6 151:8 241:12

**nearly**
95:15

**necessarily**
61:2 67:21 110:17
111:16,21 129:24
144:21 153:13 217:14
240:8 243:19

**necessary**
59:19 104:23 113:9
141:9 214:15

**need**
10:15,21 15:21 17:6
27:20 38:25 50:25
55:13,24 58:24 59:15
60:4 62:25 70:23 73:12
75:22 76:16 81:21,25
82:3 112:14 113:6,7
131:19 141:10 169:5,
12,13 192:13,25 195:11
197:22 202:3,4 205:11

207:13 231:17 233:2
240:2 248:23 253:19
257:12 260:9 262:11,14
263:2 264:10 265:21
267:7,9,12 268:8,10,18

**needed**
77:25 142:21 197:23
202:6

**needs**
129:19 250:5

**negative**
47:21 87:13 89:21
225:1 230:10 239:20
245:24 246:4,11,19
252:4,6,10

**neighborhood**
28:9

**net**
46:6 47:17,18 87:21
108:12,22 109:9 124:18
133:13 160:25 161:9
181:19 182:4,6,19,20
183:4,5 223:12 229:14,
16,19,21 230:8 242:6
245:24

**Never**
6:19

**new**
63:1,7,13,16 64:2 65:1
67:5,8 75:24 76:24
82:14 84:9,25 85:9,17
113:10 120:25 121:8,21
129:20 132:15,17,18
133:1,6 138:23 140:8,
10 141:13 142:18
201:24 212:12 226:7
230:3 262:12 264:4,7

**nice**
115:2

**night**
8:5 41:14,15 63:24
85:14 151:2 212:3
262:1

**nomenclature**
175:4

**non-adversarial**
191:1

**non-exit**
32:25

**non-exited**
34:10 39:1,7

**non-ol**
209:18

**non-orange**
17:2 53:1

**nonrecurring-type**
91:8

**nonsensical**
106:14

**normal**
167:11 170:2 180:19
214:6

**note**
116:25 117:1,9,10,12,
16 122:19 123:5

**noted**
157:23 186:11 195:21

**notes**
9:8 122:22

**notice**
7:12 165:22 209:16
268:7

**noticed**
11:17 268:7

**noting**
234:22

**now's**
58:1

**nuance**
9:1

**number**
5:5 13:8 14:11 15:18
16:4 20:17 25:22 26:21,
22 28:12,18 30:9 31:8,
14,16 32:1 33:22,25
34:18 37:25 40:16,17
41:20 43:24,25 54:18
59:2,3,12,13 60:6,7,10
62:10,12 63:7 64:5,15
68:25 69:1 75:24 78:4,
24 80:25 83:2 99:20
100:2 106:7,10 110:10
112:23 114:20,21
115:25 116:15 123:15
134:16,24 136:15,18,23
137:8,15 139:4,9
141:22 149:16,17,24

ROBERT B. MORRISON - 03/08/2019                    i26

153:3 157:15,18,19
158:7 176:2 181:17
182:4 185:14 196:22
197:15,16 203:7 204:5
205:11 209:20 219:12
231:9 232:2 233:3,5,6
234:2 244:4,5,6 251:9,
25 252:1 254:2,15
256:3,21 259:20 261:8
264:6

**numbers**
14:4 15:20 16:3 19:5
34:6,10 36:20 71:10
76:24 77:7 88:11,13
104:18 109:19 110:16
113:3 114:25 123:21
130:2 134:20 135:6,15
137:18 139:13 161:3
180:25 187:14 201:22
205:17,18 207:1 224:22
225:10 231:14,25 232:1
233:20,23,24 235:5,24
244:16 250:16,18
253:11 254:25 260:9
261:14 262:9,11

**numeral**
77:19,21

---

**O**

**o'clock**
120:4 184:9

**oath**
120:18 199:25 200:1,3,
10,14

**object**
8:3,13,25 9:13 10:2
17:14,25 19:6 25:8
28:1,25 30:24 33:6
37:1,13,20 40:8 42:7
43:3 45:3,20 46:5 48:16
49:24 56:14 70:9 71:22
72:13 73:4,15 76:2
81:22 82:23 83:16 90:7,
14 91:24 92:23 93:15
101:11 103:9 110:7
115:9 116:3 122:18
126:9,13 128:25 129:23
130:8 138:25 140:18
141:24 143:5 149:9
150:3 151:10 152:3,6
153:7 154:1 155:4,13,

22 156:11 158:21
159:11 160:7,22 161:10
162:23 165:7,13 166:12
167:24 169:20 172:24
173:13 187:12 188:7,18
193:9 197:9,21 204:8
216:11,16 217:19
220:11 234:4 235:13,21
236:1,17 239:1 240:19
243:6 244:18,24 247:8
251:1 256:7 263:15
264:16

**objection**
217:9 267:2

**objections**
18:12

**objective**
169:16

**objectively**
168:8

**obligation**
43:5 131:4 173:3

**obligations**
269:2

**observations**
157:14 261:8

**obtain**
126:17 221:8

**obtained**
23:13

**obvious**
179:7 204:3 214:12

**obviously**
17:6 25:17 149:11
240:16

**occurs**
248:25

**offer**
25:7

**offers**
163:24

**office**
35:8 49:17 94:21 147:1

**offset**
95:25 112:5

**offsetting**

248:23

**oh**
65:10 85:3 99:22
117:12 225:16 242:14
243:23

**okay**
6:4,19 8:17,19 9:7,24
10:5,21 11:16,19 12:20
14:4,17,21 15:3,5,10,13
16:12,22 18:10 19:2,18
22:6 26:9,13,25 28:22
29:3 30:15 33:18 34:5
35:13,20 36:9,13,18,23
37:16 42:4 45:7 47:4,6,
7 50:5,9 53:4 54:1,13
57:4 58:20 60:4,19
62:3,7,16 63:5 65:10,
18,21,25 66:21 67:6
68:24 69:8,16,19 72:10
73:9,12 74:11,24 76:5,
12,15 77:1,19 78:10,18
80:1 83:13 85:23 87:5,
11,12,13,19 88:4,8
90:19 94:19 95:23 97:3,
6,11,14,17,21,23,24
98:3,11,22 99:1,22
100:8 101:15,23 102:6,
8,18 103:24 108:16
109:14 111:3,15 115:12
116:7 117:18 118:1
119:13 120:4 121:5
123:5,10,14 125:1
127:16,20,25 129:7
133:4,7 134:2,19 135:4,
5,9,12 136:14,20 137:7,
17 138:15 141:11
142:15 144:4 145:23
147:5 155:5 158:3,6,10,
24 162:1 163:22 169:23
171:9 172:8,11,13
174:5 175:10,11,13,19,
20,25 176:17 177:16,
20,24 178:4,6,7 181:23
182:3,10,21 183:12,24
187:16 192:7 193:20
194:3 200:16 203:14
207:9,15,25 208:6,8,21
209:1,2,12 211:11
212:20,22 213:6,9,17
215:20 216:1,24 217:12
218:5,15 219:15,19
220:4 225:14,16 226:1,
19 227:20 228:1,9,19,
20 229:6,22 231:22

234:22 237:18 238:14
239:11,16 243:10 244:3
246:21 247:10,23
248:19 251:9 257:16,21
259:9 261:13 262:1
263:4 264:1 267:6,10
269:3

**OL**
27:3 28:18 33:13 50:18
67:25 68:11,15 76:20
82:14 114:3,10,21
116:1,15 139:3 141:25
201:15,16 202:19
207:11 209:18

**old**
129:22 226:7

**once**
6:11 181:14 187:17
196:1 220:6 245:14

**ones**
31:2,10 41:6,21 63:8,
13,16,17 79:12 110:24
129:22 143:25 144:23
209:18 214:11,12
250:19

**ongoing**
167:11 175:18,20

**online**
70:8

**open**
68:11,15 104:10 242:13
264:20

**operate**
46:3 131:20,23

**operates**
162:22

**operating**
45:23 47:21,23 77:10
78:16 80:7 84:17 87:6,
21 88:4 91:1,12,22
92:7,9 93:21 95:24 96:2
97:13 100:17 101:9,16
102:9,16 103:6,12
104:1,22 105:1 107:20,
25 108:9 109:12,17,23
110:6,21 125:21 127:4,
20 128:2,8 129:8 131:9,
15 143:15,18,21 144:14
185:9 193:7 213:21
214:21 216:3,10 218:7

223:9,12,13,14,15,20
228:17 229:14,21 230:8
251:6,13 252:1,24
253:20

**operation**
214:16

**operator**
5:12

**opine**
260:14

**opinion**
19:16,17,19 41:3 51:9
55:16,18 56:1 58:19
75:2 81:14 82:22,24
166:14 194:10,11,15
197:8,10 198:6,15
201:22 202:5 250:9

**opinion's**
251:22

**opinions**
8:11,22 9:12 16:7 19:4,
15 37:18 51:4 118:16
148:19 150:23 168:19
169:4 170:5 171:5,8
174:2,11 183:22 184:15
189:1,19 191:23
197:11,24 198:3,4
199:3 204:20 224:16
225:7 232:17,19 234:25

**opportunity**
18:17

**opposed**
107:10,11 171:18
179:17 240:3 250:19
258:10

**opposite**
46:19 135:18

**orange**
5:7 13:8,21,25 14:2
17:2 25:20 26:3,6,21
27:7,8 28:6,13,18 29:23
30:7,9,19 31:16,22
32:1,8,13 33:22,25
36:13,14,15,16 37:24
38:7,19 39:17 40:1,6,
16,17,22 41:4 42:6
49:23 52:4,25 53:8,9
54:20,25 55:2,5 56:2,7,
12 57:5,16 59:3,5,12,13
62:10,11,24 63:21

64:13,15,18,24 65:17,
23 67:1,2,15 68:9,25
70:22,24,25 72:11,23,
24 73:3,9,17,18,25
74:12 75:16 91:13,23
92:10,17 93:2,11,22
94:3,4,5,14,15,20,23
95:11,16,21 96:20
98:13,15 99:21 100:11,
13,15 101:7,10,15,20
102:4,14,15,21,25
103:4,7,13,19,25 104:7,
15,20,23 105:2 110:18
114:10 127:17 134:20,
24 138:2,3,20 145:19,
20 148:6 151:24 152:1
153:5 160:3 161:14,16,
18,20,24 164:14 171:14
193:16 197:2 198:7,8
201:3 203:9,15,18,24
204:5 206:18 209:17,18
213:10 218:16 235:8,16
237:8 255:5,7,11

**order**
11:12 51:2 73:13
129:21 131:20 199:12
202:5 211:14

**original**
31:20 87:3 226:15
227:10,21,22 261:21

**originally**
86:3,14 140:1 157:25

**Orlando**
5:13 268:14

**out-of-place**
240:16

**outcome**
176:25

**outcomes**
174:8 208:10

**outlier**
240:6,8

**outline**
261:24

**outside**
210:5,10

**overall**
83:4,9 250:6 251:20
256:1

**overhead**
107:11 111:10,12

**oversight**
166:6

**overstated**
127:5 128:9,15

**owe**
124:20

**owed**
44:11 65:12,14 123:2,
24 124:19 131:7 133:11

**owned**
112:3 161:14

**owner**
65:23 105:16 133:22,
23,25 152:21 157:24
171:14 214:9 217:7

**owners**
30:7 32:9 43:2,8 62:11
64:16 70:22 95:11
102:15 112:12 123:2,8
138:21 151:24 152:1
158:12 160:3 163:25
164:12,19

**ownership**
164:1

**P**

**P&I**
181:6 182:4 207:19
244:12

**P&Is**
178:2 179:2 180:10
181:1 248:13

**p.m.**
120:11,13,14,15 184:5,
7,8,9 247:15,16,17,18
267:14,18 269:18,23

**page**
7:9 11:7 13:13,23 14:19
15:2 26:7,11,19 33:10
36:19 38:16 39:23
61:20 62:5,8 75:7 76:16
77:2,4,19,21 78:4,21
80:23 87:20 96:13
97:22 100:10 114:1,8,
23 115:6,24 116:9,14,
15,21 117:8,16 118:4

119:6,12,16 121:4,6,18
127:8,16 128:23 134:21
135:13,23 137:23
138:16,18 139:2 144:9
145:13 157:23 177:15
178:12,15,17,20 179:3,
4,7,12,24 180:15
191:13 194:2 199:5
200:16,20,25 201:12,21
212:24 213:12 218:6
222:20 223:7,15
224:16,24 225:21,22
228:10,11,16 229:7,18
231:2,3,10 232:1,2
233:4,6,13,24 235:2
236:15,25 237:20
239:20 244:17 245:21
246:8 247:6 248:4,16,
17 249:23 250:17
252:21,22 253:22 255:1
257:13,14

**pages**
14:15 16:17,18,19
77:16 115:5 178:1
179:8 194:4 222:10

**pagination**
208:20

**paid**
27:17,21 29:15 42:6
43:9 46:20,21 59:5
60:8,24 61:25 62:4,11
63:17 65:6 70:21 73:24
105:19 111:23 112:2
122:20 124:14 125:11
131:6 137:21 146:8,13
152:2,21 153:1,3,5,9,13
154:19 157:2,5,6 178:1
215:1,5,12 217:4
219:21 220:8

**Paige**
5:20

**Panda**
5:20 22:15 23:1,4,8,11
163:8

**papa**
13:24

**paper**
73:21 94:4 115:21
123:22,23 172:20
184:18 208:6

**paragraph**

12:8 77:20 96:13 104:4
163:23 170:7 174:4
191:13,17 199:7 202:17
204:13,18,21 205:4,6,7
206:5 207:13 221:3
251:4 252:14 260:7,8

**paragraphs**
96:24 163:12 171:4
208:23 250:3,11 260:9

**Parenteau**
210:22

**parse**
95:6

**part**
13:10 23:17 36:19
46:21 48:1 49:9 50:19,
23 56:8 57:17,21 58:10,
14 59:7 60:9 129:8
151:22 152:7 155:24
183:21 204:9 208:1
221:18 226:3,14,17
237:25 255:25 256:20
261:12 264:19

**participated**
94:16

**particular**
42:17 90:6 91:22 99:12
104:13 152:15,20
171:13 189:7 206:15
250:9

**particularly**
235:19

**partners**
44:11 45:9 46:15
123:24,25 124:1,4,6,18,
20 131:8 132:1,10
133:5,10,15,18,19
219:11,12,22

**partnership**
12:11

**party**
6:15

**paste**
227:12,18

**pay**
32:11 42:13 43:5,13
59:17 63:14 71:4 95:2
129:21 130:5,6,19
131:5,20,23 132:3

133:1 172:9 173:7,12
216:2

**payable**
215:9

**payables**
215:11

**paying**
68:7,10 98:16 125:15
131:1 217:13 249:8

**payment**
153:24 217:16

**payments**
32:4 158:12

**payroll**
214:10 246:5

**pays**
155:8

**PBC**
15:3

**penalty**
188:1 232:24

**pending**
176:17,20

**people**
20:1 22:9 29:15 62:3
64:2 65:10,11 66:8
67:4,5,8,13 103:2
104:11 111:13 131:19
147:1 163:10,11 165:5,
18 173:24 177:2 188:15
209:3 219:20,24
220:13,15 256:14

**percent**
30:22 33:13,21 34:12,
13 36:14,24 37:12,19,
23,24 38:1,19 39:12
40:6,14,21 41:4,6,25
54:5,6,11,17 55:9,15
56:5,6,12,18 57:5,15
58:11,17 67:20 72:4
74:19 75:10,14 76:6,8
78:5 81:1,2,3,4 93:10,
16 94:10 95:18,20,21
96:4,5,6,7 98:9,18,24
99:4,5 100:3,4,12,20,24
103:16,18,20 104:1,2
106:13 111:2 121:10
122:1 128:15 133:24
135:2,8,9,11,12,13,20

136:1,6,7,23,24 137:14
139:2,4,5,6,15,18 140:7
141:3,4,6,12 142:1,3,
11,20 144:2 145:14
191:5 193:6,18 198:7,
13,14,17,23 202:20
203:12,22 205:7,9,11,
14,15,16 206:4,5,6,10,
11 207:7,8,11 218:6
222:7,8 223:16,21
224:3,5,6 225:1,2
228:22,23 229:8 230:10
239:17,20 250:14
251:6,8,13 252:5,6,10,
11,17,19,25 253:2,3,8
254:2,7,8,9,11,12,18
257:18 258:2 259:24

**percentage**
25:20 26:1 33:12 34:25
54:24 57:9 60:12 64:13
71:10 72:1,3,6 73:14
74:17,18 75:2 76:13
79:18 82:15 84:10
93:14,22 96:16 98:8,10,
20 99:18 117:1 134:11
135:21,25 140:14
160:11 194:12 198:8,14
201:24 204:1,10 224:7
229:10 238:4 239:17,19
240:16,18 250:2 252:2
257:25 259:23

**percentages**
33:12 34:2,7 35:25
36:5,19 38:15 63:20
93:21 117:9 121:25
134:3 140:2 238:8
253:18,20 258:16
261:14 262:9,11

**percentile**
99:11,12

**perfect**
120:8

**perform**
79:24

**performance**
242:5

**performing**
29:17 257:4

**period**
27:9 32:6 38:3,8 59:6
69:4 89:14 100:22

135:24 136:19 141:2
154:16 170:23 177:10
184:21 219:4 224:24
229:1,2,15 230:11
240:21 241:5 253:17

**perjury**
89:6 188:2 232:25

**person**
66:3,5 88:12 153:24

**personnel**
101:24 102:20

**perspective**
42:3 107:12 123:21
153:19 163:21 168:1,
10,14 172:6 187:14
216:7 231:25 256:1

**phone**
165:11

**Photograph**
201:5

**phrased**
140:19

**pick**
194:7 215:22

**picking**
186:22 194:6

**picture**
187:6 246:14 251:21

**pie**
16:20

**piece**
115:21 123:22 172:20

**pieces**
73:20

**place**
54:6,7 87:20 147:9
170:22 262:22

**placing**
261:7

**plaintiff**
6:23 11:4 26:14 51:16
52:16 85:5,11 149:12
205:22 269:20

**plaintiffs**
5:17

**plan**
260:24 261:2

**please**
5:14 6:5 13:15 26:12
28:16 50:15 58:5 76:20
77:2 85:2 132:9 163:23
174:4 177:15 191:14
199:8 202:17 221:3
223:4 268:17,22

**plus**
22:8 34:16 41:21 63:3
68:9 69:2 79:9 136:19
137:24 138:5 147:3
219:1 251:25

**pocket**
172:22

**point**
10:20 19:1 21:23 22:19
44:8 55:24 58:25 74:22
81:18,23 122:17
126:21,23 149:2 153:22
155:7 189:23 190:3
191:24 192:23 203:25
212:15 215:10 218:10
222:8,9 236:6 237:3,16

**pointed**
255:14 265:2

**pointing**
31:1

**points**
84:3 218:22 261:11

**portion**
58:8 95:14 128:3
148:22 218:1 223:23

**portions**
219:19

**posit**
94:19 95:8

**position**
20:19 70:19

**positive**
87:8,9

**possible**
187:10 188:1 208:10
231:6 248:6

**possibly**
147:2 264:16

**pot**
67:14 220:6,7

**potential**
174:8 232:24

**practice**
89:2,3 167:12

**practices**
88:24 197:19

**pre-investment**
46:24

**precisely**
58:24 61:8 73:12
156:15 235:19

**prefer**
19:14 121:14,15

**prejudiced**
265:5

**prepaid**
46:18,20 88:2 105:18,
19,20,24 122:8 125:18,
22 126:5 258:24 259:2,
6,11,13,19

**preparation**
154:24 234:18

**prepare**
48:19 82:17,18 138:9,
12 227:9,11 265:6

**prepared**
12:19 53:11,12 54:2
65:18,20 74:4,6 81:11
88:10 107:17,18 146:19
151:8 180:15,17,22
208:15,17 209:21
227:14 232:23 233:16
234:8

**prepared-by-client**
28:5

**present**
199:15

**presentation**
13:5 88:22 164:6 189:2
239:6

**presented**
76:11 104:21 183:13
236:7

**presents**
139:22 141:5

**pressing**
24:7

**presumably**
130:25 236:21 268:21

**presumes**
256:4

**pretty**
15:14 36:25 41:22 47:5
71:18 93:13 112:16
161:4

**previous**
14:15 47:9

**previously**
48:22 101:14 171:16
241:25

**primarily**
147:2

**primary**
190:20

**principal**
148:20

**principals**
112:3,7 187:8,9 220:6,9

**principle**
122:13 189:11

**principles**
188:23,25 189:8

**print**
16:2 70:8 180:6

**printed**
11:24 89:12

**printout**
180:4

**printouts**
162:3,21 207:18

**prior**
23:22 73:13 89:13
241:18

**probably**
20:13 22:8 66:21 84:12
125:24 135:2 143:1
150:13,14 155:25
192:14 201:5 227:18
240:1 260:10 266:18

**problem**
158:6 226:21

**problems**
204:16

**procedure**
122:11

**procedures**
104:20

**proceeding**
196:11

**proceedings**
5:3 196:20 269:22

**produced**
13:14 158:17 160:22
181:6

**product**
151:12

**professes**
37:11

**profession**
196:19 236:4

**professional**
102:3 103:3

**profit**
42:14,15,25 47:18 48:1
81:3 90:21 104:1,14
109:1,7,9,16,21 110:6,
10,11,14,15,16,20
172:2 177:21 178:9,17
180:3 223:9 224:25
225:1 228:21,22 229:7,
10,14,16,19 230:8
237:23 238:7,14,15,18,
21,22,24,25 239:5,6,7,
14,19 240:17 241:25
242:19 244:4 250:22
251:7 252:2 254:8,11,
19 256:21 258:18

**profit-maximizing**
214:9

**profitability**
46:6 57:17 89:21
110:14,18,20 172:2
215:12

**profits**
77:10 79:22 81:4
153:10,11 157:9 223:2

**projected**
118:19

**promised**
177:11

**proper**
40:17 86:17 157:4
214:25 217:14 245:12,
20 259:24 261:4,6

**provide**
14:9 15:10,19 22:11
25:4 27:16 32:7 35:24
48:21 49:20 53:7 59:25
114:20 141:5 148:17,18
149:13 169:1 185:8
196:20 208:18 228:20
233:21 264:24

**provided**
14:5 15:1,6 18:18,24
19:23 20:2 22:22 23:1,7
24:1 27:4 32:8 36:21
38:24 39:23 40:5 49:11
50:22 52:2,3,10,11,23
59:8 60:16 69:5,13,17
75:16,23 82:5 84:25
86:12 88:22 90:3
102:24 113:4 116:14
118:5 138:13,14,17
139:15 140:17 142:19
150:19 151:20,24
158:1,4 159:13 161:23
162:9 169:19,24 173:25
174:6,18 176:7,12
179:1,3,18,20,23
194:20 195:22 198:25
203:16 206:17 208:11,
22 211:15 212:2 217:15
218:9 221:9 231:15,20
235:16 244:16 248:4
250:16 254:15,25

**provides**
39:2 141:1,2,5 152:25
257:8

**providing**
148:19 196:19 199:24
202:12 210:24 222:25

**provision**
66:1

**pulled**
162:8 171:3 235:5
247:23

**pulling**
24:5 224:2

**pure**
22:4 146:25

**purely**
171:10

**purpose**
54:14 79:22 167:25
214:19 219:17 220:18
224:4

**purposes**
27:19 33:3 48:25 78:23
83:14 90:1,5,11 92:21
110:11 128:18,22
180:23 190:9 191:1,2
206:23 221:24 256:17
261:16,23

**pursuing**
29:5

**pushed**
209:23

**put**
24:4 75:18 86:16 96:22
99:10 110:15,19 112:20
113:22 116:2,20 122:8
132:3,11 133:7,9,12
139:3,18 166:22 170:4
171:2 172:22 173:17
174:15,16 186:1 203:3
206:10 211:11 226:23
241:11 265:24

**putting**
132:11 133:6 226:3
268:7

---

**Q**

**quarterly**
260:19,21,23,24

**question**
8:18 9:1 30:15 31:20
41:25 44:1 61:19 64:22
65:4 70:10 92:1 94:25
95:9 99:15,16,17
101:19 102:7 106:14
131:17 134:19 136:25
140:19,20,22,24 155:16
159:21 169:11 171:6
175:11 181:4 215:15,19
217:15 226:6 231:22
235:9 242:9

**questioned**
41:17

**questioning**
58:22 168:18 264:3
265:22

**questions**
41:13,17 58:15 263:6
264:25 265:16 266:19

**quick**
35:6 72:10 73:1 242:11

**Quickbooks**
180:4,5,20 181:2

**quickly**
212:23 229:3

**quite**
21:5 202:11 220:13
231:6 264:18 265:5

**quote**
46:1 63:21 66:2,10
79:22 161:24 172:21

---

**R**

**raise**
18:11

**ran**
38:14 143:18 180:10
205:18

**range**
28:9 55:12 93:17

**ranged**
196:18

**rate**
36:25 37:12,19 42:1
55:3,10 61:14,17 63:19
80:19 81:1,3 106:8,11,
12 141:9 206:4

**ratio**
96:7 144:1 234:1 250:6,
21,22

**ratios**
96:9 254:1

**raw**
113:3 115:25 244:15

**reached**
38:15 262:17

**reaching**
184:14 189:8

**read**
58:4,8 72:20 77:20
82:16 150:15 162:12
164:16 168:25 170:3,15
200:13 209:4 211:2

**reader**
163:20 168:1 169:2,14
171:10

**reading**
192:15

**reads**
207:10

**real**
35:6 72:10 73:1 131:2
204:23 218:2 250:18
258:7

**reality**
130:14

**realize**
64:2

**realized**
186:14

**reallocated**
86:11

**reallocation**
253:15,16

**really**
15:21 22:21 34:9 115:5
118:14 123:21 131:11,
23 147:7 169:7 174:16
202:15 209:7 214:12,17
239:7 260:15 264:9

**reason**
106:20 110:2 118:23
145:9 165:11 194:13,19
240:2

**reasonable**
196:15 197:18 198:5,17
199:19 255:19 266:2

**reasons**
243:17 263:17

**rebooked**
187:18

**rebut**
148:10,13,15,22 149:8

ROBERT B. MORRISON - 03/08/2019                    i31

156:9,12,13,16

**rebuttal**
149:14

**rebutting**
150:1,23

**recalculate**
253:19

**recall**
9:10,24 12:22 20:6
21:23 22:25 48:17 49:7
86:5 112:13 195:5
214:1 237:6 250:7
252:13

**recalling**
129:17

**recast**
171:23

**receivable**
68:10

**receivables**
44:9 46:14 131:25
132:10 133:5

**receive**
51:14

**received**
44:18 45:19,21 51:11
53:2 67:8 68:6,9 69:2
77:22 78:1,2,3 87:14,18
132:12 142:2 146:7,15
150:13 152:13 170:24
186:9 195:7,15,17,18
201:14 215:7

**receiver**
6:16 190:24

**receiving**
206:2

**recharacterize**
241:24 242:1

**recharacterized**
241:18,21

**reclassified**
187:18

**recognition**
211:5

**recognize**
10:19 38:13 46:23

80:17 87:15 125:8,13
157:8 174:12 234:6

**recognized**
43:11 48:1 80:15
105:17,21 106:20
125:19,20 128:13
129:14,18 172:1 219:23
241:25 242:7 248:24
258:20

**recognizes**
84:13

**recognizing**
87:14 189:12

**recollection**
10:3 134:17

**reconcile**
88:18 91:9 116:7
180:12

**reconciliation**
89:20

**record**
5:23,25 33:19 40:21
57:7 66:15,19 120:12,
16 154:10 184:6,10
247:19 264:12 267:7,
15,17,19 269:19

**recorded**
89:24,25 90:10 92:18
113:21 129:11 146:22,
24 153:20 154:5
186:10,19 243:8

**records**
17:11,16 64:15 88:15,
25 91:21 132:24 143:3
147:11,14 158:16,20
179:21 180:1 187:8,17
216:4 235:12

**recruiting**
215:22,24,25

**redo**
100:1

**reduces**
87:17

**reduction**
113:1

**Reed**
5:8,18,19 12:11 13:3,19
17:11 21:10,14,20 22:1,

11 24:11,17 25:21,22
26:2,8 27:4,16,23 28:7,
19 29:4,12,14,16 31:23,
25 32:1,7,23 33:4 34:1
37:5,11,18 39:13,23
40:7 42:2,6,16,21
43:16,18 45:18 54:2,18
56:11 57:20 59:8 61:9,
16,25 62:4,11 64:14,19
65:16,17,23 66:2,9
69:24 70:22 82:1 88:16
90:25 93:11,23 94:13,
15,16,20,23 95:3,10
103:24 107:2 108:19
112:4 119:10,14 122:3,
16 124:20 125:11
129:19 133:19,25 143:2
145:8 151:24 152:2,21,
23 153:1,4,6,9,23,25
154:14 159:19 160:3
162:9 163:4 164:23
165:1,4 171:14 172:7,9,
12,15,18,20 173:11,12,
14,24 174:16 175:5
176:1,9 177:5 179:13
180:2,19 181:1,7,16,18,
19 186:3 206:18 210:4,
15 217:2,5 219:12
220:8,23 234:3 242:18
244:21 248:5 255:1
256:4,8,13

**Reed's**
217:2,3

**refer**
18:20 29:1 122:25
211:9 222:12

**reference**
44:21 51:9 83:14,20
161:13 166:2,3 170:7
193:6 205:6 213:15

**referenced**
7:12 8:8 10:10 15:11
28:15 36:18 107:3
122:22 163:16

**references**
14:19 75:9 165:23
260:17

**referencing**
11:12

**referred**
151:16 181:11 210:17

**referring**
16:6 17:10 79:12 123:6,
7 136:11 154:7

**refers**
117:3,16 156:6

**reflect**
71:2,3 89:9,12,13 96:23
110:17 113:17 115:13
124:1 232:25

**reflected**
38:15 39:15 51:15
67:25 96:10,11 102:11
116:9,10 119:15 121:17
122:9 127:4,8 128:9,23
130:3,6 131:16 134:21
139:13 140:1 146:10
158:17 181:16 200:17
201:23 209:14 224:16
229:25 231:8 233:25
235:2 236:15 237:25
244:12 248:1 249:22
250:17 252:21 253:20
255:16

**reflecting**
115:7 215:4

**reflects**
39:24 70:21 113:18
114:6 115:22 123:23
139:22

**refund**
65:12,13,14 67:11
69:22,23 106:21 158:10
160:20 173:25 177:8
203:24 256:5,14

**refunded**
175:16,21,22,23,24
176:11

**Refunded/
unsuccessful**
176:7

**refunding**
256:9

**refunds**
32:8 59:18 60:6 67:2,9
69:3,6,14 70:21 71:3,9
72:23 73:24 74:13
137:17 139:9 158:7,18
160:14 176:12 182:6,
16,18,20,24 202:13
206:21,22 248:21,23

ROBERT B. MORRISON - 03/08/2019                    i32

249:2,8,19

**regarding**
32:4 241:13

**regardless**
42:2 71:5 94:14 105:2
173:8

**regression**
84:1 93:8 99:9,10 111:7
144:19 256:24 257:5
260:6,12,16,20 261:8,
11 262:14,16

**regurgitation**
169:18 170:1

**rehash**
193:5

**relate**
42:25 101:10 102:4,5

**related**
26:3,5 27:7,8 29:23
32:11 51:22 75:23 92:5,
10 93:2 101:20 150:8
158:10 161:19 192:22
193:1,3

**relates**
17:11 22:12 91:23
100:24 149:6 193:12,16

**relating**
14:10,22 23:20 35:25
44:2 47:13 49:13 51:25
56:7 63:21 69:6,13
73:14 91:12 99:21
101:15 102:14,15 103:3
113:3 118:5 127:17
148:23 149:3,24 156:23
167:19 171:12 174:21
200:24 201:22 249:19

**relationship**
144:24,25 203:10

**relative**
204:6

**relevance**
162:14

**relevant**
11:8 17:5 42:9,11 211:7
260:20

**reliable**
118:25

**reliance**
8:7 10:11 19:8 200:12
212:4

**relied**
8:10,22 9:5,11 10:1,16
16:9 23:2 51:3 88:23
180:14 214:3

**relief**
11:18

**relieved**
113:23 128:14

**rely**
10:13 16:5 18:15 75:25
76:5 118:14 159:20
186:7 234:25 235:4
236:16 247:1

**relying**
17:23 158:4,22 159:3,8
216:17,18 235:24
255:9,10 259:21 260:16

**remaining**
160:2 211:22

**remember**
23:23 47:25 49:16
61:13 63:1 99:17 121:6,
11 123:15,17 134:19
185:16 196:18 202:9
210:20 223:25 239:23

**render**
19:4

**rendered**
19:16

**rendering**
8:11 19:15,16 183:22

**rent**
94:24 95:2,3,4 104:11
111:15 130:19

**repay**
65:9 256:19

**rephrase**
57:7 175:11

**replace**
135:12

**replaced**
204:21

**replica**
206:1

**report**
8:8,12,23 9:2,5,17,20,
23 10:10,14,15,22 11:7,
11,22 12:9 13:12 16:7
22:13 23:3,17 37:5 49:9
50:13,22 51:5,6,9,12
52:8 63:20 64:8 65:8,
18,20 66:5,11 71:11,21,
25 72:1,2 75:10 76:1
77:1,2,18 78:2,24 79:3,
6 81:11 82:4,13,16,17,
18,20 83:7,12 84:7 86:4
92:22 93:1 96:3,11,12,
19 109:14 115:22 121:4
144:6 148:10,23 149:3
150:12 151:9,17 152:8,
13,16,25 154:25 156:9,
15,25 157:21 159:18
162:14,15,17 163:14,20
166:22 167:17,22 169:4
177:15 184:15 191:14,
22 195:21,24 196:3
197:6 198:3,15 206:23
207:20 211:9 212:5
213:7,11,17 218:6
221:22 222:5 224:17
225:17,22,23 227:11
232:2 233:13 235:1,25
251:20 261:1,24 262:18
264:18

**reported**
33:3 98:6 99:25 108:17
109:8,18 110:1 126:21
189:5 197:1,5 199:11
228:2,4 230:9 241:4,19
244:7,9

**REPORTER**
58:6 267:8

**reporting**
191:2 246:10 248:6

**reports**
24:19,22 48:19 77:13
118:22 124:11

**represent**
38:18 40:24 51:20
107:8 141:22

**representation**
30:16 185:24 214:4

**representations**
236:3

**representative**

41:25 54:2 55:9 163:4

**representatives**
164:23

**represented**
28:5 34:11 202:19
209:20 216:20

**representing**
199:21

**represents**
28:23 31:10 33:21 38:7,
9 40:6,13 51:21

**request**
7:18 195:12 256:14

**requested**
12:23 22:5 58:8 77:24

**requests**
8:2

**require**
203:7

**required**
19:4,7

**requires**
197:8

**research**
154:23 155:10

**reserve**
18:11 43:21 78:1
195:23

**reserves**
44:2

**reshuffle**
209:4

**resolution**
175:8

**resort**
72:24 73:5

**resorts**
70:25 72:25 73:8,10
161:15

**respect**
68:15 109:23 112:4
150:2,6 158:11 219:14
221:6

**respond**
199:13

**response**
8:17 169:1

**responsibility**
32:23 62:19

**responsive**
7:18 8:2,14

**rest**
6:12 265:12

**result**
9:15 39:3 88:4 219:11
229:4 253:17 262:24

**resulted**
59:4 137:22

**results**
257:9

**retained**
14:22 16:24 34:12
36:15 60:16,20 61:4,6,
9,12,22,23 62:11,22
63:6,12 64:18,23,25
65:18,23 68:18,19,21
69:3 114:21 137:9,10
139:23 147:6 148:3
167:6,10 171:14 175:7
190:12

**retained/exited**
213:6

**retainer**
146:10

**retention**
33:23 126:11 147:18

**return**
12:11 43:23 44:12,14,
21 89:17,20,25 106:1
107:5 109:15,19 110:1,
4 118:24 143:7 186:19
217:16 221:22,25 235:6
239:5 241:23 244:2,9
255:9 259:15,21

**return's**
110:3

**returned**
256:23

**returns**
12:17 87:6 88:14,16,21
90:3,15 91:10 105:25
106:16,18,19 107:22,23
108:22 109:5,20 112:14

118:8,10 124:11,16
130:3 180:13,14
186:12,16 187:21
189:18 210:9 211:16
212:25 231:19 232:22,
23 233:7,16,17 234:18
237:2 247:24 250:20

**revenue**
14:2,3 24:5 26:2,3,5,21,
22 27:4,6,8,20 28:12,13
29:25 31:12,13 33:2
34:17 37:25 38:3,7,13
42:14 43:15 44:2,7,17
45:5,16,18 46:1,19,22
47:19,24,25 48:2 49:23
50:4,12,18 51:22 52:4,
24,25 53:8 54:16,25
55:2 56:2,7 57:15,20
59:5 61:10 67:14,25
76:19 77:12,17,18,24,
25 78:14 80:5,11,14,18,
24 81:10 83:24 84:6,9,
21 87:6,14 89:24 90:6,
9,13 91:10 93:11 94:6
97:13 98:6,9,10,16,21
99:3,25 100:11,13,15,
24 101:3 103:17,19
105:16 107:20,25
108:9,17 109:9 113:2,
19 114:3 115:8 116:1
118:5,22 119:3,4 122:4,
7,9 123:23 125:4,8,10,
12,14,17,19 127:3
128:7,10,24 129:11,14,
18 137:11,21,22 138:6
149:24 153:11,16,19,
20,21 155:9 157:11
173:11 175:1 181:15,
19,21 182:4,14,16,23
183:4,5,9 192:3,18,21,
22 196:22 197:1,6
201:2,17 203:4,7,8
206:18 207:2,11 211:5
218:8,10,14,16,22,25
219:16,22,23 221:16
223:8,9,13,14 228:4,22,
23 230:9,12,14,15
231:7,9 232:2 234:3,6
235:7,8,11,17 236:25
237:8,24 238:11 240:10
241:13,14 243:5,25
244:5 245:18,19 247:23
248:5,6,11,20,23,24
249:10 250:18 251:18,
25 252:1 254:3,14,15,

22 255:8,11,23 256:1,3
257:10,23 258:1,2,14
259:6,23

**revenue's**
113:23

**revenues**
13:7 38:12 46:7 50:8
55:18 58:19 67:17,18
77:10,22 79:4 83:6,7
87:6 93:8 95:21,22,25
96:9,19,20 99:8 100:22
105:21 106:19 108:22
109:10 110:15 113:20
119:14 121:24 127:5,8,
17 128:3,9,15,16,17
129:7,15 145:15,17
148:5,7 149:18 154:11
155:7 156:20 171:12,25
172:1 182:20 183:2
185:3 189:11,12,14
196:22 201:15 211:4
213:10 215:6 217:6
219:20 222:8,12,13
223:1 224:13 225:22
228:6 229:1,23,25
230:1,3 234:11 238:3,5,
16,23 239:7 240:18
241:4 242:7 251:7,14
252:17,19 253:17
254:3,4 255:4 256:22
257:1,4 258:8 260:2,11

**reverse**
40:18

**review**
19:3 141:13 150:11
216:10 234:17 237:1

**reviewed**
18:23 37:17 150:12

**RH-219331**
69:21

**RH005740**
183:17

**RH00574O**
181:6

**RH5733**
242:11 243:14

**RH5740**
182:25

**rid**
205:6

**right**
10:5 14:18 15:2 18:8,11
20:21 26:1,19,23 29:8
30:2 31:11 34:11 35:18
39:3,5 41:1 45:4 46:2
47:8,23 50:2,5,10 51:6
54:9,17 57:19 61:14
62:5,6 65:19 67:3 71:18
72:8 73:1,7 74:3 76:23
77:7,10 78:1,12,13 80:1
82:7 85:17,20 97:4,19
98:18,19 102:11,13
107:17,23 108:1,10,17
109:7,11,19 114:1,22
115:25 117:1,8,19
118:6,11 119:17 122:13
124:8,24 127:15 128:13
130:20 131:7,11 132:25
134:6,25 135:2,25
136:2,3,16 137:9
138:12 139:8,9,11,17
140:12 141:18 142:5,8,
23 158:20 159:1,3,7,8
160:17 161:1,6,13
166:21,22 167:19,20
168:11 172:13 173:2,5
174:10 175:2 176:1,23
177:18,19,22 178:1,9,
13,24 179:20 182:4
183:19,20 188:16,20
190:8 195:23 198:11,24
200:16,23 204:23 205:4
207:23 208:1,4 209:11
211:9,11,24 213:13
220:14 222:2,19 223:11
225:6,21 230:3 231:1
232:6 233:9,12,21
234:10,12,14,17 236:22
237:13 238:4,20 239:9,
13 240:6 242:14 244:3,
4 250:23 251:23 252:14
253:10 259:2 260:6
261:9 267:13

**right-hand**
223:10

**Robert**
5:24

**robust**
83:18 245:16

**role**
210:19

**Roman**
77:19,21

**Ron**
  5:12

**room**
  135:7

**rough**
  144:17

**roughly**
  30:19,21 47:6 50:1
  81:13 104:1 142:22
  174:22 191:5 198:13
  254:16

**round**
  144:17

**rounded**
  71:8 137:17

**run**
  15:17 36:8 47:15
  118:16 120:1 204:15
  205:16

**running**
  185:14

**runs**
  218:10

---

**S**

**safely**
  163:25 165:5 166:11

**sale**
  61:12 91:23 108:14,15,
  23 122:17 126:8,21,23
  143:4 149:24 153:22
  154:4,5,7 244:6

**sales**
  42:5 56:12 57:5 87:6
  91:13 92:10 101:10,15
  102:15,25 103:4,8,13,
  21,25 104:7,24 105:2
  106:5 107:22 108:19,
  21,24 109:5 112:23
  126:17 129:20 145:8
  153:15 155:3,4,6,21
  189:24 234:13 244:23
  256:1

**Salesforce**
  24:15,18,21,22,24 25:5,
  15 117:5,19,22 152:24
  210:2,3

**sample**
  29:21

**sandwiches**
  120:2

**saw**
  24:23 133:9 151:11,15
  152:12 155:2 192:7
  209:10 221:10,20

**saying**
  40:21 61:15 63:24
  77:20 97:2 125:5
  128:14 136:7,8 141:22
  166:14,15 168:3,4
  192:16 193:11,18
  206:16 209:12 227:22
  231:6 250:10 253:1,21
  269:6

**says**
  13:24 15:3 33:11 50:18
  53:12 60:21 64:5,8,11
  68:11 79:14 96:3 114:3
  116:15,18 117:9 134:12
  141:25 142:3 157:21
  163:24 166:11 172:12,
  20 179:13 184:21
  199:10 206:13 252:24
  259:19

**scenario**
  90:11

**schedule**
  7:10,15,18 14:1 16:16
  52:23 82:5,6 84:24,25
  85:9,18,21 86:2,14
  87:3,8 88:10 92:8,21
  96:10 97:4,7 102:11
  106:3 113:15 134:4
  157:23 158:22 182:24
  202:6 209:7 213:9
  221:6,21 222:23,24
  223:3 224:7,8,9,10,11
  225:5,21,23,24 226:15
  227:7,10,21,22,23,25
  228:4,13 229:6 233:10,
  25 238:1,17 243:10
  244:8 248:1 249:8,22
  254:22 255:3,11,17
  261:15,19 262:1,8,13,
  20

**scheduled**
  263:22 266:5

**schedules**

151:16 211:17

**Schroeter**
  35:9

**scientific**
  229:13

**scratch**
  75:18 207:7

**scribblings**
  134:18

**scroll**
  16:17 209:13

**search**
  70:12 199:12

**second**
  12:4 16:9 69:9 83:17
  121:15,17 127:13 144:8
  178:12 185:22 191:16
  194:7,11,12,15 203:3
  207:16 223:7,14 228:10
  235:10 252:15 253:15,
  25 254:13 257:12

**secondary**
  28:4

**section**
  11:7,11 13:24 77:17
  79:5 87:23 88:1 141:25
  142:3 162:16 163:13
  165:23 179:4 201:12,
  22,23 202:16 206:23
  208:11 218:5 222:3
  224:17,19 251:20

**sections**
  68:5 79:11

**secure**
  94:3

**see**
  10:16,19 12:4,14 13:2
  15:2,3 17:6 19:14 24:22
  27:17,24 29:11 33:14
  34:9,22,25 35:16 36:9
  38:25 39:1 43:24 50:15
  52:13 53:18,24,25 68:4,
  12 77:4 78:4 87:7,20,24
  97:15 107:3 109:2
  114:24 116:16 117:7,10
  124:12 132:21 150:22
  152:17 156:22,24
  158:10 159:10 160:18
  164:2 167:23 178:3

179:4 181:8 186:5
  187:21 191:19 192:9
  199:16 200:3 201:19
  209:11 212:16 213:21
  216:15 223:17 227:5
  231:18 235:23 236:12
  242:21 243:2 246:1
  248:21 257:19 261:3
  265:24 266:22

**seeing**
  115:7

**seeking**
  51:13 163:25

**seen**
  7:7,15 24:19 29:19,21
  39:5,6 46:4 130:2
  132:8,25 133:7 138:20
  152:10,23 156:9
  158:20,22 159:22
  164:19 169:17 188:12
  210:7 259:13

**segregate**
  126:4

**sense**
  34:3,6,7,20,21 40:15
  41:2,9,10,12 63:25
  123:20 172:6

**sent**
  8:5,8,24 52:12 85:23
  188:10

**sentence**
  165:12 166:1,3,24
  199:10 206:8,13 207:3
  250:12

**Sentenced**
  188:21

**sentences**
  82:13 250:8

**separate**
  12:3 28:24 107:13
  126:4 141:25 145:10
  192:24 193:1 251:19

**separated**
  12:4

**separately**
  94:7,8 107:2 182:15

**serve**
  6:16 190:23

ROBERT B. MORRISON - 03/08/2019    i35

**served**
   49:13

**service**
   46:20,21 145:11

**services**
   29:16 66:9 163:24
   174:8 192:18,22 193:3,
   12 217:15 218:2,9
   243:5

**set**
   8:11 15:16 22:12 92:7
   106:25 107:16 119:3
   140:6 144:6 163:12,13
   247:21 266:21

**sets**
   32:23 174:6

**setting**
   217:6

**seven**
   264:3 265:25 266:3
   268:9

**seven-hour**
   263:24

**Seventy**
   57:9

**seventy-seven**
   39:25

**share**
   98:16,21 104:21

**shareholder**
   191:6

**shareholder-type**
   191:7

**shareholders**
   219:22

**shares**
   98:16

**she's**
   20:20,21 21:3,20

**sheet**
   43:24 105:24 106:1
   113:22 122:8 125:18
   178:13 179:5,13 182:8
   183:10 186:24 241:9

**sheets**
   90:19 179:2 180:3,10

**shouldn't**
   78:25 88:6 141:3
   227:22 248:11 249:6
   265:24

**show**
   11:19 13:15 105:22
   115:18,21 152:14
   182:25 183:6 216:10
   224:7 225:9,14 242:10
   246:24 259:19

**showed**
   177:17

**showing**
   16:25 76:21 185:1
   196:4 224:24 228:6

**shown**
   113:14

**shows**
   52:24 59:16 84:20
   179:4 185:2 192:23
   202:7 221:11,15 250:12

**sic**
   40:1 115:16

**side**
   46:19 48:9 191:10
   211:12 223:10

**sign**
   29:14 153:23 172:9

**signed**
   65:16,17,21 125:10
   126:24 146:4,6,7 188:9

**significance**
   223:23 237:5 257:25
   258:3

**signing**
   131:19

**Silverleaf**
   161:15

**simple**
   99:22 131:14 228:25

**simply**

**short**
   135:8

**shortcut**
   81:3

9:10 36:20 40:18 66:8
116:14 217:2

**single**
   115:14,18,20,21 179:12
   185:9 221:14 241:22

**sir**
   6:1,7 7:11,16 106:4
   114:2 120:20,24 121:2
   221:4

**sit**
   41:3 124:20 126:3
   196:1 254:21 262:25

**sitting**
   43:18,21 44:1 131:8
   188:20

**situation**
   155:15

**six**
   29:21 39:25 136:23
   170:24 174:7

**skills**
   74:21

**slightly**
   224:14

**small**
   93:13,22 106:7,10
   215:22

**software**
   24:12,14 177:23

**sold**
   107:4,6

**solely**
   30:1 76:12 80:10 112:3
   145:17 158:11 230:13

**somebody**
   30:13 61:15,25 65:16,
   21 70:12 131:2 155:8
   162:7 174:7 176:5
   188:9

**somebody's**
   220:8

**Something's**
   17:3

**somewhat**
   9:22 216:17

**sophisticated**

245:1,3

**sophistication**
   245:10

**sorry**
   18:2 21:22 28:23 29:16
   33:17 35:3 37:24 51:2
   54:8,22 56:23 61:19
   64:19 65:5 68:3 70:19
   74:17 100:10 106:9
   115:25 119:5,11,13
   123:6 138:16 139:5
   143:11 144:9 147:16
   152:19 163:12 165:8
   174:8 189:6 198:2
   205:10 208:24 209:8
   213:14 215:14 219:5
   222:16 224:22 228:13
   230:8 233:8 234:13
   239:24 253:10 254:7
   257:2,22 261:18

**sort**
   122:13 135:10 240:6
   258:12

**sorts**
   264:4

**sound**
   206:14 210:22

**sounds**
   34:18 206:16

**source**
   14:9 19:3,14 23:19
   27:13 51:24 90:3 92:3
   105:22 114:24 117:3,
   16,18,23 132:23 151:7
   153:4 156:10 158:14
   177:18 207:22 209:24
   236:13,20

**sources**
   192:17,21

**space**
   94:21 104:11

**spaces**
   165:22

**speak**
   90:25 163:4 210:4,13

**speaking**
   163:9 189:2

**specific**
   29:22,23 30:11 91:12

**181:1 185:6**

93:7

**specifically**
23:4 74:10 91:23 92:5,
17 149:8 180:17 193:17
208:24 220:3 248:4

**speculation**
132:6

**spend**
113:17 130:25 169:7

**spending**
47:15 100:4

**spent**
44:23 45:9 95:14 101:2,
4 103:3 130:15 173:8

**spoke**
22:3,8 165:19

**spoken**
22:10 61:15 164:12

**spread**
55:20,21 222:7 254:4

**spreads**
240:5,23

**spreadsheet**
26:9,10 36:21 41:16
53:10,16 54:1,3 74:4,9
85:7 104:4 107:16,17,
18 116:2 233:16 234:9

**spreadsheets**
96:22 151:7

**squared**
84:19 99:6,12 223:15
252:25 253:2

**squareds**
99:13

**stack**
10:6,9,12,17,24 11:13,
18 13:10 17:4 50:20,24
145:23 207:16 211:25
226:17

**staff**
22:8 88:12

**standard**
189:22 190:1,9

**standpoint**
185:17

**stapled**
13:18

**start**
35:11 36:7 41:19 92:12
109:21 231:14 260:7
266:8

**started**
8:10 41:12 74:11 134:3
147:7 186:10 212:15
245:3

**starting**
77:21 96:13 139:24
184:24 189:23 190:3
218:10,22 222:8 252:21

**starts**
97:18 187:8

**state**
5:23 58:18 190:24

**statement**
13:5 44:22 58:6 179:6
181:18,22 182:6 185:16
187:3 193:17 198:3
200:13 201:23 202:3
214:1 241:10

**statements**
16:6 89:10,16 90:21
91:9 118:9,12,14,24
143:3,8,12,13 164:19
177:21 185:7 213:3
247:1 259:18

**states**
141:1 159:17

**statistical**
84:19 99:6 145:2,3
256:24,25 264:6

**statistics**
113:4

**statute**
142:25 149:12 154:22
156:6

**stay**
246:12

**staying**
269:7

**stenographer**
58:9

**step**

28:17 125:8

**Stephanie**
5:20 20:2,3 22:16 23:8,
11 163:9 209:2

**steps**
162:19

**Steve**
148:11 207:20

**stop**
72:10 120:6 263:8,9,12,
16,18 267:1,12

**stopping**
263:15,16

**straight**
240:3

**stretch**
237:16

**strike**
24:8 29:11 49:21 65:21
84:15 87:21 93:20
133:8 148:18 154:21
170:17

**structure**
84:14 111:9

**struggle**
172:5

**stuff**
177:13 190:7 222:1

**subcontractors**
246:7

**subject**
23:17 260:3

**subjectivity**
145:5

**submitted**
188:1

**subparts**
191:17

**subsequent**
50:21,22 51:12 190:6

**substance**
79:16

**substantial**
217:4

**substantially**
71:13 250:23

**subtract**
80:2 108:1 109:5
143:21

**success**
37:12,19 42:1 55:3,10
61:14,17 63:19 67:15
73:14 137:14 141:9
206:4

**successful**
27:22 30:1,4,10,12,14,
17 31:2,10,14 32:24
40:22,23 41:7 43:6,10
46:2 50:5 63:21 67:16
77:23 82:14 135:22
136:14,22 137:5,13,22
174:13 175:14,17,20
176:1,20 201:16,25
204:22 205:14 230:13,
16 248:24 249:9

**successfully**
25:21,23 28:19 30:8,23
39:20 62:13 63:2 154:6
176:5 198:7 234:15

**sudden**
192:24

**sued**
6:19

**suffers**
187:3

**sufficient**
135:23

**suggest**
34:15 84:8 115:17
144:24 186:21 236:7

**suggested**
111:8

**suggests**
40:12 210:7 216:21

**sum**
98:5

**summarized**
222:23,24

**summarizing**
208:23

**summary**

13:6 17:12 18:24 51:21
163:13 179:15 180:15
181:11 182:8 183:13
185:25 187:1 223:1
233:20 234:19 244:16
246:18

**summed**
229:15

**supplement**
264:24

**supplemented**
265:10

**supplied**
7:19,21,25 9:25

**support**
116:9,12 212:5 259:13

**supporting**
264:18

**supports**
181:15

**supposed**
29:16 91:19 107:12
160:4 190:9 234:2
266:7

**supposedly**
153:12

**sure**
8:7 10:18 13:1,16 15:22
17:8 22:9 27:23 28:17
29:6 31:5 33:7 35:7,17
39:5 40:15 42:16,20
45:15 50:23 53:25 58:1
61:21 62:7 65:16 73:20
78:7,19 80:1 95:7 104:2
109:21 116:15 117:21
121:23 123:12 132:5
138:7 143:17 149:21
163:11 166:18 169:3,16
172:4 205:21 212:18,20
226:11 229:5 233:4
247:9,22 259:10 261:6

**suspect**
260:4

**swayed**
170:5

**switched**
241:17 254:3

**sworn**

18:21,23 19:2 164:19
235:25

**symmetrically**
145:4

**system**
14:25

---

**T**

**table**
26:10,20 28:15 30:23
39:23 59:11 60:11 76:7,
15 79:13 114:23 115:6
118:4 119:11,12,15
138:15,16,18 139:13,
16,17,21,22,25 140:4,9,
11,15 141:20 142:11
200:17 201:7 203:1,2
206:18 213:11 218:13
224:15,23 227:10,15
231:1,8,9 232:1 233:5,
6,23 234:19 235:1
236:15,25 237:1 247:6
248:3 249:22 255:1,10

**tables**
79:14 194:3

**take**
7:2 9:8 10:5,8 28:17
34:1 38:4 39:13 41:21
42:16 43:7 54:17,24
62:18 66:13 67:14
74:11 76:18 77:1 94:1
100:12 101:18 120:1,23
121:4 125:8 153:18,20
184:1,2,4 192:25 195:3
207:15 228:2,25
242:11,16 247:11
251:17 260:17 269:7

**taken**
5:7,13 66:16 89:11
112:7,11 116:1 120:13
122:16 128:6 132:19
162:19 184:7 200:14
216:19 247:16 264:9

**takes**
15:5 42:17,21,22 43:8
259:25

**talk**
20:9,10,14 53:16 91:3
170:2 218:20

**talked**
39:10 41:1 55:8 56:15
69:1 91:4,6,7,8,10 93:5
99:9 114:22 121:7
122:15 123:11 125:1
129:12 135:23 141:6
171:22 189:16 191:21
192:2 193:14 202:9,11
212:8,14 213:17 223:25
233:19 238:18 245:9
255:13

**talking**
21:4 23:21 24:20 34:18
38:24 40:14 57:9 61:13,
14 62:3 72:4 79:5 89:22
104:8 106:2 126:23
130:16 151:11 173:22
175:7 187:8 193:20
200:24 209:5 222:13
230:22 237:9,10 249:3
256:3 261:24 262:5

**talks**
147:19 242:23

**target**
264:17

**tax**
12:17 43:23 44:12,14,
21 47:22 88:14,16,21
89:16,19,20,25 90:2,11,
15 91:10 105:25 106:1,
19 107:5 109:15,19,20
110:1,3,4 112:14 118:8,
10,24 124:11,16 130:3
143:7 180:13,14
186:12,15,18,19,20
187:20,21,22,25 188:6,
15 189:18 191:1 210:6,
8,9 211:16 212:25
221:22,24,25 231:17,19
232:22,23 233:7,15,17
234:18 235:6 237:2,4,5
239:5,24 241:23
243:22,24 244:2,9
246:15 247:24 250:20
255:9 259:15,21

**Team**
13:3,20

**Technically**
47:17

**tecum**
8:15

**telephone**
165:19

**tell**
9:19 23:6 28:14 29:8
30:18 52:19,22 60:2,13
63:18 72:22 73:2,23
92:4,9 101:9 104:22
110:24 121:20 124:18
134:1 137:4 138:3
144:25 183:1,8 189:4
191:9 204:1 207:3
209:19 214:6 225:20
229:3 232:18 238:8
246:17 252:14 258:4
266:21 267:20 268:17

**telling**
17:3 64:14,15 92:19
264:15 268:5

**tells**
15:18 100:22 152:20
261:3

**ten**
39:25 69:16 163:11
169:8 263:3,5,19
265:23

**tens**
123:1 246:11

**term**
68:19 84:19 155:6
196:13,18 230:12
239:19

**terminology**
150:5 239:3,8,14

**terms**
9:3 12:24 15:7 29:4
32:12 38:11 44:5 78:10
88:24 92:16 102:1
163:9 170:7 171:3
187:5 190:2 194:10,12
232:16 245:4

**test**
97:1 119:10,20 201:6

**testified**
82:19 142:17 159:23
167:21 186:17 195:14

**testifies**
19:10

**testify**
19:11 48:11 55:12

ROBERT B. MORRISON - 03/08/2019                    i38

56:11 199:25 200:10

**testifying**
56:25 72:15,17 147:23
167:7,14 190:13

**testimony**
18:16,18,20,21,23 19:3
48:15 49:10,11,20,22
58:5 70:19 72:18 82:9,
10 103:24 104:5 121:21
138:23 149:13 164:22,
25 165:4 167:23 169:6
200:1,3,23 227:2 264:9
265:19

**TET**
21:8 77:21 154:14
157:23 158:20,22
163:24 174:8 201:14,17
202:20 207:12 213:6,9

**TET's**
77:23 102:15 158:16
193:6 201:16 218:6,8

**thank**
6:5 12:6 30:25 35:7
44:16 57:14 120:20
142:13 205:25 211:13

**Thanks**
35:11 200:16

**That'd**
80:22

**there's**
7:10 8:10,14 10:1,16
11:7,20 12:1 13:16 14:1
16:23,24,25 24:4 26:20
28:8 29:21 30:19 32:20
38:25 41:2,8 42:12
45:4,5,6 46:17 51:9
55:20 56:17 60:13
62:22 63:25 64:4,9,13
66:22,24 67:1,4,5 68:5
84:10 87:7,20 88:19,20
89:19 94:5 95:1 109:8
111:4,8 112:23 113:1
114:10 115:7,8 116:25
117:9 118:23 125:12
130:22 131:6,12
133:17,20,22,24 137:5
142:8,9,10 149:3
150:25 151:6 153:12
160:9 165:3 175:8
176:17 177:25 179:4
198:24 200:6 208:6,8

210:10 212:19 218:13
227:3,6 236:3 238:17
240:1 242:25 243:16
258:24 259:3 261:10
264:8

**they'd**
94:24 132:22

**they'll**
19:11 210:6

**they're**
16:21 43:5,12 45:23
61:12 64:14 87:13
100:4 102:11 104:23
105:21 113:21,22,23
119:15 125:15 131:1
144:23,24 169:1,16,25
171:10 172:12 189:12
192:24 204:7 215:19
231:11 247:3,4 248:6
255:2

**they've**
71:4 118:15 177:4,7
192:23 210:16 245:2

**thing**
17:22 32:3 111:6 135:2
138:15 142:4 169:8
178:15 179:8,10 204:23
206:25 215:24 223:6
232:12 241:21 265:20

**things**
10:16 24:25 25:2,18,25
43:10 91:4,8 94:9,22
114:22 115:4 121:1
130:18 145:4 151:7,22
156:12 162:19 166:21
170:3 171:11 187:6,10,
18 189:17 195:14,16
196:21 197:22 201:10
208:9 214:9,17 258:6

**think**
6:11 7:9 8:4 9:22 11:3,
21 18:4,5 20:3,20 22:3
29:21 38:22 82:5 83:17
84:3 85:13 86:20 93:19
102:6 104:14 105:3
106:12 111:6 118:12
120:9 122:15,24 124:17
128:13 129:17 131:11
134:6,15 135:16 136:16
156:8 157:1,12 161:3
162:16 163:20 195:9
197:8,13 198:15 202:4

206:12 215:10 216:24
231:7 233:9 240:14,25
248:13 253:14,25
257:17 258:15,21
259:3,9 263:21,22
264:10 268:5

**thinking**
41:14 48:13 129:17

**thinks**
264:19

**third**
11:17 12:5 13:23 15:2
26:7,11,19 76:15 83:20
100:10 114:1 116:10
119:6,16 147:2 178:15
194:9,11 200:20 206:10
208:1 228:11 235:10
260:18 262:12

**Thomas**
210:22

**thought**
63:23 86:25 123:4
134:23 209:10 221:10,
20 226:8,11 252:9

**thousand**
15:3 39:25 101:1

**threat**
89:6,7

**three**
20:13 39:24 63:15
66:22 70:17 77:7 78:14
79:14,20 83:13 84:12
93:5 119:8 121:14
175:14 177:25 190:18
191:3 194:3 222:9
261:16,23 266:15,23
268:21,22 269:6

**three-page**
13:18

**tied**
91:13

**tight**
257:10

**time**
5:10 17:1 22:19,21 27:9
32:6 38:3,8 45:13 49:6
57:25 59:6 66:14,18
68:7,10 69:4 70:7
100:22 120:11,15

122:17,20 125:7,8
128:6 133:9 136:19
142:25 146:21,22,24
150:11 151:3 152:12
153:23 154:16,19 157:7
158:16 170:19,23
177:10 184:5,9 188:3,9
189:15 198:19 219:4
224:24 229:1,2 234:22
241:5 247:12,15,18
253:17 254:10 264:10
265:20,25 266:4
267:14,18 268:8
269:10,13,18

**times**
6:8 20:9,12 48:7 58:16
167:2,9 190:17

**timeshare**
13:3,20 157:24 158:2
163:24,25 172:13 218:8
243:1,25

**timing**
131:5 154:17

**Tina**
19:25 20:10 22:15,20,
21 23:7,12 53:13,14
163:9 209:22 210:23
214:4

**Tina's**
20:5,19

**title**
14:18 117:13 210:19

**titled**
11:8 13:19,24 69:21

**today**
5:12 6:4 7:15,17 18:21
23:18 52:11 70:22
121:3 124:20 158:25
173:9 195:14 203:16
212:4 254:15 265:10

**Today's**
5:10

**told**
19:9,21 24:1 25:14,21,
22 50:24 56:16 72:11
75:20 117:21 119:18
121:14 131:11 134:23
135:1 144:4 160:3
164:22,25 179:24 210:3
222:15 268:2 269:9

ROBERT B. MORRISON - 03/08/2019                    i39

**tomato**
205:3

**tomorrow**
49:19,25 56:10,25
57:19

**top**
12:3 13:19 14:18 36:19
38:16 78:4,24 80:23
87:5 97:12 121:18
127:12,16 140:2 141:19
144:10 145:24 183:6
209:16 224:15,23 226:3
229:25 237:25 238:2,3
249:23 251:12

**topic**
250:9

**total**
13:21 14:1,3,23 22:7
25:22 26:2 28:6 30:19
31:8,14,16,22 33:11,12,
22,25 34:12 36:7,10,14,
17 39:18 40:16,17
41:20 42:5 43:15 49:22
54:18 55:5 59:12,13
60:6,10 62:10,12 64:9,
12,14,23,25 67:24
68:11,24 71:7,9 75:16
79:19 83:12 88:4 93:9,
11 95:24,25 96:7,9,19
99:13,25 100:18,20,22
103:21 107:25 108:9,
16,19 134:23 136:16,18
137:8,14,24,25 138:1,3
139:2,9,23 140:1
141:19 142:3 144:13
145:17 148:5 149:18
153:5,8 160:14,20,25
161:9 197:6 198:8
201:25 202:20 203:6,13
204:5,6 212:4 223:13,
14 228:2,4,12,16 230:9
231:7 234:2 235:7,11
242:25 243:4 255:8
256:2,21 257:19,20,23

**totality**
78:10 116:1

**totally**
6:11 263:19 268:11,12

**totals**
17:12 76:12

**town**

269:5

**track**
91:16 92:20

**tracked**
91:25 92:18

**trade**
52:19

**transaction**
154:11

**transactions**
186:1

**transcribed**
267:3

**transcript**
150:20 151:1 168:25

**transcripts**
164:16 167:12,14

**travel**
269:13

**traveled**
268:6

**treated**
154:20

**treatment**
154:9

**trial**
12:22 49:19,25 56:10
88:17 89:9,10,16 90:22
177:23 178:2 179:25
180:8,9,12 184:18,23
185:20,24 186:7,8,9,11
187:1,2,4 189:17,18
194:22 195:4 207:18
213:18,22 247:1 259:18

**trick**
212:8

**tried**
88:17 226:23 266:8

**triggered**
123:12

**trouble**
188:15

**true**
18:19 97:11 110:17
141:9 164:5 266:3

**trustee**
6:16 190:23

**truthful**
165:12

**try**
49:15 66:7 91:18,20
92:20 105:11 113:12
135:19,21 186:8 211:14
213:23

**trying**
23:23 67:19 77:17 91:9
95:5,7 99:18 116:7
123:15 125:2 140:12
142:13 166:18 180:12
181:10,13 183:14 212:8
246:9 257:17 264:20
268:13

**turned**
46:11

**turns**
188:10 198:11

**twice**
6:11

**two**
12:2 14:15 15:3 16:19
36:16 43:10 60:25 68:5
73:20 79:17 88:18
108:2 115:5 116:18
130:18 133:20 145:4
147:2 149:17 171:17,23
186:16 190:18 197:22
202:8 231:14 242:3,4
243:21 258:10 260:3
262:7

**two-page**
69:20

**two-year**
260:11

**type**
24:8,11 122:10 190:8
196:24 216:8 240:9

**Typically**
9:14

─────────────

**U**

**Uh-huh**
15:4 33:15 36:12 87:10,
25 97:20 99:24 114:12

123:9 144:11 164:3
253:24

**ultimate**
33:4 89:10 140:14
163:18 169:4 197:11

**ultimately**
29:15 54:19 67:11
77:24 79:10 131:6
133:25 144:13 189:17
201:17 215:11 251:22

**unable**
114:20 199:10 201:6
262:25

**unaudited**
143:12 179:13 213:2
243:7

**underlying**
25:12 92:2 174:21
209:24

**underneath**
109:11 207:25 223:14
260:8

**understand**
9:1 13:1 30:15 31:6
32:19 34:6 47:20 51:2
56:22 58:13,16 66:21
70:10 71:2,3 76:23 92:1
94:18 99:2 106:14
111:13 118:21 120:18
132:6 143:17 149:21
154:13 158:14 162:15,
17 164:7 165:16,18
166:14,16 168:2,5
169:2,13,15 170:6
171:7,11 172:4 181:5,
10,13 183:14 193:4
200:12 212:20 213:2
216:5 218:5 232:3
233:12 234:5,8 237:24
239:3 246:10 249:7
255:1 257:17 261:12
264:8 265:21 266:17
268:23 269:8

**understanding**
25:19 30:18 33:9 45:16
55:4 64:4 78:20 79:11
96:15 110:13 134:11
149:12 231:15,23
234:21 237:21 246:25

**understands**
169:14

**Understood**
237:12 248:12 263:14

**undetermined**
55:24 56:3

**unearned**
28:12 31:12,13 34:17
41:21 42:13,19,23 44:2,
6,7,17 45:5,16,18 46:19
47:24,25 48:2 50:7
51:22 52:4,24,25 53:7
54:15,25 56:6 57:15
59:5 61:11,24 67:13,14,
25 77:18 79:4 80:18
81:9 83:7 91:10 113:20
118:19 121:24 122:4
123:23 125:4,10,12
127:3 128:7,10,16,24
129:7,11,18 137:11,20
153:15,19,20,21 157:9
172:21 173:10 175:1
203:4,6,8 207:11 215:6
248:10 249:10 251:18,
25 254:14 255:23
258:14 259:6

**unfinished**
201:18

**unique**
157:24 158:1

**unpaid**
148:20 215:8

**unprofessional**
268:12,13,16,19,25

**unrelated**
6:12

**unsuccessful**
31:2 32:2,5,17,20,25
34:25 36:25 38:10 41:5,
24 60:8,10 63:5,10
65:6,7,11 66:6,10 72:1,
3 74:18,19 136:16
137:6,20 160:12
174:15,16,23,24 175:3,
4,15,20,22 176:21,23

**unsuccessfully**
32:14

**use**
56:5 63:9 65:19 68:19
75:15 84:13 89:1 90:23
95:4 96:16 110:11,20
126:14 131:24 132:1

140:4,13 141:23
142:16,20 155:4,17
157:2,4,7 184:13
185:21 189:21 203:10
206:24 237:24 238:20
240:3 250:25 259:24

**uses**
29:14 42:18 43:8

**usually**
107:3,8

**utilize**
83:20 93:19 113:5
128:21 186:3 188:25
189:7,18 240:16 261:5

**utilized**
10:10 60:11 66:10 86:3
128:22 189:10 208:22
261:16,19

**utilizes**
24:11,17

**utilizing**
17:23 141:19 193:7
241:2 254:21

---

**V**

**valuation**
190:25 191:1,6

**value**
68:10 140:13

**variability**
84:8 111:5

**variable**
84:17,21 99:4 100:24,
25 110:17,23 111:5
128:3 144:24 211:5
224:5 257:1,2,3,4,7

**variables**
63:15

**variations**
171:1

**varies**
190:22 191:12

**various**
16:18 33:11 140:2
177:21 178:2 195:16
261:14 265:2

**vary**
171:13

**vastly**
186:11

**veracity**
119:11

**verifiable**
12:25

**verification**
14:6

**verify**
14:22 17:11 18:17
19:18 27:1 114:25
199:23

**version**
170:17,21,25

**versus**
53:1 60:20 84:17 126:5
136:23 143:4,14 181:18
212:21 240:10 245:11

**video**
5:5,11,12,13 242:12
266:22

**VIDEOGRAPHER**
5:5 66:14,18 120:11,15
184:5,9 242:14 247:15,
18 267:14,18 269:18

**videotaped**
5:6

**viewed**
168:10

**virtually**
264:5

**vs**
5:8

---

**W**

**W-2**
20:21

**wait**
127:15 214:18 224:22
228:12

**waiting**
66:8 67:4,10,13 147:11
202:18 212:13 267:4

**walk**
225:6

**walked**
264:4

**want**
13:1 27:17,24 34:12,25
38:25 39:1 40:20 41:9
43:23 45:15 58:2 59:16,
18 62:7 65:19 73:1
74:1,3 78:19 80:1 81:17
109:22 112:21 117:21
119:23 120:1,5,25
134:2 141:23 142:16
150:22 154:13 172:4
173:11 175:5 180:25
183:3 193:4 197:19,22
199:23 200:12 204:1
207:3,15 211:2 223:6
225:11 233:4,23
235:14,23 236:8 237:24
248:9 259:10 260:17
263:7,9,12 264:12
266:15,21

**wanted**
17:21 114:24 216:3

**wanting**
268:20

**wants**
264:21

**wasn't**
30:12 52:7,10 54:12
89:24 90:10 116:14
135:2 140:24 153:8
183:21 194:19 212:17
245:10

**waste**
264:10

**way**
11:24 12:7 27:16,23
39:12 40:10 41:17
60:15 79:2 86:20 92:18,
20 94:6 97:22 107:16,
19 109:14,19 110:2,3,4
126:22 127:22 129:10
135:20 137:13 149:1
154:20 156:19 157:11
160:19 161:8 170:5
182:1 202:11,14 205:20
211:15 215:18 219:2,13
220:1,21 227:5 229:9
235:1,4 241:9 258:17

260:3 263:18 266:24

**ways**
174:7 202:8

**we'll**
10:6 11:19 69:9 74:14
85:4 120:3 168:25
175:17 205:19 215:21
225:18

**we're**
14:17 25:17 58:15,20
61:13,19 62:3,5,7,23
63:6,7,16 75:20,21
78:21 100:10 118:18
167:15 168:24 173:22
184:4 194:1 195:10
199:5 201:21 215:6
224:15 231:9 233:4
234:9 237:9,10 249:3
263:11

**we've**
23:20 24:20 26:17
38:24 39:10 40:14 41:1
55:7 67:20 72:4 93:5
106:12 118:12 141:6,16
146:22 183:25 195:15
207:17,18 211:25
212:1,3,14,21,22
218:13 233:19 237:21
243:17 255:13,14,16
256:3 261:24 262:4

**website**
37:9,10 145:9 162:4,6,
21 163:16 164:10
166:8,10,11 207:18
213:13,15,16

**websites**
177:17

**week**
23:23 51:18 147:8,16

**weeks**
70:13,17

**weight**
19:7 261:7

**weighted**
219:6 224:25 228:23
229:7 240:3,20,23,25
241:2,3 246:18 258:9

**weights**
260:1

**weird**
136:6

**went**
5:25 11:13 39:2 52:13
64:1,25 86:7 124:13
133:11 168:17

**weren't**
60:23 61:6,9 62:14
94:20 115:17 179:20
188:3,5 199:18,22
200:1 226:25 231:20

**what's**
9:20 18:1,3 57:8 60:20
76:21 80:21 88:20
108:12 116:10 124:18
132:3 145:1,24 177:20
186:17 209:1 214:18,19
222:21 225:9 233:13
237:25 238:9 246:8
252:21 257:25 267:24
268:24

**whatsoever**
149:23

**Where's**
47:8

**whichever**
89:3,4

**wide**
196:18

**Wilson**
190:13

**withheld**
23:15

**witness**
5:21 6:11 58:2,7 85:13,
22 165:8 190:20 191:10
226:16,18 263:2
267:22,25

**witnesses**
167:14,21

**Wolf**
41:20 148:11 149:8,22
150:17 151:8 159:17
160:4,19

**Wolf's**
11:22 148:23 150:12
151:23 152:16,25
156:9,15 207:20

**word**
63:9 122:12 126:14
155:4 167:5 185:11
206:24

**wording**
253:5

**words**
32:10 34:19 38:2 66:7,8
136:25 137:3 145:15
247:5 252:15

**work**
21:14 40:10 55:15
75:19 103:2 139:19
151:12 190:21 191:1
208:18 210:8 269:17

**worked**
21:20 266:25

**working**
20:1 42:20 62:23 147:1,
5

**workpaper**
14:19 17:13 18:25
23:20 24:20 26:7,11,17
35:20,21 40:11 113:24
114:24 115:6 134:5,21
221:11

**workpapers**
156:23,24 221:8 231:18

**works**
139:8 249:11 266:24
269:16

**worksheets**
82:13

**worry**
99:10

**worth**
43:9 131:2 260:1
261:10 263:6 266:19

**wouldn't**
15:20 46:2 57:21 60:25
61:6,10 80:3 110:17
118:10 153:3 167:23
211:6 214:9 236:16,21

**write**
62:25 130:19 225:15,19
237:22 256:13

**written**
246:8

**wrong**
18:1,3 57:10 106:13
135:16 159:10 198:11,
13 223:22 231:11
247:3,4

**wrongful**
105:8

---

**Y**

**yeah**
6:5 9:23 11:17,24 23:5
30:16,21 31:6 33:20
34:3,25 35:16 37:7
39:22 41:19 43:25
54:23 55:21 57:11 58:7
61:21 62:9 64:10 65:13
68:4 71:19 78:10 79:10
86:24 87:2,4,20 97:9
104:9 106:2 108:5
109:8 112:20 115:3
119:25 120:20 121:23
127:14 130:17 131:6
133:17 135:3 136:13
137:4,11 138:8,18
139:4 142:5,24 150:7
152:11 161:17 162:13
173:3 184:2 194:1
196:25 200:12 204:17
205:14 209:6 211:13
213:16 214:17 217:22
218:15 221:12,13,15
222:23 225:13 226:16
227:3,17 230:14 237:17
238:2 239:10 247:22
248:16,18 249:5,12
251:2,19,20 252:8,10
253:10,14 258:19
261:12 263:25 264:12
266:13

**year**
13:3 14:2 26:21 45:12
47:9,11 89:12 108:20
112:15 113:17,19
114:13 115:17 124:12,
13,18 133:18 144:15
154:18 170:25 180:3
185:7,14,17 186:19
190:22 191:4 203:11,12
213:3 219:4 228:5,21
229:10,15 232:7,9
237:6,9,11 239:23
240:10 241:1,7 243:11
246:13,22,23 260:4

ROBERT B. MORRISON - 03/08/2019                    i42

**year's**
    12:12 90:6,12

**years**
    32:2 86:17 87:17 88:3
    89:9 98:4 112:11,15
    124:13 137:5 142:22
    143:1 154:23 171:18,23
    177:22 179:14,15,17,22
    180:16 181:11 182:8
    184:23 185:5 191:9
    197:4 211:19 228:24
    229:24 242:3,4,8
    246:19 257:23,24
    258:8,10,11 260:2,3

**years'**
    179:1 260:1 261:10

**Yep**
    98:2 231:4

**yesterday**
    188:21

**yesterday's**
    7:3

**you'd**
    21:9,11,15 34:22 110:8
    116:22 184:3 244:25
    245:17 254:18

**you'll**
    12:4 68:4 120:9 209:16

**you're**
    13:10 16:5 17:3,10
    18:21 34:11 44:12 47:2
    56:22,24 57:9 58:14
    60:17 64:20 68:1 70:4,
    20 72:15,17 75:1 79:12,
    16 80:13,24 81:19
    87:14 88:25 97:1 98:22
    104:8,17 107:6,14
    115:15 120:18 122:12
    123:7 125:5 126:23
    127:12 128:10,11,14
    130:16 131:22 136:8,11
    140:25 141:21 142:5,10
    154:7 159:3,7,8 168:7,
    11 175:7 179:12 189:22
    190:1,9 191:11,23
    193:7 198:25 202:24
    203:20 206:14,15,16
    208:21 209:11,12
    218:21 222:15 225:20
    226:21 227:21 231:6
    234:22,25 235:24

    236:23 237:15 241:1
    246:10,25 253:21 257:5
    260:3 262:25 268:15,24

**you've**
    10:12 17:12 37:17 46:4
    47:12 49:13 50:17
    56:20 67:7 70:13 81:13
    108:24 130:2 132:8,25
    139:1,8 140:16 142:17,
    22 166:20 169:17
    175:14,15 178:1 188:12
    195:17,22 205:9 207:19
    212:2,21 219:7,13
    225:8,9 238:7 243:21
    244:7 253:12 255:15
    261:13,14 262:8

**you-all**
    15:23 263:17

_____

_____

Z

**zero**
    110:19